IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MICHAEL J. DANIELS AND BARBARA HIGH-DANIELS, INDIVIDUALLY AND AS NEXT FRIEND OF XAVIER DANIELS AND SEBASTIAN DANIELS; SHANE VINALES AND BECKY VINALES, INDIVIDUALLY AND AS NEXT FRIEND OF LANDON VINALES AND SAVANNAH VINALES; JONATHAN KLINE AND SARAH KLINE, INDIVIDUALLY AND AS NEXT FRIEND OF KONNOR KLINE, KENNEDY KLINE, AND KYLEIGH KLINE; MARK HIATT AND RACHEL HIATT, INDIVIDUALLY AND AS NEXT FRIEND OF STEPHEN HIATT, JOSHUA HIATT, DANIEL HIATT, AND JONATHAN HIATT; SAMUEL HAMILTON AND LEILANI HAMILTON, INDIVIDUALLY AND AS NEXT FRIEND OF NEVAEH HAMILTON AND EZEKIEL HAMILTON; THOMAS WOLF AND KASSANDRA WOLF, INDIVIDUALLY AND AS NEXT FRIEND OF CAEDMON GILLIS, GABRIEL WINCHELL, NADIA WOLF, AND MATTHEW WOLF; AND JON ALEXANDER AND ALLISON ALEXANDER, INDIVIDUALLY AND AS NEXT FRIEND OF NYA ALEXANDER AND MARCUS ALEXANDER; LANCE KONZEN AND MEGAN KONZEN,<br>        PLAINTIFFS<br><br>v.<br><br>AETC II PRIVATIZED HOUSING, LLC; AETC II PROPERTY MANAGERS, LLC; AND HUNT ELP, LTD. D/B/A HUNT MILITARY COMMUNITIES,<br>        DEFENDANTS | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 5:19-cv-01280 |

## PLAINTIFFS' ORIGINAL COMPLAINT

NOW COME Plaintiffs Michael J. Daniels and Barbara High-Daniels, individually and as next friend of Xavier Daniels and Sebastian Daniels; Shane Vinales and Becky Vinales, individually and as next friend of Landon Vinales and Savannah Vinales; Jonathan Kline and Sarah Kline, individually and as next friend of Konnor Kline, Kennedy Kline, and Kyleigh Kline; Mark Hiatt and Rachel Hiatt, individually and as next friend of Stephen Hiatt, Joshua Hiatt, Daniel Hiatt, and Jonathan Hiatt; Samuel Hamilton and Leilani Hamilton, individually and as next friend of Nevaeh Hamilton and Ezekiel Hamilton; Thomas Wolf and Kassandra Wolf, individually and as next friend of Caedmon Gillis, Gabriel Winchell, Nadia Wolf, and Matthew Wolf; Jon Alexander and Allison Alexander, individually and as next friend of Nya Alexander and Marcus Alexander; and Lance Konzen and Megan Konzen ("Plaintiffs"), and file this *Original Complaint* ("Complaint") against Defendants AETC II Privatized Housing, LLC, AETC II Property Managers, LLC, and Hunt ELP, Ltd. d/b/a Hunt Military Communities ("Defendants"), and in support hereof, respectfully show the Court as follows:

## I.    PRELIMINARY STATEMENT

1.      In 1996, Congress passed the Military Housing Privatization Initiative, allowing the Department of Defense to privatize housing on military bases.

2.      By 2007, the Air Force executed a 50-year lease and a quitclaim deed in favor of AETC II Privatized Housing, LLC for the real estate and improvements comprising the service-member housing section of Randolph Air Force Base ("RAFB") in Bexar County, Texas, and Laughlin Air Force Base ("LAFB") in Val Verde County, Texas.  AETC II Privatized Housing, LLC is part of the Hunt family of companies operating under the assumed name of Hunt Military Communities.  From 2007 to the present, AETC II Privatized Housing, LLC, as landlord, acting through its authorized agent, AETC II Property Managers, LLC, and in conjunction with the

property management company, Hunt ELP, Ltd. d/b/a Hunt Military Communities (collectively, "Hunt"), have leased and managed houses to service-members and their families stationed at RAFB and LAFB, happily pocketing all of the service-member's base housing allowance ("BAH").

3.      Throughout that time period, Hunt has systematically under-maintained the houses located on RAFB and LAFB, subjecting tenant service-members and their families to atrocious conditions, including pervasive mold and other airborne toxins. Service-members have discovered mold growing on their children's toys and toothpaste, taking over walls, and blackening the interior of ductwork. When Hunt received maintenance requests from service-members and their families, Hunt would misdiagnose the issue, utilize substandard service providers to allegedly remediate the problems, and mislead its tenants about the remediation actions allegedly undertaken.  Most notably, Hunt's representatives frequently would simply paint over existing mold and exclaim "Problem Solved!"  As a result, many service-members and their families have fallen ill as a result of mold exposure, lost nearly all their personal possessions, and paid their full base housing allowance for woefully substandard facilities.  By this lawsuit, Plaintiffs seek to hold Hunt, a foreign, for-profit corporation organized under the laws of Delaware, liable for the atrocious conditions, personal injuries, and property damage caused by Hunt's profound neglect, malfeasance, and greed.

## II.      PARTIES

4.      Plaintiffs are military families that have or currently live in privatized housing located on RAFB in Universal City near San Antonio, Texas and on LAFB in Del Rio, Texas.

5.      Defendant AETC II Privatized Housing, LLC, is a foreign limited liability company that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

6.      Defendant AETC II Property Managers, LLC, is a foreign limited liability company that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

7.      Defendant Hunt ELP, Ltd., d/b/a Hunt Military Communities[1] is a domestic limited partnership that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

## III.   JURISDICTION

8.      This Court has jurisdiction over this proceeding pursuant to federal enclave subject-matter jurisdiction. Federal enclave jurisdiction is part of the court's federal question jurisdiction under 28 U.S.C. § 1331. *See Paul v. United States*, 371 U.S. 245, 267 (1963); *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Arlington Hotel Co. v. Fant*, 278 U.S. 439, 455 (1929); *Sparling v. Doyle*, No. EP-12-cv-323-DCG, 2014 WL 2448926, at *3, (W.D. Tex. May 30, 2014).

9.      A federal enclave is land over which the United States government exercises federal legislative jurisdiction. *Kelly v. Lockhead Martin S'vcs. Group*, 25 F.Supp.2d 1, 3 (D. Puerto Rico 1998). Authority for federal enclave jurisdiction arises pursuant to Article I, section 8, Clause 17 of the United States Constitution, which provides in relevant part:

> The Congress shall have the power . . . to exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States,

---

[1] Hunt Military Communities is an umbrella termed used by Hunt to denote Hunt business entities that relate to military housing communities.  Property managers for RAFB use "Hunt Military Communities" as the title of their employer and all housing-related materials direct you to Hunt Military Communities and its website.

and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

10. Because the federal government has exclusive legislative powers over federal enclaves, courts have recognized that United States courts also have subject-matter jurisdiction over controversies arising on federal enclaves. *See Matter v. Holley*, 200 F.2d 123, 124–125 (5th Cir. 1952) ("It would be incongruous to hold that although the United States has exclusive sovereignty in the area here involved, its courts are without power to adjudicate cases arising there."); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'").

11. The events giving rise to Plaintiffs' lawsuit occurred on RAFB and LAFB, which indisputably qualify as federal enclaves. *See United States v. Hopkins*, 901 F.3d 518 (5th Cir. 2018) (noting that Joint Base San Antonio, which includes RAFB and LAFB, are federal enclaves). In determining whether a claim arises on a federal enclave, courts have simply looked to see where the "pertinent events" took place. *Stiefel v. Bechtel Corp.*, 497 F. Supp. 2d 1138, 1148 (S.D. Cal. 2007) (citing *Snow v. Bechtel Const. Inc.*, 647 F.Supp. 1514, 1521 (C.D.Ca1.1986)). Plaintiffs' Complaint makes it facially apparent that the pertinent events alleged by Plaintiffs giving rise to the claims arise out of Plaintiffs' occupancy in Hunt-controlled properties on federal enclaves situated in Texas.

## IV.   VENUE

12. Venue in this proceeding is proper before this Court pursuant to 28 U.S.C. § 1391, as RAFB and LAFB, where the housing is located, are within the geographical boundaries of the United States District Court for the Western District of Texas.

## V.    FACTS

13.     In 1928, the State of Texas ceded to the United States land near Shertz, Texas, which today is RAFB. In 1943, the State of Texas ceded to the United States land near Del Rio, Texas, which is now home to LAFB.  During the decades since their inception, RAFB and LAFB have served as home for millions of service members and their families. In 1996, the United States Congress established the MHPI with the chief aim of attracting private-sector financing, expertise, and innovation to provide necessary housing faster and more efficiently than traditional military construction process would allow. National Defense Authorization Act for Fiscal Year 1996, § 2601(a)(1), 10 U.S.C. § 2871, et seq. Under the MHPI, secretaries of defense may invest in eligible nongovernmental entities conducting projects "for the acquisition or construction of housing units suitable for use as military family housing or as military unaccompanied housing." *Id.*, 10 U.S.C. § 2875.

