**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| MICHAEL J. DANIELS AND BARBARA HIGH-DANIELS, INDIVIDUALLY AND AS NEXT FRIEND OF XAVIER DANIELS AND SEBASTIAN DANIELS; SHANE VINALES AND BECKY VINALES, INDIVIDUALLY AND AS NEXT FRIEND OF LANDON VINALES AND SAVANNAH VINALES; JONATHAN KLINE AND SARAH KLINE, INDIVIDUALLY AND AS NEXT FRIEND OF KONNOR KLINE, KENNEDY KLINE, AND KYLEIGH KLINE; MARK HIATT AND RACHEL HIATT, INDIVIDUALLY AND AS NEXT FRIEND OF STEPHEN HIATT, JOSHUA HIATT, DANIEL HIATT, AND JONATHAN HIATT; SAMUEL HAMILTON AND LEILANI HAMILTON, INDIVIDUALLY AND AS NEXT FRIEND OF NEVAEH HAMILTON AND EZEKIEL HAMILTON; THOMAS WOLF AND KASSANDRA WOLF, INDIVIDUALLY AND AS NEXT FRIEND OF CAEDMON GILLIS, GABRIEL WINCHELL, NADIA WOLF, AND MATTHEW WOLF; JON ALEXANDER AND ALLISON ALEXANDER, INDIVIDUALLY AND AS NEXT FRIEND OF NYA ALEXANDER AND MARCUS ALEXANDER; LANCE KONZEN AND MEGAN KONZEN; CARMEN PISANO AND MARY E. PISANO, INDIVIDUALLY AND AS NEXT FRIEND OF JULIA PISANO; ABIGAIL PISANO; AND ANNA PISANO, <br>      PLAINTIFFS <br><br> v. <br><br> AETC II PRIVATIZED HOUSING, LLC; AETC II PROPERTY MANAGERS, LLC; AND HUNT ELP, LTD. D/B/A HUNT MILITARY COMMUNITIES, <br>      DEFENDANTS | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | CASE NO. 5:19-cv-01280 |

**PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION UNDER FED. R. CIV. P. 65**

Plaintiffs file this Application for Preliminary Injunction against Defendants AETC II Privatized Housing, LLC, AETC II Property Managers, LLC, and Hunt ELP, Ltd. d/b/a Hunt Military Communities (collectively, "Hunt"), request that the Court set an *expedited hearing* and, following the hearing, enter a preliminary injunction as set forth herein.

## PRELIMINARY STATEMENT AND RELIEF SOUGHT

Plaintiffs are service members and their families who have leased on-base housing[1] from Hunt. For over a decade, Hunt has betrayed unsuspecting military families by collecting their government-guaranteed rent[2] and by relying on military culture, fear of military command, and short-term military tenancies to consciously ignore pervasive and atrocious housing conditions. Meanwhile, Hunt—a landlord with no regulatory oversight and an economic incentive to be willfully blind—negligently maintains the houses, applying "band-aid" fixes in a less than good and workmanlike manner without a care for its tenants. Hunt has not reinvested in the structural and mechanical systems of these houses, resulting in substantial deferred maintenance that makes many houses unsafe. Hunt then re-leases the unsafe houses over and over despite being on notice of the dangers. Case in point, Hunt leased the Pisanos a house with broken sewer lines, leading to a months-long undiscovered case of standing water and raw sewage under the house. The Pisanos are at least the *third consecutive family* Hunt leased the same house to without fixing or disclosing the problem. All three families were forced to flee the house.

On November 30, 2019, after Plaintiffs filed this lawsuit and after hundreds of combined repair requests and demands to Hunt, Hunt announced a $5-million renovation project.[3] While skeptical that Hunt's $15,000-per-house plan is adequate for the 317 houses at Randolph, Plaintiffs

---

[1] Plaintiffs lease from Hunt at Laughlin Air Force Base ("Laughlin") and Randolph Air Force Base ("Randolph").
[2] Base Allowance for Housing ("BAH") for each service member is paid directly to Hunt by the Dept. of Defense.
[3] San Antonio Express-New, November 30, 2019, "Problem-plagued houses at Randolph to be fixed up."

appreciate that Hunt acknowledges the need for substantial repairs. Nevertheless, Hunt has failed to provide any relief to the families who live in or are vacating the houses it now acknowledges need at least $5-million worth of work.