14.     Pursuant to the MHPI, after a competitive bidding process, the Air Force selected Defendants to engage in a public/private venture with the government to own and manage bases' family housing. Specifically, Defendants would be responsible for maintaining, repairing, constructing, and managing the housing community at RAFB and LAFB.  AETC II Privatized Housing, LLC, was formed as a joint venture with the Air Force, and the United States conveyed to Defendants, pursuant to a lease-and-quitclaim deed, the housing units and underlying land at RAFB.  Similar events occurred at LAFB. As a result, Defendants became the landlords and property managers for base housing at RAFB and LAFB.

15.     As set forth in more detail herein, Defendants have systematically under-maintained the houses located on RAFB and LAFB, subjecting Texas-based service-members and

their families to atrocious conditions, including pervasive toxic mold, and have performed extremely substandard services in their role as property managers.

16.     The stories of Plaintiffs and their families affected by Hunt are as consistent as they are horrifying.

### CAPT. MICHAEL J. DANIELS AND BARBARA HIGH-DANIELS

17.     Capt. Michael J. Daniels, his wife, Barbara High-Daniels, and their two sons moved to Hunt-managed on-base housing at RAFB in July 2016.   The dilapidated, unhealthy, and destructive conditions they encountered their first day there continued to plague them until the day the family finally packed up their few uncontaminated personal belongings and left.

18.     From the beginning, a malfunctioning water heater led to the discovery of about a foot of water in a crawl space beneath the house. Mold began to appear within the first couple of months and, after a year and a half, had essentially pervaded the entire house.  And while mold grew on the walls and windows and covered the bathrooms, Capt. Daniels also discovered mold growing on the rim of his son's toothpaste after the child forgot to put the cap back on.

19.     A toilet in one of three bathrooms caused persistent problems for two years.  When the Danielses inquired to Hunt's property managers about the dysfunctional toilet, Mrs. High-Daniels was advised that the plumbing had collapsed and that all of the waste flushed down the toilet was likely residing under the house.

20.     Within months of moving into the house, the Danielses' youngest son began to suffer from intermittent asthma.  Capt. Daniels, too, began to suffer from respiratory issues and had sinus surgery after moving into the house.  He became sick every two to three months and would have to pay frequent visits to doctors when his breathing became labored.

21.    Concerned about the condition of their house, the Danielses had private testing done in the spring of 2019, which revealed high levels of mold in all eight rooms of the family's 2,200-square-foot house that was built in the 1930s. The testing by Adaptive Environmental Consulting of Texas ("Adaptive") found "grossly contaminated water conditions" that, inspectors concluded, posed health risks to the Danielses.

22.    The testing also found a level of contamination 71-times the standard for cleanliness. The company's ATP results measured 7182 RLUs (relevant light units) in their son's room, and even higher RLUs in the master bedroom. Anything beyond 100 is considered contaminated.

23.    According to Adaptive's report, the "[s]ons' bedroom had visible water damage and fungal growth along exterior walls," and "[i]t is also grossly cross contaminated with humidity driven mold growth which was observed on sons' furniture, bedding and toys."

24.    The company suggested use of a professional cleaner, not the half-baked home remedies recommended by Hunt maintenance staff.  Hunt had by that point consistently and nonchalantly blown off the Daniels family's complaints, essentially shrugging off the hazardous conditions and instructing the family to address the issues with a mixture of water and bleach.

25.    Ultimately, after years of sounding alarm bells, top military officials toured the Daniels' house. A Hunt delegation toured soon after that, but no improvements came from the visits.

26.    The Daniels Family chose to live in Hunt-operated housing on RAFB for three key reasons: (1) at first blush, the housing facility appeared to be in decent shape; (2) the base appeared to offer a safe and convenient living environment for their family; and (3) Randolph Elementary School, where their two boys attended classes, had a stellar reputation.

27.     After years of frustration, Capt. Daniels received orders transferring him and his family to Ohio.  In the process of moving, however, the Daniels Family learned that all of their personal property possessions were contaminated with mold spores.  They were advised that any porous items contaminated with mold could not be moved and should be discarded, and that non-porous items would be cleaned and remediated by Hunt or its contractors.  Hunt attempted to remediate the mold afflicting the family's personal property.  They set up amateur clean rooms, which collapsed during cleaning, and purported to certify the family's property as mold-free.  Unfortunately, a substantial amount of their property was beyond salvation, forcing them to leave it behind.

28.     As a result of living in a Hunt-managed house at RAFB for two years, the Daniels family lost many of their personal possessions and suffered health issues associated with exposure to mold and other airborne toxins. The deplorable conditions also caused them to suffer mental distress from living in an unhealthy environment, worrying about their children, and a dealing with a derelict landlord that consistently failed to address issues that materially affected their health and safety.  And the Daniels family paid handsomely for the privilege, paying their monthly BAH to Hunt 24 times to remain living in this squalor.

### Captain Johnathan Kline and Sarah Kline

29.     Captain Jonathan Kline and his wife, Sarah Kline, and their three children moved into their house on RAFB in July 2017.  Problems with their house began immediately and were never fully remedied. Upon arrival to their house, the Kline family discovered dirt and live and dead cockroaches in and around the interior of their new house.  They walked into the house for the first time that July to find that cockroaches had not just infested, but overran, the place.  They immediately contacted Defendants' onsite director about this issue and subsequently submitted a

number of work orders for issues with the house, which Defendants never took seriously or adequately addressed.  This sort of maintenance disregard would become a recurring theme throughout the Klines' tenancy in Hunt housing at RAFB.

30.     One of the most troubling work orders involved repairs needed to the Klines' master bathroom tub, which had significant peeling issues. The tub was scheduled to be repaired on September 26, 2017, and Mrs. Kline was informed that she would need to be away from her house for four hours due the stench associated with the repair.  Mrs. Kline kenneled the family's animals in the farthest portion of their house and opened a nearby window to vent the fumes. Upon returning to the house, Mrs. Kline discovered that the contractor used by Defendants had closed the window, which allowed the smell to permeate through the entire house. Equally troubling was the fact that the repair had not been done correctly. The tub sat discolored, flaking, and had significant paint runs. Mrs. Kline soon developed a headache due to the smell and decided that she would gather her children and dogs and spend the evening out of their house to mitigate the obvious health risks. Defendants' offered to pay for an animal-friendly hotel room (located 30 miles away) and related expenses. When the Klines later submitted requests for that reimbursement, Defendants initially refused to pay despite their previous promise to do so.

31.     The Klines experienced a litany of additional issues in the house.  When they first moved in and attempted to use their oven, it began to smoke terribly.  An investigation revealed a burned piece of flooring beneath the oven impaired its function.  And to get to the oven the family had to walk across peel-and-stick tile installed by Hunt, which actually stuck to the bottoms of the family members' feet.  Smoke detectors in the house were not functioning, a seemingly simple—though physically imperiling—problem that Defendants for some reason took *two weeks* to remedy.

32.    Throughout their stay at RAFB, the Klines contacted Defendants several times regarding a lagging HVAC system in the house. This issue was of particular importance during blistering Texas summers.  Maintenance technicians for Defendants came to the house at least three times for this issue, which they could not seem to fix.

33.    Defendants conducted an energy audit on the house without the Kline Family's knowledge, and on at least one occasion in October 2017 a maintenance technician entered the house without permission. The Klines eventually learned they were using outrageous amounts of energy when, in August 2017, they received the first of a series of jaw-dropping electricity bills. When the Klines approached Hunt's agents for answers, the property managers were characteristically dismissive and unhelpful, suggesting that the Klines turn off their exterior lights at night to cut down on their wattage.  During this time period, however, a technician discovered a leak in the HVAC system in the attic. The Klines contacted Defendants, whose agents gave the usual shrug and insisted to the family that the pinhole leak was not related to the excess energy consumption.

34.    Defendants offered to let the Klines out of their lease due to this and other outstanding maintenance issues—which by that point had become a nightmare aggregated from things like the oven, air system, staggering energy bills, and cockroaches.  Hunt probably knew that breaking the lease and moving to a new residence, however, was not feasible because the Klines had already exhausted their military moving allowance to get into the unlivable house. More importantly, two of the family's children required special education accommodations for speech therapy that was only available at on-base schools. The family, for all intents and purposes, was trapped in the house, which continued to deteriorate.

35.     In October 2017, a neighbor and friend was injured by an improperly maintained door in the Klines' kitchen. Prior to the injury, Mrs. Kline informed Defendants that the pantry door was not properly maintained and was in danger of falling.  Defendants dispatched a technician who took some inadequate band-aid measures that did not remedy the issue—so the door later fell, injuring the neighbor.  When Mrs. Kline informed Defendants of the incident, the door was hastily, inadequately "repaired" and then re-painted over what appeared to be chipping lead-based paint.