To address the urgent health and safety concerns of these families, Plaintiffs request that the Court enter an injunction enjoining Hunt from (1) leasing houses at Randolph and Laughlin that were vacant as of October 29, 2019, or that have since been vacated, until such time as the houses are inspected and certified as safe for human habitation by a third-party inspector appointed by the Court; (2) retaliating against any tenant by (i) making any statements in any communications with members of the military (including to persons in the tenant's chain of command) regarding a tenant or former tenant, other than to confirm that the person was a tenant and identifying the time period of the tenancy, (ii) making any statements in any communications with landlords or prospective landlords regarding a tenant or former tenant, other than to confirm that the person was a tenant and identifying the time period of the tenancy, or (iii) refusing to lease a property to any complaining service member at any other military base; and (3) charging or collecting any termination or cleaning fees from any tenant who terminates their lease or does not renew their lease for any reason related to health and safety. Plaintiffs further seek an affirmative, mandatory injunction compelling Hunt to (1) allow any tenant who desires, because of a reason related to health and safety, to terminate their lease without penalty; (2) allow a third party inspector appointed by the Court to inspect all houses on the two bases to determine whether the houses are safe for human habitation; (3) obtain a mold assessment by a licensed mold assessment company for each house for which there has been a credible complaint of mold since November 1, 2017, and deliver the same to any current/prospective resident of the house; (4) allow any vacating family to keep their address on base for purposes of school enrollment; (5) provide any tenant whose

property has been affected by mold a secure, mold-free location where their personal property can be remediated prior to moving; and (6) deposit into the Court's registry all BAH received by Hunt for any house on Randolph and Laughlin until the inspection requested in item 2 has occurred and the house has been certified as safe for habitation by the inspector. Exhibit 1 is a proposed preliminary injunction.

## FACTUAL BACKGROUND

Private companies like Defendants assumed the role of landlord/property manager for base housing beginning in 1996. In 2007, the Air Force executed a 50-year lease and a quitclaim deed in favor of AETC II Privatized Housing, LLC for the real estate and improvements comprising the service-member housing sections of Laughlin and Randolph. Since then, Hunt has leased base housing to military families, pocketing all of their BAH. Upon inspection, Hunt is systematically undermaintaining houses at Randolph and Laughlin, causing health and safety concerns. The stories of the Hiatt and Pisano family exemplify the problems.

### A. Lt. Col. Mark and Rachel Hiatt

Lt. Col. Mark and Rachel Hiatt were stationed to Randolph in 2016. Ex. 2 ¶ 7. Hunt's agents assured the Hiatts that the unit assigned to them would be in fine condition, and the Hiatts decided to live on base despite Hunt's refusal of a walkthrough. Exs. 2 ¶ 6, 2-A.

The Hiatts moved into 36 Octagon in January 2017 and noticed a fresh coat of paint. Ex. 2 ¶ 7. At the time, the Hiatts assumed it was standard to spruce up the house for a new tenant. Now, more than two years later, the Hiatts suspect Hunt repainted the house to conceal its extensive issues. Ex. 2 ¶ 7. The mold issue surfaced first in a bedroom closet and then elsewhere. Ex. 2 ¶ 8. Mold has grown on windowsills, closets, and stubbornly reappears after it has been painted over. Ex. 2 ¶ 8. In June 2019, after Hunt failed to adequately address the mold, the Hiatts submitted

samples to a New Jersey lab. Ex. 2-B. The testing identified 19 mold types as present. Ex. 2-B.

Hunt ignored repeated maintenance and mold-remediation requests, so the Hiatts bought dehumidifiers that, over 10 days, sucked more than *96 gallons* of water out of the house's air. Ex. 2 ¶ 12. The Hiatts commissioned air testing that showed *increases* in Aspergillus penicillioides even after installing dehumidifiers. Ex. 2-C. As recently as September 2019, the Hiatts continue to find more mold. Ex. 2 ¶ 14.