36.     In the spring of 2018, Defendants inspected the HVAC filters in front of Mrs. Kline. Debris and, worse, mold permeated the filters. The Klines informed Defendants that this situation—particularly the mold—needed to be remedied immediately because Mrs. Kline suffered from mold and dust allergies. When Defendants' technicians arrived removed the vents, the Klines saw for the first time the horrific extent of the mold's growth, which was thick and extensive within the house's ductwork. The Klines requested that the mold be tested, but Defendants declined because, their agents said, Defendants do not authorize mold testing even when mold remediation is required.

37.     Additionally, the vents' removal also resulted in much lead-based paint chips falling on and around the family's beds.  In the course of their work, Defendants failed to cover the Kline Family's personal property (which should have been a standard protocol for any professional mold-remediation), did not seal any of the vents, did not use any negative pressure to treat the system, and otherwise failed to follow any actual best practices for the treatment and removal of mold.

38.     The Klines also experienced issues with the roof.  When the Kline Family moved in, it was apparent that the roof was leaking and had been repaired multiple times with ad hoc patch jobs, not proper structural/sealing measures.  At the end of April 2018, Mrs. Kline learned

that Defendants' maintenance crew would arrive in 20 minutes to review and repair the roof. Defendants gave her no prior warning of the visit. Defendants' informed Mrs. Kline that she had no right to refuse their entry into her house. Defendants' once again authorized only an inadequate and cursory patch-job that, once again, did not fix the underlying cause of the leaks. During the repair, debris fell throughout the sunroom covering the children's toys, which were out in the open in the ordinary course of those things because Defendants failed to warn the Klines that they needed to make any preparations. While the repairs went on, Mrs. Kline requested that Defendants cover their personal property. Defendants refused. Debris therefore continued to fall from the roof into the house. After the work was complete, Defendants sent a standard cleaning crew to sweep and mop, but did not even use a vacuum, much less one with a HEPA filter.

39.    The Klines also observed that the house's foundation was failing, resulting in half-inch cracks all over the house, including in the children's bedrooms. When alerted about the unsafe and worsening foundational defects, Defendants' could only muster a response that they lacked financial resources to repair foundation issues. Instead, Defendants filled the cracks with plaster and called it a day.

40.    In response to complaints of mold spreading through the Klines' bathrooms and blanketing their walls and ceilings, Defendants sent a repair person to the house to spray the mold with some ineffective chemical and then painted over it—out of sight, out of mind. By the end of their tenancy in the house, the mold had aggressively returned. Mold also grew all over the interior of the pantry cabinets, which Defendants had the gall to blame on the Klines. Captain Kline, on his own initiative, climbed under the house and found that an HVAC drain pipe had become clogged, which likely caused the mold in the pantry. Informed of his discovery, Defendants claimed they could find no signs of water intrusion and made no real efforts to investigate. Like

they did in their other failed "attempts" at mold remediation, Defendants eventually sent a maintenance technician to scrub the mold with some chemical and, before the chemical was dry, painted over it.  Upon leaving the house at the end of their tenancy, the Kline Family observed multiple-square-foot patches of thick mold near an HVAC closet in the house, which unbeknownst to the Klines had been living with them since they first arrived.  The Kline Family also discovered decomposing squirrels and cockroach nests in the attic.  Those, too, had been there for a long time and must have—and certainly *should have*—been stepped over by Defendants' maintenance technicians on countless occasions.

41.     Throughout their time in the house, the Kline Family's children began to suffer from nose bleeds.  Mrs. Kline and her son were ultimately forced to take allergy medicine on a consistent basis.  After the HVAC system was cleaned, the daughter developed a horrible rash all over her body.  These symptoms persisted throughout their time in the Hunt-managed house.

42.     As maintenance requests went unresolved and his family began to experience more and more health symptoms, Captain Kline—by then understandably upset—attempted to escalate the issue within the Hunt bureaucracy.  Ultimately, this somehow caused involvement by the military.  As a result, Captain Kline found himself the subject of an investigation by his superiors in the military.  Although the investigation ultimately resolved in Captain Kline's favor, Defendants' attempted retaliation caused him delays and setbacks in his career.

43.     In addition to the aggravation and health issues they suffered—and like the Daniels—the Klines paid Defendants handsomely (through their BAH) for their squalor, headaches, property damage, and health issues.  Like the Daniels, the Klines paid excessive utility bills, (although Hunt ultimately conceded on several of the utility bills) and the majority of the Klines' personal property, including nearly all porous personal property, has been ruined by mold.

## Lt. Col. Mark and Rachel Hiatt

44.     After over two and a half years at RAFB, Lt. Col. Mark and Rachel Hiatt have learned through accounts offered by neighbors and shared at town hall meetings that each of the installation's more than 300 residences holds its own set of issues.  The Hiatt's house suffers from nearly all of the ghastly hallmarks recounted throughout this Complaint and experienced at the base's 300-plus houses.

45.     The Hiatts first approached Defendants about on-base housing only after doing their homework.  They had heard the horror stories from their friends and neighbors, who warned the Hiatts about Hunt housing, particularly at RAFB.  During initial meetings with Defendants' leasing agents, the Hiatts knew enough to ask the right, specific questions.  Hunt's agent assured the Hiatts regarding Defendants' RAFB facilities.

46.     Ultimately, the Hiatt Family has learned that the price of living on-base is far beyond the Hiatt Family's BAH.  Defendants' leasing agents did not offer the Hiatts a pre-lease walkthrough.

47.     They arrived their first day to find that much of the house had been recently repainted, which the Hiatts now suspect was done to mask deeply pervasive issues.  It took the mold only three months to reveal itself, first in a bedroom closet and then again and again in other parts of the house.  As of the date of this Complaint, mold carpets windowsills, covers closet surfaces, and is otherwise unescapable in the four-bedroom housing unit that Defendants' leasing agents were so quick to assign to the Hiatts.

48.     The Hiatts' house, like the Klines elsewhere on base, sits on a lousy foundation. Resulting cracks—which were probably concealed by the pre-move-in paint job—tentacle along walls, and the house's exterior is pockmarked with gashes where the base of the house sinks and

sags. The house's movement also twice caused a separation in piping from a master bedroom toilet to a sewer line. Waste has for some time continued to pool underneath the structure, as maintenance workers and a shocked Hiatt family would later learn.

49.     Meanwhile, the Hiatts' cockroach infestation—now a recurring theme in this Complaint—might have been the Hiatts' chief concern had they not been distracted by the medically harmful mold and lead paint surrounding their four sons.

50.     Desperate for a read on the threat, Mrs. Hiatt submitted samples from her house to a New Jersey-based lab in June 2019.  The testing revealed that 19 of the 36 tested types of mold were present at the Hiatt's house.  Of the 19 types of mold present in the Hiatt's house, (1) twelve tested above what is considered standard limits; (2) two are a particularly pernicious and physically dangerous type; (3) six are supposed to be found only outdoors; and (4) three present in amounts above standard limits are considered elevated-danger.

51.     The Hiatts' samples tested positive, and in fact in concentrations at far higher than standard limits, for molds such as Aspergillus penicillioides and Aspergillus versicolor, which can cause headaches and a lack of concentration. Also present were high concentrations of a Cladosporium that researchers have causally linked to persistent dry cough.

52.     Jarred, worried, and perhaps a little frantic, the Hiatts purchased five expensive dehumidifiers that cost them in the thousands of dollars and that further drove up electricity bills. In just 10 days of running the humidifiers, the machines' reservoirs had collected more than *96 gallons* of water from the ramshackle house's air.

53.     Beyond the added costs and poor living conditions, the Hiatt Family most worry about their own health and the health of their four sons, including one with special needs.  As if they were not worried enough about their children's health by the summer of 2019, the Hiatts

returned from a two-week vacation to find mold growing in a closed tub of toy slime belonging to one of the boys.

54.     After the installation of an in-line dehumidifier system, the Hiatts commissioned an air quality test that showed an *increase* in Aspergillus penicillioides.  As recently as September 23, 2019, the Hiatts encountered two black spots on the baseboard behind their dining room china cabinet. They pulled the cabinet away from the wall and found, to their disgust and horror, that the baseboard was soft to the touch.  Another mold spot appeared two days later, at first white but turning dark black within 24 hours.

55.     The Hiatts paid for yet more positive mold testing in this area of their dining room after Defendants—true to form—refused to do so, instead insisting on skipping straight to the inadequate "remediation" process that had always remediated nothing.  One of Defendants' regional directors told the Hiatts that no testing was necessary because Hunts' lone mold protocol did not take into account which type of mold was present—which to put it mildly is a slapdash approach to remedying something so potentially hazardous.