The house's water intrusion has left baseboards soft and squishy. Ex. 2 ¶ 12. The Hiatts notified Hunt about the baseboards and requested that Hunt conduct mold testing. Hunt refused, insisting on skipping straight to the "remediation" processes. Ex. 2 ¶ 14. Hunt sent a crew out to the house to replace the baseboards, but it was obvious that no effort was taken to determine the source or cause of the moisture. Ex. 2 ¶ 15. The moisture levels are likely caused by the house's structural defects and consequential exposure to the elements. Ex. 2 ¶ 15. In particular, the house's foundation is in poor condition, resulting in cracking walls, which were likely concealed by the pre-move-in paint job.

During the Hiatts' two-plus years in the house, its faulty foundation has twice caused separations in piping from a master bedroom toilet to a sewer line, which has caused sewage water to pool beneath the house. Ex. 2-D. That has caused a stench to fill the living space. Ex. 2 ¶ 16.

In November 2019, the Hiatts hired an independent real estate inspection company, Five Star. The results were alarming. *See generally* Ex. 2-D.  Five Star reported that "[t]here are multiple health related issues at this house/dwelling." Ex. 2-D. Five Star discovered that the house had a "significant, long-term, and widespread Rodent infestation." Ex. 2-D. Rodents had overrun the crawlspace, nesting in insulation and soaking it in urine. Ex. 2-D. Inspectors found structural defects that have caused "water infiltration in the crawl-space" and potential "effluent discharged

under the house." Ex. 2-D. The Five Star report listed a litany of other hazardous and substandard conditions, including plumbing repairs that were "not Code compliant," dangerously exposed electrical wires, a heating system that potentially exposes occupants to carbon monoxide, and "a significant amount of deteriorated and 'peeling' paint" that may be lead-based. Ex. 2-D. The report also noted extensive mold, which is "consistent with [a] high humidity environment." Ex. 2-D.[4]

Hunt has failed, despite the Hiatts' repeated requests, to take adequate measures to address these unsanitary conditions. *See, e.g.,* Ex. 2 ¶¶ 14, 17. When Hunt's agents arrived at the house to perform "repairs," their work was substandard and mostly ineffective. The Hiatts often followed up about ineffective repairs, but Hunt would insist it fixed the problem. *See, e.g.,* Ex. 2 ¶ 15.

While the Hiatts would like to move because of the health effects the house is causing their family, they have discovered it is cost-prohibitive to move and remediate/replace their property and feel trapped because their children need base residence for school and transportation thereto. Ex. 2 ¶¶ 19-24. The Hiatts also fear that Hunt may retaliate for their complaints by contacting Lt. Col. Hiatt's superiors. Ex. 2 ¶ 25. Hunt also can harm the Hiatts' chances of obtaining base housing at future posts, as the Hiatts will need to disclose their prior housing to prospective landlords as a reference. Ex. 2 ¶ 26. Hunt's negative reference could disqualify Plaintiffs.

Meanwhile, Hunt continues to collect all of the Hiatt's BAH without regard to the fair rental value of the house, receiving such amounts directly from the Dept. of Defense. Ex. 2 ¶ 26.

**B. Lt. Col. Carmen and Mary E. Pisano**

Lt. Col. Carmen Pisano and Mary Pisano relocated to Randolph in November 2018 with their three daughters. The Pisanos contacted Hunt and were advised that they had 24 hours to

---

[4] Five Star's report paints a grim picture of a house that, if it were located in nearby San Antonio, would not comply with the city's building codes. *See, e.g.,* San Antonio Property Maintenance Code (2018) § 108.1.3 (providing that a structure is "unfit for human occupancy" if it is "insanitary, vermin or rat infested, contains filth and contamination, or lacks . . . other essential equipment required by this code").

accept the only house Hunt was offering, sight-unseen. Ex. 3 ¶ 5. As the Pisano family peeked through the windows of the house prior to moving in, a neighbor warned them of prior tenants' experiences. Ex. 3 ¶ 6. Upon hearing this, the Pisanos asked Hunt about prior issues, but Hunt assured them there was only a minor prior water issue. Ex. 3 ¶ 7. That was false.