56.     The Hiatts found yet more mold spots as they dared to peer behind other nearby furniture.  Moisture levels later tested high in the baseboards, and only in the second week of October 2019 did Defendants' crews arrive to replace the baseboards.  When the crews left after a short two-day effort, the Hiatt's doubted any effort or investigation was made with respect to future moisture exposure.

57.     The house's condition has taken its physical toll on the Hiatts.  Lt. Col. Hiatt suffers from chronic digestive trouble has labored breathing in the morning, symptoms that subside during extended stays away from the Hunt house.  Mrs. Hiatt has suffered from unusually stubborn and acute colds.  She experiences coughing fits that come and go for a month at a time.  A 15-year-old

Hiatt son sometimes experiences a metallic taste and for the first time in his life has suffered chronic headaches.  The Hiatts' eight-year-old, in addition to bouts of diarrhea, has tested as being at risk of dyslexia and attention deficit disorder, which the Hiatts are concerned could be  linked to the existence of mold and lead paint in the house. The Hiatts' 12-year-old has autism, so the Hiatts cannot be sure which health issue is linked to his environment, but moving off-base could jeopardize the family's access to special buses that currently take him to special educational facilities at nearby Fort Sam Houston.  Moving could also threaten the other three sons' enrollment at excellent on-base schools.

58.    Like others in this Complaint, moving off-base is prohibitively expensive for the Hiatts.  Even if they could, movers would no doubt refuse to transport furniture and mattresses contaminated with mold.  The Hiatt family, at six people, cannot afford the estimated $12,000 it would cost them to replace their contaminated mattresses and furniture. The Hiatt's fear that they will end up losing much more at tremendous financial and sentimental cost.

59.    In addition to the aggravation, expense, and health issues caused by Defendants disastrous management of their house, the Hiatts continue to pay their BAH to live in abject squalor.  In fact, the Hiatts pay out of pocket—i.e., above the BAH allotment—to live in these terrible conditions.

### TECHNICAL SERGEANT SAMUEL AND LEILANI HAMILTON

60.    TSgt. Samuel Hamilton, Leilani Hamilton, and their six- and 14-year-old children relocated in July 2019 from RAFB to off-base housing near Fairchild Air Force Base in Washington. But by that point the Hamiltons lived in Hunt's housing at RAFB for five and a half long, difficult years thanks to Defendants' wrongful conduct, neglect, and disregard.

61.     When they moved to RAFB in 2014, the Hamilton Family signed a lease without being afforded a property tour.  Shortly after first setting foot in their on-base Hunt duplex, the Hamiltons found themselves confronting massive housing issues, including and most notably extensive water leaks and mold contamination.  Over their five-plus years at RAFB in Defendants' facilities, the Hamiltons could not get Defendants to adequately respond to their concerns.  The Hamiltons incurred continual out-of-pocket expenses dealing with water leaks and mold.  Each of the four Hamiltons suffers significant health issues attributable to mold. Like others in this Complaint, the Hamiltons had to discard many of their personal belongings upon move-out due to mold contamination.

62.     On their first day in the duplex, the Hamiltons began hearing the water dripping from somewhere in the house, only to later enter a master bathroom shower covered—floor to ceiling—with mold.  The Hamiltons notified Defendants, who assured them that maintenance workers would arrive to address the issue.  Tired of waiting for that crew to arrive, Mrs. Hamilton attempted to clean the mold herself.  When Defendants' cleanup detail finally did arrive, the workers simply painted over the most resilient patches of mold that Mrs. Hamilton could not scrub away.

63.     Every window in the house leaked—seven downstairs and nine upstairs—and they all did so for the entire five-and-a-half-year span of the Hamiltons' residence there.  The Hamiltons learned to keep a stack of towels at the ready when it rained.

64.     The Hamiltons' pleas to Defendants went mostly unanswered.  Defendants apparently thought it suffice to say the problem was common and essentially that the Hamiltons should learn to live with it.  The Hamiltons' repeated work orders were largely ignored, so TSgt.

Hamilton rolled up his sleeves and did what he could himself, including a years-long campaign against the innumerable cockroaches.

65.     Defendants also declined for years to investigate a persistent odor in a downstairs bathroom. When Defendants finally bothered to do an inspection in November 2018, workers found two layers of tile and one of vinyl that all needed total replacement due to years of rot. A contractor was hired to finish repairs, which the Hamiltons suspected stirred up asbestos that was not preemptively mitigated by either Defendants or their contractor. Pressed on the issue, Defendants agreed to conduct comprehensive air testing after the work's completion but, when it was done, did an about-face and insisted that they would only commission testing on a physical sample of the outer layer of tiling, not the bottom layer of vinyl that was most affected.

66.     As they continued to bring their concerns to Defendants, Defendants offered and the Hamiltons agreed to participate in a pilot "program" that would clean their house of mold and somehow address air quality issues. That program commenced at the Hamiltons' house in June 2019 and endured for 11 days while the Hamiltons could not access the building. Mrs. Hamilton paid a visit during this time and discovered, to her dismay, that her family's belongings were in complete disarray. Defendants had promised that the Hamiltons' possessions would be removed, decontaminated of mold, and then placed in a containment room. None of that, of course, actually occurred. Defendants instead backtracked and insisted that no remediation was warranted. The Hamiltons' health problems returned shortly after they resumed occupying the house. The so-called pilot program was a complete failure.

67.     The mold in the Hamiltons' house stunk—badly. The stench was so bad that TSgt. Hamilton could barely enter—let alone sleep in—the master bedroom with his wife. He set up sleeping accommodations in a different room to avoid the sickness caused by his own bedroom.

68.     One of the Hamiltons' children has now been diagnosed with sleep apnea.

69.     The Hamiltons' oldest child has autism, and it is her health that has suffered the most.  The girl has developed asthma, which likely is linked to the mold and other contamination in the house.  Further, the asthmatic daughter's physician has reiterated that the house's ductwork needs wholesale, intensive cleaning.  Defendants have failed to adequately complied with the doctor's recommendations.   Perhaps most concerning for the Hamiltons is their daughter's anxieties, heightened by stress from the family's own emotional exhaustion from their living conditions, which led to an attempted (fortunately, only *attempted*) suicide nearly three years ago.

70.     By the time TSgt. Hamilton received his much awaited transfer orders to Washington, he and his family had suffered severe emotional distress, costly out-of-pocket expenses, and numerous health issues.  Like the others in this Complaint, the Hamiltons paid the entirety of their BAH to live in Defendants' squalor for over five years.  They also incurred extraordinary utility bills, and the majority of their personal property, including nearly all porous personal property, has been ruined by mold.

### TECHNICAL SERGEANT THOMAS WOLF AND KASSANDRA WOLF

71.     Defendants' conduct has put the Wolfs in a particularly precarious position.  TSgt. Thomas Wolf deployed to Kuwait in April 2019, meaning he is unable to help his family negotiate a standoff with Defendants over the condition of the RAFB duplex the Wolfs moved into three years ago.

72.     The Wolfs' house's primary issue is mold.  When they first arrived in the house, the Wolfs notice an inordinate, suspicious amount of fresh caulk around windows, vents, and wall cracks.  Hunt's maintenance personnel told the Wolfs that water damage around windows resulted from heavy condensation.  Within months of their move-in, mold appeared on caulk around

windows and vents.  Hunt's workers instructed the Wolfs to wipe the mold away with a mixture of bleach and water.

73.     In January 2019, the Wolfs noticed multiple water rings on a ceiling inside an HVAC closet, which indicated a whole history of repeated incidents resulting in standing water. The Wolfs later learned that a second-floor toilet chronically leaked.  Hunt maintenance workers and workers with a private company "examined" the damage but took no remedial action at all. Instead—and in typical Hunt fashion—maintenance personnel painted over the water rings instead.

74.     The mold was particularly acute in the HVAC system. The Wolfs submitted multiple complaints to Hunt's maintenance office regarding the HVAC system.  When Hunt would respond, workers came with differing companies to perform work, but rarely was it more than slapdash patch-work described elsewhere in this Complaint.

75.     At one point, Defendants requested that the Wolfs vacate the house for a stint so Defendants could perform remediation work.  During that time period, and while the Wolfs were still under lease, Defendants changed the locks to the house and deprived the Wolf Family of access to all of their personal property.  Despite not giving the Wolf Family access to their house, the Defendants' work teams left the doors to the house unlocked and even wide open on several occasions, giving any passerby access to the Wolfs' personal property.  Upon the so-called "remediation" work's conclusion, Defendants told to the Wolfs that Defendants would perform mold remediation on their personal property.  Defendants efforts to address the mold complied with no protocol and failed to actually remediate any issues.

76.     In addition to mold, the Wolf Family encountered numerous pest and insect infestations that Defendants failed to adequately address.  The infestation became so severe that

the Wolfs' son was bitten frequently, which caused him scarring. The scarring was so severe and obvious that officials at the boy's school became concerned and contacted Child Protective Services.