The Pisanos have battled plumbing issues, excessive moisture in the house, filthy air filters, shower mold, and bulging and soft-to-the-touch walls. Ex. 3 ¶¶ 14, 17, 25, 27. While Hunt has responded to their dozen-plus work orders, the problems persist. *See, e.g.,* Ex. 3 ¶ 35. Exposed to the problems, the family members became more and more sick—e.g., their ten-year old who began suffering from severe gastrointestinal issues that materially affected her life and mental state. Ex. 3 ¶¶ 44, 68. Perhaps the most striking defect of their house, however, existed throughout their stay in the house but was only discovered on October 11, 2019. Ex. 3 ¶ 39. During a contractor's inspection of the house, he opened the door leading to the basement/crawlspace under the house to discover at least eight inches of standing water and raw sewage. Ex. 3 ¶ 41. The door is located in the HVAC closet. Ex. 3 ¶ 40. While leaking had been ongoing, the opening of the door released sewer gas into living quarters, circulating it through the HVAC system. Ex. 3 ¶ 40.

Upon this discovery, the family fled with only suitcases containing a few sets of clothes, leaving the rest of their personal belongings behind. Ex. 3 ¶ 42. Hunt never warned the family it was dangerous to breath the sewer gas circulating through the air, and the minimal time the family was in the house packing caused several members of the family to become ill. Ex. 3 ¶ 44. Hunt assured the Pisanos that it would remediate the problem but was unable to get a plumber on site for several days, leaving the foul gas and moisture to circulate through the ducts and infiltrate the family's personal possessions. Ex. 3 ¶¶ 42, 45. During this time, Hunt temporarily relocated the Pisanos to another unit whose previous renters—the Alexanders (identified in the Complaint at ¶¶

102-104)—reported it to Hunt as uninhabitable. Ex. 3 ¶ 53.

On October 16, 2019, the Pisanos observed two men with rakes and trash bags entering their house, who said they were going to coat the crawlspace in lime powder. Ex. 3 ¶ 58. Every time the family entered the house thereafter, a pervasive and strong chemical smell met them, punctuated by a foul methane odor. *See, e.g.,* Ex. 3 ¶ 45. On October 24, 2019, Hunt advised the Pisano family that Hunt had addressed all requests and concerns with the house and indicated that the work order for the sewage leak would be closed. Ex. 3 ¶ 67. Hunt did not disclose the results of a test it claims it took. Ex. 3 ¶ 59.

In early November, 2019, following a tour of the house by several military personnel, Brig. Gen. Lenderman sent Hunt an email identifying the issues and seeking a resolution for the family. To date, no meaningful response has been given. Ex. 3 ¶ 63. On November 7, 2019, a contractor the Pisanos hired inspected the crawlspace and showed them lime so soaked he could squeeze liquid from it. Ex. 3 ¶ 64. Since then, the Pisanos have learned that the prior two tenants in the house moved from the house after experiencing many of the same issues. Ex. 3 ¶ 71.

### APPLICATION FOR PRELIMINARY INJUNCTION

A preliminary injunction ("PI") aims to prevent irreparable injury. Fed. R. Civ. P. 65(a). A PI need not preserve the status quo "[i]f the currently existing status quo itself is causing one of the parties irreparable injury." *Canal Auth. of State of Fla. v. Callaway,* 489 F.2d 567, 576 (5th Cir. 1974). A PI applicant must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury outweighs any damage that the PI might cause; and (4) that the injunction will not disserve the public interest. *Bluefield Water Ass'n Inc. v. City of Starkville*, 577 F.3d 250, 252–53 (5th Cir. 2009).