77. Some members of the Wolf household became ill soon after moving into the house, and the health of all six Wolfs eventually deteriorated. TSgt. Wolf experienced no health issues before the move to Hunt's facilities at RAFB. Beginning on that date, however, he began suffering from frequent headaches and nosebleeds. Notably, those same headaches and nosebleeds stopped after his deployment to Kuwait in 2019.

78. Mrs. Wolf has suffered a range of health issues since moving into the Hunt-managed house at RAFB. She began experiencing a runny nose and persistent headaches within the first two months. Mrs. Wolf also began suffering from numbness and strange pins-and-needles sensations in her nerves within four months of the move to Hunt's on-base housing. Then she started suffering from lower back pain. When mold was cleaned from ductwork in August 2018, all these symptoms became noticeable more severe. Mrs. Hunt suffered a ruptured gall bladder in December 2018 and was found then to have MRSA, a form of staph infection. Her doctor urged that she move because of living conditions in the RAFB housing.

79. The Wolf children started suffering, for the first time despite having been in San Antonio for three years prior to moving on base, from allergy symptoms shortly after they began living on base at RAFB.

80. One of the Wolf children, who had no health issues before the move to RAFB, has been hospitalized twice since with an elevated white cell count. He was taken to the hospital because he had been lethargic, like he had the flu, and kept saying his side was hurting.

81.     Another of the Wolf children suffered from asthma before moving to RAFB, but his condition had been improving and he was off his asthma medications. The asthma returned with an unprecedented severity shortly after his family moved on base.  Eventually, he required a daily nebulizer and daily inhaler. The child's symptoms have lessened since leaving RAFB. While the child also suffered from anxiety before the move to RAFB, his condition worsened significantly since moving into Hunt's housing.  He attempted suicide in May 2019.

82.     A Wolf daughter was born with a developmental disorder that has caused one side of her body to become more developed than the other.  After moving into the Hunt-managed housing, the girl developed persistent and severe constipation and required over-the-counter medication on a daily basis.  She also began suffering from frequent migraines and light-sensitivity.  Her symptoms have seemed less severe since the family moved off of RAFB in May 2019.

83.     One of the Wolf sons began suffering from allergies and nosebleeds while in the RAFB housing.  Those have lessened since moving out.  This child, like one of his siblings, was chronically tired while living in Hunt housing.  Both children developed bags under their eyes, which have disappeared since the Wolfs moved off-base.

84.     In addition to dealing with medical issues, TSgt. Wolf and his wife's marriage and relationship strained against the backdrop of their deplorable living conditions, the issues their living conditions were causing their children, and the failure of Defendants to respond to and resolve the issues brought to their attention.  While TSgt. Wolf was deployed to a secure location and unable to regularly communicate, Defendants refused to speak to Mrs. Wolf at all.  As a result, issues with the house brought to Defendants' attention remained ignored during TSgt. Wolf's deployment.

85.     Mrs. Wolf now lives in a house the couple bought after giving up on Defendants' willingness to genuinely rid their house of the mold, which has sickened them and their four children.   All are enjoying better health since moving out, including significant decreases in headaches, nosebleeds, skin rashes, and respiratory and digestive issues.   However, the family struggled to replace their personal property possessions, many of which were left behind or thrown away because of visible traces of mold contamination.

86.     In addition to the extreme mental distress, marital stress, and health issues they suffered, the Wolfs also paid their BAH to live in squalor for over three years.  They paid excessive utility bills and the majority of their personal property, including nearly all porous personal property, has been ruined by mold.

## Lt. Col. Shane Vinales and Becky Vinales

87.     Lt. Col. Shane Vinales and Mrs. Becky Vinales moved to RAFB in October 2017 with their two children.  Throughout the Vinaleses' time in Hunt housing at RAFB, they have dealt with pervasive mold issues, which has affected the health of their children.

88.     From day one in the house leased to them by Defendants, the house smelled musty, was dirty, and was littered with insects.  There was visible light intrusion at the doors of the house, and the house suffered from water intrusion when it rained.

89.     Mrs. Vinales was a vocal advocate for healthy housing, constantly raising issues with Defendants regarding maintenance of the house.  On many occasions, Defendants would respond to her requests for work orders by sending unprofessional, unqualified laborers.

90.     In early November 2017, the Vinaleses were forced to run an extension cord from the exterior of the house in order to power their refrigerator as a result of repair work being carelessly performed by Hunt's contractors.  The floor of the house had separated from the

remainder of the house, leaving an approximately one-inch gap to the exterior and damaging the electrical system.  Defendants attempted to repair the severe structural issues by simply filling the gap with expanding foam.  To repair the electricity, Defendants hired contractors who hacked into the walls of the house with pickaxes and concrete saws, spreading asbestos dust throughout and with complete disregard to the Vinaleses' and their twelve guests.  The contractors failed to so much as put up plastic to contain the dust.  Even more troubling was the fact that the Vinaleses had to acknowledge the existence of asbestos in the walls and were told not to drill into the walls— but the contractors hired by Defendants were woefully unaware of or ignored these issues.  When the new electric box was ultimately installed in the kitchen, there was a two-inch gap beneath it, exposing living wiring that the Vinales children could have touched had Mrs. Vinales not covered the area.

91.    Mrs. Vinales continued her efforts to get Defendants to properly maintain a healthy house for her family.  She discovered that Defendants had simply painted over the pervasive mold, which continued reappearing in areas with fresher paint.  As Mrs. Vinales made service requests to Hunt, she discovered that most of her requests were not properly or adequately responded to, and those that were responded to were handled in a substandard manner.

92.    In November 2018, Mrs. Vinales reported problems related to a leak in the roof above the master bedroom.  Hunt reported to Mrs. Vinales that workers repaired the roof, but the situation never improved.  The roof continued to leak and debris continued to land in the couple's bed throughout the remainder of their tenancy at RAFB.  By the time they departed, the ceiling and walls were in the same condition.  Through this experience and other similar ones, the Vinaleses discovered that Hunt had simply cancelled work orders submitted without performing the work.  In the course of dealing with Hunt in connection with similar situations, the Vinaleses

requested that Hunt test the house for mold, but Hunt declined because, the company's agents said, Hunt does not authorize mold testing even when mold remediation is required.  Nevertheless, Mrs. Vinales has learned of the existence of undisclosed mold tests performed at the house, either by Hunt or contractors commissioned by Hunt.

93.    The mold and asbestos exposure contributed to significant health issues for her family.  Three months after moving into the house, Mrs. Vinales required sinus surgery and continued to suffer from ongoing sinus infections, necessitating steroids and antibiotics for approximately nine months following the surgery.

94.    A Vinales son became vitamin D deficient and has tested as being at risk of having dyslexia and attention deficit disorder.

95.    A Vinales daughter suffered from intestinal issues, including phases of severe constipation and diarrhea, which resulted in her having to seek medical treatment.

96.    The Vinaleses, faced with these issues but ignored by their property manager, paid out-of-pocket for testing on the house.  The family obtained a copy of a mold test from the prior tenant at the house, which revealed the presence of mold.  A mold test performed by a company called Adaptive revealed the presence of a mold that is known to cause intestinal issues in animals. An inspection of the HVAC system revealed carbon monoxide issues associated with the vent system and numerous code violations.  Further, a test of the water at the house revealed a high level of lead and a particular particulate that can cause organ damage.

97.    In 2019, Hunt began extensive repair work on the Vinaleses' house, forcing the family to live in their camper trailer.  During the process, the majority of the family's personal belongings remained in the house.  However, the house was not secured.  Mrs. Vinales would go by the house at various times throughout the day and find random people—presumably contractors

but bearing no observable identification—wandering in and out of the house where her family's property sat unguarded.  On multiple occasions, Mrs. Vinales found doors left open and/or unlocked after work had ceased for the day, and her personal possessions were moved from room to room and left exposed to dust and debris from mold- and asbestos-related repair work.  She discovered slats on her bed had inexplicably broken.  And after one particularly frustrating trip to the house, Lt. Col. Vinales discovered that someone who had been accessing his house had finished a bottle of liquor from the pantry and replaced it with water.

98.    Ultimately, in the summer of 2019, the Vinales family received orders transferring them to a base in Hawaii.  Shortly before they moved, Defendants repaired railing at the house that was identified on the initial inspection and for which a work order was submitted at the beginning of their tenancy.

99.    Confronted with the presence of mold at the move-out time, Hunt undertook efforts to remediate the mold issues afflicting the family's personal property, but the process was a joke. Purported clean rooms were not maintained as clean rooms, and personal property was not adequately cleaned.  The military transporters engaged to move the Vinaleses' property refused to move property with visible traces of mold, which endured even after Hunt's purported, joke remediation of the personal property.

100.    At the end of the day, Hunt confessed to the Vinaleses that the Hunt-managed house where they had been residing had been riddled with extensive issues that implicated—i.e., potentially violated—the Texas Property Code.  However, the work done to repair and remedy the conditions at the house that affected the health and safety of the family were dramatically substandard and failed to cure the issues, and the alternatives offered to the Vinaleses were not viable.  Hunt was content to lease the Vinaleses an uninhabitable house, take all of their base

housing allowance, and give them the runaround regarding purported repairs. Ultimately, after the Vinaleses incurred excessive utility bills during their tenancy, which they refused to pay, Hunt wiped some of the excess charges off of their account before the family moved.