**A. Substantial likelihood of success on the merits**

Showing a substantial likelihood of success does not require a plaintiff to prove that he is certain to win at trial. *See Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011). Rather, plaintiffs instead must "'raise[] questions going to the merits . . . as to make them a fair ground for litigation and thus for more deliberate investigation.'" *Placid Oil Co. v. U.S. Dept. of Interior*, 491 F. Supp. 895, 905 (N.D. Tex. 1980) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)). Plaintiffs have shown likely success on, e.g., their negligence claims.[5]

A Texas negligence claim has three elements: (1) legal duty; (2) breach of that duty; and (3) proximately caused damages. *Martinez v. Walgreen Co.*, 935 F.3d 396, 399 (5th Cir. 2019).

Hunt owed Plaintiffs a recognized legal duty both as landlord and as property manager at Randolph and Laughlin. *Compare* Ex. 2-A § 19 *with Daitch v. Mid-Am. Apartment Communities, Inc.*, 250 S.W.3d 191, 195 (Tex. App.—Dallas 2008, no pet.) ("[A] landlord who agrees to repair the leased property owes a duty to exercise ordinary care."); *Stone v. Nirvana Apts.*, CIVA SA-08-CA-656-FB, 2008 WL 4844715, at *7 (W.D. Tex. Oct. 17, 2008) (citing *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992)). Plaintiffs will establish the threshold element of a duty.

Hunt breached its duty to Plaintiffs by leasing unsafe housing units to families despite knowing about unsafe conditions. *See* Ex. 2 ¶ 5; Ex. 3 ¶ 48. Hunt also breached its duty of care to the Hiatts and Pisanos (as examples) by failing to properly maintain and remediate unsafe and unsanitary defects in the houses. *See, e.g.,* Ex. 2 ¶ 10; Ex. 3 ¶ 67. Hunt has effectively admitted it failed to comply with its duty by announcing the $5-million renovation project. *See* FN4.

Plaintiffs have suffered serious economic and bodily injury as a result of Hunt's breaches of its duties. *See, e.g.,* Ex. 2 ¶ 23; Ex. 3 ¶ 69. Further, Hunt's negligence and failure to comply with its duties proximately caused Plaintiffs' damages. *See, e.g., First Assembly of God, Inc. v.*

---

[5] Plaintiffs likely will succeed on *all* of their claims, including their DTPA and Statutory Fraud claims, but they address only their negligence claim here in order to comply with the Court's local page-limit rule.

*Texas Utilities Elec. Co.*, 52 S.W.3d 482, 493 (Tex. App.—Dallas 2001, no pet.) ("The two elements of proximate cause are cause in fact and foreseeability."). The first element is satisfied because, but for Hunt's negligence, Plaintiffs would not have suffered health problems and sustained property damage. *See* Ex. 2 ¶ 19; Ex. 3 ¶ 72. Plaintiffs' injuries were foreseeable. *See, e.g., Brown v. Edwards Transfer Co., Inc.*, 764 S.W.2d 220, 223–24 (Tex. 1988) ("All that is required is that the injury be of such a general character as might reasonably have been anticipated and that the injured party be so situated with relation to the wrongful act that injury might reasonably have been foreseen."). Hunt demonstrably knew of the homes' dangers, yet leased them to families like the Hiatts and Pisanos anyway. *See, e.g.,* Ex. 2 ¶ 7; Ex. 3 ¶ 72.

### B. Substantial Threat of Irreparable Injury

"To establish irreparable harm, plaintiffs must show three factors: (1) harm is imminent; (2) the injury caused by the alleged action is irreparable; and (3) there is no adequate remedy at law." *Cibolo Waste, Inc. v. City of San Antonio*, SA-06-CA-801-FB, 2006 WL 8421764, at *2 (W.D. Tex. Dec. 19, 2006), *report and recommendation adopted*, 2007 WL 9627471 (Jan. 26, 2007).

Hunt's practice of placing newly-relocated military families in unsafe housing poses an ongoing and imminent physical risk to military families. Unless enjoined, Hunt's actions will continue to cause bodily harm. *See, e.g.,* Ex. 3 ¶ 71. Physical injury is one example of irreparable injury. *See, e.g., Crowder v. Kelly*, 928 F. Supp. 2, 6 (D.D.C. 1996) (enjoining secondhand smoke).