101.    In addition to the aggravation and health issues they suffered, the Vinaleses also paid their BAH to live in squalor for years. The majority of their personal property, including nearly all porous personal property, including some highly valuable articles of clothing belonging to Mrs. Vinales, has been ruined by mold.

### PO1 JON ALEXANDER AND ALLISON ALEXANDER

102.    PO1 Jon Alexander and his wife, Allison Alexander lived for a year in a duplex house at RAFB along with their two children. The house was filled with mold, dust, and degraded fiberglass in ductwork. During their time in the house, the Alexanders suffered from insect infestations that were never remediated.  The Alexanders also had to live with a faulty HVAC system. As a result, the family suffered from constant allergy issues. Their daughter has since been diagnosed with asthma.

103.    The Alexanders moved to RAFB after being stationed in Italy and had little time to find housing. They signed a lease for the house sight-unseen and without any cautionary notes from Hunt. From the day they walked into the house, the family could smell mildew and the house felt damp. Mold visibly grew on the vents. Ants infested the upstairs carpet. Stairs and closet doors were broken.  Toilets and faucets leaked. On move-in day, the floors were filthy, turning the Alexanders' socks black. When Mrs. Alexander opened the refrigerator for the first time, she nearly fell over from the smell of rot and decay.

104.    Mrs. Alexander contacted Hunt to complain of the condition of the house. Hunt's agents advised her to submit a repair request form and that maintenance would immediately

respond.  After the Alexanders tracked down the head of maintenance five days later, Hunt finally sent two maintenance technicians to the house and it took them nearly five hours to address all of the preliminary issues that should have been taken care of before any family moved in.

105.    For a few weeks, things seemed to improve.  However, over that time the family began to suffer from runny noses, itching eyes, and coughs.  One of the Alexander children began to constantly cough at night, awaking with red eyes with circles beneath her eyes.  The girl's performance at school, which she had previously loved, began to suffer and the family received notes from her teacher about her performance.  School officials ultimately put the Alexander daughter on a behavior plan at school.

106.    In early 2019, the Alexander Family requested that Defendants clean the ductwork in their house, which Hunt contracted out.  After leaving the house for several hours for the cleaning, the Alexanders removed a vent in their daughter's room to inspect the work.  The duct was filthy.  The Alexander Family examined behind other vents in the house to find the duct work still coated with debris.  After bringing the issue up to Hunt and their contractor, the family was told that the dark material was just fiberglass, not mold, and that the ductwork was too delicate because of its level of degradation to clean thoroughly.  After intense conversations, Hunt and its contractor finally agreed to do additional work on the house's ductwork. The company Hunt contracted proceeded to rip the black debris from the vents leaving holes in the ceiling and around the vents. They took no precautions to safeguard the family or their belonging from exposure to the chemicals they used and from the debris they released from the ductwork (which due to the age of the home may contain lead and/or asbestos as well as mold). The smell of chemicals was so strong in the house when the family returned that the children were immediately sent to a

friend's house while their parents thoroughly cleaned the house for hours to ensure it was safe for her children.

107.    As a direct result of breathing in these chemicals and the debris in the air, Mrs. Alexander ended up losing her voice, had trouble breathing, and ended up in the emergency room, where she was treated for chemical inhalation and placed on a steroid to help heal the damage it had done to her vocal cords and lungs. On top of all that, the contractor also left their chemical cans in the children's play area, which could have been catastrophic had Mrs. Alexander not found the chemicals first.

108.    Third-party opinions confirmed the Alexanders' suspicions about the hazards and condition of the duct work, which the third-party inspectors confirmed needed to be ripped out and replaced.  Hunt, of course, refused to take the recommended actions.  The Alexanders' daughter's symptoms worsened, resulting in her asthma diagnosis.  The girl now needs to use an inhaler twice a day and has been placed on multiple allergy medications to treat her worsening symptoms.

109.    And while the Alexanders continued suffering from respiratory issues, they began to notice that the more time they spent away from the house, the better they felt.  Excursions outdoors helped alleviate symptoms.  On trips throughout the country, both children's symptoms improved.

110.    Over time, the Alexanders compiled a long list of complaints and repair requests submitted to Defendants.  Hunt made minimal efforts to actually cure any of the issues raised, notwithstanding the health concerns.  It took intervention from officers in the military to get Defendants to agree to perform additional repairs, but Defendants adamantly refused to test the air quality in the home.  The testing Defendants did perform was not relayed to the Alexanders until after Hunt supposedly finished the repairs to the home under a pilot remediation program.  Even

then, it appeared that Hunt's commissioned testing sampled only took two small fragments taken off the small portion of ductwork that had just been replaced.  When the Alexanders repeatedly tried to contact the testing company to get information on its methodology and process, their messages were apparently ignored.  Months after the testing was completed, Mrs. Alexander was finally able to get ahold of Hunt's testing contractor—but once the company's personnel realized she was a tenant at RAFB, they refused to speak to her.

111.    In May 2019, the Alexanders learned they would be put on a pilot program to perform certain repairs to the house.  They were instructed to leave their house for a set of repairs.  Initially, they were told it would be five days.  However, after eight days the Alexanders did a walkthrough of the house and discovered that nothing had been done in regard to the ductwork in their daughter's room.  The cleaning missed entire sections of ductwork that had been pointed out during the initial meetings.

112.    After more "remediation" work and more walkthroughs, raised issues were still ignored.  Whatever changes were made to the HVAC system had rendered the system incapable of cooling the house's main level.  Dehumidifiers failed to work and had to be disconnected.  And gutters that caused water to penetrate into the house were never remediated.  Altogether, the Alexanders were locked out of their home for over three weeks while ineffective repairs were being performed.

113.    The health and wellbeing of their children under threat, the Alexanders utilized what resources they had to move themselves to a new location off-base.  The Alexanders would have moved out earlier but Hunt refused to let them out of their lease without penalty.  Since moving off-base, the health of the Alexanders has improved.  All of the family's members are off all of their medications.

114.    As a result of their experience with Defendants, the Alexander Family has suffered mental distress, adverse health consequences, their personal property has been tainted with mold and anything that could not be thoroughly washed had to be replaced, and they have paid their BAH to live in squalor for a year.  They are hoping there will be no long term negative health effects from their time on base

## SECOND LIEUTENANT LANCE KONZEN AND MEGAN KONZEN

115.    Second Lieutenant Lance Konzen and Megan Konzen lived for eight months at LAFB in a Hunt-managed house with an HVAC system with extensive mold and debris.  The poorly maintained house and HVAC system caused severe health effects, including frequent headaches, coughing, dizziness, and episodes of vertigo.

116.    The Konzens moved to LAFB in July 2018, a month after they married.  Lt. Konzen had been located there for pilot training.  In August 2018, the couple moved into their seemingly tidy three-bedroom, two-bath house with a backyard desert view.

117.    Twenty-year-old Megan Konzen had always enjoyed good health.  But within a week of the move she started having headaches on a daily basis that over time increased in severity and frequency.  Her illnesses intensified in September 2018 while Lt. Konzen was on temporary training deployment in Colorado.  In one instance, Mrs. Konzen began coughing so hard it caused her to vomit and experience severe vertigo.  She felt so ill she could not get out of bed, could not make it to the kitchen to eat, and began losing the ability to care for herself

118.    After the discovery of mold and debris in their house's HVAC system, the Konzens underwent extensive tests at Brooke Army Medical Center in San Antonio.

119.    Lt. Konzen called Defendants after returning from the San Antonio hospital, at which time a maintenance worker arrived to examine the HVAC system.  After a cursory

inspection, the worker told the Konzens simply that he could see the debris but was not qualified to say whether it was mold or simply dirt. The worker—like the company he works for—appeared totally unconcerned about Mrs. Konzen's health.

120. An examination of the HVAC unit outside the home surprised even the maintenance worker when he discovered that the unit was in its original packaging, meaning it had never been serviced. When the unit was opened, Lt. Konzen observed billows of mold.

121. Defendants promised to inspect the Konzen's house, and Lt. Konzen arranged to have a private inspector examine the ductwork at the same time.

122. John Spalten, an inspector with San Antonio-based Aladdin Environmental, told the Konzens in a November 16, 2018, letter that lab results from a few days earlier indicated "various spore types that are similar or lower than the outside sample." But Spalten also wrote that the overall results for spore types and quantities were not considered within acceptable ranges for indoor air. The third-party inspectors also suspected the spore count was likely lower due to the HVAC system's sitting idle for several days before samples were taken.