Plaintiff cannot be made whole if Hunt retaliates against tenants by complaining to their superiors. *Compare* Ex. 2 ¶ 25 *with Kroupa v. Nielsen*, 731 F.3d 813, 820 (8th Cir. 2013) (enjoining to prevent "reputational harm"). The proposed PI also prevents Hunt's interference with families' choice of schools, a recognized irreparable harm. *Compare* Ex. 2 ¶ 24 *with Gonzalez v. Chasen*, 506 F. Supp. 990, 999 (D.P.R. 1980). De-enrollment at base schools would cause even more severe

harm to Plaintiffs with special-needs children. *Compare* Ex. 2 ¶ 24 *with Lofton v. D.C.*, 7 F. Supp. 3d 117, 124 (D.D.C. 2013) (noting harm caused by interfering with special education).

Monetary damages awarded months or years after these injuries will not compensate families who are stuck in these houses, fearful of the cost to move, fearful of the family's future in the military, and fearful of moving their children from their current schools.

### C.  Threatened injury weighed against an injunction's damage

Refusal to enter a PI would cause immense and irreversible injury to Plaintiffs, including depriving Plaintiffs of access to schools, allowing for career and housing setbacks, and continuing to expose Plaintiffs to unsafe housing.  Hunt is unlikely to suffer harm as a result of the Court requiring it to comply with its contractual and legal obligations.[6] Hunt's economic inconvenience pales in comparison to the health and safety of military families[7].  Hunt is the largest military housing contractor and has been receiving government guaranteed rent without incurring the expense of maintaining houses. There are too many instances of Hunt leasing unsafe houses to military families. Hunt will be minimally damaged by requiring inspections/certifications.

### D.  A preliminary injunction serves the public interest

The requested injunction forces a third-party inspection of the living conditions at Laughlin and Randolph. Not only does this promote the health and safety of military families, it also ensures this country's service members have at least some peace of mind pending trial, so they may focus on their duties to the nation. The public interest in safe housing for military families is served by subjecting Defendants to oversight, ensuring that base housing is safe and habitable.

---

[6] For this reason, only minimal security should be required. *See* Fed. R. Civ. P. 65(c).
[7] *See Oregon State Pub. Interest Research Group v. Pac. Coast Seafoods Co.*, 374 F. Supp. 2d 902, 908 (D. Or. 2005) (holding that the ongoing harm outweigh[s] financial interests defendants may have").

## PRAYER

WHEREFORE, Plaintiffs pray that the Court grant the Application, enter the proposed PI (*see* Exhibit 1) against Hunt, and grant Plaintiffs all relief to which Plaintiffs may be entitled.

    Respectfully submitted,

    **PULMAN, CAPPUCCIO & PULLEN, LLP**
    2161 NW Military Highway, Suite 400
    San Antonio, Texas 78213
    (210) 222-9494 Telephone
    (210) 892-1610 Facsimile

    By: */s/ Ryan C. Reed*
        Randall A. Pulman
        Texas State Bar No. 16393250
        rpulman@pulmanlaw.com
        Ryan C. Reed
        Texas State Bar No. 24065957
        rreed@pulmanlaw.com
        Matthew J. McGowan
        Texas State Bar No. 24098077
        mmcgowan@pulmanlaw.com
        Sarah Jackson Donahue
        Texas State Bar No. 24103760
        sdonahue@pulmanlaw.com

    **LAW OFFICES OF JAMES R. MORIARTY**
    James. R. Moriarty
    Texas State Bar No. 14459000
    jim@moriarty.com
    4119 Montrose, Suite 250
    Houston, Texas 77006
    (713) 528-0700 Telephone
    (713) 528-1390 Facsimile

    **ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that on the 5th day of December, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| Jennifer Skipper<br>BALCH & BINGHAM LLP<br>1888 East Capitol Street, Suite 1400<br>Jackson, Mississippi 39201 | Julia W. Mann<br>JACKSON WALKER LLP<br>112 E. Pecan Street, Suite 2400<br>San Antonio, Texas 78205 |

*/s/ Ryan C. Reed*
Ryan C. Reed