123. The inspection discovered that the HVAC supply registers had been removed and were all covered in significant spore growth. HVAC duct openings and duct lines were also dirty with mold growth. Based on the layers of paint on the HVAC supply registers, it appeared that the system had not ever been cleaned.

124. When Mrs. Konzen confronted Defendants about the conditions of their house and threatened to make the issues public, Hunt representatives threatened Lt. Konzen's career.

125. Thereafter, Mrs. Konzen traveled to Washington, D.C., for a congressional hearing on poor housing conditions on military installations with privatized housing. She believes now that

trip led to an offer for Lt. Konzen for an assignment to Sheppard Air Force Base in Wichita Falls, Texas.

126.    The Konzens relocated from LAFB on April 1, 2019, and Mrs. Konzen's good health has since returned.  She contacted previous residents of their house through social media and was told that family had suffered just as she had.

127.    As a result of their experience with Defendants, the Konzen Family has suffered mental distress, adverse health consequences, and they have paid their BAH to live in squalor for a year of their early married life.

## VI.    CONDITIONS PRECEDENT

128.    All conditions precedent to Plaintiffs' recovery have occurred or have been waived, excused, or otherwise satisfied. All notices required have been provided or were waived, excused, or otherwise satisfied

## VII.    CAUSES OF ACTION

129.    Paragraphs 1 through 127 are incorporated into this section and all causes of action asserted herein by reference as if fully set forth again.

### Count 1 – DECEPTIVE TRADE PRACTICES

130.    Plaintiffs assert claims against Defendants for breach of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA").

131.    Plaintiffs are consumers as defined by the DTPA, as they sought to acquire goods and services by lease—namely a habitable, properly maintained residence from Hunt at RAFB and LAFB.  Defendants are proper defendants under the DTPA.

132.    Defendants, in the course of leasing residences to Plaintiffs, violated the DTPA in multiple respects, including without limitation: (i) breaching the implied warranty of habitability[2]; (ii) engaging in an unconscionable course of action; and (iii) using false, misleading, and deceptive practices, including:

    a.    causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;[3]

    b.    representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;[4]

    c.    representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;[5]

    d.    representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;[6]

    e.    knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;[7]

    f.    representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve;[8]

    g.    representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced;[9] and

    h.    failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into

---

[2] The Texas Supreme Court recognized that in residential leases the landlord impliedly warrants that the property is habitable and fit for human living as of the beginning of the leases and that such condition will remain in effect throughout the lease. *Kamarath v. Bennett*, 568 S.W.2d 658, 660–61 (Tex. 1978).
[3] Tex. Bus. & Com. Code §17.46(b)(2)
[4] Tex. Bus. & Com. Code §17.46(b)(5)
[5] Tex. Bus. & Com. Code §17.46(b)(7)
[6] Tex. Bus. & Com. Code §17.46(b)(12)
[7] Tex. Bus. & Com. Code §17.46(b)(13)
[8] Tex. Bus. & Com. Code §17.46(b)(20)
[9] Tex. Bus. & Com. Code §17.46(b)(22)

which the consumer would not have entered had the information been disclosed.[10]

133.    Specifically, Defendants, by virtue of their course of administering, leasing, and repairing the houses at RAFB and LAFB since 2007 were uniquely aware of the age of the houses, the existence of lead-based paint, the existence of asbestos, the existence of mold, and the electrical, plumbing, and HVAC issues associated with the houses they manage.  Nevertheless, Defendants leased houses to Plaintiffs, necessarily and, as a matter of fact, representing to Plaintiffs that the houses were habitable and that appropriate repair and remedy work had been undertaken in the past and would be undertaken in the future.

134.    Defendants' representations to Plaintiffs in leasing houses to Plaintiffs were materially false and misleading.  Plaintiffs relied on the representations of Defendants in entering into their leases.  However, each of the Plaintiffs has discovered that the houses were uninhabitable and not safe for human occupancy, suffering medical issues as a result of occupying the houses. Plaintiffs have further discovered that Defendants mislead them into believing that the houses had been properly maintained, and that Defendants' repair and remedy work requested by the Plaintiffs during their tenancy was undertaken by qualified professionals and performed in a good and workmanlike manner so as to repair the complained-of issues.  Had Plaintiffs had an opportunity to properly inspect the houses leased to them, none would have entered into the lease.

135.    In reality, each of the houses leased to Plaintiffs suffers from such extreme deterioration and mold that the houses are not safe for human habitation.  Mold pervades and grows in the houses.  Asbestos and lead-based paint fill the air.  Floors detach from walls.  Plumbing is disconnected for years, depositing human waste under the houses.  Electrical lines break.  Roofs leak.  HVAC systems pump cold air into attics as opposed to the houses.  In short, Defendants

---

[10] Tex. Bus. & Com. Code §17.46(b)(24)

leased Plaintiffs houses that were uninhabitable from the inception of the lease and subsequently refused to perform reasonable repairs to address the issues and make the houses fit for human habitation.

136. Moreover, Defendants have utilized their relationship with the military, Plaintiffs' status within the military, Plaintiffs' relatively weaker economic position, the availability (or lack thereof) of military benefits associated with moving, and the good schools associated with living on military bases to effectively hold Plaintiffs hostage in their leases until their received orders stationing them elsewhere. Meanwhile, Defendants obtained the full amount of Plaintiffs' base housing allowance directly from the federal government, giving Plaintiffs no discount for the size, quality, or condition of their house.

137. Defendants conduct in subjecting Plaintiffs to uninhabitable living conditions has been and remains a producing cause of economic damages, including without limitation loss of base housing allowance, damage to personal property, repair bills, excessive utility bills, medical bills, and future medical bills. Moreover, each of the Plaintiffs and their family members have suffered mental anguish damages as a result of Defendants' conduct in knowingly placing them in uninhabitable houses, many times manifesting itself in physical symptoms associated with the conditions in which Plaintiffs were forced to live. Plaintiffs' have also suffered through concerns about their family members' wellbeing, their concerns about how they could afford to escape those conditions, concern about find suitable housing, and concern about replacing personal property.

138. As a result of Defendants' conduct, Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, mental anguish damages, treble damages, and attorneys' fees and costs as authorized by section 17.50 of the DTPA.

## Count 2 –BREACH OF IMPLIED WARRANTY OF HABITABILITY

139.    Pleading further, assert claims against Defendants for violations of the Texas Property Code, including but not limited to section 92.051, *et seq.*

140.    Plaintiffs have, in accordance with their leases and chapter 92 of the Texas Property Code, given Defendants notice of myriad issues identified in Section V herein associated with the houses each family has leased at RAFB.  Nevertheless, Defendants failed to repair defects and make each house habitable for human occupation.  To date, the houses leased by Plaintiffs suffer from pervasive mold and other conditions that materially affect the health and safety of occupants. Defendants have had adequate time to repair or remedy the unsafe and unsanitary conditions after Plaintiffs' notice, but have not made a diligent effort to repair or remedy the condition after receiving notice from Plaintiffs.

141.    Moreover, unique to the fact that Defendants are in the business of leasing to members of the military and obtaining rent payments directly from the federal government and providing housing on a base affiliated with good schools, Defendants have effectively deprived Plaintiffs of potential remedies, including withholding rent and performing repairs themselves, or terminating their respective leases and moving to suitable housing.

142.    Defendants' conduct therefore violates section 92.051 *et seq.* of the Texas Property Code and has further deprived Plaintiffs of remedies that are statutorily prescribed.  As a result, Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, statutory damages, and attorneys' fees and costs as authorized by sections 92.056 and 92.0563 of the Texas Property Code.

**Count 3 – BREACH OF CONTRACT**

143.    Pleading further, Plaintiffs assert claims against Defendants for breach of the Military Housing Residential Lease ("Lease") to which each of the Plaintiff-families and Defendants are parties.

144.    Pursuant to Texas law, implicit in the Lease is the warranty that Defendants were leasing Plaintiffs houses that were fit for human habitation.  Further, pursuant to section 19 of each Plaintiffs' lease, Defendants were required to make a diligent effort to repair or remedy the condition at the premises.

145.    To date, Defendants have failed to comply with the material terms of each Lease by failing to ensure that the houses Defendants leased to Plaintiffs were fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation at the premises as set forth in more detail in Section V herein.  As such, Defendants have materially breached their leases with Plaintiffs, causing Plaintiffs actual damages.

146.    Because of Defendants' breaches, Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, and attorneys' fees and costs pursuant to section 38.001 of the Texas Civil Practice and Remedies Code.

**Count 4 – NEGLIGENCE AND NEGLIGENT MISREPRESENTATION**

147.    Pleading further, and in the alternative to the extent necessary, Plaintiffs assert claims against Defendants for negligence and negligent misrepresentation in connection with the lease and maintenance of houses to Plaintiffs.

148.    Defendants, as specialized landlords in the business of privatized military housing, owed Plaintiffs a duty to provide them with habitable living conditions in the houses leased to

them, and to properly maintain and repair the houses to a standard fit for human habitation. Defendants' conduct fell far below the applicable standard of care due to Plaintiffs.  Defendants' breaches of their duty consist of failing to properly evaluate housing conditions to ensure leased properties were fit for human habitation, and failing to properly repair and remedy those conditions affecting human health and safety.

149.    Moreover, Defendants, with specialized knowledge regarding the business of military tenancies and the properties leased to the Plaintiffs, and pecuniary interest in leasing houses to military families, falsely represented to Plaintiffs that their houses were safe and fit for human habitation and were and would continue to be properly maintained, without exercising reasonable diligence in ascertaining whether the houses were habitable.  Plaintiffs, who were not given an opportunity to inspect the houses leased to them prior to signing the lease, justifiably relied on the misrepresentations of Defendants (a private housing company).

150.    As a proximate cause of Defendants' conduct, Plaintiffs have incurred and seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, and exemplary damages for Defendants' gross negligence pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

**Count 5 – STATUTORY FRAUD IN A REAL ESTATE TRANSACTION**

151.    Pleading further, and in the alternative to the extent necessary, Plaintiffs assert claims against Defendants for statutory fraud.

152.    Pursuant to section 27.01 of the Texas Business and Commerce Code, fraud in a transaction involving real estate consists of a false representation of past or existing material fact when the representation is made to a person to induce them to enter into a contract and relied on

by that person in entering into that contract.  Furthermore, fraud in a transaction involve real estate consists of a false promise to do an act when it is material, made with the intention of not fulfilling it, made to induce a person to enter into a contract, and relied upon by the person in entering into that contract.

153.     Undisputedly, Plaintiffs and Defendants entered into leases, which are transactions involving real estate.  In the course of those transactions, Defendants represented to Plaintiffs that the houses being leased to them were safe for human habitation and that Defendants would perform repair and remedy work to keep the houses habitable throughout the term of the leases.  Defendants made these representations to Plaintiffs to induce them to sign leases (including discussing repairs and remedies in section 19 of the Leases), and Plaintiffs justifiably relied on those representations and promises because of the nature of the association between the military and Defendants, which exclusively controlled and leased on-base housing.

154.     However, because the houses managed and leased by Defendants suffer from pervasive mold and condition issues and have been "repaired" to no avail for years, it is readily apparent that Defendants were aware that their representations that the houses were fit for human habitation were false, and their promise to perform future repairs to make the houses habitable was made without any intention of fulfilling it.

155.     As a result, Plaintiffs suffered damages.  Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, and attorneys' fees and costs pursuant to Chapter 27 of the Texas Business and Commerce Code.  Plaintiffs further seek to recover exemplary damages in accordance with Chapter 41 of the Texas Civil Practice and Remedies Code because Plaintiffs' damages arose from Defendants' fraud and/or malice.

**Count 6 – COMMON LAW FRAUD**

156.    Pleading further, and in the alternative to the extent necessary, Plaintiffs assert claims against Defendants for common law fraud.

157.    As described herein, Defendants made multiple material omissions regarding the condition of the houses, and multiple misrepresentations regarding the habitability of the houses. Defendants also made representations that repair work would be completed or had been completed, and that as a result, the houses had become habitable and the problems resolved.  Defendants were aware that all of their omissions of fact concerning the condition of the houses were material when they presented Plaintiffs with leases, and Defendants—because of the ongoing condition issues, repair and remedy of the same problem, and pervasive mold reporting—knew that their representations regarding the habitability of the houses were false and/or misleading. Despite knowing the falsity, Defendants made these representations intentionally or, at the very least, recklessly, as positive assertions and without knowledge of their truth.

158.    Defendants    intentionally    omitted    information    and    made    the    foregoing misrepresentations with the intent that Plaintiffs would rely on them and enter into leases, and, in fact, Plaintiffs did rely thereon to their detriment.  Plaintiffs' reliance was justified given their lack of an ability to inspect the houses and given Defendants' power over the market.  This conduct caused injury to Plaintiffs, including but not limited to paying rent for uninhabitable houses, excessive utility bills, environmental testing, and medical expenses in the past and to be incurred in the future.

159.    As a result of Defendants' conduct, Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, mental anguish damages, and exemplary damages

in accordance with Chapter 41 of the Texas Civil Practice and Remedies Code as Plaintiffs' damages arose from Defendants' fraud and/or malice.

**Count 7 – UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED**

160.    Through the transactions described herein, Defendants were in the business of and were on notice that Plaintiffs intended to lease from them habitable housing on military bases in Texas.    Defendants, through their conduct in leasing Plaintiffs substandard housing that Defendants failed to maintain in exchange for Plaintiffs' BAH, have been unjustly enriched and have received money from Plaintiffs that, in equity and good conscience, belongs to Plaintiffs.

## VIII.    Attorneys' Fees & Costs

161.    Pursuant to section 38.001 of the Texas Civil Practice and Remedies Code, section 27.01 of the Texas Business and Commerce Code, chapter 92 of the Texas Property Code, and section 17.50(d) of the Texas Business and Commerce Code, and as otherwise allowed at law and in equity, Plaintiffs are entitled to recover from Defendants all of their reasonable attorneys' fees and expenses incurred in connection with this lawsuit. Plaintiffs are also entitled to recover from Defendants all costs of court.

## IX.    Exemplary Damages

162.    Pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code, because the injury suffered by Plaintiffs resulted from the fraud, malice, and/or gross negligence of Defendants, Plaintiff are entitled to and seek the recovery of exemplary damages from Defendants.

## X.    Joint Liability

163.    Defendants are jointly and severally liable to Plaintiffs on all causes of action asserted herein for a multitude of reasons.

164.    First, Defendants had a meeting of the minds and embarked on a systematic attempt to defraud Plaintiffs by making false representation and promises to Plaintiffs in order to induce them to lease with Defendants, without any legitimate expectation that they would provide Plaintiffs with a habitable home as promised.  Defendants engaged in one or more unlawful, overt acts to accomplish the actions complained of herein.  Therefore, all Defendants are jointly and severally liable for the claims asserted against each of them.

165.    Second, Defendants are part of a joint enterprise or single business enterprise associated with the rental of houses at military bases in Texas and are not individually distinguishable.  All Defendants carried on business as a mutual undertaking with a common business or pecuniary purpose and using the common name "Hunt Military Communities." Defendants had an express or implied agreement for a common purpose to be carried out by their enterprise, had a community of pecuniary interest, and each had an equal right to direct and control the enterprise.  Therefore, all Defendants were engaged in a single, joint enterprise and each of them is jointly and severally liable for the claims asserted against each of them.

166.    Third, Defendants intentionally conferred authority on one another to act on their behalf, intentionally allowed one another to believe they had authority to act on behalf on one another, and/or by lack of care, allowed one another to believe they had authority to act on behalf of one another.  As a result, all Defendants acted as the agent of the others in the course of the conduct described herein.  Therefore, all Defendants are jointly and severally liable for the claims asserted against each of them.

167.    Fourth, Defendants committed the acts complained of herein on behalf on one another and ratified the same.  Each of the Defendants approved these acts by word, act, or conduct after acquiring full knowledge of these acts, including accepting money from Plaintiffs.  This

approval was given with the intention of giving validity to the acts. Therefore, all Defendants are jointly and severally liable for the claims asserted against each of them.

168.     Fifth, a person who knowingly aids and abets and/or participates in a breach of duty or fraudulent conduct is liable as a joint tortfeasor. All Defendants aided and abetted, participated in, and induced each other to make fraudulent representations and promises to Plaintiffs and to breach their duties set forth herein. Each of the Defendants did so knowingly and benefitted from such conduct. Therefore, each is jointly and severally liable for the same.

## XI.     Jury Demand

169.     Plaintiffs demand a trial by jury and tender the jury fee.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Court grant them judgment against Defendants, jointly and severally, on all claims and for all relief sought herein, including but not limited to, judgment for:

a.     Actual damages in the past and future;

b.     Mental anguish damages;

c.     Statutory damages;

d.     Treble damages;

e.     Exemplary damages;

f.     Reasonable and necessary attorneys' fees and costs of court;

g.     Pre-judgment interest at the highest rate allowed by law;

h.     Post-judgment interest at the highest rate allowed by law from the date of judgment until paid;

i.     All writs necessary to effectuate the judgment; and

j.     Such other and further relief, at law or in equity, as the Court deems to be just, proper, and equitable.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Ryan C. Reed*
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com
    Ryan C. Reed
    Texas State Bar No. 24065957
    rreed@pulmanlaw.com
    Matthew J. McGowan
    Texas State Bar No. 24098077
    mmcgowan@pulmanlaw.com

**LAW OFFICES OF JAMES R. MORIARTY**
James. R. Moriarty
Texas State Bar No. 14459000
jim@moriarty.com
4119 Montrose, Suite 250
Houston, Texas 77006
(713) 528-0700 Telephone
(713) 528-1390 Facsimile

**ATTORNEYS FOR PLAINTIFFS**