```
                IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
                   SAN ANTONIO DIVISION

MICHAEL J. DANIELS, ET AL.,  )
                             )
     PLAINTIFFS,             )
                             )
VS.                          )  CASE NO.
                             )  SA-19-CA-01280-FB
AETC II PRIVATIZED HOUSING,  )
LLC, ET AL.,                 )
                             )
     DEFENDANTS.             )


  ******************************************************

                    ORAL DEPOSITION OF

                    KRISTY BECK-MILLER

                       MAY 5, 2022

                       VOLUME TWO

  ******************************************************
```

        THE ORAL DEPOSITION of KRISTY BECK-MILLER,

produced as a witness at the instance of the

Defendants and duly sworn, was taken in the

above-styled and numbered cause on the 5th day of

May 2022, from 9:12 a.m. to 4:11 p.m., before

TERRY L. SCHULTZ, Certified Court Reporter in and

for the State of Texas, reported by stenographic and

computer-aided transcription, at Pulman, Cappuccio &

Pullen, LLP, 2161 NW Military Highway, Suite 400,

San Antonio, Texas 78213, pursuant to the Federal

Rules of Civil Procedure and the provisions stated

**EXHIBIT 17**

## Page 2

```
 1    on the record or attached hereto.
 2
 3            S-T-I-P-U-L-A-T-I-O-N-S
 4
 5        It is further stipulated and agreed by
 6    and between counsel for the respective parties
 7    hereto that the original of the deposition of
 8    KRISTY BECK-MILLER shall be sent to RYAN C. REED,
 9    the attorney for the witness, for the purpose of
10    obtaining the signature of the witness thereon
11    before any notary public.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1            A-P-P-E-A-R-A-N-C-E-S
 2
      FOR THE PLAINTIFFS:
 3
        RYAN C. REED
 4      PULMAN, CAPPUCCIO & PULLEN, LLP
        2161 NW Military Highway, Suite 400
 5      San Antonio, Texas 78213
        PHONE:  (210) 222-9494
 6      E-MAIL:  rreed@pulmanlaw.com
 7      ROBERT E. BRZEZINSKI
        WATTS GUERRA, LLP
 8      Four Dominion Drive, Bldg. 3, Suite 100
        San Antonio, Texas 78257
 9      PHONE:  (210) 477-0500
        E-MAIL:  rbrzezinski@wattsguerra.com
10
11    FOR THE DEFENDANTS:
12      WALTER H. BOONE
        BALCH & BINGHAM, LLP
13      188 East Capitol Street, Suite 1400
        Jackson, Mississippi 39201
14      PHONE:  (601) 961-9900
        FAX:  (601) 961-4466
15      E-MAIL:  wboone@balch.com
16
17
18
19
20    ALSO PRESENT:
21
        KRISTY BECK-MILLER,
22      The Witness; and
23      TERRY L. SCHULTZ,
        Certified Court Reporter.
24
               -oOo-
25
```

## Page 4

```
 1                I-N-D-E-X
 2    WITNESS:
      KRISTY BECK-MILLER                    PAGE
 3
 4    Stipulations ...................    2
 5    Appearances ....................    3
 6    Index ..........................    4
 7    Exhibit Index ..................  4-5
 8    Examination by Mr. Boone .......    6
 9    Witness Signature Page .......... 226
10    Reporter's Certificate .......... 227
11
12            E-X-H-I-B-I-T  I-N-D-E-X
13    EXHIBIT                    PAGE
      NO.         DESCRIPTION      MARKED
14
15    Exhibit 26   Hill Summary Letter and Report    7
16    Exhibit 27   Invoice                   8
17    Exhibit 28   Invoice                   9
18    Exhibit 29   Invoice                  10
19    Exhibit 30   Invoice                  11
20    Exhibit 31   Invoice                  12
21    Exhibit 32   Invoice                  12
22    Exhibit 33   Invoice                  12
23    Exhibit 34   Field Notes for Daniels Home    13
24    Exhibit 35   Field Notes for Wolf home       18
25
```

## Page 5

```
 1    E-X-H-I-B-I-T  I-N-D-E-X  C-O-N-T-I-N-U-E-D
 2    EXHIBIT                 PAGE
      NO.         DESCRIPTION      MARKED
 3
 4    Exhibit 36   Chain of Custody for Vinales    18
                   Home
 5
 6    Exhibit 37   Excerpt from S520            20
 7    Exhibit 38   Rachel Adams Report         28
 8    Exhibit 39   Video Transcript            58
 9    Exhibit 40   George Coto's Report        70
10    Exhibit 41   E-Mail Correspondence      167
11    Exhibit 42   E-Mail Correspondence      168
12    Exhibit 43   E-Mail Correspondence      169
13    Exhibit 44   E-Mail Correspondence      173
14    Exhibit 45   E-Mail Correspondence      172
15    Exhibit 46   E-Mail Correspondence      193
16    Exhibit 47   Social Media Messages      195
17    Exhibit 48   E-Mail Correspondence      210
18    Exhibit 49   E-Mail Correspondence      211
19    Exhibit 50   E-Mail Correspondence      211
20    Exhibit 51   E-Mail Correspondence      212
21    Exhibit 52   Plaintiffs' Designation of 220
                   Rebuttal Expert Witness
22    Exhibit 53   Witness's Handwritten List 223
23                   -oOo-
24
25
```

                                           2  (Pages 2 to 5)

Page 6

1    P-R-O-C-E-E-D-I-N-G-S
2         KRISTY BECK-MILLER,
3    having been previously duly sworn, testified as
4    follows:
5              EXAMINATION
6    BY MR. BOONE:
7         Q.   As a reminder, Ms. Miller, this is a
8    continuation of your deposition, so you're still
9    under oath.  You understand that, correct?
10        A.   Correct.
11        Q.   And have you had any conversations with
12   anyone regarding the substance of your testimony?
13        A.   No.
14             MR. REED:  Just I want to clarify.
15   We have had conversations regarding the documents
16   that you requested.  But other than identifying
17   documents, no substance.
18             MR. BOONE:  Okay.  Thank you.
19        Q.   (By Mr. Boone)  And you have now produced
20   some documents which were called for by the
21   subpoena, correct?
22        A.   Correct.
23        Q.   And I wanted to kind of walk through some
24   of those.  And we might as well go ahead and mark
25   them.

Page 7

1             (Exhibit 26 marked.)
2         Q.   (By Mr. Boone)  The first one is Exhibit
3    Number 26, which is your report in the Hill -- from
4    that Hill inspection; is that correct?
5         A.   Correct.
6         Q.   I didn't put it together till today, but
7    you did that inspection on the same day that you did
8    Paisano and Hiatt, right?
9         A.   I suppose so.  Per the date, yeah.
10        Q.   Okay.  Well, you don't have an
11   independent recollection of that?
12        A.   No.
13        Q.   Okay.  But you agree that the Hill
14   inspection was for a separate home, right?
15        A.   Correct.
16        Q.   And the Hill plaintiffs are actually in a
17   separate case, right?
18             MR. REED:  I don't think she knows
19   that.  But yes, we'll stipulate to that.
20             THE WITNESS:  Okay.  Yes.
21        Q.   (By Mr. Boone)  And when we went through
22   the list of things you were opining about and the
23   reports that you opined about, you did not include
24   the Hill report in that list, correct?
25        A.   Correct.

Page 8

1         Q.   Remember the designation list that we
2    went through where we got all five of the reports in
3    the Daniels case and then the two letters?
4         A.   Yes.
5         Q.   Okay.  And the Hill report was not one of
6    the reports that you listed that you were basing
7    your opinions on in this case, true?
8         A.   True.
9         Q.   All right.  And the Hill is a separate
10   case, and we may have to come back and talk about
11   what you learned there.
12        A.   Okay.
13        Q.   But for purposes of the Daniels case, you
14   are not relying on any conclusions or facts or data
15   gathered at the Hill residence to opine in the
16   Daniels case; is that true?
17        A.   That is true.
18        Q.   Okay.  Next, I'm going to show you --
19   Maybe we'll do this separately.  You had a series of
20   invoices that you located.  Is that correct?
21        A.   Correct.
22        Q.   I'm going to mark the first one as
23   Exhibit 27 and get you to identify that for us.
24             (Exhibit 27 marked.)
25             MR. REED:  Walter, I'd just like to

Page 9

1    say with the exception of Exhibit 27, the other
2    invoices I thought had been produced.  And so
3    forgive me if they have not and you're just seeing
4    them for the first time this morning.
5             MR. BOONE:  All right.
6         Q.   (By Mr. Boone)  So can you tell us what
7    Exhibit 27 is?
8         A.   It is the invoice for travel and the
9    deposition for this week.
10        Q.   Okay.  And you're producing that pursuant
11   to the subpoena that we issued?
12        A.   Correct.
13        Q.   All right.  I'll show you an invoice
14   we'll mark as Exhibit 28.
15             (Exhibit 28 marked.)
16        Q.   (By Mr. Boone)  And if you'd identify 28
17   for us?
18        A.   This is the invoice for the Hiatt home on
19   December 13th, 2019.
20        Q.   All right.  And we were talking about how
21   much you charge.  So for the Hiatt, the
22   full-meal-deal Hiatt inspection, you charged $1550?
23        A.   Correct.
24        Q.   So that includes the initial mold
25   assessment of $650, right?

3  (Pages 6 to 9)

Page 10

1     A.   Correct.
2     Q.   And then the air sampling for 750, right?
3     A.   Yes.  Correct.
4     Q.   And then you charged for the ATP swabs of
5  150?
6     A.   Correct.
7     Q.   And for the air samples, you told me that
8  your cost on those was somewhere in the neighborhood
9  of 30 to 40 dollars per sample?
10    A.   Correct.
11    Q.   All right.  All right.
12         (Exhibit 29 marked.)
13    Q.   (By Mr. Boone)  I'll show you Exhibit 29.
14  Tell us what that is.
15    A.   This is the bill for -- the invoice for
16  the Hill home on December 13th.
17    Q.   And how much is that invoice?
18    A.   1475.
19    Q.   What's the difference between that one
20  and the one we just looked at?
21    A.   The number of samples.
22    Q.   All right.  So you charged the customer
23  how much per sample?
24    A.   75 per sample.
25    Q.   I see.  Okay.  It's sitting right there.

Page 11

1         So we can just do the math on however
2  many samples the report had, air samples or tape or
3  swab samples, and multiply that times 75, and that's
4  how much they'll get charged?
5     A.   Yes.
6     Q.   All right.  Let's mark Exhibit Number 30.
7  And you can tell us what this is.
8         (Exhibit 30 marked.)
9         THE WITNESS:  Invoice dated
10  December 13, 2019, the Paisano home.
11    Q.   (By Mr. Boone)  So this is the third one
12  that you did on that same day for December 10th,
13  correct?
14    A.   Correct.
15    Q.   And how much is this one?
16    A.   $1925.
17    Q.   And again, the difference is what?
18    A.   The number of samples.
19    Q.   Were all of these -- These invoices, all
20  three were charged to the particular families -- Oh,
21  no.  They were charged to Ryan Reed.
22    A.   Correct.
23    Q.   So on that occasion, you charged and
24  collected $1925 plus $1475 plus $1550, correct?
25    A.   Correct.

Page 12

1         (Exhibit 31 marked.)
2     Q.   (By Mr. Boone)  And then I'll show you
3  the last one from that time, Exhibit Number 31.
4  Tell us what that is.
5     A.   This is an invoice dated December 13,
6  2019, for $1800 for travel expenses and being out of
7  the office for several days.
8     Q.   Okay.  So you add that to the total list
9  I gave before, and that's how much you were paid for
10  the December inspection, true?
11    A.   True.
12         (Exhibit 32 marked.)
13    Q.   (By Mr. Boone)  I'm going to show you
14  Exhibit Number 32.  Tell us what this is.
15    A.   It's billed on January 10th, 2020, and
16  it's hourly rate for conference call with Ryan Reed.
17    Q.   All right.  And that was billed to Ryan
18  Reed?
19    A.   Yes.
20         (Exhibit 33 marked.)
21    Q.   (By Mr. Boone)  I'll show you Exhibit
22  Number 33.  Can you tell us what that is?
23    A.   Invoice on January 16th, 2020, an hourly
24  rate for writing a letter for -- on a Randolph case
25  working on Hills drawing, letters and e-mails for

Page 13

1  three hours.
2     Q.   It says "fixing Hills drawing."  Do you
3  remember what that is?
4     A.   I think I had to go in and kind of make
5  it a little bit clearer as to what I was wanting and
6  to do the colors on it.
7     Q.   And it says "letters and e-mails."
8     A.   Right.
9     Q.   To whom?
10    A.   I'm not a hundred percent sure that I
11  remember.
12    Q.   All right.  And the next in the stack are
13  documents broken down by particular home; is that
14  right?
15    A.   Correct.
16         (Exhibit 34 marked.)
17    Q.   (By Mr. Boone)  So I'll show you Exhibit
18  Number 34.  Can you identify that for us?
19    A.   This is the field notes that I took while
20  I was in the Daniels home on April 5th of 2019.
21    Q.   All right.  So here is the -- you have
22  the -- and we'll talk about this when we talk about
23  the Daniels report.  But you have one of the Daniels
24  e-mail addresses right here on the front page,
25  right?

Page 14

1    A.   Correct.
2    Q.   And then it says, on the third page,
3  "Limited preliminary water impact and microbial
4  assessment."  And you have written observations
5  there, right?
6    A.   Correct.
7    Q.   And when you say "VMG," that's when
8  you're talking about visible mold growth, correct?
9    A.   Correct.
10   Q.   And we kind of agreed yesterday that
11 without these, that if you didn't see something,
12 that meant that there was nothing there.  Is that
13 fair?
14   A.   Fair.
15   Q.   So if there's nothing written here, then
16 we can assume that there was no visible mold growth
17 or no moisture damage or no water damage.  Fair?
18   A.   Fair.
19   Q.   All right.  So the only examples of that
20 in this house are in the observations section,
21 correct?
22   A.   Correct.
23   Q.   And then you have some notes regarding
24 relative humidity?
25   A.   Correct.

Page 15

1    Q.   And it says, "Fluctuates between 57 and
2  47."  What does that mean?
3    A.   Between 57 and 47 percent.
4    Q.   Okay.  But is that in the same room at
5  different times or different rooms?
6    A.   It's kind of just going throughout the
7  house.
8    Q.   So different rooms had different relative
9  humidities?
10   A.   Right.
11   Q.   But you don't write down which one is
12 which?
13   A.   Correct.
14   Q.   And then the listing of the samples --
15 Well, what's the bottom half?  Is that your --
16   A.   It's the ATP samples.
17   Q.   So that's what the numbers that you read
18 off the screen?
19   A.   Yes.
20   Q.   But you didn't take a picture of those?
21   A.   I do not recall.  It would -- I haven't
22 seen the report.
23   Q.   All right.  And then the next page is
24 what?
25   A.   These are my drawings for my floor plan

Page 16

1  where I make my additional notes and kind of draw
2  what needs to be removed.
3    Q.   All right.  And then the last page is
4  what?
5    A.   It's if a post -- if the post-testing had
6  been done after remediation, I would have put my
7  notes in there.
8    Q.   Okay.  So the way I'm looking at this --
9  and you tell me if I'm wrong -- the way the pages
10 are numbered, this is like a little packet that you
11 take with you to every job; is that right?
12   A.   Correct.
13   Q.   So at the bottom center of each page, it
14 says Page 1, 2, 3, 4, 5, 6.  So you spit these out
15 and take blank copies of this in hard copy to each
16 job, right?
17   A.   It's on my computer.
18   Q.   Right.  But then you handwrite the stuff
19 on there at the job?
20   A.   Correct.
21   Q.   Okay.  So you have a hard copy of this
22 for each mold assessment that you do?
23   A.   Not hard copy.  It's on the computer.
24   Q.   So you write it --
25   A.   I have a Surface Pro, so I write it on

Page 17

1  there.
2    Q.   Okay.  Excellent.
3           So there's an electronic version of
4  each one of these somewhere?
5    A.   Somewhere.
6    Q.   And this is the one for the field notes
7  for Barbara Daniels, correct?
8    A.   Correct.
9    Q.   And before last night, you had not even
10 looked for this, correct?
11   A.   I believed I had sent them all to Ryan
12 months and months ago.
13   Q.   But did you?
14   A.   I don't recall.  I didn't send this to
15 him last night.  It was in his files.
16   Q.   I see.  Okay.  So counsel's producing
17 this.  But you believe you sent it to him when?
18   A.   I can't recall.
19   Q.   Months and months and months ago?
20   A.   Yeah.
21   Q.   All right.  Let's table that for the time
22 being.
23          MR. REED:  Walter, can we go off the
24 record for a moment?
25          MR. BOONE:  Yes.

5  (Pages 14 to 17)

Page 18

1      (Short break.)
2      (Exhibit 35 marked.)
3      Q.   (By Mr. Boone)  I'm going to show you
4  what's been marked as Exhibit 35.  See if you can
5  identify this for me.
6      A.   This is the field notes for the Wolf
7  home.
8      Q.   All right.  And it's the same pages that
9  are referenced below before, correct?
10     A.   Correct.
11     Q.   And again, you got the same observations
12 listed there, right?
13     A.   Yes.
14     Q.   The sampling locations, right?
15     A.   Correct.
16     Q.   Then a floor plan?
17     A.   Correct.
18     Q.   All right.  So that's for the Wolfs.
19     (Exhibit 36 marked.)
20     Q.   (By Mr. Boone)  The last one we'll mark
21 is Exhibit 36.  And tell us what that is.
22     A.   This is a chain of custody for the
23 Vinales home.
24     Q.   And is this the only chain of custody
25 that you had in your records?

Page 19

1      A.   I have to finish -- I have to go into the
2  portal to see if I can find the rest of them.
3      Q.   Okay.  But this is certainly a chain of
4  custody for the sampling that you did on the Vinales
5  home, correct?
6      A.   Yes.
7      Q.   Did you find any field notes for Vinales?
8      A.   Not yet, sir.
9      Q.   But you believe that they were stored
10 electronically like the others, correct?
11     A.   Correct.
12     Q.   And do you know whether you produced the
13 field notes in Vinales to Mr. Reed, or do you know?
14     A.   I do not recall.
15     Q.   Okay.  Now, the documents that we have
16 just been through, are those up-to-date in terms
17 of -- are there any other documents that you are
18 aware of that you have or have given to Mr. Reed
19 that are subject to our subpoena that are not
20 included there?
21     A.   Not that I'm aware of.
22     Q.   And you were starting to make a list
23 yesterday of the things that were subject to the
24 subpoena that you believed you had and you were
25 going to look for.  Fair?

Page 20

1      A.   Fair.
2      Q.   All right.  And you are going to do that
3  when we adjourn?
4      A.   Correct.
5      Q.   Okay.
6      (Exhibit 37 marked.)
7      Q.   (By Mr. Boone)  All right.  I want to go
8  finish up a couple of things that we talked about
9  yesterday.  I'm going to show you Exhibit 37.  I
10 corrected my mistake from yesterday and copied an
11 excerpt of S520, the right one, that I wanted you to
12 look at.  Do you see that?
13     A.   Yes.
14     Q.   Do you recognize that as an excerpt from
15 S520?
16     A.   Yes.
17     Q.   And you remember yesterday, we were
18 talking about the definitions of conditions,
19 correct?
20     A.   Correct.
21     Q.   And these are -- S520 deals with the --
22 it's the mold remediation standard, correct?
23     A.   Correct.
24     Q.   And so this gives mold remediation
25 contractors the guidelines by which they should do

Page 21

1  their work, correct?
2      A.   Correct.
3      Q.   And one of the things that it requires is
4  an assessment of the particular condition for the
5  particular area of concern, correct?
6      A.   Correct.
7      Q.   And it's not that you give a condition
8  for the house as a whole; it is that you give the
9  condition for particular locations within the home
10 that you see.  Fair?
11     MR. REED:  Objection; form.
12     THE WITNESS:  Fair.
13     Q.   (By Mr. Boone)  And you see here, on
14 Exhibit 37, the definition of the conditions that
15 are there, correct?
16     A.   Correct.
17     Q.   And the actual language is there.  But as
18 I understand it, Condition 2 is basically the
19 presentation of settled spores, correct?
20     A.   Correct.
21     MR. REED:  Objection; form.
22     Q.   (By Mr. Boone)  And Condition 3 is the
23 presence of actual mold growth; is that correct?
24     MR. REED:  Objection; form.
25     THE WITNESS:  Correct.

6 (Pages 18 to 21)

Page 22

1    Q.   (By Mr. Boone)  And is that the primary
2  distinction between the two?
3    A.   Yes.
4    Q.   All right.  So if you -- So to know that
5  you have Condition 2, you obviously have to do some
6  sort of testing, correct?
7    A.   Correct.
8    Q.   Because you cannot see a spore with your
9  eye, right?
10   A.   Correct.
11   Q.   And you do not know that Condition 2
12 exists without either an air sample or a tape sample
13 or a swab sample, which are looking for the presence
14 of spores, correct?
15   A.   Correct.
16   Q.   And I think you told us yesterday that
17 your general assumption is that spores are
18 everywhere, right?
19   A.   Correct.
20   Q.   And it's not an assumption; it actually
21 is a fact, right?
22   A.   Correct.
23   Q.   And that everywhere in the indoor
24 environment, in your opinion, is Condition 2,
25 because spores are everywhere?

Page 23

1    A.   Correct.
2    Q.   So when it says -- So basically, every
3  assessment, in your opinion, is at least
4  Condition 2.  Is that fair?
5    A.   Yes.
6    Q.   All right.  And so there are no
7  Condition 1 locations that you have assessed, true?
8    A.   True.
9    Q.   All right.  And you make that assumption
10 without testing for each particular location.  Fair?
11   A.   Fair.
12   Q.   Meaning, you come to this with the idea
13 that spores are everywhere, therefore, I'm going to
14 say there's Condition 2 everywhere, basically,
15 correct?
16   A.   If there's Condition 3.
17   Q.   Okay.  But you don't just limit the
18 presentation of Condition 2 to the areas where there
19 is visible mold growth, do you?
20   A.   Typically, it's part of -- if there's
21 Condition 3, it's always been taught to do
22 Condition 2 and 3.  And it is just --
23   Q.   Okay.
24   A.   Unfortunately, there is not a good
25 definition of what Condition 2 is.

Page 24

1    Q.   It says it right there, right?
2    A.   Scientifically.
3    Q.   So you're saying that the definition of
4  Condition 2 scientifically is vague and subject to
5  multiple interpretations?
6    A.   Correct.
7    Q.   Okay.  So then if I now understand what
8  you're telling me, you would say that if there is
9  visible mold anywhere in the home, you have
10 Condition 3 in that area?
11   A.   Correct.
12   Q.   And therefore, you have Condition 2, not
13 only in that area, but everywhere else in the home.
14 Is that what you're telling us?
15   A.   Typically, it's to that area.  But when
16 you have several areas, it goes to the home.
17   Q.   How many areas of visible mold growth
18 does it take before you say there's Condition 2
19 throughout the home?
20   A.   There's no standard for that.
21   Q.   That is all Kristy Beck-Miller saying
22 what she says?
23   A.   Correct.
24   Q.   All right.  Well, did you -- And we
25 talked about this in connection with the language in

Page 25

1  all of your reports.  If you remember the Hiatt
2  report, Exhibit 9?
3    A.   Yes.
4    Q.   Remember that language in that second
5  bullet point?
6    A.   Yes.
7    Q.   All right.  So here you say Condition 3,
8  that's visible mold growth, slash, Condition 2,
9  which is the presence of spores, right?
10   A.   Correct.
11   Q.   And all you're saying in this -- Well,
12 let me ask you.  What are you saying when you say
13 this?  That you discovered visible mold somewhere in
14 the house?
15   A.   Correct.
16   Q.   On something?
17   A.   Correct.
18   Q.   Not everything?
19   A.   Correct.
20   Q.   And that is Condition 3?
21   A.   Correct.
22   Q.   What are you saying with respect to
23 Condition 2 and the presence of spores?
24   A.   That it is probable that because you have
25 active mold growth, areas of active mold growth,

7  (Pages 22 to 25)

Page 26

1   that it's probably -- you could have Condition 2.
2   Q.   Okay.  In that location or throughout the
3   home?
4   A.   In that location.
5   Q.   Okay.
6   A.   Also depending on where that location is.
7   Q.   Okay.  So this is -- and I'm not trying
8   to be critical, but this is kind of -- if you see
9   visible mold growth anywhere in a home, you're going
10  to get this same statement from you; is that true?
11  A.   True.
12  Q.   And again, I'm not being flippant, but
13  there are areas in my home right now that have
14  visible mold growth.  In my house in the washing
15  machine area, it's an enclosed nook where the
16  moisture stays in there, and there is visible mold
17  growth on the ceiling in there.  You would give me
18  the same assessment from this bullet point that
19  you're giving all of these plaintiffs; is that true?
20  A.   True.
21  Q.   Okay.
22       MR. REED:  Would you like my business
23  card?
24       MR. BOONE:  Please.  I might need
25  that.

Page 27

1        THE WITNESS:  Might need mine first.
2   Q.   (By Mr. Boone)  And I'm not being funny,
3   but that really means, it seems to me, it's less
4   severe than it reads.
5   A.   Definitely.
6        MR. REED:  Objection; form.
7   Q.   (By Mr. Boone)  Okay.  It reads like this
8   particular home has mold growth everywhere.  And
9   that's not what you're saying?
10  A.   Correct.
11  Q.   And it reads like this particular home
12  has mold spores everywhere.  And that's not what
13  you're saying?
14  A.   Correct.
15  Q.   You're saying that you saw visible mold
16  growth in a single location or maybe more, and that
17  because of that, you're saying both of those
18  conditions may be present?
19  A.   Correct.
20  Q.   All right.  And you're not saying
21  anything more than that, right?
22  A.   No.
23  Q.   And in terms of like who this same
24  statement might apply to, it would apply to every
25  home where you see any visible mold growth, even in

Page 28

1   the shower, for example?
2   A.   Correct.
3   Q.   Okay.  And so even if the only place I
4   have in my house is my washing machine area or in
5   my shower, you're going to give this same bullet
6   point?
7   A.   Correct.
8   Q.   All right.  And that doesn't mean that
9   the whole house is contaminated or that all the
10  contents are ruined or anything else.  It's just --
11  A.   Correct.
12       MR. REED:  Objection; form.
13  Q.   (By Mr. Boone)  -- that there was visible
14  mold growth in a single location, and from that,
15  you're assuming that spores are present.  Fair?
16  A.   Fair.
17       (Exhibit 38 marked.)
18  Q.   (By Mr. Boone)  All right.  And we were
19  talking a bit about contents.  And I just wanted to
20  circle that up, and then we can move on.  I'm going
21  to show you Exhibit 38, which is the report of
22  Rachel Adams.  Have you seen that before?
23  A.   I don't recall seeing this one.
24  Q.   Okay.  She is a mold remediation
25  contractor.  And she did analysis -- looked at your

Page 29

1   reports and then looked at them side by side with
2   the two standards we've been talking about, S500 and
3   S520.  Are you with me?
4   A.   Yes.
5   Q.   And I'm not going to -- I'm going to ask
6   you particular questions about it.  You can take a
7   look at the whole thing or whatnot.  But I think
8   these are some of the things that you told me
9   yesterday, and I just want to make sure I've got it
10  right.
11  A.   Okay.
12  Q.   So going to Page 3 of her report,
13  Exhibit 38, where it says "contents."
14  A.   Yes.
15  Q.   Are you with me?
16  A.   Yes.
17  Q.   And that's what we're going to be talking
18  about, is contents.  Are you with me?
19  A.   Yes.
20  Q.   All right.  And she writes that S520 has
21  adopted common features and requirements of an
22  appropriate contents remediation.  And then she
23  lists some of the things that the standard provides.
24  Correct?
25  A.   Correct.

8  (Pages 26 to 29)

Page 30

1    Q.  And those are -- And that's true, right?
2    A.  Yes.
3    Q.  All of those things are in the standard?
4    A.  Correct.
5    Q.  And then she cites to 9.3.2, says that
6  "documentation relating to contents should include
7  contents and personal property inventories," and
8  then gives all of the other things that are
9  required, true?
10   A.  True.
11   Q.  And then she says that S520 also requires
12 the remediator to select the most appropriate
13 cleaning method for the situation, correct?
14   A.  Correct.
15   Q.  And that is in the standard?
16   A.  Yes.
17   Q.  All right.  And that's based on what the
18 thing is made of, the condition of it, where it is,
19 and those kinds of things?
20   A.  Correct.
21   Q.  Again, all in the standard, right?
22   A.  Right.
23   Q.  And then she says, "After a review of the
24 Adaptive reports, I did not see evidence where
25 Adaptive considered or documented any of the

Page 31

1  conditions above."
2         And that's a true statement, correct?
3    A.  Correct.
4    Q.  You did not document any of those
5  conditions required by the standards S520, correct?
6    A.  Correct.
7         MR. REED:  Objection; form.
8    Q.  (By Mr. Boone)  And that is because you
9  did not intend to and did not give any opinion
10 regarding contents remediation, true?
11   A.  True.
12   Q.  And so if anybody did anything with
13 contents based on your report, that was mistaken and
14 an error, true?
15        MR. REED:  Objection; form.
16        THE WITNESS:  True.
17   Q.  (By Mr. Boone)  All right.  And she says,
18 "Without consideration of this information, a proper
19 contents remediation cannot be undertaken."
20        Do you see that?
21   A.  Yes.
22   Q.  And that is true, correct?
23   A.  Correct.
24   Q.  And that was not done, and contents
25 remediation cannot be undertaken without that

Page 32

1  information.
2    A.  Correct.
3    Q.  And it is also information that must be
4  done and must be performed by an expert, correct?
5    A.  Correct.
6    Q.  A person like me, who doesn't have
7  training or a license, cannot make that decision,
8  correct?
9    A.  Correct.
10   Q.  Because I don't have a mold remediation
11 consultants license, do I?
12   A.  No.
13        MR. REED:  Objection; form.
14   Q.  (By Mr. Boone)  And I have to have one to
15 do this in Texas, true?
16   A.  True.
17   Q.  So this is not something that a plaintiff
18 in this case can do on their own; they must have an
19 expert to do it, true?
20   A.  True.
21   Q.  And to your knowledge, there is no expert
22 on the contents remediation portion, correct?
23        MR. REED:  Objection; form.
24        THE WITNESS:  Correct.
25   Q.  (By Mr. Boone)  Because you didn't do it.

Page 33

1    A.  I did not.
2    Q.  All right.  Moving to -- She then goes on
3  to discuss S500.  And if you would turn to Page 5 of
4  her report.  Do you see the section called
5  "contents"?
6    A.  Yes.
7    Q.  And she then does a similar analysis for
8  what's in S500 with respect to contents remediation.
9  Do you see that?
10   A.  Yes.
11   Q.  And then she says that the S500 requires
12 a determination of the category and then a
13 determination of the composition of affected
14 materials.  And that includes porosity and
15 restorability.  Correct?
16   A.  Correct.
17   Q.  All these things are required by the
18 standard; do you agree?
19   A.  Agree.
20   Q.  And it says that restorability is
21 dependant on the category of water, the time of
22 exposure, what the thing is made of, the cost of
23 restoration, the value of the thing, and the types
24 of value, whether it's sentimental or whatnot,
25 right?

9  (Pages 30 to 33)

Page 34

1    A.   Right.
2    Q.   All of those things are listed in the
3  standard as well?
4    A.   Right.
5    Q.   And all of those things have to be
6  determined on an item-by-item basis, correct?
7    A.   Correct.
8    Q.   And they have to be determined by a mold
9  remediation contractor, true?
10   A.   True.
11   Q.   And there it says, "S500 further provides
12 that for each content, the type of service required
13 can be restoration, disposal or preservation."  And
14 the contractor has to decide that for each item,
15 true?
16   A.   True.
17   Q.   All right.  And it talks about the
18 Chapter 15 of the reference guide.  Because this
19 standard has a separate reference guide, doesn't it?
20   A.   Yes.
21   Q.   And it talks about the process and
22 procedure for the correct identification process and
23 documentation of contents remediation, doesn't it?
24   A.   Yes.
25   Q.   And you are familiar with that standard,

Page 35

1  right?
2    A.   Yes.
3    Q.   Okay.  And she then concludes that the
4  Adaptive reports do not contain any of the
5  information which is required by S500 and its
6  reference guide.  Do you see that?
7    A.   Yes.
8    Q.   That's true, correct?
9    A.   Pertaining to contents.
10   Q.   Yes.
11   A.   Yes.  Because we did not do that.
12   Q.   Right.
13   A.   Okay.
14   Q.   So that's all we're talking about here,
15 is contents.
16   A.   Okay.
17   Q.   And you agree that your report does not
18 contain any of that information with respect to
19 contents, correct?
20   A.   Correct.
21   Q.   And so she concludes, "Without following
22 these procedures and guidance and considering this
23 information, the nature and extent of any damage to
24 contents cannot be determined."
25   A.   Correct.

Page 36

1    Q.   Do you agree with that?
2    A.   Yes.
3    Q.   All right.  So sitting here today, again,
4  you would need an expert to do that, correct?
5    A.   Correct.
6    Q.   You did not do that, right?
7    A.   Correct.
8    Q.   And those requirements for both S500 and
9  S520 with respect to contents were not done by you,
10 correct?
11   A.   Correct.
12   Q.   And to your knowledge, have not been done
13 by any expert, correct?
14        MR. REED:  Objection; form.
15        THE WITNESS:  Correct.
16   Q.   (By Mr. Boone)  And without an analysis
17 complying with those standards for contents, then we
18 don't know which contents, if any, need to be
19 remediated or what that process is, right?
20   A.   Right.
21   Q.   And without that information -- And an
22 expert has to tell us that, right?
23   A.   Right.
24   Q.   Okay.  So wrapping up the Hiatt report,
25 which we discussed in length yesterday, you agree

Page 37

1  that this is the sum total of your opinions with
2  respect to the Hiatts, correct?
3    A.   Correct.
4    Q.   And you don't hold any opinions with
5  respect to the Hiatts that are not contained in this
6  report, correct?
7    A.   Correct.
8    Q.   And all of the facts and data that you
9  considered are referenced within the report itself,
10 true?
11   A.   True.
12   Q.   And I think for the Hiatts, we went
13 through a couple of sampling results that you had in
14 advance, right?
15   A.   Right.
16   Q.   But for everybody else, it's what's in
17 the four corners of their report?
18   A.   Correct.
19   Q.   All right.  Let's move on to the next
20 plaintiff, which I'd like to talk about the
21 Paisanos.  So that's Exhibit Number 12.  And if you
22 remember, this is the color version of the one that
23 has the Bates-numbers on it, because I think we
24 might need to talk about pictures.
25   A.   Okay.

Page 38

1 Q.  It's hard to see the pictures in the
2 black-and-white.  But you've already confirmed that
3 this is the one.
4   So generally speaking, you would
5 agree, would you not, that this report contains all
6 of your opinions with respect to the Paisano family;
7 is that correct?
8 **A.  Correct.**
9 Q.  And the Paisano mold assessment, true?
10 **A.  True.**
11 Q.  And there are no opinions with respect to
12 the Paisanos that are not contained in this report,
13 right?
14 **A.  Correct.**
15 Q.  And all of the facts and data that you
16 relied upon is referenced in this report; is that
17 true?
18 **A.  True.**
19 Q.  And you believe that there would be field
20 notes for this one as well?
21 **A.  Correct.**
22 Q.  And those have not been produced,
23 correct?
24 **A.  Correct.**
25 Q.  Nor have they be produced for the Hiatts,

Page 39

1 correct?
2 **A.  Correct.**
3 Q.  The only two that you gave us were the --
4 **A.  Wolf and Daniels.**
5 Q.  Right.
6 **A.  Okay.**
7 Q.  So on the other three, we don't have
8 field notes, correct?
9 **A.  Correct.**
10 Q.  And all of the testing that you undertook
11 is going to be referenced in the Paisano report,
12 correct?
13 **A.  Correct.**
14 Q.  And there's no testing that you did that
15 is not in that report, true?
16 **A.  True.**
17 Q.  So this is -- The four corners of this
18 report, Exhibit 12, is all the opinions you have on
19 the Paisanos, right?
20 **A.  Yes.**
21 Q.  All right.  I'm going to do my best not
22 to cover plowed ground, but, like the Hiatt report,
23 a lot of the same language is in this one as well,
24 right?
25 **A.  Right.**

Page 40

1 Q.  And so all of your testimony regarding
2 that common language would be the same for this
3 report as for the Hiatts, true?
4 **A.  True.**
5 Q.  All right.  Now, Exhibit 12, beginning on
6 the first page, gives that list of potential --
7 Well, I can't tell, because it differs from report
8 to report, as to whether this is the laundry list of
9 things that you offer or these are the things that
10 they chose.  Do you know?
11 **A.  These, we did a visual assessment, the**
12 **water testing, laser particle counts and air**
13 **sampling.**
14 Q.  Okay.  So I noticed, from your laundry
15 list, you don't have bulk or tape samples on there;
16 is that correct?
17 **A.  I will need to check the results.**
18 Q.  In the first page after the pictures,
19 there are some swab sample results there.
20 **A.  Yes.**
21 Q.  Does that mean that that was selected?
22 **A.  It was missing on this list.**
23 Q.  Okay.  So you did do swab samples, but
24 you don't list them on Exhibit 12?
25 **A.  Correct.**

Page 41

1 Q.  Okay.  So is that just a mistake?
2 **A.  Yes.**
3 Q.  All right.  And again, we're starting
4 with the transmittal letter, right?
5 **A.  Yes.**
6 Q.  All right.  So let's talk about the next
7 section, which is where you go room by room, right?
8 **A.  Right.**
9 Q.  Okay.  So you say the master bedroom, and
10 you reference there air samples and tape samples --
11 I'm sorry.  Is this just air samples?
12 **A.  Yes, sir.**
13 Q.  Okay.  And you note -- Well, let me ask
14 you, because I think you'll agree with me.  When you
15 use the words "extremely elevated," that is
16 technically incorrect, right?
17 **A.  It is an opinion.**
18 Q.  All right.  Well, but it is an opinion
19 that's not based on any scientific standard or
20 guideline?
21 **A.  Correct.**
22   MR. REED:  Objection; form.
23 Q.  (By Mr. Boone)  The only accepted
24 methodology is a comparison with the control sample,
25 true?

Page 42

1   A.   True.
2   Q.   And the sample for the master bedroom was
3   higher than the outside control sample, true?
4   A.   True.
5   Q.   But the accepted scientific standards say
6   that that's the only thing that you can say about
7   those results, true?
8   A.   True.
9   Q.   So when you say "extremely elevated,"
10  that is not based on any scientific analysis or
11  standard?
12  A.   True.
13  Q.   All right.  The result on the master
14  bedroom also references Chaetomium, doesn't it?
15  A.   Yes.
16  Q.   And according to the test result, there
17  was one spore --
18  A.   Correct.
19  Q.   -- of that genera, correct?
20  A.   Correct.
21  Q.   And how big is one spore?  In the size of
22  microns?
23  A.   A little over 10 microns.
24  Q.   10 microns.  Okay.
25       And can you see that with the naked

Page 43

1   eye?
2   A.   No.
3   Q.   And how many of those size spores would
4   it take to fill the head of a pin?
5   A.   Oh, gosh.  I would have to --
6   Q.   100,000?
7   A.   That would be a guess.
8   Q.   It'd be a huge number, wouldn't it?
9   A.   Right.
10  Q.   Because that's super, super small.
11  A.   Correct.
12  Q.   All right.  Bedroom 1.  Air sample.  You
13  would adopt the same statements regarding, your
14  words, "extremely elevated," correct?
15  A.   Correct.
16  Q.   Not based on any scientific standard?
17  A.   Correct.
18  Q.   Bedroom 2.  You would say the same thing
19  with regards to extremely elevated, correct?
20  A.   Correct.
21  Q.   And maid's quarters.  You have the same
22  language, you would agree, also with that, right?
23  A.   Yes.
24  Q.   And when you say "extremely elevated,"
25  you know from your own experience that you can test

Page 44

1   in the same location for one 15 minutes, turn the
2   machine off, put another cassette in and test the
3   same area again, and get air sample results that are
4   tens of thousands of spores per cubic meter
5   different?
6   A.   Correct.
7   Q.   And that's you doing it back to back?
8   A.   Correct.
9   Q.   Okay.  The maid's quarters.  You
10  reference the mud room off the kitchen had an area
11  of water damage.  Do you recall that?
12  A.   I believe so.
13  Q.   That was by the back door?
14  A.   Right.
15  Q.   And do you remember also that we did a
16  walk-through, all of us --
17  A.   Yes.
18  Q.   -- on that occasion?
19  A.   Uh-huh.
20  Q.   And do you agree that you identified for
21  us what was present and what you saw during that
22  walk-through?
23  A.   I remember vaguely.
24  Q.   Do you remember that we videotaped that?
25  A.   I believe so.

Page 45

1   Q.   All right.  And would you agree that that
2   videotape would accurately reflect what you
3   discovered in your visual observation?
4   A.   I believe so.
5   Q.   And the reason I ask is because I don't
6   have the field notes, right?
7   A.   Right.
8   Q.   And we were all there together to do a
9   joint inspection, right?
10  A.   Right.
11  Q.   And we all wanted to know what it is that
12  you saw, right?
13  A.   Right.
14  Q.   And you went, and we all followed you
15  throughout the house, and you pointed out everything
16  that you saw.  Do you recall that?
17  A.   Yes.
18  Q.   Okay.  Living room.  You would say the
19  same -- In one of the areas was that -- I think it
20  was beside a door in that area.  But we'll check
21  that in just a second.  Does that refresh your
22  recollection?
23  A.   No.
24  Q.   No?  Okay.  Fair enough.
25  A.   It's been a long time.

Page 46

1    Q.   That's fair.  It has.
2         Living room.  Same answer with
3    respect to extremely elevated, correct?
4    A.   Correct.
5    Q.   Chaetomium in the living room.  That was
6    two spores, right?
7    A.   Yes.
8    Q.   Dining room.  Same answer with respect to
9    elevated levels, right?
10   A.   Right.
11   Q.   And it says, "Visible fungal growth
12   throughout cabinets and drawers."  And that was in
13   that butler pantry area, right?
14   A.   Right.
15   Q.   That was between the dining room and the
16   kitchen, right?
17   A.   Right.
18   Q.   Okay.  Upstairs bathroom.  Same answer.
19   Well, kitchen, elevated -- extremely elevated
20   levels.  The same answer that you would have there,
21   right?
22   A.   Right.
23   Q.   And the sunroom, you had a tape sample
24   result?
25   A.   A swab sample.

Page 47

1    Q.   A swab sample?  Okay.
2         And what did that one show?
3    A.   Alternaria and Aspergillus/Penicillium
4    and Cladosporium.
5    Q.   All right.  And that was rare
6    Aspergillus/Penicillium, which is less than ten
7    spores.  Low Alternaria, which is up to 100 spores.
8    And then medium Cladosporium.  Is that correct?
9    A.   Correct.
10   Q.   And again, this is the area that used to
11   be part of the outside, is now part of the inside?
12   A.   Correct.
13   Q.   Upstairs bathroom.  You took an air
14   sample in there.  You'd say the same thing about
15   extremely elevated levels, right?
16   A.   Correct.
17   Q.   And then you have a bullet here on HVAC
18   system.  But you've agreed that you're withdrawing
19   all of those opinions in your reports, correct?
20   A.   Correct.
21   Q.   Because you did not inspect that and do
22   not have opinions on what should be done, if
23   anything, about the HVAC system, true?
24   A.   True.
25   Q.   All right.  And then the same thing with

Page 48

1    respect to personal items.  You are withdrawing that
2    statement because you did not make any opinions
3    regarding personal items at all, correct?
4    A.   Correct.
5    Q.   And then I think you also agreed with
6    respect to the entire home section of these
7    transmittals.  You are also withdrawing all of those
8    opinions, correct?
9    A.   Correct.
10   Q.   Because those opinions relating to the
11   entire home are not appropriate, because the
12   standards require that you go area by area.  Fair?
13   A.   Fair.
14   Q.   Okay.  And the crawl space.  It says
15   crawl space was flooded with Category 3 water,
16   right?
17   A.   Right.
18   Q.   And we looked at that definition of
19   Category 3.  And one of those definitions was
20   sewage, right?
21   A.   Right.
22   Q.   So this is actually Category 3 water,
23   right?
24   A.   Right.
25   Q.   And it's not something that used to be

Page 49

1    Category 1 that turned into Category 2 that turned
2    into Category 3.  This water actually was the kind
3    that's listed in Category 3, right?
4    A.   Right.
5    Q.   And that is -- on all five of these,
6    that's the only indication you have ever had of that
7    actual kind of water present in the home, true?
8    A.   True.
9    Q.   And your other opinions with respect to
10   Category 3 water were Kristy Beck-Miller's
11   interpretation that anything that had Category 2
12   that had been there 24 or 48 hours must be described
13   as Category 3, basically, right?
14   A.   Correct.
15   Q.   But you do recognize that the actual
16   Category 3 water was only present in the Paisanos,
17   right?
18   A.   Right.
19        MR. REED:  Objection; form.
20   Q.   (By Mr. Boone)  Not present in the
21   Hiatts, correct?
22   A.   Right.
23   Q.   Not present in the Wolfs, correct?
24   A.   Not that I recall.
25   Q.   Not present in the Daniels, right?

Page 50

1      A.   **Right.**
2      Q.   Not present in the Vinales, right?
3      A.   **Right.**
4      Q.   All right.  It has a reference to the
5    attic.  Did somebody take a look-see up there?
6      A.   **Yes.**
7      Q.   But you say here that's a non-condition
8    living space, right?
9      A.   **Right.**
10     Q.   And typically, that's not part of the
11   mold assessment unless you believe it's coming into
12   the house some kind of way?
13     A.   **Typically, if it's safe, we'll look, but**
14   **it being non-conditioned living space, it does not**
15   **follow under the Texas rules and regs.**
16     Q.   Right.  So under the Texas rules and
17   regs, you were only supposed to look at the living
18   spaces, correct?
19     A.   **I can look anywhere.  I can do basements**
20   **or crawl spaces in attics.**
21     Q.   But your opinions must related to the
22   living spaces.  Is that what you're saying?
23          MR. BRZEZINSKI:  Object to form.
24          THE WITNESS:  I can give an opinion
25   on a crawl space or an attic.  It just doesn't fall

Page 51

1    under the rules that -- like a mold remediation
2    contractor has to do that work, because it's not
3    part of the living -- the conditioned living space.
4      Q.   (By Mr. Boone)  I gotcha.  Okay.
5          And then you have a health statement
6    there where you're recommending that these results
7    be shared with a physician.  Do you see that?
8      A.   **Yes.**
9      Q.   Do you know if they were?
10     A.   **No.**
11     Q.   Okay.  Did you know that the Paisanos
12   were willing to share testing results with NBC news
13   but they never showed it to a doctor?
14          MR. BRZEZINSKI:  Object to form.
15          THE WITNESS:  No.
16     Q.   (By Mr. Boone)  And why did you want them
17   to share these with a doctor?
18     A.   **Because anybody who reports health**
19   **statements -- because I can't -- I'm not -- If these**
20   **are saying they have health issues, I can't give**
21   **them information.  I always say, "Take this to your**
22   **doctor."**
23     Q.   And they were reporting health issues and
24   complaints to you, correct?
25     A.   **Yes.**

Page 52

1      Q.   When they were reporting these health
2    issues, did they tell you that they had not been in
3    the house?  Well, when did you have that
4    conversation with them?
5      A.   **I believe it came from Ryan.  I don't**
6    **know that I've ever met them.**
7      Q.   Okay.  So you didn't have any information
8    from them directly at all?
9      A.   **I don't believe so.**
10     Q.   Okay.  Well, at this point, a lawsuit had
11   been filed, right?  Or did you know that?
12     A.   **Right.**
13     Q.   And it certainly alleged medical issues
14   in the lawsuit.
15     A.   **Okay.**
16     Q.   Did you see the complaint?
17     A.   **No.**
18     Q.   Or know that at all?
19     A.   **Uh-uh.**
20     Q.   Okay.  But obviously, a bunch of lawyers
21   there walking through the house, you knew there was
22   litigation going on?
23     A.   **Right.**
24     Q.   But you don't think you had any
25   information directly from the Paisanos?

Page 53

1      A.   **I don't believe so.**
2      Q.   And did you know -- And I think you told
3    me this yesterday, but did you know that the
4    Paisanos had not been living in the house since
5    October?
6      A.   **I don't believe I did.**
7      Q.   All right.  So that's new news to you
8    today, right?
9      A.   **Correct.**
10     Q.   And that makes a difference in the
11   assessment, doesn't it?  Or in your conclusions,
12   doesn't it?
13     A.   **Possibly.**
14     Q.   All right.  Because, for example, an
15   unoccupied house is not being cleaned regularly,
16   true?
17     A.   **True.**
18     Q.   And so all of these things that measure
19   dust and dirt and whatnot would be accumulating over
20   that period of time, right?
21          MR. BRZEZINSKI:  Object to form.
22          THE WITNESS:  Correct.
23     Q.   (By Mr. Boone)  And that could alter the
24   results that you're testing for and your conclusions
25   based on those, true?

14  (Pages 50 to 53)

Page 54

1    **A.    True.**
2    Q.    All right.  And it also might change what
3    it is that you do with respect to testing; is that
4    right?
5    **A.    Maybe.**
6    Q.    Okay.
7    **A.    It's --**
8    Q.    Well, for example, on your ATP testing,
9    if you learned that a surface is unclean, that might
10   provide some background or context for why it's
11   unclean.
12   **A.    Correct.**
13   Q.    Right?
14   **A.    Yes.**
15   Q.    So if it hadn't be lived in in two months
16   and your result comes back unclean, then that's a
17   pretty good explanation for why that result
18   happened, true?
19   **A.    Correct.  Yes.**
20   Q.    All right.  So moving to the report
21   itself.  Beginning on Page 7, we've got the laundry
22   list of things again.  Can you tell us which ones of
23   these you did and they paid for or Ryan Reed paid
24   for?
25   **A.    We did the water source testing, ATP,**

Page 55

1    **laser particle, air sampling and surface sampling.**
2    Q.    And you did not do the remainder?
3    **A.    Correct.**
4    Q.    All right.  And moving to the inspection.
5    So tell us -- In Section 2.1, beginning on Page 9,
6    you talk about these -- these are the same
7    conclusion statements, right?
8    **A.    Right.**
9    Q.    That are fields that you click yes or no
10   on?
11   **A.    Correct.**
12   Q.    All right.  And you clicked "Active
13   elevated moisture issues were identified."  You said
14   no.
15   **A.    Correct.**
16   Q.    Why is that?
17   **A.    I do not recall.  I would -- There are --**
18   **I did not -- I don't believe I saw, like, any**
19   **active, you know, water areas.  But I'm trying to**
20   **look.  (Reviewing document.)  It's been way too long**
21   **since I went through there.**
22   **          I don't believe I saw any in that**
23   **home.**
24   Q.    You didn't see any water damage or
25   evidence of moisture issues?

Page 56

1    **A.    I didn't see any elevated moisture**
2    **issues.**
3    Q.    Okay.
4    **A.    We saw some areas of water damage.**
5    Q.    And what is it that triggers a yes or no
6    there?  Elevated moisture issues, what does that
7    mean?
8    **A.    It's like when we use the moisture meter**
9    **and it's, you know, above whatever the surface**
10   **should be.**
11   Q.    Okay.
12   **A.    Or standing water is another indication.**
13   Q.    Okay.  And then it says, the next one --
14   So that's based on the moisture meter?
15   **A.    Correct.**
16   Q.    And it's not based on the relative
17   humidity samples?
18   **A.    Correct.**
19   Q.    "Water damage or other impact issues were
20   identified by AEC."  And you say yes.
21   **A.    Correct.**
22   Q.    And that was the areas -- couple of areas
23   that you identified on the walk-through, right?
24   **A.    Right.**
25   Q.    All right.  And then it says, "Bacteria

Page 57

1    or other moisture-based contamination issues are
2    opined present."  You say no, right?
3    **A.    Right.**
4    Q.    I thought when we were talking about this
5    yesterday, you said that gets an automatic yes --
6    **A.    Yes.**
7    Q.    -- if there's a mold growth.
8    **A.    And it should have been yes.**
9    Q.    So that's an error?
10   **A.    Yes.**
11   Q.    Okay.
12   **A.    I've never seen it say no.  I don't**
13   **understand that.**
14   Q.    Because what you told us yesterday is,
15   that's automatically populated.  When you click --
16   **A.    Click.**
17   Q.    -- yes for mold growth, it automatically
18   goes yes to bacteria?
19   **A.    Correct.**
20   Q.    And you were saying that's because where
21   there's potential mold growth, there's potential
22   bacteria.
23   **A.    Correct.**
24   Q.    But this didn't happen on this one.
25   **A.    No.  I don't recall if I went in and**

Page 58

1   changed it, which I never -- I didn't know I could,
2   or if it has something to do with the elevated
3   moisture being no.
4        Q.   Okay.
5             MR. BOONE:  All right.  Why don't we
6   take a break.
7             (Short break.)
8        Q.   (By Mr. Boone)  What I want to do -- and
9   we'll do it later when I can get the tech worked
10   out -- is, I'm going to show you, Ms. Miller -- if
11   you recall, when we were there at the joint
12   inspection, we had a videographer there.  Do you
13   remember?
14        A.   Yes.
15        Q.   And at the conclusion of all your
16   testing, we asked you to walk us through the entire
17   home and determine -- or tell us where you saw
18   evidence of either visible mold growth or moisture
19   water issues.  Do you remember that?
20        A.   Yes.
21             (Exhibit 39 marked.)
22        Q.   (By Mr. Boone)  Okay.  I'm going to show
23   you Exhibit Number 39.  And do you remember the
24   videographer was there, kind of walking around
25   behind us?  Do you remember that?

Page 59

1        A.   Yes.
2        Q.   All right.  And we had a transcript of
3   that made.  Now, as you might expect, because we
4   weren't in a deposition, some of the language is not
5   super clear.  But do you remember doing all that and
6   saying all that?
7        A.   Yes.
8             MR. BRZEZINSKI:  Object to form.
9             MR. BOONE:  That was terrible.  Let
10   me withdraw that.
11        Q.   (By Mr. Boone)  Take a look at Exhibit
12   Number 39.
13        A.   Okay.
14        Q.   And see if this refreshes your
15   recollection about what you told us on
16   December 10th, 2019 during that walk-through.
17        A.   I believe so.
18        Q.   Okay.  And I will do my best to get the
19   video so that you can actually look at it.  But I
20   kind of want to use Exhibit 39 just to walk through
21   some areas that are referenced in here.  Are you
22   with me?
23        A.   Yes.
24        Q.   Okay.  So beginning in Exhibit 39, on
25   Page 2, it says, "We have some slight water damage

Page 60

1   back here.  I didn't see anything that looked like
2   mold growth."  I believe that's the area that you
3   referred to in your report that was back by the --
4   or in your transmittal that is related to the maid's
5   quarters off the kitchen and the maid's quarters had
6   an area of water damage.
7        A.   Okay.
8        Q.   Do you recall that?
9        A.   Not --
10        Q.   Okay.  Fair enough.
11             Then going on, you say, "HVAC
12   system's very dusty."
13             Do you see that?
14        A.   Yes.
15        Q.   Looked like they could possibly have
16   condensation or they had mold growth on them.
17   Right?
18        A.   Right.
19        Q.   And the HVAC system being dusty, that
20   would be another -- that happens when homes sit
21   unoccupied, true?
22        A.   True.
23        Q.   Okay.  So that could be an explanation
24   for that as well, right?
25        A.   Correct.

Page 61

1        Q.   And then Page 3, there's a -- it says,
2   "This is a big area under here where we have fungal
3   growth, and we got it in the mats and stuff down
4   there, along the side walls and the back walls."
5             And those are the cabinets that were
6   in that maid's quarters -- I mean, the butler
7   pantry, between the dining room and the kitchen,
8   right?
9        A.   Right.
10        Q.   And we all opened up those cabinets and
11   looked, and there's dishes and stuff in there,
12   right?
13        A.   Right.
14        Q.   Okay.  And then you say, on Page 4,
15   "Seeing a lot of dishes, which can be cleaned," you
16   say, right?
17        A.   Yes.
18        Q.   All right.  And then also on Page 4, "We
19   have an area of water damage here" -- and it doesn't
20   say where it is -- but "it looks like it may have
21   been fixed."  And then you say, "I think we're okay
22   back here."  Right?  I'm on Page 4.
23        A.   Okay.  Yes.  Okay.  I see that.
24        Q.   All right.  And then 4 and 5, you talk
25   again about the vents to the AC system, right?

Page 62

1    A.   Right.
2    Q.   And I think we're upstairs now, because
3    you say, "Got some growth in the caulking around
4    these windows from the condensation, because it's
5    all very wet."
6         Do you remember that?
7    A.   No.
8    Q.   Do you remember which room that was?
9    A.   No.
10   Q.   All right.
11   A.   It says up here the master, so...
12   Q.   We may be upstairs?
13   A.   Yeah.
14   Q.   Okay.
15   A.   But it's unclear.
16   Q.   I'll tell you what, I'm going to switch
17   gears.  That's not helping at all, the way that
18   transcript is.  I'll do my best to get you the video
19   so you can see it.
20   A.   Okay.
21   Q.   And that might refresh your recollection.
22   All right?
23   A.   It's hard to know which room we're
24   standing in.
25   Q.   I know.  Because we didn't say it for the

Page 63

1    record, so we didn't get it that way.
2         So move back to Exhibit Number 12,
3    which is your report.  And here you have one of
4    those charts that I've seen in your reports, right?
5    A.   Correct.  Yes.
6    Q.   You go room by room, and then a bunch of
7    questions, you ask yes or no.
8    A.   Right.
9    Q.   All of the answers on elevated moisture
10   are no, right?
11   A.   Right.
12   Q.   And that was because of what?
13   A.   We didn't find any high moisture
14   readings.
15   Q.   Okay.  So that's with the moisture meter?
16   A.   Right.
17   Q.   And what level is high on a moisture
18   meter?
19   A.   It depends on what kind of service it is.
20   So if it's drywall, it's like 14.  If it's wood --
21   It just varies based on what you put it on.
22   Q.   Well, did you write down or reference
23   what those moisture readings were in any particular
24   location?
25   A.   I don't know.  I would have to look on my

Page 64

1    field notes.
2    Q.   And those aren't here?
3    A.   Correct.
4    Q.   Okay.  But you didn't see anything there,
5    right?
6    A.   Right.
7    Q.   And so water impact noted.  And you
8    checked all the boxes for all the rooms yes, they're
9    here.  Right?
10   A.   Right.
11   Q.   And did you see water impact in each of
12   those rooms?
13   A.   I would have to go back through and look
14   at the photos.  It could be something as simple as
15   swelling on the windowsill.  So we would have to
16   look back through it.
17   Q.   Well, do you see in the photos that are
18   attached there?  You don't have photos of every room
19   to start with, right?
20   A.   Right.
21   Q.   So you wouldn't know based on the photos
22   alone, would you?
23   A.   Not on this level, no.
24   Q.   Okay.  So is it fair to say that you
25   can't tell me what the basis is for water impact on

Page 65

1    any of those rooms?
2    A.   Yes.
3    Q.   Okay.  And you say "mold growth noted."
4    Did you see actual mold growth in all of these
5    rooms?
6    A.   This came from the samples, the sample
7    levels, because they were so high.
8    Q.   Okay.  So I thought mold growth noted was
9    what you saw with your eyes.  It's not?
10   A.   Should be.
11   Q.   It should be what you saw with your eyes,
12   right?
13   A.   Correct.
14   Q.   And I get what your samples say.
15   A.   Right.
16   Q.   And you have -- the next column is
17   samples collected, and then the results from those
18   samples.
19   A.   Correct.
20   Q.   Are you saying that's a mistake and that
21   auto-filled by mistake?
22   A.   In some areas, yes.
23   Q.   Okay.  Well, can you tell us which --
24   where you saw actual mold growth and in which one of
25   those rooms?

17 (Pages 62 to 65)

Page 66

1      A.   Going to my floor plan, it would have
2  been the enclosed porch, the butler's pantry, the
3  master and bedroom 1 and bedroom 2.
4      Q.   Okay.  So the "Y" would be correct for
5  those rooms, correct?
6      A.   Correct.
7      Q.   But not correct for the remainder?
8      A.   Correct.
9      Q.   So we've got kitchen.  That "Y" should be
10 an "N," right?
11     A.   Correct.
12     Q.   Upstairs bedroom, the "Y" should be an
13 "N," right?
14     A.   Correct.
15     Q.   Dining room should be -- the "Y" should
16 be an "N," right?
17     A.   Correct.
18     Q.   Living room, "Y" should be an "N,"
19 correct?
20     A.   Correct.
21     Q.   So about half of those are wrong, right?
22     A.   Right.
23     Q.   Okay.  So sample results.  This is you're
24 picking up directly from the samples, either air
25 samples or tape swab samples; is that correct?

Page 67

1      A.   Correct.
2      Q.   But you don't have samples for all of
3  these rooms that are marked yes, do you?
4      A.   If it were visual -- well --
5      Q.   Well, this column is for samples
6  collected, right?
7      A.   Right.
8      Q.   And look at upstairs bathroom.  And
9  confirm for me that you didn't take any kind of
10 sample in the upstairs bathroom.
11     A.   You are correct.
12     Q.   And that's a mistake there?
13     A.   Yes.
14     Q.   All right.  So when it says AEC sample
15 results for the upstairs bathroom, that is also not
16 correct?
17     A.   Correct.
18     Q.   And the next category is the S500
19 category.  And that's the category of water, right?
20     A.   Right.
21     Q.   And you agree that the only Category 3
22 water was located underneath the house in the crawl
23 space, correct?
24     A.   Correct.
25     Q.   And that water entered none of these

Page 68

1  rooms, true?
2      A.   True.
3      Q.   And your conclusion about Category 3
4  water is not true as to these particular rooms,
5  correct?
6      A.   Correct.
7      Q.   And your opinion about Category 2 water
8  is also not true with respect to these particular
9  rooms?
10     A.   Correct.
11     Q.   So --
12     A.   It should have been.
13     Q.   You were -- When you were doing that at
14 the beginning of your report, you were talking
15 about:  Somewhere in this house, I found Category 3
16 water, but only in that spot.
17          You can't then take that and say:  I
18 found it in every spot that's listed.
19          Correct?
20     A.   Correct.
21     Q.   So that is incorrect, true?
22     A.   Yes.
23     Q.   All right.  And the same goes for S520
24 Condition 3, which is visible mold growth, right?
25     A.   Right.

Page 69

1      Q.   So you say that Condition 3 exists in all
2  of these rooms.  And that's not true, right?
3      A.   True.
4      Q.   It's only located in the rooms where you
5  actually saw visible mold growth, right?
6      A.   Correct.
7      Q.   And that's the same ones that you just
8  listed earlier.  About half of these you did see
9  visible mold growth?
10     A.   Correct.
11     Q.   But the other half, you did not, correct?
12     A.   Correct.
13     Q.   And for those where you did not, it is
14 not correct to have Condition 3 listed there, true?
15     A.   True.
16     Q.   All right.  And the next page is the HVAC
17 system.  You've agreed you were not making any
18 opinions about that --
19     A.   Correct.
20     Q.   -- right?
21          And also personal items, you are not
22 making any opinions about that, right?
23     A.   Correct.
24     Q.   Okay.  So going to the sampling data,
25 beginning on Page 11.  Are you with me?

18  (Pages 66 to 69)

Page 70

1    A.   Yes.
2    Q.   You took air samples in a number of
3  rooms.  That's the first one on your list; is that
4  right?
5    A.   Right.
6    Q.   And I think you told me yesterday that
7  you had been provided a copy of George Coto's
8  report.  Is that also true?
9    A.   Yes.
10    Q.   I'll mark this as Exhibit 40.
11        (Exhibit 40 marked.)
12    Q.   (By Mr. Boone)  See if that refreshes
13  your recollection of the copy of that report.
14    A.   Yes.
15    Q.   And what I want to do, just so you know
16  what we're going to do, is, I want to talk --
17  because you met George Coto that same day, on
18  December 10th, right?
19    A.   Correct.
20    Q.   And you did your sampling when we first
21  got there in the morning, is my recollection.  And
22  then you left presumably to go to Hiatt's and the
23  Hill's house.
24    A.   Correct.
25    Q.   All right.  Mr. Coto did his sampling

Page 71

1  right after you left, same day.
2    A.   I believe we were in the house at the
3  same time.
4    Q.   Yeah.  Were you testing at the same time?
5    A.   Yes.
6    Q.   Okay.  So it was actually side-by-side
7  testing?
8    A.   Correct.
9    Q.   And go to the spore trap report of his,
10  which is -- it's Appendix D of his report.  And
11  that's about this much through.
12    A.   Okay.
13    Q.   It is EMLab results?
14    A.   Okay.
15    Q.   Are you with me?
16    A.   Yes.
17    Q.   What I want to do is look at yours
18  side-by-side.
19    A.   Okay.
20    Q.   And let's pull up yours in Exhibit 12,
21  which are at the very end, right?
22    A.   Yes.
23    Q.   And let's just look -- I mean, the
24  most -- Let's just look at the dining room, for
25  example.  I don't think we have to do this much.

Page 72

1  Are you with me?  I want to compare Mr. Coto's spore
2  trap -- And these are -- we're talking to apples and
3  apples, right?
4    A.   Right.
5    Q.   You did a spore trap analysis and got a
6  result that the total fungi was 390,000 spores per
7  cubic meter, right?
8    A.   Correct.
9    Q.   He did a spore trap sample at the same
10  time in the dining room, and he got 52,000 spores
11  per cubic meter; is that right?
12    A.   Correct.
13    Q.   He saw -- or the spore trap he collected
14  had a total of a 104 spores, right?
15    A.   Yes.
16    Q.   And yours had a total of 8900 spores,
17  right?
18    A.   Right.
19    Q.   Is that the kind of variability that you
20  could expect side-by-side?
21    A.   Well, we weren't doing in the same room
22  at the same time.  So he was moving through, and we
23  were on both sides of the house.  So it's not like
24  we were let's start our machines.
25    Q.   Right.

Page 73

1    A.   But you can expect huge amounts of
2  variability depending on who moved -- If somebody
3  moved through there, it could have lowered the
4  numbers or raised the numbers.
5    Q.   I gotcha.
6        So I guess the difference between --
7  in your view, between 390,000, which is your result,
8  and 52,000 would be expected, is what you're saying?
9  Or could be expected.
10    A.   It could be.
11    Q.   Let me get at it this way:  Does this
12  necessarily mean that somebody didn't do it right?
13    A.   No.
14    Q.   Okay.  So I assume Mr. Coto knows how to
15  do it.  I assume you know how to do it.  The
16  divergence of these results is not in how the mold
17  assessment consultant did the testing.  Is that your
18  opinion?
19    A.   Yes.
20    Q.   It is just what can happen when you test
21  the same room at different times.
22    A.   Correct.
23    Q.   Okay.  Which is -- But this was on the
24  same day, minutes apart?
25    A.   Yeah.  Maybe 20, 30.

Page 74

1    Q.   Right.
2         And we have a wide divergence,
3    390,000 for you and 50,000 for him.
4    A.   Right.
5    Q.   And nothing in that disparity shocks your
6    mind as to what's going on?
7    A.   No.
8    Q.   Okay.  Let me ask you, because -- do you
9    remember a dried up --
10   A.   Pear.
11   Q.   -- pear in the dining room?
12   A.   Yes.
13   Q.   Okay.  And it was -- Where was it?  It
14   was sitting out in the open on some --
15   A.   It was like on a side table.
16   Q.   Right.
17        So you saw -- and it was what had
18   been a pear that had been left there and was
19   completely rotten and moldy.
20   A.   Correct.
21   Q.   Okay.  And that was right in that room
22   where this testing was done, correct?
23   A.   Correct.
24   Q.   All right.  And obviously, dead fruit,
25   that dead fruit had mold on it, right?

Page 75

1    A.   Right.
2    Q.   Which had nothing to do with the
3    condition of the home, right?
4    A.   Right.
5    Q.   Everything to do with the fact that
6    somebody had left a pear there and it had rotted; is
7    that right?
8    A.   Correct.
9    Q.   All right.  Could that be an explanation
10   for some of these results in that room?
11   A.   Yes.
12   Q.   Okay.  And do you also remember that you
13   and your husband turned on the ceiling fans?
14   A.   I do not recall that at all.
15   Q.   Okay.  Do you know or did you write
16   anywhere where the ceiling fans were on or off?
17   A.   No.
18   Q.   We don't have your field notes, right?
19   A.   Right.
20   Q.   Okay.  If the ceiling fans were on -- and
21   I don't believe that there was one in the dining
22   room.  But it's an open floor plan to the living
23   room.  Is that your recollection?
24   A.   Yes.
25   Q.   And there was a ceiling fan in that room.

Page 76

1    If a ceiling fan or something else is moving the
2    air, then that could take the spores from the rotten
3    peach and move them certainly in the dining room and
4    maybe throughout the house.  Is that fair?
5         MR. BRZEZINSKI:  Objection.  Are you
6    asking her to assume that there was a ceiling fan?
7    Are you telling her there was a ceiling fan?  Or are
8    you asking if she knows there was a ceiling fan?
9         THE WITNESS:  I do not recall even
10   turning on lights when we were there.
11   Q.   (By Mr. Boone)  All right.
12   A.   So I'm not --
13   Q.   You don't recall?
14   A.   Right.
15   Q.   That's fair.
16        Let me move to the next part in
17   Page 12 of your report.
18        And let me also, before we leave
19   Coto's Exhibit 40, all of the spore trap numbers
20   that Coto got on the same day, they're all different
21   than the ones that you got, right?
22   A.   Right.
23   Q.   Generally speaking, yours are higher and
24   his are lower, right?
25   A.   Correct.

Page 77

1    Q.   And you also recall that at the Paisanos,
2    it had just been -- or do you recall that it had
3    just been raining outdoors?
4    A.   Yes.
5    Q.   All right.  And so the outdoor control
6    sample was taken after the rain, which we had talked
7    about earlier would lessen the amount of spores in
8    the air outside?
9    A.   Correct.
10   Q.   So on the one hand, we have a situation
11   where we have an unoccupied house, perhaps with
12   ceiling fans on, blowing stuff around, and on the
13   other hand, we have a control where the rain has
14   just occurred, right?
15        MR. REED:  Objection; form.
16        THE WITNESS:  Right.
17   Q.   (By Mr. Boone)  The former would raise
18   the spore count in the indoors, correct?
19   A.   Correct.
20   Q.   And the latter would lower the spore
21   count on the outdoors, correct?
22   A.   Correct.
23   Q.   All right.  The surface sample in your
24   Page 12 SFC, you state that the results are not
25   satisfactory.  Do you see that?

Page 78

1    A.   Yes.
2    Q.   And you agree that that is just
3    Kristy Beck-Miller and not -- that's just your
4    opinion, correct?
5    A.   Correct.
6         MR. REED:  Objection; form.
7    Q.   (By Mr. Boone)  Not based on any
8    standard, guideline or scientific method, true?
9         MR. REED:  Objection; form.
10        THE WITNESS:  True.
11   Q.   (By Mr. Boone)  So all of these swab
12   samples are either rare or low or medium, correct?
13   A.   Correct.
14   Q.   And there is no written standard,
15   guideline, scientific method, peer-reviewed study
16   that tells you -- that you're aware of that tells
17   you that those levels are satisfactory or
18   unsatisfactory, true?
19   A.   True.
20        MR. REED:  Objection; form.
21   Q.   (By Mr. Boone)  In fact, the opposite is
22   true.  There are no such standards, correct?
23   A.   Correct.
24   Q.   But you reached the conclusion, just
25   Kristy Beck-Miller, not satisfactory?

Page 79

1         MR. REED:  Objection; form.
2         THE WITNESS:  Correct.
3    Q.   (By Mr. Boone)  You had the crawl space
4    bulk sample there where you were still awaiting
5    results, right?
6    A.   Right.
7    Q.   And then the RLU, which is the ATP
8    results, again, you don't take a picture of those,
9    and your field notes would have whatever it is that
10   was handwritten at the time, right?
11   A.   Right.
12   Q.   And these are swab samples that you took
13   in the rooms listed; is that right?
14   A.   Yes.
15   Q.   Again, ATP measures all kinds of things,
16   not just mold, right?
17   A.   Correct.
18   Q.   And this is a method to analyze
19   cleanliness, correct?
20   A.   Correct.
21   Q.   And as you talked about, the fact that
22   the home had been unoccupied for approximately two
23   months could easily explain why the ATP results
24   showed unclean surfaces, true?
25        MR. REED:  Objection; form.

Page 80

1         THE WITNESS:  True.
2    Q.   (By Mr. Boone)  Moving to the laser
3    particle sample.  This is measuring the particle in
4    the air again, right?
5    A.   Right.
6    Q.   And it does not reference or pick up mold
7    at all, right?
8    A.   Right.
9    Q.   Just the stuff in the air, right?
10   A.   Right.
11   Q.   That would be affected by ceiling fans if
12   they were turned on, true?
13   A.   True.
14   Q.   And these conclusions about what is
15   satisfactory or not satisfactory are not based on
16   any standards, guideline or peer-reviewed study.
17        MR. REED:  Objection; form.
18   Q.   (By Mr. Boone)  Correct?
19   A.   Correct.
20   Q.   These are your opinions and your opinions
21   alone, not based on anything other than what you
22   think?
23        MR. REED:  Objection; form.
24        THE WITNESS:  Correct.
25   Q.   (By Mr. Boone)  All right.  Relative

Page 81

1    humidity, you say those numbers are -- you have
2    those numbers there.  And you saw high.  And those
3    are above the ASHRAE and EPA limits, aren't they?
4    A.   Yes.
5    Q.   And you also note the temperature.  I
6    don't remember it being low 60s.  But that's cool
7    for a living space, isn't it?
8    A.   Yes.
9    Q.   What I'm getting at here is, I'm
10   wondering if those relative humidity results were
11   explained or could be explained by the fact that the
12   heating system or air conditioning system had not
13   been turned on and was not pulling the humidity out
14   of the home.
15   A.   Yes.
16   Q.   Okay.  So you think the same thing?
17   A.   Yes.
18   Q.   Okay.  And that could be explained as
19   well by the fact that the home was not occupied at
20   the time, true?
21   A.   True.
22   Q.   All right.  Let's move to the protocol
23   section, which is Page 16.  You with me?
24   A.   Yes.
25   Q.   And remind me again how you selected

Page 82

1   these rooms.
2       A.   Based on observations and air testing.
3       Q.   Okay.  Is it either-or both or what?
4       A.   Both.
5       Q.   Okay.  And so the master bedroom -- And
6   is this the place where we would need to look at
7   your diagram to understand what you're really
8   talking about?
9       A.   Yes, sir.
10      Q.   And that's further in your report.  So
11  let's talk about the master bedroom, which is on the
12  second page of the diagram; is that right?
13      A.   Yes.
14      Q.   And what needs to be done there?  This
15  was an area where -- am I right, was this the area
16  behind the bed?
17      A.   Yes.
18      Q.   Okay.  And what did you see?  And what
19  are you concluding there?
20      A.   I believe there was water damage and
21  cracking.
22      Q.   All right.  And I see bedroom 1 in the
23  front of the home.  And what was the issue there?
24      A.   Water damage under the windows.
25      Q.   All right.  And then bedroom 3.

Page 83

1       A.   Water damage and mold on that window, I
2   believe.
3       Q.  Bedroom 2.  Okay.
4            And then the maid's quarters, which
5   is downstairs.
6       A.   And these were due to settled spores or
7   high mold counts in the Air-O-Cells.
8       Q.   So you're making a recommendation for
9   remediation -- Well, I don't see anything in the
10  maid's quarters on the diagram, is there?
11      A.   No.
12      Q.   All right.  So what are they supposed to
13  do in the maid's quarters?
14      A.   Air wash and clean and Fungistat fog.
15      Q.   Okay.  But that's based only on air
16  sample results, not any finding of visible mold?
17      A.   As far as I recall.
18      Q.   Okay.  Well, that's what your report
19  reflects, right?
20      A.   Right.
21      Q.   And I thought you told me earlier that
22  you only do remediation where you have visible mold
23  growth.
24      A.   Well, when we have air samples that are
25  super high like that, those areas generally need to

Page 84

1   be cleaned.
2       Q.   Okay.  Well, the air samples were
3   throughout the house.  And you don't have every room
4   listed here, do you?
5       A.   I believe so.  Living room, the bedrooms,
6   dining room, kitchen, upstairs bathroom.
7       Q.   All right.  So what is to be done in the
8   living room?
9       A.   The content cleaning -- or consideration
10  of the contents, air wash action and Fungistat
11  fogging.
12      Q.   And that's based only on air samples, not
13  any seeing of visible mold?
14      A.   Correct.  I believe so.  It's been too
15  long since I walked through there too.  But, right.
16      Q.   I'm not asking you -- Everything you need
17  to refresh your recollection is in this report,
18  correct?
19      A.   Correct.
20      Q.   So if you need to see something, please,
21  now's the time.
22      A.   Okay.
23      Q.   But I didn't see any -- Well, your report
24  does not reflect that you saw any visible mold in
25  the living room whatsoever.

Page 85

1       A.   Right.  These are based on the high
2   fungal levels of the air samples.
3       Q.   All right.  And the dining room, same
4   thing?
5       A.   Yes.
6       Q.   So no visible mold, air testing only?
7       A.   Correct.
8       Q.   And the kitchen, same thing; no visible
9   mold, air testing only?
10      A.   Correct.
11      Q.   And did you have air tests in the
12  kitchen?  You did.  Okay.
13           And then upstairs bathroom.  What is
14  that based on?
15      A.   Just because everything else in the house
16  has such high levels.
17      Q.   Okay.  Well, there's two bathrooms
18  upstairs, right?
19      A.   Yes.  So it should have said master -- or
20  upstairs bathrooms, I suppose.
21      Q.   Well, is it one or both?
22      A.   Both.
23      Q.   Okay.  And for these two rooms, it is not
24  even based on air sampling in those rooms, correct?
25      A.   Correct.

Page 86

1    Q.   So you didn't see mold present in those
2    rooms, true?
3    A.   True.
4    Q.   And the air samples weren't done in those
5    rooms, true?
6    A.   True.
7    Q.   But you want to --
8    A.   Air wash and clean.
9    Q.   All right.  Well, your note says that --
10   you opine wall ceiling and flooring material as
11   marked on the attached diagram requires removal and
12   discard.
13   A.   But there are no areas marked in those
14   rooms.
15   Q.   Okay.  I see.  So you don't -- nothing
16   needs to be done.  But you don't even write that
17   those rooms should be air-washed.
18   A.   I mean, I have it under entire home, air
19   wash, air scrub and Fungistat fog.
20   Q.   All right.  And I believe, if I'm
21   correct, that you have withdrawn that recommendation
22   based on what we've talked about before; is that
23   right?
24   A.   Correct.  Yes.
25   Q.   And then beginning on Page 21, you're

Page 87

1    withdrawing and no longer -- well, don't have any
2    opinion with respect to the HVAC system, right?
3    A.   Right.
4    Q.   And no opinion with respect to the
5    personal items in the home?
6    A.   Correct.
7    Q.   And in fact, you didn't see any visible
8    mold growth on any content items at the Paisano
9    home, true?
10   A.   True.
11   Q.   In fact, remember, we were asking you
12   about that.  You confirmed that -- You took us to
13   one dresser that had some stuff on there, and we all
14   concluded that that was probably some type of makeup
15   goo --
16   A.   Yeah.
17   Q.   -- left on that surface, true?
18   A.   True.
19   Q.   And that was -- So there was nothing on
20   any content that you saw in that home?
21   A.   Correct.
22   Q.   All right.  And you did not opine that
23   those -- any of those items needed to be cleaned or
24   stored in any form or fashion, true?
25   A.   True.

Page 88

1    Q.   And if Mrs. Paisano or the Paisanos threw
2    those items away, that was not based on anything you
3    told them; is that true?
4    A.   True.
5    Q.   And if they say they did it based on your
6    report, then they were not correct in relying on
7    that report.  Is that fair?
8         MR. BRZEZINSKI:  Object to form.
9         THE WITNESS:  Fair.
10   Q.   (By Mr. Boone)  That's their decision.
11   As you said over and over and over again, it has
12   nothing to do with your opinions or your
13   recommendations, true?
14   A.   True.
15   Q.   All right.  And ultimately, the crawl
16   space result did come back; is that right?
17   A.   Yes.
18   Q.   And it showed total coliform present,
19   correct?
20   A.   Correct.
21   Q.   And E. coli absent, right?
22   A.   Correct.
23   Q.   And total coliform would be an indication
24   of sewage?
25   A.   Correct.

Page 89

1    Q.   And your recommendation about that was to
2    remove the dirt -- a certain level of dirt to get
3    rid of that?
4    A.   Correct.
5    Q.   And you don't know, but -- well, that was
6    ultimately done.  But that's all that would, in your
7    view, need to be done underneath the home, true?
8    A.   True.
9    Q.   All right.  You want to take a break
10   while we move to the next family?
11   A.   Sure.
12        (Short break.)
13   Q.   (By Mr. Boone)  So let's move to the
14   Vinales report, which is Exhibit 16.  You with me?
15   A.   Yes.
16   Q.   Now, same questions about this, that all
17   of your opinions with respect to the Vinales home
18   are contained within the four corners of this
19   report, true?
20   A.   True.
21   Q.   And you have no opinions other than what
22   are set forth in this report, right?
23   A.   Right.
24   Q.   And that all the facts and data you
25   considered and all the information you considered

23  (Pages 86 to 89)

Page 90

1    and the bases for all of your opinions are contained
2    in the four corners of Exhibit 16, right?
3        A.    Right.
4        Q.    And you would also adopt and abide by the
5    general testimony we established on the Hiatt
6    report, because a lot of those things are in here as
7    well, true?
8        A.    True.
9        Q.    So this report is the first of the three
10   that occurred on April 5th, 2019, right?
11       A.    Right.
12       Q.    And I know you live in Dallas or Fort
13   Worth normally, so this is not your normal neck of
14   the woods, right?
15       A.    Right.
16       Q.    So we've seen both -- you were here for
17   two days, basically, doing testing.  One day,
18   April 5th of 2019, right?
19       A.    Right.
20       Q.    And on that day, you did the Vinales, the
21   Wolfs and the Daniels, right?
22       A.    Correct.
23       Q.    And then you were here December 10th,
24   2019, right?
25       A.    Right.

Page 91

1        Q.    And on that date, you did the Paisano,
2    Hiatts and Hills, right?
3        A.    Right.
4        Q.    Okay.  And how long does it take you to
5    do one of these assessments?
6        A.    Hour, hour and a half.
7        Q.    Okay.  So you got about -- not counting
8    getting to and from and lunch and all that stuff,
9    but you got about six hours per day doing the stuff
10   you're doing to generate these reports?
11       A.    Right.
12       Q.    All right.  So all these reports are
13   basically the product of about 12 hours of work,
14   roughly?
15       A.    Well, I mean, physical onsite.
16       Q.    Okay.  Some report-generation work in
17   addition to that?
18       A.    And laboratory, you know, reviewing the
19   results and things like that.
20       Q.    Okay.  So how much longer does it take
21   you to generate a report and all that?
22       A.    Probably another two hours per report.
23       Q.    Okay.  So you got two hours for the
24   inspection, two hours for the report.  We've got six
25   reports.  We're looking at roughly 24 hours, right?

Page 92

1        A.    Right.
2        Q.    Okay.  So let's go to Exhibit 16 and kind
3    of walk our way through like we've done with the
4    others.
5             The first thing you do is, in your
6    transmittal letter -- which is always at the front,
7    right?
8        A.    Right.
9        Q.    You kind of do your room-by-room
10   analysis, right?
11       A.    Right.
12       Q.    And the first one is the HVAC system.
13   But you are withdrawing all your comments about
14   that, true?
15       A.    True.
16       Q.    Because you didn't inspect it, and you're
17   not qualified to render those opinions.  Fair?
18       A.    Fair.
19       Q.    Sunroom.  You say visible mold growth on
20   the windows and on personal items in the area.  You
21   don't specify which personal items, though, correct?
22       A.    Correct.
23       Q.    And your photographs don't really show us
24   that either, do they?
25       A.    It's the furniture, like the desk that

Page 93

1    was in the sunroom.
2        Q.    Okay.  But you're going to say the same
3    thing about contents on that, that you didn't do an
4    item-by-item work on that?
5        A.    Correct.
6        Q.    And not make any opinions about what that
7    means or what needs to happen with any particular
8    piece of furniture, true?
9        A.    True.
10       Q.    All right.  So when you say that the area
11   is to be considered cross-contaminated and all
12   personal property will require remediation, you're
13   saying potentially --
14       A.    Correct.
15       Q.    -- that's the case, right?
16       A.    Right.
17       Q.    That you did not do the work required by
18   the standards to make that determination, true?
19       A.    True.
20       Q.    And therefore, you're not -- you're
21   withdrawing that statement and opinion.  Fair?
22       A.    Fair.
23       Q.    All right.  You say that the sunroom
24   windows were tested using the ATP method.  And
25   that's the method for cleanliness, correct?

24  (Pages 90 to 93)

Page 94

1    A.   Correct.
2    Q.   And you say that the results showed them
3  to be heavily contaminated by fungi.  Do you see
4  that?
5    A.   Yes.
6    Q.   That statement is not correct?
7    A.   **Correct.  It should just be heavily**
8  **contaminated by whatever.**
9    Q.   Okay.  But you cannot say from the ATP
10  method that it was fungi at all?
11    A.   Correct.
12    Q.   And so that statement, heavily -- ATP
13  method which showed it to be heavily contaminated by
14  fungi, is false?
15    A.   Correct.
16    Q.   You can say that it's dirty, right?
17    A.   Right.
18    Q.   That's all that the ATP test tells you,
19  right?
20    A.   Right.
21    Q.   And you make that statement over and over
22  and over again in this transmittal letter, do you
23  not?
24    A.   Yes.
25    Q.   And it is false in each place where you

Page 95

1  say it, correct?
2    A.   Correct.
3    Q.   For the same reasons, correct?
4    A.   Correct.
5    Q.   On the kitchen, you say that a sample was
6  taken in an area where the wood was warped.
7    A.   Correct.
8    Q.   Where?
9    A.   **I believe it was in the cabinet.  Just**
10  **outside the cabinet.  (Reviewing photographs.)**
11    Q.   Is it the cabinet -- Well, can you tell
12  me where?
13    A.   **It was right in this area of the cabinet,**
14  **on the -- where the sink is.**
15    Q.   So in the cabinet underneath the sink?
16    A.   **In the cabinet beside the sink.**
17    Q.   But underneath the counter?
18    A.   **Like more at floor level, if I recall.**
19    Q.   Well, what -- We don't have your field
20  notes, right?
21    A.   Correct.
22    Q.   They don't say where you took the sample,
23  right?
24    A.   Right.
25    Q.   And if you say there was water damage

Page 96

1  there, then no one has anything to go by on how to
2  find it or fix it, right?
3    A.   Correct.
4    Q.   And there is no site diagram on this
5  report, is there?
6    A.   No.
7    Q.   So we don't have any idea where you took
8  that sample or where that wood was; is that true?
9    A.   True.
10    Q.   And that is not the way these things are
11  supposed to be done, correct?
12    A.   Correct.
13    Q.   You are a -- Mold assessment is supposed
14  to document what you find and where specifically,
15  true?
16    A.   True.
17    Q.   And that did not happen, correct?
18    A.   Correct.
19    Q.   The results themselves are what kind of
20  results?  And I'm on the kitchen now.  So I think
21  it's --
22    A.   **Oh.  Are we --**
23    Q.   Right?
24    A.   **I'm sorry.  Under the kitchen sink -- or**
25  **actually, next -- it was -- that was under the**

Page 97

1  **kitchen sink, now that I've seen the --**
2    Q.   So --
3    A.   **And it showed levels of Chaetomium and**
4  **Penicillium and Aspergillus.**
5    Q.   Okay.  It showed very few Chaetomium and
6  Penicillium/Aspergillus, correct?
7    A.   Correct.
8    Q.   And the tape sample reference in your
9  report says kitchen sink, correct?
10    A.   Correct.
11    Q.   And your refreshed recollection now is
12  that you took that sample underneath the kitchen
13  sink; is that right?
14    A.   Right.
15    Q.   And you do recognize, do you not, that
16  underneath the kitchen sink is a place where there
17  is water damage in a lot of houses, true?
18    A.   True.
19    Q.   Because kitchen sinks from time to time
20  leak, and water gets under that space, true?
21    A.   True.
22    Q.   All right.  So the presence of mold
23  underneath a kitchen sink is not abnormal, right?
24    A.   Right.
25    Q.   And you say that it contains a mycotoxin

25  (Pages 94 to 97)

Page 98

1    producing fungi.  Do you see that?
2        A.   Yes.
3        Q.   You are aware that only some species of
4    Chaetomium produce mycotoxins, correct?
5        A.   Correct.
6        Q.   Not all species, right?
7        A.   Correct.
8        Q.   And this sample result does not tell you
9    which species of Chaetomium was present, correct?
10       A.   Correct.
11       Q.   Only the genera, correct?
12       A.   Correct.
13       Q.   So the statement that a mycotoxin
14   producing fungi was found under the sink is not
15   true, correct?  Because you don't know.
16       A.   True.
17       Q.   And you did not test for mycotoxins
18   there, and you could have, right?
19       A.   I have the ability.
20       Q.   Right.  But you did not?
21       A.   Did not.
22       Q.   You have that heavily contaminated by
23   fungi statement regarding ATP results.  That's
24   false, right?
25       A.   Correct.

Page 99

1        Q.   The back bathroom.  On contents, you're
2    withdrawing and not making any opinions about those,
3    right?
4        A.   Right.
5        Q.   The water intrusion from several areas,
6    what were you referring to there?
7        A.   I believe it was a window issue.
8        Q.   You do not have a picture of it; is that
9    correct?
10       A.   (Reviewing photographs.)  You cannot
11   tell.
12       Q.   Okay.  And you don't have a picture of
13   it, right?
14       A.   Correct.
15       Q.   You don't have a diagram for the Vinales
16   home at all, right?
17       A.   Correct.
18       Q.   And your transmittal letter here does not
19   tell us what it is that you saw, correct?
20       A.   Correct.
21       Q.   And that is not consistent with the
22   requirements for a mold assessment, true?
23       A.   True.
24       Q.   And the downstairs bedroom, you say you
25   saw fungal growth along the edges of the hardwood

Page 100

1    floors.  Do you see that?
2        A.   Yes.
3        Q.   Do you have a picture of that?
4        A.   Yes.
5        Q.   And would you write --
6        A.   Through there.
7        Q.   Right.  Write on the margins there
8    "hardwood floors."
9        A.   (Complies.)
10       Q.   And did you see visible mold growth
11   there?
12       A.   Yes.
13       Q.   Then write "VMG," right?
14       A.   (Complies.)
15       Q.   And --
16       A.   And here.
17       Q.   And the other place too?
18       A.   Yes.
19       Q.   Okay.  So help me see on those two photos
20   where the actual fungal growth is.
21       A.   You can see it, the discoloration, all
22   through here.  And especially up against the wall
23   area.  This one is -- you can see a bit up here of
24   just discoloration.  But you can actually -- This
25   one's not a great picture, but this one shows the

Page 101

1    actual green discoloration.
2        Q.   And this looks like, to me, to be
3    underneath a bed.  Is that what I'm seeing?
4        A.   Behind the bed, yes.
5        Q.   Okay.  Behind the bed.
6        A.   Right.
7        Q.   And it's filthy.
8        A.   Correct.
9        Q.   So it has not been -- there is dust and
10   dirt.  Not casting aspersions.  Underneath my bed
11   looks exactly the same.  But where there is dust and
12   dirt, that is an invitation for mold to come and
13   live there.  Is that true?
14       A.   Correct.
15       Q.   And had that been properly cleaned, we
16   have no idea whether that same mold growth would be
17   there, true?
18       A.   True.
19       Q.   And whatever happens, that area has not
20   been cleaned and could be cleaned to eliminate both
21   the dirt, the dust, as well as the mold, right?
22       A.   Right.
23       Q.   All right.  The formal dining room,
24   you're removing any opinions regarding the contents
25   there, correct?

26 (Pages 98 to 101)

Page 102

1    A.   Correct.
2    Q.   And you say "sweating windows."  But do
3  you have any pictures of that?
4    A.   Does not appear.
5    Q.   All right.  And that is contrary to the
6  requirements of a mold assessment, true?
7    A.   True.
8    Q.   Upstairs bathroom.  No visible mold noted
9  there, right?
10   A.   Right.
11   Q.   And all you say is -- Well, let me ask
12  you.  Do you have a photograph of that?  I think you
13  do.
14   A.   I've got the picture of the shower, but
15  this is talking about the contents.
16   Q.   Right.  But is that the bathroom you're
17  talking about?  Is that the upstairs bathroom?
18   A.   Yes.
19   Q.   And I'm seeing mold -- visible -- Well,
20  what is that on the bathroom tile?
21   A.   That looks to me to be like a calcium
22  deposit.
23   Q.   Okay.  Is that not visible mold growth?
24   A.   It doesn't appear to be.
25   Q.   All right.  And you didn't see any in

Page 103

1  that bathroom?
2    A.   Correct.  It was just about the personal
3  contents.
4    Q.   All right.  But you're not making any
5  opinions about those contents in that room.
6    A.   Correct.
7    Q.   Or any room, right?
8    A.   Right.
9    Q.   All right.  Master bedroom.  Where did
10  you see visible water damage, fungal growth?
11   A.   Yeah.  It was all along several of the
12  walls and ceiling, which are what these two pictures
13  are.  See, you can -- there's a big crack.
14   Q.   Can you put "master bedroom" beside
15  those?
16   A.   Yes.  (Complies.)  There's more back
17  here.
18   Q.   And those are all photos of visible mold
19  growth in the master bedroom?
20   A.   And water damage as well.
21   Q.   Okay.  You say from a leaking roof?
22   A.   That's what it appeared to be.
23   Q.   Okay.  You are -- On the next page,
24  Page 3, you are removing your opinion about the
25  entire home, correct?

Page 104

1    A.   Correct.
2    Q.   You're removing your opinion about the
3  personal items, right?
4    A.   Right.
5    Q.   Did the Vinales mention to you health
6  complaints?  Is that the reason for the health
7  statement?
8    A.   Yes.
9    Q.   Do you know if they ever took this report
10  to any doctor?
11   A.   I do not.
12   Q.   You were recommending them to do that,
13  right?
14   A.   Right.
15   Q.   All right.  Moving to the report itself.
16  There was, on Page 11 of the report -- are you with
17  me -- inspection conclusions?
18   A.   Yes.
19   Q.   All of these got answered yes.  Is that
20  right?
21   A.   Right.
22   Q.   And you have your standard language there
23  about Category 3 water.  But there was no sewage
24  water or anything that is within the meaning of
25  Category 3 water, correct?

Page 105

1    A.   Other than the over the time.
2    Q.   Right.  So it may have been some other
3  kind of water --
4    A.   Correct.
5    Q.   -- longer that 24 or 48 hours?
6    A.   Correct.
7    Q.   All right.  So going through your
8  walk-through checklist, help me understand that
9  elevated moisture.  You say yes in those listed
10  rooms?
11   A.   Correct.
12   Q.   Why?
13   A.   Condensation from the single-pane windows
14  leaking onto the -- it's not the sill plate, but the
15  windowsill and down.
16   Q.   Okay.  And did you -- You don't specify
17  that's what the moisture noted is, correct?
18   A.   Correct.
19   Q.   And it's not documented in your report,
20  is it?
21   A.   I don't know.
22   Q.   It's not in any photographs, correct?
23   A.   Correct.
24   Q.   There is no diagram, correct?
25   A.   Correct.

Page 106

1    Q.   Other than some isolated references in
2  the transmittal letter, it's not in the report
3  itself, is it?
4    **A.   I don't believe so.**
5    Q.   All right.  And that wouldn't be proper
6  or appropriate for a mold assessment, would it?
7    **A.   No.**
8    Q.   And water impact noted, you have yes on
9  all the rooms there.  What's the basis for that?
10   **A.   There were just several areas where --**
11 **and that's more like along the lines of those**
12 **windows as well.  Typically, most everything was**
13 **window-related in their house.  And**
14 **humidity-related.**
15   Q.   Okay.  Well, what was the humidity in the
16 home?
17   **A.   Apparently, that chart didn't make it in**
18 **here.  Let me see if I noted it.  It is not listed.**
19   Q.   So you're basing your opinion in part on
20 there being high humidity, but you did not document
21 that fact, right?
22   **A.   Correct.**
23   Q.   And that is contrary to accepted
24 standards regarding how to do a mold assessment,
25 true?

Page 107

1    **A.   True.**
2    Q.   You have to note what the relative
3  humidity is and in which room you were taking the
4  measurement and the conditions under which you are
5  taking it, right?
6    **A.   Right.**
7    Q.   And you didn't do any of that?
8    **A.   Correct.**
9    Q.   So we have no basis to understand whether
10 that is true or not, correct?
11   **A.   Correct.**
12   Q.   And the other was based on the
13 condensation from the windows.  Did you see that on
14 every single window or only some?
15   **A.   I do not recall.**
16   Q.   Okay.  And we can't know from the
17 substance of this report which one of those was,
18 true?
19   **A.   True.**
20   Q.   So if I'm looking to go and take this
21 report and do repairs, there's no way on earth I can
22 figure out which windows I need to look at, is
23 there?
24   **A.   Not without the diagram.**
25   Q.   And the diagram is not included, correct?

Page 108

1    **A.   Correct.**
2    Q.   Which makes it not a complete protocol,
3  right?
4    **A.   Right.**
5    Q.   Which makes it not a complete or accurate
6  or accepted mold assessment, correct?
7         MR. REED:  Objection; form.
8         THE WITNESS:  Correct.
9    Q.   (By Mr. Boone)  All right.  And the same
10 thing for mold growth.  Mold growth, you have yes in
11 every room, but you did not actually see it in every
12 room.  Is that true?
13   **A.   True.**
14   Q.   And we can't know which rooms you saw it
15 in from this table here, because you just say yes to
16 all rooms; is that right?
17   **A.   Correct.**
18   Q.   And that's not the way you're supposed to
19 do a mold assessment either, is it?
20   **A.   Correct.**
21   Q.   All right.  And the AEC samples
22 collected, you're withdrawing your opinions
23 regarding the HVAC system, correct?
24   **A.   Correct.**
25   Q.   You say you collected samples in the

Page 109

1  sunroom.  What samples was that?
2    **A.   I believe it was a tape sample.**
3    Q.   Okay.  Which one was that?
4    **A.   The hutch.  It came off the hutch in the**
5  **sunroom.**
6    Q.   Okay.  So that's the -- And that one
7  there says very few is the number of spores present,
8  correct?
9    **A.   Correct.**
10   Q.   And then it says Aspergillus as the
11 genera, right?
12   **A.   Right.  The laboratory also says mold --**
13 **their general impression is, it is mold growth.**
14   Q.   Gotcha.
15        And the kitchen on AEC samples -- And
16 that one, you say not satisfactory for the same
17 reasons.  That's just Kristy Beck-Miller, no
18 standard determining that, right?
19   **A.   The laboratory, their general impression**
20 **is that it's mold growth.**
21   Q.   Okay.  And any mold growth anywhere is
22 unacceptable, not satisfactory?
23   **A.   When you have visible and you're looking**
24 **at just a swab or a tape sample and the lab says**
25 **mold growth based on, you know, the spores and the**

28 (Pages 106 to 109)

Page 110

1  hyphae, then I would say that would be not
2  acceptable.
3      Q.  Gotcha.  All right.
4          And the kitchen on samples collected,
5  that's the one sample underneath the sink, right?
6      A.  Correct.
7      Q.  The back bedroom.  I didn't see any
8  reference to a sample there.  Maybe I missed it.
9  Back bedroom is there, right?
10     A.  Correct.  Yes.
11     Q.  But then you say -- So that -- you
12  haven't actually --
13     A.  This is back bathroom.
14     Q.  Oh, back bathroom.  I gotcha.
15     A.  Yes.
16     Q.  So you did not see -- you did not take
17  any samples there?
18     A.  Correct.
19     Q.  But you did see visible mold growth?
20     A.  I believe that was on the air vents.
21     Q.  Do you have a photo of that?
22     A.  This one.  These two.
23     Q.  You can write, if you would, "back
24  bathroom."
25     A.  (Complies.)

Page 111

1      Q.  And what about did you see there?
2      A.  Just visible mold growth on the air
3  registers.
4      Q.  And write "back bathroom visible mold
5  growth, VMG," if you would.
6      A.  Okay.
7      Q.  Downstairs bedroom?
8      A.  Yes.  We have air samples for that.
9      Q.  How many bedrooms were in this house?
10     A.  I do not recall.
11     Q.  And you don't have a diagram, right?
12     A.  Correct.
13     Q.  And you say the downstairs bedroom.  So
14  you're referring to the spore trap sample that's
15  sample number 4; is that right?
16     A.  Yes.
17     Q.  And that sample is less than the control,
18  right?
19     A.  There was one.  The basidiospores were
20  higher than the control.  Or close to the control.
21  I apologize.
22     Q.  Well, the basidiospores were less than
23  the control, right?
24     A.  Right.
25     Q.  The sample says 157.  The control says

Page 112

1  183.  Right?
2      A.  Correct.
3      Q.  So under what you told me for the Hiatts,
4  that would be satisfactory, correct?
5      A.  Correct.  But when you -- it's very rare
6  to see that high a number of basidiospores in a home
7  unless they have a bunch of plants.  So, I mean,
8  that's kind of a indicator that something could
9  possibly be going on.
10     Q.  Well, do you know if the Daniels had
11  plants in their homes?
12     A.  The Vinales.
13     Q.  I mean Vinales.
14     A.  In the sunroom, they did, but not in the
15  back bedroom, that I recall.
16     Q.  All right.  So --
17     A.  That would just be a personal opinion on
18  the air samples.
19     Q.  Right.  So based on the nationally
20  accepted standards, this would be satisfactory?
21     A.  Correct.
22     Q.  Kristy Beck-Miller believes it's
23  unsatisfactory without reliance on any nationally
24  accepted standard.  Is that what you're saying?
25     A.  Yes.

Page 113

1      Q.  All right.  Dining room.  It says no
2  sample collected, and then sample results, VMG.
3  What does that mean?
4      A.  There was visible mold growth on some of
5  the furnishings in the living room and the formal
6  dining room.
7      Q.  Do you have any of that documented?
8      A.  I believe I have photos of that.  This is
9  part from the living room where it's got visible
10  mold growth on that piece of furniture.  Had some on
11  a bag that had been sitting there.
12     Q.  Well, this says formal dining room.
13     A.  Okay.
14     Q.  Do you have any documentation of that?
15     A.  I am not seeing any photos of the formal
16  dining room.
17     Q.  And no diagram either, correct?
18     A.  Right.
19     Q.  So there's no basis to understand what
20  you're seeing with the visible mold growth in that
21  room, right?
22         MR. BRZEZINSKI:  Object to form.
23         THE WITNESS:  Correct.
24     Q.  (By Mr. Boone)  And that is not proper
25  procedure, that is not compliant with the way a mold

Page 114

1   assessment is supposed to be done, true?
2       **A.   True.**
3       Q.   Upstairs bathroom.  No sample collected.
4           Master bedroom.  You say a sample was
5   collected, right?
6       **A.   Right.**
7       Q.   This one is also less than the control,
8   right?
9       **A.   Correct.**
10      Q.   Yet you reach the NS conclusion.  Why?
11      **A.   Because we had visible water damage and**
12  **microbial growth on the ceiling and part of the**
13  **wall.**
14      Q.   So the sample results themselves are
15  satisfactory?
16      **A.   Yes.**
17      Q.   Okay.  And this column, as I read your
18  report, is just talking about the sample results,
19  right?
20      **A.   Correct.**
21      Q.   And that should be "S" rather than "NS."
22  Is that true?
23      **A.   Correct.**
24      Q.   So that's an error?
25      **A.   Yes.**

Page 115

1       Q.   And you are removing your opinions
2   regarding the entire home, correct?
3       **A.   Correct.**
4       Q.   You are removing your opinions regarding
5   the personal belongings; is that correct?
6       **A.   Yes.**
7       Q.   We'll now go to Page 13 where we look at
8   some more sample results.  The upstairs master
9   bedroom, you now agree that your report says not
10  satisfactory, but that is, in fact, satisfactory?
11      **A.   Correct.**
12      Q.   Okay.  On the downstairs back bedroom,
13  you agree that according to nationally accepted
14  standards, that would be satisfactory, correct?
15      **A.   Correct.**
16      Q.   But according to Kristy Beck-Miller, it
17  is not?
18      **A.   Correct.**
19      Q.   All right.  And the ATP samples all again
20  showing cleanliness, correct?
21      **A.   Correct.**
22      Q.   You say -- And not satisfactory means
23  unclean or dirty, right?
24      **A.   Right.**
25      Q.   The tape or swab samples for the hutch,

Page 116

1   the kitchen sink and the air register in the living
2   room, you say are not satisfactory; is that correct?
3       **A.   Correct.**
4       Q.   But all of those in terms of the number
5   of spores seen are all listed as very few, correct?
6       **A.   Correct.**
7       Q.   And you agree that there is no nationally
8   accepted standard, guideline or peer-review study
9   that you know of that would judge whether or not
10  those test results were satisfactory or not
11  satisfactory, true?
12      **A.   True.**
13      Q.   All right.  So that is -- conclusion is
14  not based on any nationally accepted standard but is
15  just Kristy Beck-Miller.
16          MR. BRZEZINSKI:  Object to form.
17      Q.   (By Mr. Boone)  Right?
18      **A.   Yes.**
19      Q.   And you noted on here that two of these
20  surface samples were SFC and one was a SWB; is that
21  correct?
22      **A.   Correct.**
23      Q.   Oh, I see.  So the swab was of the air
24  register.  The tape samples, under the kitchen sink
25  and on the hutch.  Right?

Page 117

1       **A.   Right.**
2       Q.   And you include the actual air sample
3   results there, correct?
4       **A.   Correct.**
5       Q.   And those again indicate that the spore
6   trap samples results in both places are less than
7   the control and the total fungi, correct?
8       **A.   Correct.**
9       Q.   And less than the control on all of the
10  genera listed, correct?
11      **A.   Correct.**
12      Q.   And under nationally accepted standard
13  and methodology, that comparison would be okay, for
14  lack of a better word, correct?
15          MR. BRZEZINSKI:  Object to form.
16      Q.   (By Mr. Boone)  Is that true?
17      **A.   True.**
18      Q.   Meaning, what you're looking for in the
19  comparison is for the indoor samples to be less than
20  the control.  And in this case, they were.  Fair?
21      **A.   Fair.**
22      Q.   And on this one, we do not have your
23  field notes at all, correct?
24      **A.   Correct.**
25      Q.   And I don't mean to be flippant or --

Page 118

1    Well, let's keep walking through the report.  We get
2    to the protocol section on Page 18; is that right?
3        A.   Yes.
4        Q.   And here again you are removing your
5    opinions with respect to the HVAC system and the
6    contents, right?
7        A.   Correct.
8        Q.   But with respect to all of the other
9    rooms, we don't have a description of where the
10   damage is in your report, correct?
11       A.   Correct.
12       Q.   And we don't have a photograph for where
13   the damage is in all of them, correct?
14       A.   Most of them.
15       Q.   And we don't have a diagram saying where
16   the damage is, correct?
17       A.   Correct.
18       Q.   And we don't have a diagram that says
19   your recommendations about what ought to be done to
20   clean or remediate a specific area, correct?
21       A.   Correct.
22       Q.   And without that, you can't have a
23   protocol.
24       A.   Correct.
25       Q.   So this can't be a protocol under the

Page 119

1    Texas rules, right?
2        A.   Correct.
3        Q.   And under nationally accepted standards
4    that you follow, correct?
5        A.   Correct.
6        Q.   And in fact, your mold assessment as a
7    whole does not meet those standards for this house.
8    Would you agree?
9             MR. BRZEZINSKI:  Object to form.
10            THE WITNESS:  I don't know.
11       Q.   (By Mr. Boone)  Okay.  Well, and I don't
12   mean to be down on you, but we've been through a
13   number of deficiencies and errors and mistakes --
14       A.   Correct.
15       Q.   -- and things that you disagree with the
16   nationally accepted standards and things that you
17   said that are just not true.
18       A.   Right.
19       Q.   And given all of that, you would agree
20   with me that you would not hold this Vinales mold
21   assessment report up as compliant with national
22   standards, would you?
23            MR. BRZEZINSKI:  Object to form.
24            THE WITNESS:  No.
25       Q.   (By Mr. Boone)  So this Exhibit 16 does

Page 120

1    not comply with national standards, correct?
2        A.   Correct.
3        Q.   And it says it will and it does, but in
4    fact, it doesn't; is that true?
5        A.   True.
6        Q.   Okay.  And so you don't want a court or
7    anyone else to rely on this as compliant with
8    national standards, because it is not.
9        A.   Correct.
10            MR. BRZEZINSKI:  Object to form.
11       Q.   (By Mr. Boone)  And so you would say to
12   the court that "I do not offer this as a reliable
13   scientific mold assessment."  Is that fair?
14       A.   Fair.
15            MR. BRZEZINSKI:  Object to form.
16       Q.   (By Mr. Boone)  Okay.  Are there any
17   other instances of visible mold growth in the
18   photographs other than those that you've marked
19   already?
20       A.   We have visible mold growth on this desk
21   that was in the sunroom.  Do you want me to mark
22   those?
23       Q.   Yes.  Just tell us what it is in the
24   margin and what you saw.
25       A.   Okay.  So we've got visible mold growth

Page 121

1    there on the desk.  (Indicating on photograph.)
2    Okay.
3        Q.   So you've noted all of the areas where
4    you saw visible mold in the photographs that you
5    mentioned, correct?
6        A.   Correct.
7        Q.   And that is all of the visible mold
8    growth that you saw in the home; is that true?
9        A.   I believe so.
10       Q.   Meaning that you tried to capture by
11   photograph wherever you saw visible mold so that you
12   could show it in your report, right?
13       A.   Right.
14       Q.   And so I don't want to -- there are no
15   other places or locations in the home that had
16   visible mold growth that are not in these photos
17   attached to Exhibit 16; is that true?
18       A.   I believe so.
19       Q.   All right.  And you were not a part of
20   the content sampling that occurred before the
21   Vinales moved; is that correct?
22       A.   That is correct.
23       Q.   So you don't have any opinions on whether
24   that sampling was done correctly or not or anything
25   like that?

Page 122

1    A.   No.  I wasn't even aware it existed.
2    Q.   Okay.  And we have again talked about all
3  of your opinions with respect to the Vinales
4  inspection; is that correct?
5    A.   Correct.
6    Q.   And there's nothing else that you -- no
7  opinion that you hold regarding that inspection
8  other than what's in here in your report?
9    A.   No.
10   Q.   And as we talked about too, you are not
11 submitting this court to the -- not submitting this
12 report to the court, because it is not compliant and
13 following national standards; is that true?
14         MR. BRZEZINSKI:  Object to form.
15         THE WITNESS:  How does that work?
16   Q.   (By Mr. Boone)  Well, you agreed with me
17 that there were many instances in here where you did
18 not follow national standards, right?
19   A.   Right.
20   Q.   And your report says that you will,
21 right?
22   A.   Right.
23   Q.   And you're -- just going forward, you
24 don't want to offer this to the court as compliant
25 with national standards, because it's not.

Page 123

1    A.   Correct.
2          MR. BRZEZINSKI:  Object to form.
3          MR. BOONE:  All right.  Why don't we
4  take a break.  Maybe a lunch break.
5          (Lunch break.)
6    Q.   (By Mr. Boone)  So we're back on the
7  record.  And during the lunch break, I've now had a
8  chance to show you the video of the walk-through of
9  the Paisano residence.  Do you recall that?
10   A.   Yes.
11   Q.   And we just looked at that, right?
12   A.   Right.
13   Q.   And what I asked you to do is, on
14 Exhibit 39, which is the transcript, to kind of
15 follow along and write in the margins what room you
16 were in when you were talking about things; is that
17 right?
18   A.   Right.
19   Q.   And you have done that in the margins.
20 But for clarity, I just kind of want to walk through
21 them just so we have it ail on the record.
22   A.   Okay.
23   Q.   In Page 2, approximately lines 10 through
24 15, you were in that utility closet.  Is that about
25 right?

Page 124

1    A.   Correct.
2    Q.   And then from Page 2, line 21 to
3  approximately Page 3, line 12, that was in the
4  dining room, correct?
5    A.   Correct.
6    Q.   And then we have, on Page 3, line 14,
7  going to Page 4, about line 14, that was in the
8  butler pantry.  Is that right?
9    A.   Correct.
10   Q.   Okay.  On Page 4, line 15 where you talk
11 about an area of water damage here, that is at the
12 back door, right?
13   A.   Correct.
14   Q.   And then you have a note, "I think we're
15 okay back here."  That relates to maid's quarters on
16 line 17 of Page 4, correct?
17   A.   Correct.
18   Q.   And then beginning on Page 4, line 24,
19 "We have this vent."  And that's in the kitchen,
20 correct?
21   A.   Correct.
22   Q.   It's just that one line, "We have this
23 vent," is in the kitchen, right?
24   A.   Yes.
25   Q.   And when you say, "And we have some

Page 125

1  growth in the caulking around these windows," you
2  are now in the sunroom.  Is that correct?
3    A.   Correct.
4    Q.   And that discussion about the sunroom
5  continues to Page 5, line 4, right?
6    A.   Right.
7    Q.   And then you're still downstairs.
8  Beginning on line 17 of Page 5, you're talking about
9  the living room contents, right?
10   A.   Right.
11   Q.   And then on Page 6 where your husband
12 says, "We labeled this as bedroom 2," that's
13 upstairs in Abigail's room, which y'all note as
14 bedroom 2, correct?
15   A.   Correct.
16   Q.   And there's a lot of discussion about
17 that.  But then Page 7, line 18, you're also in
18 Abigail's room, bedroom 2, correct?
19   A.   Correct.
20   Q.   And that goes to line 20 on Page 7,
21 right?
22   A.   Right.
23   Q.   Then Page 7, line 24, the texture coming
24 up is in the master bedroom, right?
25   A.   Right.

Page 126

1    Q.   And that master bedroom continues on
2    Page 8, line 3 and 4, where you say "the weird split
3    in the texture," that's also master bedroom, right?
4    **A.   Right.**
5    Q.   And then beginning on Page 8, line 17,
6    there are general questions about contents all over
7    the house, right?
8    **A.   Correct.**
9    Q.   And that's where you say, on line 21, "I
10   didn't see anything that was overly concerning."
11   Right?
12   **A.   Right.**
13   Q.   You say, "But we didn't see the
14   typical" -- and then you go to the dresser but rule
15   that out.  And that was the dresser in the master
16   bedroom, right?
17   **A.   Right.**
18   Q.   But no mold there?
19   **A.   Right.**
20   Q.   And then you say, in line 13 through 16
21   of Page 9, "Haven't seen anything growing on the
22   furniture or pictures or anything."  Correct?
23   **A.   Correct.**
24   Q.   That all relates to the contents as well?
25   **A.   Correct.**

Page 127

1    Q.   And then both I and Ryan Reed asked you
2    if that's all, and you confirmed that that's all.
3    **A.   Okay.**
4    Q.   Is that right?
5    **A.   Right.**
6    Q.   Okay.  Does that help refresh your
7    recollection about what you actually saw on
8    December 10th?
9    **A.   I believe so.**
10   Q.   All right.  So going back to Exhibit 12,
11   which is the Paisano report.  I wanted to ask you
12   this question.  In your report itself about -- in
13   the visual inspection part, which is your boxes.
14   **A.   Okay.**
15   Q.   Right?
16           And particularly your columns "water
17   impact noted" and "mold growth noted."  Do you see
18   that?
19   **A.   Right.**
20   Q.   So now that your memory is refreshed
21   about what you actually saw, did you see any water
22   impact in the master?
23   **A.   Yes.**
24   Q.   That crack?
25   **A.   Right.**

Page 128

1    Q.   Okay.  What about mold growth there?
2    **A.   It appeared to look like that crack maybe**
3    **had slight mold growth.**
4    Q.   In it?
5    **A.   Yeah.**
6    Q.   Okay.  We saw the crack.  I didn't hear
7    you say that there was mold in there.  Was there?
8    **A.   I honestly don't recall without, like,**
9    **being up against it again.**
10   Q.   Okay.  So question mark maybe about a
11   mold growth in the master bedroom.  Is that fair?
12   **A.   Fair.**
13   Q.   All right.  Bedroom 1, which is the front
14   of the house, you didn't see anything in that room.
15   That's Julia's room, right?
16   **A.   Right.**
17   Q.   So --
18   **A.   We need to --**
19   Q.   -- change that to no, correct?
20   **A.   Correct.**
21   Q.   So that's not correct.
22           And then mold growth noted, that's
23   also no; is that correct?
24   **A.   Yes.**
25   Q.   And then bedroom 2, which is Abigail's

Page 129

1    room, I think that's the one where you saw the
2    softness under the window?
3    **A.   Correct.**
4    Q.   So that's water impact there, yes?
5    **A.   Yes.**
6    Q.   But mold growth, no?
7    **A.   Along the window, in that -- that's where**
8    **Brian took that tape sample.**
9    Q.   Okay.  All right.  So those two are
10   correct.
11           Maid's quarters, that was downstairs.
12   That's where you said there's nothing back here,
13   right?
14   **A.   Yes.**
15   Q.   So that is no there.  And no for mold
16   growth.  Correct?
17   **A.   Correct.**
18   Q.   The living room, that's also no and no,
19   right?
20   **A.   With the exception of the possible mold**
21   **growth noted on the HVAC system -- or the register.**
22   Q.   So the vent?
23   **A.   Right.**
24   Q.   Okay.  So it would be no as to water
25   impact, but question mark on mold growth?

Page 130

1    **A.   Correct.  It appeared to be mold growth**
2    **looking at the video.**
3        Q.   Okay.  Dining room, water impact?  Is
4    that correct?  It's where you started.
5        **A.   No on water impact, and yes on visible**
6    **mold for the air register.**
7        Q.   So we changed dining room from yes to no.
8    And then yes on the vent?
9        **A.   Yes.**
10       Q.   Okay.  And then the kitchen, water
11   impact, that's no?
12       **A.   And yes for the vent.**
13       Q.   And then yes for the vent.  Okay.
14           And the upstairs bathroom was
15   nothing?
16       **A.   We didn't go in there at all.**
17       Q.   Right.
18       **A.   Well, during our walk-through.**
19       Q.   Which means no and no, right?
20       **A.   Right.**
21       Q.   Okay.  And that's all of the rooms on
22   your checklist.  Is that right?
23       **A.   Right.**
24       Q.   So I am counting, looks like -- one, two,
25   three, four, five, six, seven, eight -- nine of

Page 131

1    those responses in this request for those two
2    columns are incorrect.  Did I get that right?
3        **A.   Correct.**
4        Q.   And again, the purpose of a visual
5    inspection is to detail on a room-by-room basis
6    where water impact is, where visible mold growth is,
7    and record that fact accurately, correct?
8        **A.   Correct.**
9        Q.   And the Paisano report does not record
10   that accurately, does it?
11       **A.   Not in this section.  It was a copy-paste**
12   **error, apparently.**
13       Q.   Okay.  Well, this is the section of your
14   report talking about your walk-through inspection,
15   correct?
16       **A.   Correct.**
17       Q.   And we just saw a video of the summary of
18   that.  And it is incorrect, true?
19       **A.   True.**
20       Q.   All right.  Does that cast all of your
21   conclusions into doubt?
22           MR. BRZEZINSKI:  Object to form.
23           THE WITNESS:  No, not since we had
24   such, you know, high numbers, you know, as far as
25   the air testing.

Page 132

1        Q.   (By Mr. Boone)  Okay.  Well, but this
2    section deals with the visual observations, which
3    were relatively minor, true?
4        **A.   Define minor.**
5        Q.   Well, there were a handful or less of
6    instances that you pointed out in that walk-through,
7    weren't there?
8            MR. BRZEZINSKI:  Object to form.
9            THE WITNESS:  Yes.
10       Q.   (By Mr. Boone)  Okay.  That's all I want
11   to do on that.  So we're going to switch to the
12   Daniels.  Are you with me?
13       **A.   Yes.**
14       Q.   And that's Exhibit Number 13, correct?
15       **A.   Correct.**
16       Q.   All right.  Same questions about this,
17   that all of your opinions with respect to the
18   Daniels home are included in Exhibit 13, correct?
19       **A.   Correct.**
20       Q.   And all of the facts and data considered
21   are in this exhibit, right?
22       **A.   Correct.**
23       Q.   And all of the bases for all of your
24   opinions are in this exhibit?
25       **A.   Correct.**

Page 133

1        Q.   And that you have no opinions other than
2    what's contained in the four corners of this report,
3    true?
4        **A.   Correct.**
5        Q.   And you adopt all of the general
6    statements and testimony you had about the
7    provisions of this report that we went through on
8    the Hiatt?
9        **A.   Yes.**
10       Q.   Okay.  So we don't need to re-plow all of
11   that ground, correct?
12       **A.   Correct.**
13       Q.   I want to show you first in the
14   transmittal letter again -- which is on the front of
15   Exhibit 13, right?
16       **A.   Right.**
17       Q.   The first thing you mention is the HVAC
18   system.  And you have withdrawn all of those
19   opinions about that, correct?
20       **A.   Correct.**
21       Q.   Because you did not inspect the HVAC
22   system, nor do you believe you're qualified to
23   render an opinion on what needs to happen to it,
24   true?
25       **A.   True.**

Page 134

1    Q.   But I wanted to call your attention to
2  the second sentence, "This has been backed up by
3  laboratory analysis of air register and boot."
4    A.   Right.
5    Q.   Do you see that?
6    A.   Yes.
7    Q.   I didn't see any laboratory analysis of
8  the air register and boot, but maybe I missed it.
9  Is there any?
10   A.   Let me look.  Do we have -- I thought
11 that there was a swab test done.  But apparently
12 not.  It was ATP.  So that sentence should not be in
13 there.  That is a mistake.
14   Q.   So that's false?
15   A.   It's a mistake.  Correct.
16   Q.   Okay.  And I'm wondering, is that a
17 cut-and-paste error from some other report?  Or
18 what's the reason for that?
19   A.   Quite possibly, yes.
20   Q.   Okay.  So the whatever -- Well, there is
21 no laboratory analysis of the air register and boot
22 for the Daniels, correct?
23   A.   Correct.
24   Q.   Okay.  You have visible mold, water
25 damage in the master bedroom and closet, right?

Page 135

1    A.   Right.
2    Q.   You have a statement there about the
3  personal contents, but you are withdrawing all of
4  those opinions, correct?
5    A.   Correct.
6    Q.   And you say "will require professional
7  remediation," but you don't know that to be true,
8  right?
9    A.   Correct.
10   Q.   And you used the same language that you
11 used in the Vinales about the ATP results, that they
12 showed it was heavily contaminated by fungi,
13 correct?
14   A.   Correct.
15   Q.   And that is not true?
16   A.   Correct.
17   Q.   Because ATP does not detect fungi,
18 correct?
19   A.   Correct.
20   Q.   It detects cleanliness.
21   A.   Cleanliness.
22   Q.   Correct?
23   A.   So all of those statements throughout
24 these reports should be -- instead of fungi should
25 be -- go back to cleanliness.

Page 136

1    Q.   Right.
2         And you agreed and opined that this
3  home was dirty, correct?
4         MR. BRZEZINSKI:  Object to form.
5         THE WITNESS:  I do not recall the
6  Daniels being super dirty --
7    Q.   (By Mr. Boone)  Okay.
8    A.   -- per se.
9    Q.   Well, the ATP tests reflect that, don't
10 they?
11   A.   Yes.
12   Q.   Okay.  But on the master bedroom, you did
13 ATP tests there, but you did not do any tape samples
14 there, correct?
15   A.   Correct.
16   Q.   Master bath, you've got a notation there.
17 Do you have a photograph of that?
18   A.   I believe so.  Yeah.  This is the master
19 bath.  It had --
20   Q.   If you would just write "master bath" by
21 whatever pictures are relating to the master bath.
22   A.   Okay.  (Complies.)  I believe this is the
23 whole page.
24   Q.   Okay.  That makes it easy.  So are you
25 done marking all the master bath?

Page 137

1    A.   Yes.
2    Q.   All right.  Moving to the son's bedroom.
3  Do you see that on your report?
4    A.   Yes.
5    Q.   And go to, if you would, your field
6  notes, Exhibit 34.  It looks like this on the front.
7  Exhibit 34 is your field notes taken at the time; is
8  that right?
9    A.   Right.
10   Q.   So you have a son's bedroom notation in
11 your transmittal.  I don't see son's bedroom on your
12 field notes.  Am I missing something?
13   A.   No.  Sometimes I'll do it by photos or on
14 a drawing.  Yeah.  The boy's room is connected to
15 that bathroom.  So we had areas around this exterior
16 wall right here and some spontaneous mold growth.
17   Q.   And where is your diagram?  Oh, on the
18 field notes?
19   A.   Yeah, on the field notes.  And that is
20 this, the son's room.  (Indicating on photograph.)
21   Q.   So there's no notation on your
22 observations about anything in the son's bedroom,
23 correct?
24   A.   Right.  Sometimes if I'm mapping it out,
25 I'll write it over there.  But I don't see that I

Page 138

1    wrote any of that down.
2       Q.   Okay.  And it's not even in your diagram,
3    is it?
4       A.   It's just about the wall issue.
5       Q.   Right.  So there's no information in here
6    about the son's bedroom taken at the time, true?
7       A.   As far as we have our RLUs from the son's
8    room window.
9       Q.   Okay.
10      A.   And so, yes.  I mean, we've got the ATP
11   results.
12      Q.   But visible water damage and fungal
13   growth is not reflected in your field notes, right?
14      A.   Right.  But, I mean, a hundred percent of
15   what I -- not everything makes it in the field
16   notes.  Some of it's up here.
17      Q.   Some of it's in your head.
18      A.   Uh-huh.
19      Q.   Okay.  You got a reference there to the
20   furniture, bedding and toys, but you're not making
21   any opinions about that, correct?
22      A.   Correct.
23      Q.   And no tape samples in that room,
24   correct?
25      A.   Correct.

Page 139

1       Q.   And it's got that heavily contaminated by
2    fungi language, which is not true, right?
3       A.   Right.
4       Q.   No -- Same language in the dining room
5    about -- Well, do you have photos of the office or
6    the dining room or the studio bathroom?
7       A.   This is -- These are from the back room
8    studio.
9       Q.   And when you say "these," I need you to
10   write in the margins or draw arrows or whatever.
11      A.   Okay.  (Indicating on photographs.)
12      Q.   All right.  Did you write down all the
13   areas in the office, dining room, living room?
14      A.   I'll go through.  Just did the back.
15      Q.   Or if you want to, just write on there
16   where you see visible mold growth, what room it is,
17   on all the pictures.
18      A.   Okay.  Do you want me to show where
19   visible mold growth is or just write "visible mold
20   growth"?
21      Q.   Just write "VMG" that you saw it, and if
22   it's not clear, what room that is.
23      A.   Okay.  Because this whole page is the
24   master bath.
25      Q.   Bathroom, right.

Page 140

1       A.   (Indicating on photographs.)  Okay.  I
2    believe I got the majority of them.
3       Q.   You finished?
4       A.   No, sir.  (Indicating on photographs.)
5    Okay.
6       Q.   All right.  So you have -- At my request,
7    you've written beside all of the pictures where you
8    saw visible mold growth and written what room
9    they're in; is that right?
10      A.   Yes.
11      Q.   And you would agree with me, like you've
12   done before, that you try to take pictures of every
13   location where you see visible mold growth, correct?
14      A.   Correct.
15      Q.   So there wouldn't be any other areas in
16   the Daniels house that had visible mold growth other
17   than what you took pictures of; is that correct?
18          MR. BRZEZINSKI:  Object to form.
19          THE WITNESS:  I've got the
20   notification about the hutch, but I do not have a
21   picture of the hutch.
22      Q.   (By Mr. Boone)  Okay.  Other than that
23   example -- And where is the indication of the hutch?
24      A.   In the dining room, living room.  And it
25   was just an ATP test.

Page 141

1       Q.   Okay.  But that's not a finding of
2    visible mold growth, is it?
3       A.   No.  It was just to check to see if what
4    was -- what they were -- you know, wondering if it
5    was mold growth on it.  And we just did an ATP on
6    it.
7       Q.   Okay.  So that's not going to answer that
8    question, right?
9       A.   Right.
10      Q.   You didn't take a tape sample on that to
11   know whether it was or not, right?
12      A.   Right.  I was limited by their finances.
13      Q.   Understood.
14          How much did each of these -- We saw
15   the ones that you were charging to Ryan Reed were
16   about 1500 per inspection.  How much did you charge
17   these people?
18      A.   I believe I gave them a discount on my
19   time and then $75 per sample.
20      Q.   So what would that be total?
21      A.   I believe it was 550 based on just that.
22      Q.   Okay.  The first page of the field notes,
23   Exhibit 34.  So that's 550 total, includes your time
24   and all the samples?
25      A.   I would have to double-check -- if I can

Page 142

1   get into the accounting program to double-check
2   that.
3       Q.   Okay.  All right.  So you didn't take as
4   many samples as you wanted to based on cost?
5       A.   Correct.
6       Q.   And you didn't take the required number
7   of samples under NIOSH 800, correct?
8       A.   Correct.
9       Q.   Or any of the accepted standards we've
10  talked about, correct?
11      A.   Due to their inability to be able to pay
12  for it.
13      Q.   All right.  The entire home section here
14  in the transmittal, you are withdrawing all of that,
15  correct?
16      A.   Correct.
17      Q.   And withdrawing the personal belongings
18  section there, correct?
19      A.   Correct.
20      Q.   And you were not present for any of the
21  content cleaning or clearance verification, were
22  you?
23      A.   I have no idea if they even had it done.
24      Q.   Okay.  So you have no basis to dispute
25  any of those findings?

Page 143

1       A.   Right.
2       Q.   All right.  Let's move on to your report.
3   Page 6 has got the laundry list of things that you
4   offer.  Which ones did they get?
5       A.   They got ATP and air samples.
6       Q.   And the rest are noes?
7       A.   Correct.
8       Q.   All right.  Oh, I didn't see in this one
9   a hypothesis written down either.  Is that correct?
10      A.   Yes.
11      Q.   And that's true for all of them, isn't
12  it?
13      A.   Yes.
14      Q.   We went through it with Hiatt.
15      A.   Right.
16      Q.   It wasn't in Hiatt.
17      A.   Right.
18      Q.   There's no hypothesis in the Paisano one
19  either, right?
20      A.   Correct.
21      Q.   The Vinales we've been through.  There
22  wasn't one in there, correct?
23      A.   Correct.
24      Q.   Wasn't one in Daniels, right?
25      A.   Right.

Page 144

1       Q.   And there wasn't one in Wolf.
2       A.   Okay.
3       Q.   Is that right?
4       A.   Correct.
5       Q.   And that is, as we've been through the
6   national standards, that's a requirement for mold
7   assessment?
8       A.   It's a suggestion by IICRC, by their
9   standards.
10      Q.   Well, it's a requirement under the -- or
11  it's a should under the ASTM standard we went
12  through, right?
13      A.   Correct.  But not a shall.
14      Q.   So Page 9 of Daniels, elevated moisture
15  is based on what?
16      A.   Moisture readings.
17      Q.   And those are -- Again that's moisture
18  meter readings in the building materials; is that
19  right?
20      A.   Correct.
21      Q.   And they're not reflected or documented
22  in any way, correct?
23      A.   Yes.
24      Q.   And that is not proper procedure for a
25  mold assessment, is it?

Page 145

1       A.   That elevated moisture be not documented?
2       Q.   Yes.  It must be documented.
3       A.   Right.  So we can go ahead -- if this
4   again looks like it's just a messed up chart.
5       Q.   So you would agree with me that the
6   elevated moisture noted where it says "Y," those you
7   have no documentation to support that, correct?
8       A.   Unless it's written in my first outline
9   here, but I do not see -- in my bullet points -- But
10  I don't see anything that says that.  So again, it's
11  just a chart error.
12      Q.   Okay.  And is that because -- So you were
13  withdrawing that -- all of those answers?
14      A.   Yes.
15      Q.   Okay.  And did you actually -- Well, so
16  you don't have -- I mean, you know how you do that
17  is, you go room by room and you check with the
18  moisture meter, building materials in that room to
19  see whether or not they are high or low, right?
20      A.   Correct.
21      Q.   And you don't have any documentation that
22  you did that?
23      A.   No.  I typically will do it if I see
24  something that's questionable.  But I'm not seeing
25  in any of my notes on here that I did that.

37 (Pages 142 to 145)

KRISTY BECK-MILLER, VOL. 2                          MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

Page 146

1    Q.  Okay.  So it's not just that you don't
2  have documentation; it's that you actually did not
3  do that?
4    A.  I do not recall that I did or didn't.
5  But since it's not written down here -- I mean, we
6  can -- because I would have written, you know, that
7  there was an area, you know, that was at, you know,
8  X and X, you know, X percent of moisture.
9    Q.  Right.  You'd put the moisture meter at
10  the baseboard, and it gave a reading of blank?
11    A.  Right.
12    Q.  But you don't have that anywhere?
13    A.  I don't.  So strike that.
14    Q.  So this elevated moisture noted, that is
15  not reliable and you don't want us to rely on that?
16    A.  Correct.
17    Q.  Okay.  Water impact noted.  Are all of
18  those rooms -- did you see water impact in each?
19    A.  In the master bedroom, yes.  Master
20  bathroom, yes.  Son's bedroom, yes.  Office, yes.
21  Dining room and living room, no.  Studio bathroom
22  yes.  Kitchen, no.  And back den, yes.
23    Q.  So two of those responses in that column
24  are not correct?
25    A.  Correct.

Page 147

1    Q.  And mold growth noted.  Can you do the
2  same thing for me?  Are all those rooms correct?
3    A.  In the master bedroom and closet, that is
4  correct.  Master bathroom, correct.  Son's bedroom,
5  correct.  Office is correct.  Dining room and living
6  room, incorrect.  Studio and bathroom, correct.
7  Kitchen, not correct.  Back den, correct.
8    Q.  So there are two items in that column
9  that are not correct in your report?
10    A.  Correct.
11    Q.  All right.  And then it says "AEC samples
12  collected."  Can you --
13    A.  Those would have been -- they were taken
14  in the studio, back studio -- back room and the
15  master bedroom.  Which it's kind of -- their
16  bedrooms are connected, the son's room and the
17  master.  So it was taken in between both, so we
18  could say bedrooms, basically.
19    Q.  So the master and the son's bedroom is
20  correct.
21    A.  Correct.
22    Q.  But no samples of any kind in the master
23  bath; is that right?
24    A.  Correct.
25    Q.  What about the office?  Any samples of

Page 148

1  any kind there?
2    A.  No.
3    Q.  All right.  What about the dining room,
4  living room?
5    A.  Other than the cleanliness test for the
6  hutch, no.
7    Q.  What about the studio bathroom?
8    A.  Yes.  Oh.  Well, they were both together.
9    Q.  Okay.
10    A.  So it's the studio and the bathroom, yes.
11    Q.  Okay.  And skip HVAC.
12      Kitchen?
13    A.  No.
14    A.  No.
15      And then back den?
16    A.  We did an ATP test on the windows.
17    Q.  Okay.  So that was one, two, three --
18  four of the responses in the samples collected
19  column are incorrect?
20    A.  Correct.
21    Q.  Is that true?
22    A.  True.
23    Q.  And the sample results, let's just go to
24  the next page, 10, where you summarize those; is
25  that correct?

Page 149

1    A.  Correct.
2    Q.  And you took two air samples; is that
3  right?
4    A.  Yes.
5    Q.  And those results are on Page 10 and 11
6  of the report, right?
7    A.  Right.
8    Q.  And both of those air samples were less
9  than the outdoor control, correct?
10    A.  No.
11    Q.  Well, they're less in the total spores,
12  correct?
13    A.  The Aspergillus/Penicillium in both are
14  much higher than the outdoors.
15    Q.  Okay.
16    A.  Maybe easier to look at it from the lab.
17    Q.  Yeah, maybe.
18      All right.  So we've got -- the total
19  spore count is less in both rooms than the control?
20    A.  Correct.
21    Q.  What you're saying is, the
22  Aspergillus/Penicillium is greater than the control,
23  right?
24    A.  Correct.
25    Q.  All right.  And is that the basis for the

38  (Pages 146 to 149)

Page 150

1    not satisfactory?
2       A.   Yes.
3       Q.   Is that a mixed bag, fair to say?  Total
4    mold is okay, but that particular one, not?
5       A.   That's fair to say.
6       Q.   All right.  ATP, that's the cleanliness
7    standard.  Again, that's Kristy Beck-Miller's
8    perception of satisfactory or not, right?
9            MR. BRZEZINSKI:  Object to form.
10           THE WITNESS:  Well, it's based on the
11   number that the RLU returns, which are listed on
12   Page 2 in each section.
13      Q.   (By Mr. Boone)  So you list those in the
14   transmittal letter?
15      A.   Right.  So for, like, the master bedroom,
16   it was 7851.
17      Q.   All right.  And that's the cleanliness
18   standard, right?
19      A.   Correct.
20      Q.   Okay.  And so going to the protocol,
21   beginning on Page 15.  Are you with me?
22      A.   Yes.
23      Q.   This is the section again where you talk
24   about what needs to be done in each room, right?
25      A.   Right.

Page 151

1       Q.   And tell me how you reach the conclusion
2    about which rooms to include on this list.
3       A.   Based on visual observations, some on the
4    air samples and the, you know, visual areas of
5    fungal growth.
6       Q.   All right.  There is no diagram attached
7    to this report, correct?
8       A.   Correct.  We are going to have to look
9    into that, because I normally always do one.  So I
10   don't know why there was not one produced.
11      Q.   Okay.  Well, I don't either.  This is the
12   only one I was given and the one that I was told you
13   were going to opine about.
14      A.   Right.
15      Q.   But there is no diagram.  And as we've
16   been before, without the diagram, it's not a
17   Texas-compliant protocol, true?
18      A.   It's not industry -- There's nothing in
19   Texas that says I have to produce it.  But I prefer
20   it on a professional level so that it makes it
21   easier.
22      Q.   Okay.  Well, let me see if I can clarify.
23   Maybe my question wasn't good enough.
24           But Texas does require a mold
25   assessment consultant to complete a protocol,

Page 152

1    correct?
2       A.   If mold remediation will be done.
3       Q.   Right.  And in this instance, your
4    opinion was it needs to be done, right?
5       A.   Correct.
6       Q.   So it would have to have a protocol?
7       A.   Not necessarily.  You can -- It has to
8    have a protocol, yes.
9       Q.   Yeah.
10      A.   But the protocol is not required to have
11   the drawing.
12      Q.   A step at a time.
13      A.   Okay.
14      Q.   The assessment must have a protocol if
15   you believe remediation is necessary in your
16   opinion, correct?
17      A.   Yes.
18      Q.   A protocol must tell the remediation
19   contractor what needs to be repaired, how much needs
20   to be repaired, in which rooms it needs to be
21   repaired, and give specific directions on how to do
22   that, right?
23      A.   Correct.
24      Q.   In your practice, you put all of that
25   information on the diagram, correct?

Page 153

1       A.   Correct.
2       Q.   It is not included in this written
3    protocol piece beginning on Page 15, correct?
4       A.   Correct.
5       Q.   So without the diagram in your practice,
6    this doesn't get to -- doesn't amount to a protocol.
7       A.   Correct.
8       Q.   Okay.  That's what I thought.
9            THE WITNESS:  Sometimes I feel like
10   he and I are arguing the same point.
11      Q.   (By Mr. Boone)  And then you -- So there
12   is no protocol here, correct?
13      A.   I would call this an assessment report.
14      Q.   An assessment report.  So when it says on
15   the front page "and protocol," that is not correct?
16      A.   It should not say -- Unless there's a
17   diagram, it should not say protocol.
18      Q.   Okay.  And you also saw that there were
19   multiple errors in the visual observation, right?
20      A.   Right.
21      Q.   One, two, three, four, five, six, seven,
22   eight, nine -- eight examples where you put yes and
23   it should have been no, right?
24      A.   Right.
25      Q.   And does that affect the reliability --

Page 154

1   It certainly affects the reliability of those
2   statements, doesn't it?
3       A.   For that section, yes.
4       Q.   Okay.  All right.  Let's put Exhibit 13
5   down.
6            Now, I want to show you what has
7   already been marked as Exhibit Number 380.
8       A.   Okay.
9            MR. BRZEZINSKI:  That's a big number.
10           MR. BOONE:  Yeah, it is.
11      Q.   (By Mr. Boone)  And is that your
12  handwriting on Exhibit 380?
13      A.   Yes.
14      Q.   And it says, "Add outdoor from Vinales."
15  Right?
16      A.   Right.  Because it was raining that
17  night.  But I didn't do it.  I took it off the mold
18  lab reports.  On the mold range as well, which are
19  here.
20      Q.   Well, that's what I wanted to -- And when
21  you say "here," let's be more specific.
22      A.   It's right after the -- right after the
23  outdoor baseline.
24      Q.   Okay.  Well, I want to understand what's
25  going on.

Page 155

1       A.   Certainly.
2       Q.   Did you send a spore trap sample for the
3   Vinales?
4       A.   I am sure I did, because they were all
5   together.
6       Q.   Okay.  So you sent -- So the test results
7   from the Vinales were from an actual control at the
8   Vinales residence; is that correct?
9       A.   Correct.
10      Q.   Okay.  And let's look at -- that's
11  Exhibit 16.
12      A.   That I recall.
13      Q.   That's too many pieces of paper.  My
14  apologies.
15      A.   I'm trying to remember why -- I know it
16  was raining when we left.  It was very, very late,
17  and it was raining.  And --
18      Q.   When we left who?
19      A.   When I left Daniels.  I did them late
20  that night.
21      Q.   The last one?
22      A.   The last one.
23      Q.   All right.
24      A.   And I know it was raining.  And we needed
25  to -- I also needed to make a note to get the mold

Page 156

1   range.  But they also live right across from each
2   other, relatively speaking, in the same area.  So --
3       Q.   Who lives across from who?
4       A.   Don't the Daniels and the Vinales live
5   relatively close?  From what I recall.
6       Q.   Okay.  Well, let me unpack that for a
7   minute.
8       A.   Okay.
9       Q.   Because you would agree with me that it
10  doesn't matter if they live next door, you need to
11  be taking the control sample from the area where --
12  outside the building you tested, correct?
13      A.   Correct.
14      Q.   So close doesn't really matter, does it?
15           MR. BRZEZINSKI:  Object to form.
16           THE WITNESS:  If they're very close.
17  But I don't recall how close they are.  If they were
18  next door to each other, one right in the middle
19  would suffice.
20      Q.   (By Mr. Boone)  Fair enough.  But they
21  weren't next door to one another.
22      A.   Yeah, I don't recall.
23      Q.   They're multiple houses in between,
24  right?
25      A.   I don't recall.

Page 157

1       Q.   Okay.  Well, if they're multiple houses
2   in between, you can't use a control sample from one
3   house for the other; is that true?
4       A.   True.
5       Q.   Okay.  And that's what -- The control
6   sample is, you test the air that's immediately
7   outside the home you're testing so you have
8   something to compare what's going on inside versus
9   the air that's outside right by that house, right?
10      A.   Right.
11      Q.   And so a control sample from ten doors
12  down is not going to fulfill that purpose, correct?
13      A.   Correct.
14      Q.   And every national accepted standard
15  would say you got to take it at the place where
16  you're doing the indoor sample, correct?
17      A.   Correct.
18      Q.   And there is no provision in any national
19  standard that you do anything but take the control
20  at the location where you're doing the indoor
21  sampling, correct?
22      A.   As far as I know.
23      Q.   Right.  Okay.
24           So in this instance, you believe you
25  took an outdoor sample at the Vinales, correct?

Page 158

1      A.   Correct.
2      Q.   But then with respect to the Daniels, you
3  just told EMLab to add the outdoor sample from the
4  Vinales to the Daniels, right?
5      A.   The data so that we could get the mold
6  range.  Because I have to have an outdoor to get a
7  mold range for Texas for that area.
8      Q.   Well, are you telling them to just use
9  the results from the Vinales?
10     A.   So that I could get this data.
11     Q.   But I thought you --
12     A.   Get this data.
13     Q.   I thought you told me you took an outdoor
14  sample from the Vinales.
15     A.   I did.
16     Q.   Okay.  And what are you asking them to
17  do?  I read it as "Just use the Vinales results for
18  the control for the Daniels."  Is that what you did?
19     A.   I don't recall.
20     Q.   Okay.
21     A.   But I know that it was pouring down rain,
22  and I needed this data, the mold range data.
23     Q.   For which one?
24     A.   For Daniels, because it was pouring down
25  rain.

Page 159

1      Q.   Okay.  So you didn't use the Vinales
2  sample.
3      A.   Well, if you look -- and I didn't realize
4  this -- this is the same as in the Vinales, which I
5  just looked at.
6      Q.   Right.
7      A.   Right.
8      Q.   And it's also the same as in the Wolf.
9      A.   It is?
10     Q.   Yeah.
11          MR. BRZEZINSKI:  Object to form.
12          THE WITNESS:  Okay.
13     Q.   (By Mr. Boone)  Look at Exhibit
14  Number 10.
15     A.   You are correct.
16     Q.   So here's what I'm getting at.  If you
17  took an actual sample of the Vinales and sent it in
18  to EMLab, do you think they just sent you back the
19  mold score numbers?
20     A.   I don't know.
21     Q.   Okay.  Because --
22     A.   Mold range numbers.
23     Q.   Okay.  Mold range numbers.  So let's be
24  clear about what we're talking about.  In Exhibit
25  Number 16 -- Well, let's do --

Page 160

1      A.   I'm lost.
2      Q.   I apologize.  It's confusing.  But let's
3  go to the Daniels report, Exhibit Number 13.
4      A.   Okay.
5      Q.   Okay?
6      A.   Right.
7      Q.   This one says, on the face of the report,
8  "outside," right?
9      A.   Right.
10     Q.   Okay.  And then the following page is
11  this mold range analysis that's prepared by EMLab.
12  Do you see that?
13     A.   Correct.  Yes.
14     Q.   And this is based on data in Texas as a
15  whole, right?
16     A.   Texas as a whole for an entire year and
17  in the month of April.
18     Q.   Right.  So when you were talking about
19  ZIP codes earlier, it's not ZIP codes.  It's the
20  whole state --
21     A.   It's the state.  You are correct.
22     Q.   So that's --
23     A.   Different.
24     Q.   Yeah.  Because Texas is like a huge
25  state, right?  Austin's a lot different than

Page 161

1  El Paso, right?
2      A.   Right.
3      Q.   And it's taking data from all of those
4  and some kind of average that they come up with on
5  the mold range, right?
6      A.   Right.
7      Q.   And it has an average of total spores,
8  43,000 total spores, correct?
9      A.   Correct.
10     Q.   And then 39,000 of that is Cladosporium?
11     A.   Correct.
12     Q.   All right.  But that's their estimate
13  that -- I mean, is that -- do you rely on that?
14     A.   We do when it's raining.
15     Q.   Okay.
16     A.   And in fact, I think even in part of
17  my -- it used to say in my report that we -- at
18  times, we have -- yeah, AEC may use mold range
19  tables for air sample comparison and analysis.
20     Q.   Okay.  Well, it's one thing to say you
21  may use it, and it's another to say that you've used
22  it three times and not tell anybody.  Do you agree?
23          MR. BRZEZINSKI:  Object to form.
24          THE WITNESS:  I agree.
25     Q.   (By Mr. Boone)  And none of these reports

Page 162

1    tell anybody that you're using the mold range
2    estimate at all, do they?
3        A.   I guess not.
4        Q.   Well, I mean, you've got the reports in
5    front of you.  They're your reports.  They all say
6    outside as if the control sample were taken at the
7    particular residence, correct?
8        A.   Correct.
9        Q.   And that's not true, is it?
10       A.   Correct.
11       Q.   It's not a sample taken from outside of
12   anywhere, is it?
13       A.   No.  It's based on the sample taken
14   outside of the Vinales, which was put in to do the
15   mold range.  Because you have to have an outdoor for
16   them to give you a mold range.  I know, it's...
17       Q.   Well, then how does a mold range
18   substitute if it's raining outside?
19       A.   It's just based on that -- It wasn't
20   raining when I did Vinales.
21       Q.   Okay.  So you're telling me that Vinales
22   is an accurate report of the outside air at the
23   Vinales residence when you took it?
24       A.   I believe so.
25       Q.   Okay.  And so look at those numbers, if

Page 163

1    you would, in Exhibit 16.  And look then in
2    Exhibit 13 at the mold range numbers.  And tell me
3    if they're the same.
4        A.   They are the same.
5        Q.   They're identical.
6        A.   Yes.
7        Q.   For every species, correct?
8        A.   Yes.
9        Q.   And the odds of you returning an actual
10   sample at the Vinales residence that matches up per
11   spore to precisely what the mold range is is
12   infinitesimal.  Do you agree?
13       A.   I agree.
14       Q.   So this is the mold range in the Vinales
15   test result; is that right?
16       A.   Yes.  I'm seeing that now, that that's
17   what they returned as outdoors.
18       Q.   Now, my question is, did you actually
19   take a sample at Vinales and the lab screwed it up
20   and sent you a bogus result?  Or did you just use
21   the mold range to start with?
22       A.   Well, do we have the Vinales chain of
23   custody?
24       Q.   Do you?
25       A.   I don't believe so.  I would have to look

Page 164

1    it up.
2        Q.   All right.  Aren't you responsible under
3    the nationally accepted standards for keeping the
4    chain of custody?
5        A.   It's in the mold portal.
6        Q.   And have you accessed that?
7        A.   No.
8        Q.   Have you produced that?
9        A.   No.
10       Q.   Have we asked you to produce that?
11       A.   Yes.
12       Q.   Okay.  So do you know what's on the chain
13   of custody?
14       A.   I do not.
15       Q.   Okay.  But what we have here, would you
16   agree, is that you, in your reports, are using some
17   lab's estimate of outdoor spore counts for the whole
18   state of Texas?
19       A.   In these --
20       Q.   Correct?
21       A.   -- three, yes.
22       Q.   Okay.  And in the reports -- So they are
23   not control samples from the particular locations at
24   issue, correct?
25       A.   Correct.

Page 165

1        Q.   And they are not, therefore, taken
2    according to nationally accepted standards, correct?
3            MR. BRZEZINSKI:  Object to form.
4            THE WITNESS:  Correct.  But many
5    people -- many assessors use mold range when they
6    can't get an accurate -- take an accurate sample due
7    to weather.
8        Q.   (By Mr. Boone)  I don't know whether
9    that's true about whether many people do it or not.
10   What I do know is that the national standards, ASTM,
11   NIOSH 800, all the -- AIHA, ACGIH, none of them
12   authorize or recognize the use of an average for the
13   control, do they?
14           MR. BRZEZINSKI:  Object to form.
15           THE WITNESS:  True.
16       Q.   (By Mr. Boone)  All right.  And so your
17   use of the average for the control here is against
18   those accepted standards, true?
19           MR. BRZEZINSKI:  Object to form.
20           THE WITNESS:  True.
21       Q.   (By Mr. Boone)  All right.  And would you
22   agree with me that based on that fact alone, you
23   don't have anything to compare these samples to that
24   is recognized by the national accepted standards,
25   correct?

Page 166

1    A.   Correct.
2    Q.   And for that reason, you cannot make a
3  comparison that is compliant with the national
4  accepted standards, correct?
5    A.   Correct.
6    Q.   And therefore, the air testing in these
7  three instances is not reliable according to the
8  national accepted standards, correct?
9            MR. BRZEZINSKI:  Object to form.
10            THE WITNESS:  But it can
11  also be -- I mean, maybe not national standards, but
12  as far as, you know, industry standards, you know,
13  when we have to do something different, you know, we
14  use the mold range.  That's the whole reason why it's there.
15    Q.   (By Mr. Boone)  Kristy Beck-Miller can
16  decide to do what she wants to do, right?  And
17  that's what you're saying, is that it is raining, I
18  couldn't take a control, and so I used the estimate.
19            MR. BRZEZINSKI:  Object to form.
20    Q.   (By Mr. Boone)  Right?
21    A.   The next best thing I had.
22    Q.   All right.  But it wasn't raining at the
23  Vinales house, and you actually were able to take a
24  sample there.  But you used the mold range anyway,
25  right?

Page 167

1    A.   I used what the lab sent back to me as my
2  outside.
3    Q.   Okay.  All right.
4            THE WITNESS:  Can we take a break
5  before we --
6            MR. BOONE:  Sure.
7            (Short break.)
8            (Exhibit 41 marked.)
9    Q.   (By Mr. Boone)  I want to show you now
10  some e-mails that are between you and the Daniels
11  family.
12    A.   Okay.
13    Q.   Exhibit 41 is one.  If you remember, I
14  asked you at the beginning of the deposition whether
15  you had looked for any correspondence -- well, you
16  hadn't produced any correspondence with any of the
17  plaintiffs.
18    A.   Right.  I was having a hard time finding
19  them.
20    Q.   All right.  Well, this is some e-mail
21  correspondence with Barbara High-Daniels, is it not?
22    A.   Yes.
23    Q.   It says, "I wonder if you could provide
24  Michael and I with feedback from our latest mold
25  result from Argus."

Page 168

1            Do you recall receiving that?
2    A.   I do not recall that.
3    Q.   All right.  Then it says, "Michael filed
4  an additional TDLR complaint, and we haven't heard
5  anything."
6            Do you know who that --
7    A.   I do not recall.
8    Q.   Do you know who they filed the complaint
9  against?
10    A.   I don't.  I don't recall.  If you've got
11  it somewhere, then I would know.  I don't recall.
12    Q.   I'm asking you.
13    A.   Right.
14    Q.   I don't know.  The e-mail's to you.
15            (Exhibit 42 marked.)
16    Q.   (By Mr. Boone)  Let me show you Exhibit
17  Number 42.  It's another e-mail.  Have you seen that
18  before?
19    A.   Yes.  I don't -- It says I wrote it to
20  look at the report to see if there was anything that
21  I had missed.
22    Q.   All right.  So this is a draft of the
23  report that you sent to the Daniels, right?
24    A.   Correct.
25    Q.   And this is in an e-mail.  This is not

Page 169

1  any kind of portal or anything else, right?
2    A.   Correct.
3    Q.   And you're asking if there's -- to see if
4  there's anything that I missed, right?
5    A.   Right.
6    Q.   It says, "I still have to do the floor
7  plan drawings for the remediation, but that will
8  take me across the weekend to do.  But I want to go
9  ahead and get these into your hands."
10            Correct?
11    A.   Correct.
12    Q.   Does that refresh your recollection about
13  whether you ever did a floor plan?
14    A.   No, sir, it doesn't.  It's just rare.
15  But I don't, so...
16            (Exhibit 43 marked.)
17    Q.   (By Mr. Boone)  Let me show you
18  Exhibit 43.  More e-mail communication.
19    A.   So it looks as though I did review the
20  Argus report, which it's been so long, I don't
21  recall.  Because I have comments on that.
22    Q.   Okay.  And your comments are, "I don't
23  know what method they're using for what should be
24  considered clean."
25            What is -- You've done clearance

43 (Pages 166 to 169)

Page 170

1   verification before.  What is the standard operating
2   procedure?
3        A.   Is this post-clearance?
4        Q.   Yes.
5        A.   I guess so, yes.
6             It has to be visually clean of dust
7   and debris, and it also has to be either an air
8   sample or a tape sample.  And you have to use a --
9   like a standard to --
10       Q.   What is the standard?
11       A.   That's what I'm getting -- I'm sorry.  My
12  brain's going 90 to nothing.
13            You have to use a nationally --
14  accredited is not the word -- a nationally accepted
15  clearance procedure.
16       Q.   All right.  And who comes up with those?
17       A.   It could be -- according to the state of
18  Texas, I mean, any of the standards.
19       Q.   I know, but you've done verification
20  clearance before, right?
21       A.   Right.
22       Q.   What standard --
23       A.   ACGIH, IIC -- Well, not IIC or -- They
24  talk about it in the S520.
25       Q.   Well, what definition do you use of

Page 171

1   cleaning when you do verification clearance?
2        A.   It has be less than the non-control, it
3   has to not have any of the suspect -- the high
4   moisture suspect fungal spores in it, such as
5   Chaetomium or Stachybotrys, things like that, and
6   visually clean.  And also, I use ATP for surface
7   sampling.  It has to get rid of the biofilm.
8        Q.   All right.  When you say less than the
9   control, you're talking about air sampling?
10       A.   Correct.
11       Q.   That is for contents, though, isn't it?
12       A.   I do not recall.
13       Q.   Okay.  Because there is no -- It's
14  talking about tape sampling.
15            Well, I'm just wondering, can you
16  answer any of the questions that you're asking for
17  yourself?  So what is the term clean when you do a
18  verification clearance?
19       A.   Well, I would have to go back -- I mean,
20  if this is on contents, I would have to -- I mean, I
21  have to see how they sampled.  Because what I'm
22  reading is, it looks like they used one tape and
23  went in several different areas.  But you can't do
24  that.  You have to use one tape sample per area.
25       Q.   Okay.  Well, they -- that wouldn't be

Page 172

1   appropriate, would it?
2        A.   What?
3        Q.   Using the same tape over and over again?
4        A.   No.  That's why it says -- because it's
5   not going to be as sticky.
6             (Exhibit 45 marked.)
7        Q.   (By Mr. Boone)  All right.  I'll show you
8   Exhibit Number 45, which is some more communication.
9             Well, let me -- back on 44.  You
10  didn't intend to opine about any of that stuff, do
11  you?
12       A.   No.  It's somebody else's test.
13       Q.   Okay.  And that's what I'm going to say.
14  You don't have any opinions about what Argus did,
15  whether they did it right or the answers.  You don't
16  have any criticisms of anything they did, right?
17       A.   I don't even remember the report, so no.
18       Q.   And Exhibit 45.
19       A.   This is a continuation of 43.
20       Q.   Yes.
21       A.   Right.  Because that's when I sent this
22  from 43.
23       Q.   Right.
24            So they ask you, "Can you translate
25  the mold reports?"

Page 173

1             You say, "Send them over."
2             They say, "Thanks for your
3   willingness."
4             And then later, you give some
5   comments back.
6        A.   Correct.
7             (Exhibit 44 marked.)
8        Q.   (By Mr. Boone)  All right.  I'll show you
9   Exhibit Number 44.
10       A.   And that's a continuation of 41 where
11  she's asking about whoever they complained about.
12       Q.   Right.
13       A.   And so I say, typically, they -- what
14  they do is, they go to the inspector.
15       Q.   All right.  And I'm not going to -- You
16  weren't involved in the content sampling at the
17  Daniels home, correct?
18       A.   Correct.
19       Q.   You have no opinions about whether that
20  was done correctly or incorrectly, correct?
21       A.   Correct.
22       Q.   And we've just been through about five or
23  six different e-mails, which were subject to our
24  subpoena, right?
25       A.   Right.

44  (Pages 170 to 173)

Page 174

1    Q.   We asked for communications with the
2    plaintiffs, right?
3        A.   Right.
4        Q.   These were produced by the plaintiffs.
5        A.   Okay.
6        Q.   Did you even look for any --
7        A.   Yes.
8        Q.   -- communications?
9        A.   Uh-huh.  We went through this yesterday,
10   where I went and searched through the names and
11   everything.  And I don't know -- I don't know.
12       Q.   So you looked in the right place where
13   these e-mails would have been?
14       A.   Yes.
15       Q.   And you did not find these five or six
16   e-mails?
17       A.   No, sir.
18       Q.   Okay.  And you knew that you -- Well, you
19   knew that you had only done reports for five of
20   these plaintiffs, right?
21       A.   Right.
22       Q.   One of whom's name was Daniels, right?
23       A.   Right.
24       Q.   I presume you searched by "Daniels,"
25   right?

Page 175

1        A.   And High-Daniels.
2        Q.   And High-Daniels.
3        A.   Correct.
4        Q.   And there's five e-mails right here that
5    would have come up on that search, right?
6        A.   Right.
7        Q.   Are you saying that it didn't come up on
8    your search?
9        A.   It did not.
10       Q.   Okay.  So now let's move to the Wolfs.
11       A.   Okay.
12       Q.   And that's Exhibit 10.  And if you would,
13   get out your field notes, which is also Exhibit 35.
14   Looks like this.
15       A.   Okay.
16       Q.   All right.  So same questions, last one.
17   Your opinions with respect to the Wolf residence are
18   contained in this report, Exhibit 10, correct?
19       A.   Correct.
20       Q.   And all the facts and data you considered
21   are in here, right?
22       A.   Yes.
23       Q.   The basis for all your opinions is in
24   here, right?
25       A.   Yes.

Page 176

1        Q.   And there are no other opinions that you
2    want to give about the Wolf residence other than
3    what's in here?
4        A.   Correct.
5        Q.   All right.  The transmittal is first.
6    And on the Wolf report, I don't see any photographs
7    at all.  Is that correct?
8        A.   They are not attached to this report.
9        Q.   Okay.
10       A.   For which reason, I do not know.
11       Q.   Okay.  Did you take photographs?
12       A.   I can't believe that I would not have
13   taken photographs.
14       Q.   Okay.  Well, we went through and looked
15   at the designation and read the numbers off, and
16   this is what we were given.
17       A.   Okay.
18       Q.   Are there photos somewhere that relate to
19   the Wolfs?
20       A.   I would have to look.  I typically put
21   them all in here when I do the report.
22       Q.   All right.  Well, did you -- I mean,
23   obviously we asked for that in the subpoena,
24   correct?
25       A.   Correct.

Page 177

1        Q.   And did you even look?
2        A.   Of course I did.  Yes.
3        Q.   Okay.  So the Wolfs, we don't have any
4    pictures to look at.  Fair?
5        A.   Fair.
6        Q.   And we don't have any diagram to look at,
7    right?
8        A.   Right.
9        Q.   So that's not going to be any
10   documentation of any kind that's in the report,
11   right?
12       A.   Right.
13       Q.   So we've got HVAC closet, talking about
14   visible water damage and fungal growth, but no
15   documentation of what that is, how big it was, where
16   it is, any of that?
17       A.   It's a six-by-three-foot closet, based on
18   my field notes.
19       Q.   All right.
20       A.   And having drawn this, it -- I mean, I
21   would have done a floor plan.  So as to where it is,
22   why it's not attached to these reports with the
23   photos, I do not know.
24       Q.   Okay.  But the dimensions of the
25   closet -- you just told us the dimensions of the

45 (Pages 174 to 177)

Page 178

1    closet, not of the water damage and fungal growth,
2    right?
3        A.   Right.
4        Q.   So we don't know what the size is of the
5    fungal growth from this report, right?
6        A.   Correct.
7        Q.   Or your field notes, right?
8        A.   Correct.
9        Q.   And you talk about the living room
10   ceiling being wet at the time --
11       A.   Correct.
12       Q.   -- due to a toilet seal leak above,
13   correct?
14       A.   Correct.
15       Q.   Do you know whether that had been
16   reported to maintenance or not?
17       A.   I have no idea.
18       Q.   Okay.  Because toilet seals do leak from
19   time to time, don't they?
20       A.   Yes.
21       Q.   All right.  And I assume -- But you don't
22   know what the maintenance status of that request was
23   or not?
24       A.   No idea.
25       Q.   Fair enough.

Page 179

1            Master bedroom had visible water
2    damage on the wall.  Is that from this same water
3    leak?
4        A.   Yes.
5        Q.   Okay.  So it sounds like there was a
6    toilet seal leak that was active while you were
7    there?
8        A.   Correct.
9        Q.   Okay.  In the master bedroom, you used
10   the same language "heavily contaminated by fungi."
11   That is not true for ATP sampling, correct?
12       A.   Correct.
13       Q.   You use that over and over again on this
14   transmittal as well, right?
15       A.   Right.
16       Q.   And that's not correct, right?
17       A.   Right.
18       Q.   Master bathroom.  It says visible fungal
19   growth, but you don't say how much or where or the
20   cause, do you?
21       A.   It's all part of that bathroom seal.  And
22   I got it written -- It's in my field notes.  So the
23   master bathroom would have been from a leak above
24   that.
25       Q.   Okay.  But you don't write how much

Page 180

1    visible fungal growth there is anywhere, right?
2        A.   Correct.
3        Q.   And nor are there any pictures of that,
4    right?
5        A.   Correct.
6        Q.   And heavily contaminated by fungi per ATP
7    results is not true, right?
8        A.   Correct.
9        Q.   Upstairs bathroom.  This is the culprit
10   bathroom, right?
11       A.   Right.
12       Q.   So this is where the toilet seal was
13   leaking downstairs, right?
14       A.   Right.
15       Q.   You say visible mold growth present, but
16   you don't say where or how much, type, any of that,
17   right?
18       A.   Right.
19       Q.   And there's no documentation of that in
20   your file or in -- well, anywhere, right?
21       A.   Right.
22       Q.   And I'm not making that up, am I?  One of
23   the things of a mold assessment inspection is to
24   identify where you see fungal growth, state where it
25   is, how much it is, describe it as best you can,

Page 181

1    either in words, pictures or both, right?
2        A.   Right.
3        Q.   And that is not here.
4        A.   Right.
5        Q.   Kitchen floor sustained repeated water
6    damage, causing flooring to drop in one corner.
7    What's that about?
8        A.   The kitchen leaned, and it's away from
9    where this bathroom leak is.  So it appeared that
10   there was a leak in, like, maybe from an exterior or
11   something, and it caused the floor to just kind of
12   get soft and drop a little.  Or a lot, actually.
13       Q.   But no pictures to verify any of that?
14       A.   Right.
15       Q.   No diagram to verify any of that?
16       A.   Correct.
17       Q.   You are withdrawing your statement about
18   the HVAC system, correct?
19       A.   Correct.
20       Q.   And this has that same language in it
21   about "This has been backed up by laboratory
22   analysis of air register and boot."  Right?
23       A.   Right.
24       Q.   There was no such laboratory analysis of
25   air register or boot for the Wolf family, was there?

46  (Pages 178 to 181)

Page 182

1    A.  I'll have to look at the -- No.
2    Q.  So this is a cut-and-paste -- Or it's not
3  true as to the Wolfs, right?
4    A.  It's a cut-and-paste error.
5    Q.  And that made its way to the Wolf report,
6  correct?
7    A.  Correct.
8    Q.  And the Daniels report, correct?
9    A.  Correct.
10   Q.  And it's just not true in either, right?
11   A.  Correct.
12       MR. REED:  Objection; form.
13   Q.  (By Mr. Boone)  And you're withdrawing
14  the HVAC system opinion, right?
15   A.  Yes.
16   Q.  Withdrawing the entire home opinion,
17  right?
18   A.  Right.
19   Q.  Withdrawing the personal items and
20  contents opinion, right?
21   A.  Right.
22   Q.  Did Ms. Wolf express any health-related
23  claims to you?
24   A.  For her children.
25   Q.  Okay.  And you recommended she share the

Page 183

1  results of this with a physician, right?
2    A.  Right.
3    Q.  Do you know if she did that?
4    A.  No.
5    Q.  All right.  Let's go to the report
6  itself.  And which ones of the laundry list of
7  things did the Wolfs get?
8    A.  Air samples and ATPs.
9    Q.  So air sample, nonviable, right?
10   A.  Correct.
11   Q.  And ATP.  But none of the others; is that
12  right?
13   A.  Correct.
14   Q.  Okay.  And the active elevated -- Well,
15  the report -- preliminary report conclusions are all
16  yes, right?
17   A.  Yes.
18   Q.  And elevated moisture, is that again the
19  moisture meter --
20   A.  Yes.
21   Q.  -- calculation that you did?
22   A.  Yes.
23   Q.  Or I guess you don't know whether you
24  did.  Is that fair?
25   A.  I would have had to.  And I remember

Page 184

1  doing that in this home.
2    Q.  Okay.
3    A.  Because of the water that was coming from
4  up above.
5    Q.  All right.  Well, do you document what
6  those moisture readings were?
7    A.  I believe they were on photographs.  But
8  I'm not seeing -- I'm not seeing the lab results,
9  I'm not seeing the photographs, and nor am I seeing
10 the floor plan, which makes me think this is --
11 sometimes they don't get put together in one -- a
12 lot of times, they'll put them into one PDF, but
13 sometimes I send them as three.  So I don't -- There
14 should be more to this report.  I just do not know
15 where it is.
16   Q.  Okay.
17   A.  I don't know if it was missing in -- I
18 don't know.
19   Q.  Okay.
20   A.  It's been so long since I put these files
21 together for this that -- I mean, I haven't looked,
22 revisited that.
23   Q.  That's fair, except that in November of
24 2020, we issued a subpoena to you to look, correct?
25   A.  Right.

Page 185

1    Q.  Did you look?
2    A.  We went through the documents that Ryan
3  needed from me based on what he had and what else
4  was needed.
5    Q.  Well, did you look for your reports?  It
6  seems like that would be the first thing you would
7  look for, is where are my reports for these people?
8    A.  I thought they were already given to him,
9  because he didn't say he needed them; he said he
10 already had them, so...
11   Q.  Well, did you look for your reports or
12 not?  I get that you think there's more, but it
13 shouldn't be a surprise as of today that we're just
14 coming to this, because we issued a subpoena a year
15 and a half ago.
16   A.  Right.
17   Q.  And then again a couple months ago,
18 right?
19   A.  Right.
20   Q.  And on neither occasion did you actually
21 generate or produce what you believe to be a
22 complete report for this family.  Is that fair?
23       MR. REED:  Objection; form.
24       THE WITNESS:  I generated it.  I'm
25 just not sure where it -- why it's not all given to

Page 186

1    you.
2        Q.   (By Mr. Boone) Right. Okay.
3            So let me see if we can get it this
4    way. This elevated moisture business, you have a
5    personal recollection of taking those readings? Is
6    that what you're telling me?
7        A.   Yeah. And also just from my drawings
8    here. So the HVAC closet was wet, part of the
9    living room, the master bedroom, the master
10   bathroom, the upstairs bathroom where the water leak
11   was.
12       Q.   Yeah. But what I'm -- Then the squiggly
13   is where the water is?
14       A.   Yes.
15       Q.   Okay. I get that. I get you saw water.
16       A.   Right.
17       Q.   What I'm trying to get is what the
18   moisture readings were and where you took them and
19   what they were.
20       A.   Okay. I do not have those listed on
21   here.
22       Q.   Okay. So you say that there are
23   moisture -- elevated moisture in all of these rooms,
24   but you don't have any documentation to support
25   that; is that true?

Page 187

1        A.   Correct.
2        Q.   Okay. And you say water impact noted.
3    Is that in all of these rooms?
4        A.   With the exception of the HVAC system,
5    the personal items in the entire home.
6        Q.   So you're withdrawing all those, right?
7        A.   Right.
8        Q.   Okay. But everything else, is there
9    water impact in the kitchen, upstairs bathroom,
10   master bathroom, master bedroom, living room?
11       A.   Yes.
12       Q.   All right. And did you see mold growth
13   in all of those?
14       A.   HVAC closet, yes. Master bedroom, yes.
15   Master bathroom, yes. Upstairs bathroom. So that
16   would -- I do not have it noted in the living room
17   or the kitchen.
18       Q.   All right. So --
19       A.   Wait. Kitchen over here, visible mold
20   growth.
21       Q.   So on this one, it says "living room mold
22   growth noted." Your report says yes. But that's
23   not correct?
24       A.   As far as just looking back on these
25   notes that I have, I did not write that down in

Page 188

1    these notes.
2        Q.   All right. And then AEC samples
3    collected, same thing. Did you collect them in all
4    those --
5        A.   They were collected in the kids' bedroom,
6    in the living room downstairs.
7        Q.   So what about the master bedroom?
8        A.   Those were ATPs. And then the upstairs
9    bathroom was an ATP.
10       Q.   And do you count those as samples?
11       A.   Yes, I do.
12       Q.   All right. But upstairs bathroom,
13   there's ATP, right?
14       A.   Right.
15       Q.   What about kitchen?
16       A.   I am not seeing ATP sample for the
17   kitchen.
18       Q.   Or an air sample, right?
19       A.   Correct.
20       Q.   So kitchen says yes but should be no?
21       A.   Correct.
22       Q.   So one of those is wrong?
23       A.   Yes.
24       Q.   Okay. And then the category of water
25   under S500, you saw an active toilet leak, but

Page 189

1    that's not Category 3 water, correct?
2        A.   It was by this time due to time that the
3    toilet had been running.
4        Q.   So that gets to your 24-hour rule or
5    whatever?
6        A.   Yes.
7        Q.   If it's water there longer than 24 hours,
8    it's automatically --
9        A.   24 or 48.
10       Q.   Okay. Between 24 to 48, then it's
11   automatically Category 3?
12       A.   Right.
13       Q.   All right. Okay. So let's talk about
14   the air sampling beginning on Page 10. This, we've
15   already been through. It says outside here. That's
16   not an outside control sample, is it?
17       A.   It's based on the mold range.
18       Q.   It says outside.
19       A.   Correct.
20       Q.   And that's not true.
21       A.   Correct.
22           MR. REED: Objection; form.
23       Q.   (By Mr. Boone) But even if you use that,
24   the living room is less than the control, whatever
25   that was, right?

Page 190

1  **A.  With the exception of**
2  **Aspergillus/Penicillium.**
3  Q.  And what was that?
4  **A.  3600.**
5  Q.  All right.  And is that the reason why
6  that was not satisfactory?
7  **A.  Yes.**
8  Q.  All right.  And the ATP is the
9  cleanliness standard we talked about over and over,
10  right?
11  **A.  Correct.**
12  Q.  So when you say not satisfactory, that
13  just means not clean, right?
14  **A.  Correct.**
15  Q.  You didn't do any laser particle counting
16  on this one, right?
17  **A.  I did not.**
18  Q.  Or the Daniels, right?
19  **A.  Right.**
20  Q.  Or the Vinales, right?
21  **A.  Right.**
22  Q.  Any particular reason?
23  **A.  I don't recall.**
24  Q.  All right.  Do you charge extra for LPC?
25  **A.  No.**

Page 191

1  Q.  And I didn't see any relative humidity
2  recordings here anywhere either, right?
3  **A.  Correct.**
4  Q.  And that's for Wolf.
5  I didn't see them in Daniels either,
6  right?
7  **A.  Right.**
8  Q.  Or Vinales, right?
9  **A.  Right.**
10  Q.  And relative humidity is a standard --
11  one of the tools in your tool kit, right?
12  **A.  It's one of my tools.  So is laser**
13  **particle counter.  It's just one of the tools.**
14  Q.  I gotcha.
15  But you didn't use that tool --
16  **A.  Correct.**
17  Q.  -- on any of these three that you did
18  this day?
19  **A.  Correct.**
20  Q.  So going to the protocol section of the
21  report, beginning on Page 15, here again we've got a
22  situation where we don't have a diagram.  And so we
23  don't have a description of what needs -- what you
24  found in what rooms, in what dimensions, and what
25  needs to be done about it.  Fair?

Page 192

1  **A.  Fair.**
2  Q.  And that means that this cannot be a
3  nationally recognized or accepted protocol, right?
4  MR. REED:  Objection; form.
5  THE WITNESS:  Correct.
6  Q.  (By Mr. Boone)  And without it being a
7  protocol, you got to take off the title of the
8  report like you did before?
9  **A.  Right.  It would be a mold assessment**
10  **report.**
11  Q.  All right.  And you believe in this one,
12  like the last one, that some type of mold
13  remediation is warranted, correct?
14  **A.  Correct.**
15  Q.  And under Texas rules, when you reach
16  that conclusion as a mold assessor, you have to
17  include a protocol, right?
18  **A.  No.  No.  If the work is going to be**
19  **remediated by a professional mold remediation**
20  **company, they have to have a protocol to do it.**
21  Q.  Okay.  But you don't, as a mold
22  assessment person, have to generate a protocol under
23  the TDLR?
24  **A.  No.**
25  Q.  All right.  And again, removing your

Page 193

1  opinions about the HVAC system and about the
2  personal contents in the Wolf home, right?
3  **A.  Right.**
4  Q.  And removing your sections about the
5  entire home in this Wolf report, right?
6  **A.  Right.**
7  Q.  All right.  Do you recall having any
8  conversations with Kassandra Wolf about any of this
9  testing?
10  **A.  Regarding my testing?**
11  Q.  Yeah.
12  **A.  I don't recall.  I believe she had asked**
13  **a few questions, but I don't recall what they were.**
14  Q.  Were you provided any other test results
15  of the Wolf home in connection -- well, at any time?
16  **A.  Not that I recall.**
17  Q.  And not as reflected in your report,
18  right?
19  **A.  Right.**
20  **(Exhibit 46 marked.)**
21  Q.  (By Mr. Boone)  Okay.  I'll show you
22  Exhibit Number 46.  E-mail message with Kassandra
23  Wolf.  Do you see that at the bottom?
24  **A.  Yes.**
25  Q.  This is another communication with

Page 194

1   another one of your clients that was not produced by
2   you, right?
3       A.   Right.
4           MR. REED:  It was produced.
5           MR. BOONE:  That's fair.
6           THE WITNESS:  This is just my
7   preliminary, you know, take a look at this and I
8   have to finish the report.
9       Q.   (By Mr. Boone)  Right.  And again, it
10  says -- it's the same language that we saw with the
11  last one, wasn't it?
12      A.   Right.
13      Q.   So I haven't done the floor plan
14  drawings, take me across the weekend to do it, and
15  here's the draft.  Right?
16      A.   Right.
17      Q.   Do you know whether you actually even
18  finished the draft?
19      A.   You've got the draft.  I just have to
20  do -- I just -- I don't recall, but more than likely
21  I finished the floor plan.
22      Q.   Okay.  Well, that's all I'm asking, is,
23  does this -- Now that you've seen it, you sent two
24  of them out without the floor plan, does that
25  refresh your recollection of maybe I never did a

Page 195

1   floor plan on these?
2       A.   I don't know.  It would be very rare.
3       Q.   All right.  Did you ever have
4   conversations with Chief Latagne at Randolph?
5       A.   It does not ring a bell.
6       Q.   Do you know that the plaintiffs Kassandra
7   Wolf, Leilani Hamilton and others were lobbying
8   Chief Latagne for you to do mold testing all across
9   Randolph?
10      A.   Not that I was aware of.
11          (Exhibit 47 marked.)
12      Q.   (By Mr. Boone)  Show you Exhibit 47.
13  These are some social media messages.  Look at the
14  control number 59 at the bottom.  It looks like this
15  page right here.  Do you see this?
16      A.   Yes.
17      Q.   And this is Chief Latagne in the gray and
18  then I believe Kassandra Wolf in the blue.  And she
19  says, "When we had the meeting with my mold
20  assessor, she was very clear that everything had to
21  be cleaned or everything would be recontaminated.
22  If they aren't cleaning everything, then what I was
23  promised in the room with you and my husband's --
24  Can we please start an open e-mail conversation
25  including you and Kristy so she can explain why this

Page 196

1   isn't correct?"
2           Do you see that?
3       A.   Yes.
4       Q.   Did you tell any of these plaintiffs that
5   everything they had would have to be cleaned or
6   everything would be recontaminated?
7       A.   I do not recall saying those words.  I
8   know that if a mold remediation issue or a water
9   issue is ongoing, it will contaminate everything.
10      Q.   I understand.  We've been through now all
11  five of your reports.  And you were very careful to
12  say that you did not make any opinions as to the
13  state of anyone's contents, right?
14      A.   Right.
15      Q.   I'm just wondering if you would tell
16  something different to these plaintiffs.
17      A.   I -- No.  Not that I know of.
18      Q.   Okay.  So if Ms. --
19      A.   I'm assuming -- Is she talking about the
20  house, or is she talking about her goods?
21      Q.   It looks like, to me, that they're
22  talking about the goods.
23      A.   Okay.
24          MR. REED:  We're not going to assume
25  anything.

Page 197

1           MR. BOONE:  Well, I don't know.  I
2   wasn't in the conversation for sure.
3       Q.   (By Mr. Boone)  But all I'm doing is to
4   ask you -- So as best you recall, did you tell any
5   of your clients that everything -- their contents
6   would have to be cleaned or everything would be
7   recontaminated?
8       A.   Not as far as their contents.  I would
9   think it would just be in whatever was wet, if
10  something was wet, or the buildings, you know, where
11  their stuff is, if there's visible mold growth.
12      Q.   All right.  So the answer's no?
13      A.   Yeah.  As far as I remember.
14      Q.   All right.  And you did not participate
15  in any of the mold assessment or any other work at
16  the Wolf residence after that one day you were
17  there, correct?
18      A.   Correct.
19      Q.   So you don't have any opinions about the
20  quality of that work, whether they got it right or
21  wrong or too much or too little, no opinions about
22  that?
23      A.   No opinions.
24      Q.   All right.  We're at a good stopping
25  place.  You want to take another break?

50 (Pages 194 to 197)

Page 198

1    A.  Sure.
2         (Short break.)
3    Q.  (By Mr. Boone)  So the next -- and
4  actually, this is the last of the things that were
5  identified in the designation, if you remember when
6  we started, right?
7    A.  Right.
8    Q.  This is the letter to -- Well, tell me
9  what this is.
10   A.  It's a letter to Brigadier General
11 Lenderman, just kind of asking for a sit-down to
12 talk with her about just the things that I had
13 visually seen and tested through those three
14 families, the Wolfs, Daniels and Vinales.
15   Q.  Okay.  And that's on Exhibit 14?
16   A.  Yes.
17   Q.  And the pitch was that you wanted to do
18 at Randolph what you had been doing at Fort Hood,
19 right?
20   A.  I wanted to kind of just talk to her.  It
21 wasn't so much about getting the work.  I just felt
22 like somebody up needed to know what was going on.
23   Q.  But you asked for the work?
24   A.  Of course.
25   Q.  All right.  So what was -- what

Page 199

1  precipitated this?
2    A.  There was -- We had a very large meeting.
3    Q.  Who was at the meeting?
4    A.  Brigadier General Lenderman and about 30
5  other people.
6    Q.  Okay.  So this is a -- So your letter led
7  to that meeting?
8    A.  Yes.
9    Q.  Okay.  Let's start in the timeline.  What
10 led you to write the letter?  Was there a phone
11 call?  Meetings with any of these plaintiffs?  Or
12 what was the situation?
13   A.  I honestly do not recall.  I don't know
14 if Becky Vinales asked me to do it.
15   Q.  Surely some or one -- all of the
16 plaintiffs had to ask you to go talk to her.
17   A.  Well, I had to get their permission.
18        MR. REED:  Objection; form.
19   Q.  (By Mr. Boone)  Okay.  Because you
20 couldn't just go and see what -- tell what you had
21 seen in their homes without their permission?
22   A.  Correct.
23   Q.  So you had their permission --
24   A.  Right.
25   Q.  -- to go and write her, right?

Page 200

1    A.  Right.
2    Q.  And you believe Becky Vinales may have
3  asked you to do so?
4    A.  Maybe.
5    Q.  All right.  Any other of the others?
6    A.  I don't recall exactly.
7    Q.  All right.  And at this time, we are just
8  talking about Wolf, Daniels, Vinales, correct?
9    A.  Correct.
10   Q.  All right.  You mention personal items,
11 visible fungal growth on personal items.  Which you
12 had seen and documented that we've been through,
13 right?
14   A.  Correct.
15   Q.  Did you tell or -- I didn't see in this
16 letter that you were not making an opinion as to
17 what needed to happen to those contents.  Did you at
18 any point ever tell General Lenderman that you had
19 no opinions about that?
20        MR. REED:  Objection; form.
21        THE WITNESS:  I don't recall.
22   Q.  (By Mr. Boone)  Okay.  And the next --
23 the sentence that says "the level of
24 cross-contamination in these homes."  And you've
25 used this word before in these reports, right?

Page 201

1    A.  Right.
2    Q.  And what you mean by that word is the
3  potential for something in one place to be
4  transmitted to someplace else, right?
5    A.  Right.
6    Q.  Okay.  But did you explain that
7  distinction to General Lenderman?
8    A.  I don't recall.
9    Q.  All right.  So you say, "These homes are
10 some of the worst I have encountered in my 20-year
11 career."
12   A.  I said the level of cross-contamination
13 in these homes.
14   Q.  Okay.  Well, what we have been through
15 today is that you do not have any documented proof
16 of cross-contamination anywhere.  You only have your
17 assumption that that is true based upon what you
18 believe to be spores going elsewhere.  True?
19   A.  And based --
20        MR. REED:  Objection; form.
21        You can answer.
22        THE WITNESS:  And based on the air
23 sample and the things that I've seen, and
24 experience.
25   Q.  (By Mr. Boone)  I'm curious about whether

51 (Pages 198 to 201)

KRISTY BECK-MILLER, VOL. 2                    MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

Page 202

1    the things that you saw at Fort Hood were worse or
2    not.
3        A.   It varies some, but these were some of
4    the worst I had seen.
5        Q.   Okay.  You say, "I've been given
6    permission."  Right?  That confirms that the three
7    families have authorized you to do it, right?
8        A.   Right.
9        Q.   And you provided the reports to General
10   Lenderman, correct?
11       A.   Correct.
12       Q.   And you acknowledge after our experience
13   today that those three reports are full of errors,
14   aren't they?
15       A.   Correct.
16           MR. REED:  Objection; form.
17       Q.   (By Mr. Boone)  All right.  And there are
18   many factual inaccuracies in them, correct?
19       A.   Correct.
20       Q.   And that with respect to one of them, the
21   Vinales report, you do not even believe it is
22   reliable according to national standards, correct?
23           MR. REED:  Objection; form.
24           THE WITNESS:  Correct.
25       Q.   (By Mr. Boone)  And you sent those

Page 203

1    reports to General Lenderman without disclosing any
2    of that information, true?
3        A.   I did not know it at the time.
4        Q.   All right.  You say that "my statement
5    that base housing is not being handled well by the
6    current maintenance company."  You see that?
7        A.   Yes.
8        Q.   That's not --
9        A.   It's my opinion.
10           MR. REED:  Wait till the question is
11   asked.
12           THE WITNESS:  I'm sorry.
13       Q.   (By Mr. Boone)  Well, you don't have any
14   information about that, do you?
15       A.   Just based on what they -- what the three
16   families were saying, you know, I couldn't get this
17   fixed or that fixed, or anything like that.
18       Q.   And that's exactly where I'm going.
19       A.   Right.
20       Q.   100 percent of the basis of that
21   statement is what those three families told you,
22   correct?
23       A.   Correct.
24       Q.   You have no idea about whether what they
25   told you is actually true.

Page 204

1        A.   Correct.
2        Q.   Okay.  So, for example, you have not seen
3    maintenance record number one on any of those three
4    homes to this day, have you?
5        A.   No.
6        Q.   So you have no idea whether any of the
7    things they were complaining about had even been
8    reported to maintenance, do you?
9        A.   No.
10           MR. REED:  Objection; form.
11       Q.   (By Mr. Boone)  Nor do you know what the
12   maintenance response was to any of those complaints,
13   correct?
14       A.   Correct.
15       Q.   And without any of that information, you,
16   Kristy Beck-Miller, can't comment on whether or not
17   they did their job or not, can you?
18           MR. REED:  Objection; form.
19           THE WITNESS:  True.
20       Q.   (By Mr. Boone)  All right.  And it says
21   that "issues are not being handled in accordance
22   with the TDLR."  What issues?
23       A.   Like mold, any mold remediations, from
24   what I was being told, were not being handled by
25   mold remediation companies, but just by maintenance.

Page 205

1        Q.   Okay.  Well, would you also agree that
2    that is 100 percent based upon what those three
3    families told you?
4        A.   Yes.
5        Q.   And zero percent based upon what you
6    actually know?
7        A.   Correct.
8        Q.   So you don't know how any mold
9    remediation at any of these three or any other thing
10   was handled by Randolph Family Housing, do you?
11           MR. REED:  Objection; form.
12           THE WITNESS:  Correct.
13       Q.   (By Mr. Boone)  And so you don't know
14   whether those practices were being done in
15   accordance with the TDLR or not, right?
16       A.   Right.
17       Q.   And then it says "and to our national
18   standards."  You likewise don't have any idea
19   whether that's true or not, correct?
20           MR. REED:  Objection; form.
21           THE WITNESS:  Correct.
22       Q.   (By Mr. Boone)  So why would you believe
23   everything these three families told you and act
24   like it's a fact to the general in charge of the
25   whole base?

KRISTY BECK-MILLER, VOL. 2                                    MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

Page 206

1           MR. REED:  Objection; form.
2           THE WITNESS:  I do not recall why.
3       Q.   (By Mr. Boone)  Okay.  You would agree,
4   would you not, that General Lenderman, when she
5   reads this, doesn't have any idea whether that is --
6   she might think that's your Kristy Beck-Miller's
7   opinion about those, right?
8           MR. REED:  Objection; form.
9           THE WITNESS:  I don't know what she
10  would assume.
11      Q.   (By Mr. Boone)  Well, that's what the
12  plain language says, that -- well, it does not say
13  that based solely on what these people are telling
14  me those things.  It says those things, right?
15      A.   It says these things, but you asked me
16  what she would assume or think.  I don't --
17      Q.   That's fair.
18           So when you say that would back up my
19  statement that base housing -- When you say "my
20  statement," that's not really your statement.
21          MR. REED:  Objection; form.
22          THE WITNESS:  Correct.  I suppose.
23      Q.   (By Mr. Boone)  Yep.
24           You say, "Due to some of the evidence
25  I have seen in these three houses, these industry

Page 207

1   controls are not being met."
2           Which industry controls are you
3   talking about?
4       A.   I'm talking about, you know, the going
5   in, doing an assessment, doing a -- by the base.
6   Having it assessed, doing a mold remediation, you
7   know, by a licensed contractor and having it
8   cleared, and dealing with the things that are the
9   cause of the issues.
10      Q.   Okay.  With respect to one of the
11  families, there was an active toilet leak going on
12  when you were there.  You don't even know whether
13  maintenance had had the opportunity to respond to
14  that yet, do you?
15      A.   I do not.
16      Q.   Okay.  So you don't know whether the
17  controls were being met or not; is that true?
18          MR. REED:  Objection; form.
19          THE WITNESS:  I suppose so.
20      Q.   (By Mr. Boone)  All right.  When you
21  disclosed the three reports, did you also disclose
22  to her that there were things that were missing that
23  are required by the national standards you hold
24  yourself to?
25          MR. REED:  Objection; form.

Page 208

1           THE WITNESS:  No, because I did not
2   realize it at the time.
3       Q.   (By Mr. Boone)  All right.  You disclose,
4   in the last paragraph, that you had been hired by
5   Fort Hood, right?
6       A.   Right.
7       Q.   And that was 176 homes you told me
8   before, right?
9       A.   Correct.
10      Q.   And what was your base -- what was your
11  pay for that per home?
12      A.   I don't remember.
13      Q.   Was it about what you charged at
14  Randolph?
15      A.   Yeah.
16      Q.   Somewhere in the neighborhood of 1500 an
17  inspection?
18      A.   No.  It was a lot less than that.
19      Q.   Like a thousand?
20      A.   Like 450 a home.
21      Q.   Were you doing just assessments or
22  verifications, or what?
23      A.   Yes.  Both.
24      Q.   Okay.  And you were only charging 450 a
25  home?

Page 209

1       A.   That was the only way I could get the
2   contract.
3       Q.   Okay.  At 500 a home, that's still
4   $85,000?
5       A.   Approximately.
6       Q.   All right.  And here at the end is that
7   you would strongly recommend that Randolph hire you,
8   right?
9       A.   No.  I said we would -- I do not want
10  this letter to be about us seeking a contract from
11  you.  I was recommending that they do the same, have
12  somebody come in and look at it.
13      Q.   All right.  Well, you're pitching for the
14  business, though.
15      A.   There's nothing wrong with that.
16      Q.   There is not.  But let's be honest about
17  it.  You're asking her, I would strongly recommend
18  that Randolph hire me to do the same, right?
19      A.   It doesn't say that.
20      Q.   Okay.  The last sentence there says "in
21  helping them have a healthy home to breathe in."
22  You have been clear with me, I think, that you -- it
23  is beyond your expertise to comment on whether any
24  home is healthy or not, true?
25      A.   True.

53 (Pages 206 to 209)

Page 210

1    Q.   That's not something that Kristy
2  Beck-Miller is qualified to do, correct?
3    A.   Correct.
4    Q.   And you didn't -- you did not intend to
5  insinuate that any of these homes were unhealthy,
6  did you?
7    A.   No.
8    Q.   All right.  I'll show you -- You also
9  remember at the beginning I asked you whether you
10  had looked for any e-mails with Air Force personnel;
11  do you recall that?
12    A.   Yes.
13    Q.   And you told me that you had searched but
14  you had not located any.  Is that --
15    **A.   It's hard for me to find anything that**
16  **goes back that far in my files, so...**
17    Q.   Okay.  Well, this correspondence occurred
18  in April of 2019, right?
19    A.   Okay.
20         (Exhibit 48 marked.)
21    Q.   (By Mr. Boone)  I'll show you Exhibit
22  Number 48 and ask if that's your e-mail address on
23  there.
24    A.   Yes.
25    Q.   And so here's some communication by

Page 211

1  Captain Herrmann, trying to set up this meeting with
2  Lenderman you're talking about, right?
3    A.   Right.
4    Q.   Your search did not uncover this e-mail?
5    A.   No.
6    Q.   All right.
7         (Exhibit 49 marked.)
8    Q.   (By Mr. Boone)  Exhibit 49 is another
9  series of e-mails.  Same kind of link that your
10  search did not uncover Exhibit 49 either?  Is that
11  right?
12    A.   Correct.
13    Q.   And you are listed on there in the loop
14  somewhere, aren't you?
15         Actually, maybe not on Exhibit 49.
16  It's about you but not to or from you; is that
17  right?
18    A.   Correct.
19    Q.   All right.
20         (Exhibit 50 marked.)
21    Q.   (By Mr. Boone)  But Exhibit 50, you're in
22  the chain, are you not?
23    A.   Yes.
24    Q.   And your search did not uncover any of
25  that?

Page 212

1    A.   Correct.
2         (Exhibit 51 marked.)
3    Q.   (By Mr. Boone)  And Exhibit 51, you're
4  also in the chain.  Your search did not uncover any
5  of that?
6         MR. REED:  Walter, we produced all of
7  these.
8         MR. BOONE:  That's true.  But she
9  didn't.
10         MR. REED:  They all came through us.
11         MR. BOONE:  She didn't.
12         MR. REED:  She's our expert.  You
13  have all the e-mails.
14    Q.   (By Mr. Boone)  The answer to the
15  question is, your search did not uncover that,
16  correct?
17    A.   Correct.
18    Q.   All right.  So to Mr. Reed's point, you
19  produced no correspondence.  You, Kristy
20  Beck-Miller, produced no correspondence to or from
21  the Air Force, right?
22    **A.   As far as I know.  I know that -- like I**
23  **said, from the beginning when this all started over**
24  **a year ago, I put together everything in files for**
25  **Ryan, and then he came to me with what was missing.**

Page 213

1  **So I could have done it back then, I could -- But**
2  **when I looked earlier -- well, last year, I didn't**
3  **find anything left.**
4    Q.   All right.  So we asked for
5  correspondence with the Air Force, and you didn't
6  produce any, right?
7    A.   Correct.
8         MR. REED:  Objection; form.
9    Q.   (By Mr. Boone)  And we asked for
10  correspondence with the plaintiffs, and you didn't
11  produce any?
12         MR. REED:  Objection; form.
13         THE WITNESS:  Correct.
14    Q.   (By Mr. Boone)  I want to ask a question
15  about the original designation -- or maybe the first
16  amended designation, which is Exhibit 6.
17         MR. BOONE:  That's from yesterday.
18  In this stack?
19         THE REPORTER:  Yes.
20    Q.   (By Mr. Boone)  You with me?
21    A.   Yes.
22    Q.   Okay.  I want to draw your attention to
23  Page 2 of this.  It says, "Ms. Beck-Miller will
24  testify that the environmental conditions she
25  observed in houses on Randolph Air Force Base were

Page 214

1   similar and consistent, and that mold was frequently
2   discovered in elevated quantities in the houses."
3       Do you see that?
4   A.  Yes.
5   Q.  Okay.  I want to -- My understanding is
6   that you have seen six houses total at Randolph; is
7   that true?
8   A.  True.
9   Q.  The five that we've talked about plus the
10  Hill residence, correct?
11  A.  Correct.
12  Q.  And you are not intending to opine as to
13  any other home at Randolph, correct?
14  A.  Correct.
15  Q.  All right.  And I think you told me
16  yesterday that to do -- You are a mold assessor,
17  right?
18  A.  Right.
19  Q.  And to assess a home, you actually have
20  to go to the home, right?
21  A.  Correct.
22  Q.  So you would not be qualified and would
23  not have any of the relevant information to render
24  an opinion about anything other than the six homes
25  that you've seen.

Page 215

1       MR. REED:  Objection; form.
2       THE WITNESS:  Correct.
3   Q.  (By Mr. Boone)  And you would also agree
4   with me, would you not, that there are differences
5   between the six homes that you saw?
6   A.  Yes.
7   Q.  All right.  And both in terms of what you
8   saw, the severity of what you saw, the test results,
9   they are different home to home, as we've been
10  through in agonizing detail, right?
11  A.  Right.
12  Q.  Okay.  So you're not intending to give
13  any opinions as to any home other than those six,
14  right?
15  A.  Right.
16  Q.  And in fact, none of your reports touch
17  on any of those homes -- anything other than the six
18  that you've written reports about?
19  A.  Correct.
20  Q.  Okay.  And for the five plaintiffs in the
21  Daniels case --
22  A.  Okay.
23  Q.  -- that's Paisano, Hiatt, Daniels, Wolf,
24  Vinales, right?
25  A.  Right.

Page 216

1   Q.  You did not have -- Well, you have not
2   read their depositions?
3   A.  No.
4   Q.  You have not read their sworn
5   interrogatory responses?
6   A.  No.
7   Q.  You have not reviewed any of the
8   documents relating to that home, right?
9   A.  Right.
10  Q.  None of the maintenance records or
11  anything else, right?
12  A.  Correct.
13  Q.  You don't know whether the conditions
14  that you saw had been reported by any of those
15  plaintiffs, do you?
16      MR. REED:  Objection; form.
17      THE WITNESS:  No.
18  Q.  (By Mr. Boone)  And you don't know what
19  the maintenance response, if any, had been, true?
20  A.  True.
21  Q.  And you don't know whether the response
22  was timely or appropriate, right?
23  A.  Right.
24  Q.  And you don't know whether the problem
25  was fixed or not, right?

Page 217

1   A.  Right.
2   Q.  You don't know whether the problem had
3   occurred before that time or since that time,
4   correct?
5   A.  Correct.
6   Q.  You don't know whether the plaintiff
7   family was satisfied with the repair or not --
8   A.  Correct.
9   Q.  -- right?
10      You've not read any of the
11  correspondence about any of repairs?
12  A.  Correct.
13  Q.  Nor any of documents that the defendants
14  produced about them, correct?
15  A.  Correct.
16  Q.  You've seen no photos that any of the
17  plaintiffs took of the homes, have you?
18  A.  No.
19  Q.  You took all your own photos?
20  A.  Correct.
21  Q.  You have not inspected any home at
22  Randolph other than the six we've talked about?
23  A.  Correct.
24  Q.  And you've only prepared reports for
25  those six houses?

Page 218

1    A.   Correct.
2    Q.   You don't know anything about the
3    Humidity Reduction Project, do you?
4    A.   No.
5    Q.   Or even what that is, right?
6    A.   No.
7    Q.   Or whether that has worked or not worked;
8    you don't know anything about it?
9    A.   Nothing.
10   Q.   And you've reviewed none of the documents
11   about that project?
12   A.   No.
13   Q.   You haven't conducted any tests or any
14   other kind of measurements on any other home other
15   than the six we're talking about?
16   A.   Correct.
17        MR. REED:  At Randolph or in general?
18        MR. BOONE:  At Randolph.
19        THE WITNESS:  I made the assumption
20   he was speaking Randolph.
21        MR. BOONE:  I was.  And thank you for
22   the objection.  I was speaking about Randolph.
23        MR. REED:  Fair enough.
24   Q.   (By Mr. Boone)  And there are four other
25   plaintiffs that are in the Daniels case, Conzen,

Page 219

1    Alexander, Kline and Hamilton.  You have not done
2    mold assessments for those homes?
3    A.   No.
4    Q.   Rendering no opinions --
5    A.   Wait.
6         THE WITNESS:  Did I do Hamilton?
7         MR. REED:  Was it in the stack?
8         MR. BOONE:  No.
9         THE WITNESS:  Okay.
10   Q.   (By Mr. Boone)  Hill was in the stack.
11   A.   Okay.  Yes.
12   Q.   But that was in the other case.
13   A.   Okay.
14        MR. REED:  And you did a Hamilton at
15   Fort Hood.
16        THE WITNESS:  Fort Hood.  Right.
17   Okay.  You're correct.
18   Q.   (By Mr. Boone)  Okay.  So to clean that
19   up, no mold assessments at Conzen, Alexander,
20   Hamilton or Kline, right?
21   A.   Right.
22   Q.   Giving no opinions about any of those
23   homes whatsoever, right?
24   A.   No.  None.
25   Q.   Okay.  Last subject.

Page 220

1              (Exhibit 52 marked.)
2    Q.   (By Mr. Boone)  I'll show you Exhibit 52,
3    which is the rebuttal designation.  Take a minute to
4    read your section of that.
5    A.   (Reviewing document.)
6    Q.   Have you read it?
7    A.   Yes.
8    Q.   All right.  Have you seen this before?
9    A.   I don't believe so.
10   Q.   All right.  This is Plaintiffs'
11   Designation of Rebuttal Expert Witnesses.  Do you
12   know what a rebuttal expert witness is?
13   A.   Can you explain it to me so I can be
14   clear?
15   Q.   Yeah.  You have an expert witness that
16   says "I'm going to opine as to A-B-C."  And the
17   other side has the opportunity to designate a
18   rebuttal expert witness, which says, "I disagree
19   with what he" -- or she -- "said about A-B-C."
20   A.   Okay.
21   Q.   So did you know that you were a rebuttal
22   expert witness?
23   A.   I'm sure that he's told me.  I did not --
24   I'm learning new terms here, so yeah.
25   Q.   I gotcha.

Page 221

1         It's for the first time in, I guess,
2    federal court you've ever done this, right?
3    A.   Right.
4    Q.   And the rules require an expert rebuttal
5    report.  And you have not drafted such, have you?
6    A.   No.
7         MR. REED:  And let me offer something
8    just to see if it clarifies.  We are only offering
9    her as a rebuttal to stand by the testing she does
10   to the extent your folks have said she's done it
11   wrong.
12        MR. BOONE:  Okay.  But I guess I
13   don't know what parts of that she disagrees with,
14   and that's my point.
15        MR. REED:  Sure.  Understood.
16   Q.   (By Mr. Boone)  So we don't have a report
17   from you saying -- Well, let me back up.
18        Let's go with Exhibit 52.  It says
19   that you were designated as a rebuttal witness to
20   all mold assessment consultants designated by
21   defendant and specifically to George Coto and to
22   Rachel Adams.  Do you see that?
23   A.   Yes.
24   Q.   Now, I have, in the course of the
25   deposition, shown you both of those reports, right?

Page 222

1    A.   Right.
2    Q.   George Coto you told me you had seen
3  before, right?
4    A.   Right.
5    Q.   All right.  And Rachel Adams, you told me
6  that you had not even seen that one before.
7    A.   Correct.
8    Q.   So you don't know what's in that
9  report -- Well, we went through it, actually.  And
10 you agreed with all that she said about contents; is
11 that correct?
12   A.   Correct.
13   Q.   All right.  But other than that, you
14 don't know what's in that report that you may
15 disagree with or not, true?
16   A.   True.
17   Q.   Okay.  And as to George Coto,
18 you don't -- can you tell me specifically what it is
19 you disagree about what he said?
20   **A.   Not without going through line by line**
21 **and things like that.**
22   Q.   Okay.  And that's -- And that's what
23 rebuttal expert witnesses do.  They go line by line
24 and say, "You said this, and I disagree.  You
25 haven't done that analysis."  Correct?

Page 223

1    A.   Correct.
2    Q.   So you can't tell me sitting here today
3  which specific opinions of George Coto's that you
4  rebut or disagree with, true?
5    A.   True.
6    Q.   All right.  And George Coto's report is
7  the only report that you have seen from the
8  defendants; is that correct?
9    A.   Correct.
10   Q.   All right.  I think those are all the
11 questions I have.  Let me just do a little
12 housekeeping and make sure.  So it'll be about five
13 minutes, and I'll let you know for sure.
14        (Short break.)
15        (Exhibit 53 marked.)
16   Q.   (By Mr. Boone) Ms. Beck-Miller, just one
17 more final housekeeping matter.  I've marked, as
18 Exhibit Number 53, your list of things that you're
19 going to look for, correct?
20   A.   Correct.
21   Q.   And you're going to provide those to
22 Mr. Reed.  Mr. Reed will send those on to me, right?
23   A.   Right.
24        MR. BOONE:  With that, no further
25 questions.

Page 224

1        MR. REED:  We'll reserve our
2  questions for trial.
3        (Deposition concluded, 4:11 p.m.)
4                -oOo-
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 225

1        CHANGES AND SIGNATURE
2  KRISTY BECK-MILLER            MAY 5, 2022
3  PAGE LINE    CHANGE    REASON FOR CHANGE
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 226

1      I, KRISTY BECK-MILLER, have read the
2    foregoing deposition and hereby affix my signature
3    that same is true and correct, except as noted
4    above.
5
6            _____
7            KRISTY BECK-MILLER
8
9    THE STATE OF _____ )
10   COUNTY OF _____ )
11
12       Before me _____ on this
13   day personally appeared KRISTY BECK-MILLER, known to
14   me to be the person whose name is subscribed to the
15   foregoing instrument and acknowledged to me that
16   they executed the same for the purpose and
17   consideration therein expressed.
18       Given under my hand and seal of office
19   this _____ day of _____, _____.
20
21
22           _____
23           NOTARY PUBLIC IN AND FOR
24           THE STATE OF _____
25           My Commission Expires: _____

Page 227

1        IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
2                 SAN ANTONIO DIVISION
3    MICHAEL J. DANIELS, ET AL., )
                               )
4      PLAINTIFFS,          )
                            )
5    VS.              ) CASE NO.
                      ) SA-19-CA-01280-FB
6    AETC II PRIVATIZED HOUSING, )
     LLC, ET AL.,            )
7                            )
       DEFENDANTS.           )
8
9    ***************************************************
10           REPORTER'S CERTIFICATE
11     ORAL DEPOSITION OF KRISTY BECK-MILLER
12                 MAY 5, 2022
13               VOLUME TWO
14   ***************************************************
15       I, TERRY L. SCHULTZ, Certified Court
16   Reporter in and for the State of Texas, hereby
17   certify to the following:
18       That the witness, KRISTY BECK-MILLER, was
19   duly sworn by the officer and that the transcript of
20   the oral deposition is a true record of the
21   testimony given by the witness;
22       That the original deposition transcript
23   was delivered to _____ ;
24       That a copy of this certificate was
25   served on all parties and/or the witness shown

Page 228

1    herein on _____.
2        I further certify that pursuant to FRCP
3    Rule 30 (f)(1) that the signature of the deponent:
4        _____ was requested by the deponent or
5    a party before the completion of the deposition and
6    that the signature is to be before any notary public
7    and returned within 30 days from date of receipt of
8    the transcript.  If returned, the attached Changes
9    and Signature Page contains any changes and the
10   reasons therefore:
11       _____ was not requested by the deponent
12   or a party before the completion of the deposition.
13       I further certify that I am neither
14   counsel for, related to, nor employed by any of the
15   parties or attorneys in the action in which this
16   proceeding was taken, and further that I am not
17   financially or otherwise interested in the outcome
18   of the action.
19       Certified to by me on this _____ day of
20   _____, _____.
21           _____
22           TERRY L. SCHULTZ, Texas CSR 7042
             Expiration Date:  12/31/22
23           Hoffman Reporting & Video Service
             206 E. Locust
24           San Antonio, Texas 78212
             Telephone No.: (210) 736-3555
25           Fax No.: (210) 736-6679

Page 229

1    COUNTY OF BEXAR  )
2    STATE OF TEXAS   )
3
4
5        I hereby certify that the witness was
6    notified on _____ that the witness
7    has 30 days or (_____ days per agreement of
8    counsel) after being notified by the officer that
9    the transcript is available for review by the
10   witness and if there are changes in the form or
11   substance to be made, then the witness shall sign a
12   statement reciting such changes and the reasons
13   given by the witness for making them:
14       That the witness' signature was/was not
15   returned as of _____.
16       Subscribed and sworn to on this, the
17   _____ day of _____, _____.
18
19           _____
20           Hoffman Reporting & Video Service
             206 E. Locust
21           San Antonio, Texas 78212
             Telephone No.: (210) 736-3555
22           Fax No.: (210) 736-6679
             Firm Registration No. 93
23
24
25

58  (Pages 226 to 229)

KRISTY BECK-MILLER, VOL. 2                    MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

| A | | | |
|---|---|---|---|
| **A-B-C** 220:16 220:19 | **act** 205:23 | 67:21 78:2 | 83:7 |
| **A-P-P-E-A-R-...** 3:1 | **action** 84:10 228:15,18 | 115:9,13 116:7 119:8,19 | **air-washed** 86:17 |
| **a.m** 1:19 | **active** 25:25,25 55:12,19 179:6 183:14 188:25 207:11 | 140:11 145:5 156:9 161:22 161:24 163:12 163:13 164:16 165:22 205:1 206:3 215:3 | **AL** 1:3,6 227:3,6 |
| **abide** 90:4 | | | **Alexander** 219:1 219:19 |
| **Abigail's** 125:13 125:18 128:25 | **actual** 21:17,23 49:7,15 65:4 65:24 100:20 101:1 117:2 155:7 159:17 163:9 | | **alleged** 52:13 |
| **ability** 98:19 | | | **alter** 53:23 |
| **able** 142:11 166:23 | | **agreed** 2:5 14:10 47:18 48:5 69:17 122:16 136:2 222:10 | **Alternaria** 47:3 47:7 |
| **abnormal** 97:23 | | | **amended** 213:16 |
| **above-styled** 1:18 | **Adams** 5:6 28:22 221:22 222:5 | **agreement** 229:7 | **amount** 77:7 153:6 |
| **absent** 88:21 | | **ahead** 6:24 145:3 169:9 | **amounts** 73:1 |
| **AC** 61:25 | **Adaptive** 30:24 30:25 35:4 | | **analysis** 28:25 33:7 36:16 42:10 72:5 92:10 134:3,7 134:21 160:11 161:19 181:22 181:24 222:25 |
| **acceptable** 110:2 | | **AIHA** 165:11 | |
| **accepted** 41:23 42:5 106:23 108:6 112:20 112:24 115:13 116:8,14 117:12 119:3 119:16 142:9 157:14 164:3 165:2,18,24 166:4,8 170:14 192:3 | **add** 12:8 154:14 158:3 | **ail** 123:21 | |
| | **addition** 91:17 | **air** 10:2,7 11:2 22:12 40:12 41:10,11 43:12 44:3 47:13 55:1 66:24 70:2 76:2 77:8 80:4,9 81:12 82:2 83:14,15 83:24 84:2,10 84:12 85:2,6,9 85:11,24 86:4 86:8,18,19 110:20 111:2,8 112:18 116:1 116:23 117:2 130:6 131:25 134:3,8,21 143:5 149:2,8 151:4 157:6,9 161:19 162:22 166:6 170:7 171:9 181:22 181:25 183:8,9 188:18 189:14 201:22 210:10 212:21 213:5 213:25 | |
| | **additional** 16:1 168:4 | | **analyze** 79:18 |
| | **address** 210:22 | | **and/or** 227:25 |
| | **addresses** 13:24 | | **answer** 46:2,8 46:18,20 141:7 171:16 201:21 212:14 |
| | **adjourn** 20:3 | | |
| | **adopt** 43:13 90:4 133:5 | | **answer's** 197:12 |
| | **adopted** 29:21 | | **answered** 104:19 |
| **accessed** 164:6 | **advance** 37:14 | | **answers** 63:9 145:13 172:15 |
| **accounting** 142:1 | **AEC** 56:20 67:14 108:21 109:15 147:11 161:18 188:2 | | **Antonio** 1:2,24 3:5,8 227:2 228:24 229:21 |
| **accredited** 170:14 | | | |
| **accumulating** 53:19 | **AETC** 1:6 227:6 | | **anybody** 31:12 51:18 161:22 162:1 |
| **accurate** 108:5 162:22 165:6,6 | **affect** 153:25 | | |
| | **affix** 226:2 | | **anyone's** 196:13 |
| **accurately** 45:2 131:7,10 | **ago** 17:12,19 185:15,17 212:24 | | **anyway** 166:24 |
| | | | **apart** 73:24 |
| **ACGIH** 165:11 170:23 | **agonizing** 215:10 | | **apologies** 155:14 |
| **acknowledge** 202:12 | **agree** 7:13 33:18 33:19 35:17 36:1,25 38:5 41:14 43:22 44:20 45:1 | | **apologize** 111:21 160:2 |
| | | | **apparently** 106:17 131:12 134:11 |
| **acknowledged** 226:15 | | **Air-O-Cells** | |

| | | | **appear** 102:4,24 |
|---|---|---|---|
| | | | **Appearances** 4:5 |
| | | | **appeared** 103:22 128:2 130:1 181:9 226:13 |
| | | | **Appendix** 71:10 |
| | | | **apples** 72:2,3 |
| | | | **apply** 27:24,24 |
| | | | **appropriate** 29:22 30:12 48:11 106:6 172:1 216:22 |
| | | | **approximately** 79:22 123:23 124:3 209:5 |
| | | | **April** 13:20 90:10,18 160:17 210:18 |
| | | | **area** 21:5 24:10 24:13,15 26:15 28:4 44:3,10 45:20 46:13 47:10 48:12,12 60:2,6 61:2,19 82:15,15 92:20 93:10 95:6,13 100:23 101:19 118:20 124:11 146:7 156:2,11 158:7 171:24 |
| | | | **areas** 23:18 24:16,17 25:25 26:13 45:19 55:19 56:4,22 56:22 59:21 65:22 83:25 86:13 99:5 106:10 121:3 137:15 139:13 140:15 151:4 171:23 |
| | | | **arguing** 153:10 |
| | | | **Argus** 167:25 169:20 172:14 |
| | | | **arrows** 139:10 |

KRISTY BECK-MILLER, VOL. 2                    MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

Page 231

**ASHRAE** 81:3
**asked** 58:16
  123:13 127:1
  164:10 167:14
  174:1 176:23
  193:12 198:23
  199:14 200:3
  203:11 206:15
  210:9 213:4,9
**asking** 76:6,8
  84:16 87:11
  158:16 168:12
  169:3 171:16
  173:11 194:22
  198:11 209:17
**Aspergillus** 97:4
  109:10
**Aspergillus/Pe...**
  47:3,6 149:13
  149:22 190:2
**aspersions**
  101:10
**assess** 214:19
**assessed** 23:7
  207:6
**assessment** 9:25
  14:4 16:22
  21:4 23:3
  26:18 38:9
  40:11 50:11
  53:11 73:17
  96:13 99:22
  102:6 106:6,24
  108:6,19 114:1
  119:6,21
  120:13 144:7
  144:25 151:25
  152:14 153:13
  153:14 180:23
  192:9,22
  197:15 207:5
  221:20
**assessments**
  91:5 208:21
  219:2,19
**assessor** 192:16
  195:20 214:16

**assessors** 165:5
**assume** 14:16
  73:14,15 76:6
  178:21 196:24
  206:10,16
**assuming** 28:15
  196:19
**assumption**
  22:17,20 23:9
  201:17 218:19
**ASTM** 144:11
  165:10
**ATP** 10:4 15:16
  54:8,25 79:7
  79:15,23 93:24
  94:9,12,18
  98:23 115:19
  134:12 135:11
  135:17 136:9
  136:13 138:10
  140:25 141:5
  143:5 148:16
  150:6 171:6
  179:11 180:6
  183:11 188:9
  188:13,16
  190:8
**ATPs** 183:8
  188:8
**attached** 2:1
  64:18 86:11
  121:17 151:6
  176:8 177:22
  228:8
**attention** 134:1
  213:22
**attic** 50:5,25
**attics** 50:20
**attorney** 2:9
**attorneys**
  228:15
**Austin's** 160:25
**authorize**
  165:12
**authorized**
  202:7
**auto-filled** 65:21

**automatic** 57:5
**automatically**
  57:15,17 189:8
  189:11
**available** 229:9
**average** 161:4,7
  165:12,17
**awaiting** 79:4
**aware** 19:18,21
  78:16 98:3
  122:1 195:10

───────

**B**

**back** 8:10 44:7,7
  44:13 54:16
  60:1,3 61:4,22
  63:2 64:13,16
  88:16 99:1
  103:16 110:7,9
  110:13,14,23
  111:4 112:15
  115:12 123:6
  124:12,15
  127:10 129:12
  135:25 139:7
  139:14 146:22
  147:7,14,14
  148:15 159:18
  167:1 171:19
  172:9 173:5
  187:24 206:18
  210:16 213:1
  221:17
**backed** 134:2
  181:21
**background**
  54:10
**bacteria** 56:25
  57:18,22
**bag** 113:11
  150:3
**BALCH** 3:12
**Barbara** 17:7
  167:21
**base** 203:5
  205:25 206:19
  207:5 208:10
  213:25

**baseboard**
  146:10
**based** 30:17
  31:13 41:19
  42:10 43:16
  53:25 56:14,16
  63:21 64:21
  78:7 80:15,21
  82:2 83:15
  84:12 85:1,14
  85:24 86:22
  88:2,5 107:12
  109:25 112:19
  116:14 141:21
  142:4 144:15
  150:10 151:3
  160:14 162:13
  162:19 165:22
  177:17 185:3
  189:17 201:17
  201:19,22
  203:15 205:2,5
  206:13
**baseline** 154:23
**basements** 50:19
**bases** 90:1
  132:23
**basically** 21:18
  23:2,14 49:13
  90:17 91:13
  147:18
**basidiospores**
  111:19,22
  112:6
**basing** 8:6
  106:19
**basis** 34:6 64:25
  106:9 107:9
  113:19 131:5
  142:24 149:25
  175:23 203:20
**Bates-numbers**
  37:23
**bath** 136:16,19
  136:20,21,25
  139:24 147:23
**bathroom** 46:18

47:13 67:8,10
  67:15 84:6
  85:13 99:1
  102:8,16,17,20
  103:1 110:13
  110:14,24
  111:4 114:3
  130:14 137:15
  139:6,25
  146:20,21
  147:4,6 148:7
  148:10 179:18
  179:21,23
  180:9,10 181:9
  186:10,10
  187:9,10,15,15
  188:9,12
**bathrooms**
  85:17,20
**Beck-Miller**
  1:11,15 2:8
  3:21 4:2 6:2
  24:21 78:3,25
  109:17 112:22
  115:16 116:15
  166:15 204:16
  210:2 212:20
  213:23 223:16
  225:2 226:1,7
  226:13 227:11
  227:18
**Beck-Miller's**
  49:10 150:7
  206:6
**Becky** 199:14
  200:2
**bed** 82:16 101:3
  101:4,5,10
**bedding** 138:20
**bedroom** 41:9
  42:2,14 43:12
  43:18 66:3,3
  66:12 82:5,11
  82:22,25 83:3
  99:24 103:9,14
  103:19 110:7,9
  111:7,13

KRISTY BECK-MILLER, VOL. 2                    MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

112:15 114:4
115:9,12
125:12,14,18
125:24 126:1,3
126:16 128:11
128:13,25
134:25 136:12
137:2,10,11,22
138:6 146:19
146:20 147:3,4
147:15,19
150:15 179:1,9
186:9 187:10
187:14 188:5,7
**bedrooms** 84:5
111:9 147:16
147:18
**beginning** 40:5
54:21 55:5
59:24 68:14
69:25 86:25
124:18 125:8
126:5 150:21
153:3 167:14
189:14 191:21
210:9 212:23
**believe** 17:17
19:9 38:19
44:12,25 45:4
50:11 52:5,9
53:1,6 55:18
55:22 59:17
60:2 71:2
75:21 82:20
83:2 84:5,14
86:20 95:9
99:7 106:4
109:2 110:20
113:8 121:9,18
127:9 133:22
136:18,22
140:2 141:18
141:21 152:15
157:24 162:24
163:25 176:12
184:7 185:21
192:11 193:12

195:18 200:2
201:18 202:21
205:22 220:9
**believed** 17:11
19:24
**believes** 112:22
**bell** 195:5
**belongings**
115:5 142:17
**best** 39:21 59:18
62:18 166:21
180:25 197:4
**better** 117:14
**BEXAR** 229:1
**beyond** 209:23
**big** 42:21 61:2
103:13 154:9
177:15
**bill** 10:15
**billed** 12:15,17
**BINGHAM**
3:12
**biofilm** 171:7
**bit** 13:5 28:19
100:23
**black-and-wh...**
38:2
**blank** 16:15
146:10
**Bldg** 3:8
**blowing** 77:12
**blue** 195:18
**bogus** 163:20
**Boone** 3:12 4:8
6:6,18,19 7:2
7:21 9:5,6,16
10:13 11:11
12:2,13,21
13:17 17:25
18:3,20 20:7
21:13,22 22:1
26:24 27:2,7
28:13,18 31:8
31:17 32:14,25
36:16 41:23
49:20 51:4,16
53:23 58:5,8

58:22 59:9,11
70:12 76:11
77:17 78:7,11
78:21 79:3
80:2,18,25
88:10 89:13
108:9 113:24
116:17 117:16
119:11,25
120:11,16
122:16 123:3,6
132:1,10 136:7
140:22 150:13
153:11 154:10
154:11 156:20
159:13 161:25
165:8,16,21
166:15,20
167:6,9 168:16
169:17 172:7
173:8 182:13
186:2 189:23
192:6 193:21
194:5,9 195:12
197:1,3 198:3
199:19 200:22
201:25 202:17
202:25 203:13
204:11,20
205:13,22
206:3,11,23
207:20 208:3
210:21 211:8
211:21 212:3,8
212:11,14
213:9,14,17,20
215:3 216:18
218:18,21,24
219:8,10,18
220:2 221:12
221:16 223:16
223:24
**boot** 134:3,8,21
181:22,25
**bottom** 15:15
16:13 193:23
195:14

**boxes** 64:8
127:13
**boy's** 137:14
**brain's** 170:12
**break** 18:1 58:6
58:7 89:9,12
123:4,4,5,7
167:4,7 197:25
198:2 223:14
**breathe** 209:21
**Brian** 129:8
**Brigadier**
198:10 199:4
**broken** 13:13
**BRZEZINSKI**
3:7 50:23
51:14 53:21
59:8 76:5 88:8
113:22 116:16
117:15 119:9
119:23 120:10
120:15 122:14
123:2 131:22
132:8 136:4
140:18 150:9
154:9 156:15
159:11 161:23
165:3,14,19
166:9,19
**building** 144:18
145:18 156:12
**buildings**
197:10
**bulk** 40:15 79:4
**bullet** 25:5
26:18 28:5
47:17 145:9
**bunch** 52:20
63:6 112:7
**business** 26:22
186:4 209:14
**butler** 46:13
61:6 124:8
**butler's** 66:2

――――――――
C
――――――――
**C** 2:8 3:3
**C-O-N-T-I-N-...**

5:1
**cabinet** 95:9,10
95:11,13,15,16
**cabinets** 46:12
61:5,10
**calcium** 102:21
**calculation**
183:21
**call** 12:16 134:1
153:13 199:11
**called** 6:20 33:4
**Capitol** 3:13
**Cappuccio** 1:22
3:4
**Captain** 211:1
**capture** 121:10
**card** 26:23
**career** 201:11
**careful** 196:11
**case** 1:5 7:17 8:3
8:7,10,13,16
12:24 32:18
93:15 117:20
215:21 218:25
219:12 227:5
**cassette** 44:2
**cast** 131:20
**casting** 101:10
**category** 33:12
33:21 48:15,19
48:22 49:1,1,2
49:3,10,11,13
49:16 67:18,19
67:19,21 68:3
68:7,15 104:23
104:25 188:24
189:1,11
**caulking** 62:3
125:1
**cause** 1:18
179:20 207:9
**caused** 181:11
**causing** 181:6
**ceiling** 26:17
75:13,20,25
76:1,7,8 77:12
80:11 86:10

103:12 114:12
**ceiling** 75:16
  76:6 178:10
**center** 16:13
**certain** 89:2
**certainly** 19:3
  52:13 76:3
  154:1 155:1
**certificate** 4:10
  227:10,24
**Certified** 1:20
  3:23 227:15
  228:19
**certify** 227:17
  228:2,13 229:5
**Chaetomium**
  42:14 46:5
  97:3,5 98:4,9
  171:5
**chain** 5:4 18:22
  18:24 19:3
  163:22 164:4
  164:12 211:22
  212:4
**chance** 123:8
**change** 54:2
  128:19 225:3,3
**changed** 58:1
  130:7
**changes** 225:1
  228:8,9 229:10
  229:12
**Chapter** 34:18
**charge** 9:21
  141:16 190:24
  205:24
**charged** 9:22
  10:4,22 11:4
  11:20,21,23
  208:13
**charging** 141:15
  208:24
**chart** 106:17
  145:4,11
**charts** 63:4
**check** 40:17
  45:20 141:3

145:17
**checked** 64:8
**checklist** 105:8
  130:22
**Chief** 195:4,8,17
**children** 182:24
**chose** 40:10
**circle** 28:20
**cites** 30:5
**Civil** 1:25
**Cladosporium**
  47:4,8 161:10
**claims** 182:23
**clarifies** 221:8
**clarify** 6:14
  151:22
**clarity** 123:20
**clean** 83:14 86:8
  118:20 169:24
  170:6 171:6,17
  190:13 219:18
**cleaned** 53:15
  61:15 84:1
  87:23 101:15
  101:20,20
  195:21 196:5
  197:6
**cleaning** 30:13
  84:9 142:21
  171:1 195:22
**cleanliness**
  79:19 93:25
  115:20 135:20
  135:21,25
  148:5 150:6,17
  190:9
**clear** 59:5
  139:22 159:24
  195:20 209:22
  220:14
**clearance**
  142:21 169:25
  170:15,20
  171:1,18
**cleared** 207:8
**clearer** 13:5
**click** 55:9 57:15

57:16
**clicked** 55:12
**clients** 194:1
  197:5
**close** 111:20
  156:5,14,16,17
**closet** 123:24
  134:25 147:3
  177:13,17,25
  178:1 186:8
  187:14
**codes** 160:19,19
**coli** 88:21
**coliform** 88:18
  88:23
**collect** 188:3
**collected** 11:24
  65:17 67:6
  72:13 108:22
  108:25 110:4
  113:2 114:3,5
  147:12 148:18
  188:3,5
**color** 37:22
**colors** 13:6
**column** 65:16
  67:5 114:17
  146:23 147:8
  148:19
**columns** 127:16
  131:2
**come** 8:10 23:12
  88:16 101:12
  161:4 175:5,7
  209:12
**comes** 54:16
  170:16
**coming** 50:11
  125:23 184:3
  185:14
**comment** 204:16
  209:23
**comments** 92:13
  169:21,22
  173:5
**Commission**
  226:25

**common** 29:21
  40:2
**communication**
  169:18 172:8
  193:25 210:25
**communicatio...**
  174:1,8
**companies**
  204:25
**company** 192:20
  203:6
**compare** 72:1
  157:8 165:23
**comparison**
  41:24 117:13
  117:19 161:19
  166:3
**complained**
  173:11
**complaining**
  204:7
**complaint** 52:16
  168:4,8
**complaints**
  51:24 104:6
  204:12
**complete** 108:2
  108:5 151:25
  185:22
**completely**
  74:19
**completion**
  228:5,12
**compliant**
  113:25 119:21
  120:7 122:12
  122:24 166:3
**Complies** 100:9
  100:14 103:16
  110:25 136:22
**comply** 120:1
**complying** 36:17
**composition**
  33:13
**computer** 16:17
  16:23
**computer-aided**

1:22
**concern** 21:5
**concerning**
  126:10
**concluded** 87:14
  224:3
**concludes** 35:3
  35:21
**concluding**
  82:19
**conclusion** 55:7
  58:15 68:3
  78:24 114:10
  116:13 151:1
  192:16
**conclusions** 8:14
  53:11,24 80:14
  104:17 131:21
  183:15
**condensation**
  60:16 62:4
  105:13 107:13
**condition** 21:4,7
  21:9,18,22
  22:5,11,24
  23:4,7,14,16
  23:18,21,22,25
  24:4,10,12,18
  25:7,8,20,23
  26:1 30:18
  68:24 69:1,14
  75:3
**conditioned**
  51:3
**conditioning**
  81:12
**conditions** 20:18
  21:14 27:18
  31:1,5 107:4
  213:24 216:13
**conducted**
  218:13
**conference**
  12:16
**confirm** 67:9
**confirmed** 38:2
  87:12 127:2

KRISTY BECK-MILLER, VOL. 2                     MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

confirms 202:6
confusing 160:2
connected
  137:14 147:16
connection
  24:25 193:15
consideration
  31:18 84:9
  226:17
considered
  30:25 37:9
  89:25,25 93:11
  132:20 169:24
  175:20
considering
  35:22
consistent 99:21
  214:1
consultant 73:17
  151:25
consultants
  32:11 221:20
contain 35:4,18
contained 37:5
  38:12 89:18
  90:1 133:2
  175:18
contains 38:5
  97:25 228:9
contaminate
  196:9
contaminated
  28:9 94:3,8,13
  98:22 135:12
  139:1 179:10
  180:6
contamination
  57:1
content 34:12
  84:9 87:8,20
  121:20 142:21
  173:16
contents 28:10
  28:19 29:13,18
  29:22 30:6,7
  31:10,13,19,24
  32:22 33:5,8

34:23 35:9,15
35:19,24 36:9
36:17,18 84:10
93:3 99:1
101:24 102:15
103:3,5 118:6
125:9 126:6,24
135:3 171:11
171:20 182:20
193:2 196:13
197:5,8 200:17
222:10
context 54:10
continuation 6:8
  172:19 173:10
continues 125:5
  126:1
contract 209:2
  209:10
contractor
  28:25 34:9,14
  51:2 152:19
  207:7
contractors
  20:25
contrary 102:5
  106:23
control 41:24
  42:3 77:5,13
  111:17,20,20
  111:23,25
  114:7 117:7,9
  117:20 149:9
  149:19,22
  155:7 156:11
  157:2,5,11,19
  158:18 162:6
  164:23 165:13
  165:17 166:18
  171:9 189:16
  189:24 195:14
controls 207:1,2
  207:17
conversation
  52:4 195:24
  197:2
conversations

6:11,15 193:8
195:4
Conzen 218:25
  219:19
cool 81:6
copied 20:10
copies 16:15
copy 16:15,21
  16:23 70:7,13
  227:24
copy-paste
  131:11
corner 181:6
corners 37:17
  39:17 89:18
  90:2 133:2
correct 6:9,10
  6:21,22 7:4,5
  7:15,24,25
  8:20,21 9:12
  9:23 10:1,3,6
  10:10 11:13,14
  11:22,24,25
  13:15 14:1,6,8
  14:9,21,22,25
  15:13 16:12,20
  17:7,8,10 18:9
  18:10,15,17
  19:5,10,11
  20:4,19,20,22
  20:23 21:1,2,5
  21:6,15,16,19
  21:20,23,25
  22:6,7,10,14
  22:15,19,22
  23:1,15 24:6
  24:11,23 25:10
  25:15,17,19,21
  27:10,14,19
  28:2,7,11
  29:24,25 30:4
  30:13,14,20
  31:2,3,5,6,22
  31:23 32:2,4,5
  32:8,9,22,24
  33:15,16 34:6
  34:7,22 35:8

35:19,20,25
36:4,5,7,10,11
36:13,15 37:2
37:3,6,7,18
38:7,8,14,21
38:23,24 39:1
39:2,8,9,12,13
40:16,25 41:21
42:18,19,20
43:11,14,15,17
43:19,20 44:6
44:8 46:3,4
47:8,9,12,16
47:19,20 48:3
48:4,8,9 49:14
49:21,23 50:18
51:24 53:9,22
54:12,19 55:3
55:11,15 56:15
56:18,21 57:19
57:23 60:25
63:5 64:3
65:13,19 66:4
66:5,6,7,8,11
66:14,17,19,20
66:25 67:1,11
67:16,17,23,24
68:5,6,10,19
68:20 69:6,10
69:11,12,14,19
69:23 70:19,24
71:8 72:8,12
73:22 74:20,22
74:23 75:8
76:25 77:9,18
77:19,21,22
78:4,5,12,13
78:22,23 79:2
79:17,19,20
80:18,19,24
84:14,18,19
85:7,10,24,25
86:21,24 87:6
87:21 88:6,19
88:20,22,25
89:4 90:22
92:21,22 93:5

93:14,25 94:1
94:6,7,11,15
95:1,2,3,4,7,21
96:3,11,12,17
96:18 97:6,7,9
97:10 98:4,5,7
98:9,10,11,12
98:15,25 99:9
99:14,17,19,20
101:8,14,25
102:1 103:2,6
103:25 104:1
104:25 105:4,6
105:11,17,18
105:22,23,24
105:25 106:22
107:8,10,11,25
108:1,6,8,17
108:20,23,24
109:8,9 110:6
110:10,18
111:12 112:2,4
112:5,21
113:17,23
114:9,20,23
115:2,3,5,11
115:14,15,18
115:20,21
116:2,3,5,6,21
116:22 117:3,4
117:7,8,10,11
117:14,23,24
118:7,10,11,13
118:16,17,20
118:21,24
119:2,4,5,14
120:1,2,9
121:5,6,21,22
122:4,5 123:1
124:1,4,5,9,13
124:16,17,20
124:21 125:2,3
125:14,15,18
125:19 126:8
126:22,23,25
128:19,20,21
128:23 129:3

KRISTY BECK-MILLER, VOL. 2                    MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

129:10,16,17
130:1,4 131:3
131:7,8,15,16
132:14,15,18
132:19,22,25
133:4,11,12,19
133:20 134:15
134:22,23
135:4,5,9,13
135:14,16,18
135:19,22
136:3,14,15
137:23 138:21
138:22,24,25
140:13,14,17
142:5,7,8,10
142:15,16,18
142:19 143:7,9
143:20,22,23
144:4,13,20,22
145:7,20
146:16,24,25
147:2,4,4,5,5,6
147:7,7,9,10
147:20,21,24
148:20,25
149:1,9,12,20
149:24 150:19
151:7,8 152:1
152:5,16,23,25
153:1,3,4,7,12
153:15 155:8,9
156:12,13
157:12,13,16
157:17,21,25
158:1 159:15
160:13,21
161:8,9,11
162:7,8,10
163:7 164:20
164:24,25
165:2,4,25
166:1,4,5,8,10
168:24 169:2
169:10,11
171:10 173:6
173:17,18,20

173:21 175:3
175:18,19
176:4,7,24,25
178:6,8,11,13
178:14 179:8
179:11,12,16
180:2,5,8
181:16,18,19
182:6,7,8,9,11
183:10,13
184:24 187:1
187:23 188:19
188:21 189:1
189:19,21
190:11,14
191:3,16,19
192:5,13,14
196:1 197:17
197:18 199:22
200:8,9,14
202:10,11,15
202:18,19,22
202:24 203:22
203:23 204:1
204:13,14
205:7,12,19,21
206:22 208:9
210:2,3 211:12
211:18 212:1
212:16,17
213:7,13
214:10,11,13
214:14,21
215:2,19
216:12 217:4,5
217:8,12,14,15
217:20,23
218:1,16
219:17 222:7
222:11,12,25
223:1,8,9,19
223:20 226:3
**corrected** 20:10
**correctly** 121:24
  173:20
**correspondence**
  5:9,10,11,12

5:13,14,16,17
5:18,19 167:15
167:16,21
210:17 212:19
212:20 213:5
213:10 217:11
**cost** 10:8 33:22
  142:4
**Coto** 70:17,25
  73:14 76:20
  221:21 222:2
  222:17
**Coto's** 5:8 70:7
  72:1 76:19
  223:3,6
**counsel** 2:6
  228:14 229:8
**counsel's** 17:16
**count** 77:18,21
  149:19 188:10
**counter** 95:17
  191:13
**counting** 91:7
  130:24 190:15
**counts** 40:12
  83:7 164:17
**COUNTY**
  226:10 229:1
**couple** 20:8
  37:13 56:22
  185:17
**course** 177:2
  198:24 221:24
**court** 1:1,20
  3:23 120:6,12
  122:11,12,24
  221:2 227:1,15
**cover** 39:22
**crack** 103:13
  127:24 128:2,6
**cracking** 82:21
**crawl** 48:14,15
  50:20,25 67:22
  79:3 88:15
**critical** 26:8
**criticisms**
  172:16

**cross-contami...**
  93:11
**cross-contami...**
  200:24 201:12
  201:16
**CSR** 228:22
**cubic** 44:4 72:7
  72:11
**culprit** 180:9
**curious** 201:25
**current** 203:6
**custody** 5:4
  18:22,24 19:4
  163:23 164:4
  164:13
**customer** 10:22
**cut-and-paste**
  134:17 182:2,4

---

### D

**D** 71:10
**Dallas** 90:12
**damage** 14:17
  14:17 35:23
  44:11 55:24
  56:4,19 59:25
  60:6 61:19
  82:20,24 83:1
  95:25 97:17
  103:10,20
  114:11 118:10
  118:13,16
  124:11 134:25
  138:12 177:14
  178:1 179:2
  181:6
**Daniels** 1:3 4:23
  8:3,13,16
  13:20,23,23
  17:7 39:4
  49:25 90:21
  112:10 132:12
  132:18 134:22
  136:6 140:16
  143:24 144:14
  155:19 156:4
  158:2,4,18,24
  160:3 167:10

168:23 173:17
174:22,24
182:8 190:18
191:5 198:14
200:8 215:21
215:23 218:25
227:3
**data** 8:14 37:8
  38:15 69:24
  89:24 132:20
  158:5,10,12,22
  158:22 160:14
  161:3 175:20
**date** 7:9 91:1
  228:7,22
**dated** 11:9 12:5
  228:7,22
**day** 1:18 7:7
  11:12 70:17
  71:1 73:24
  76:20 90:17,20
  91:9 191:18
  197:16 204:4
  226:13,19
  228:19 229:17
**days** 12:7 90:17
  228:7 229:7,7
**dead** 74:24,25
**dealing** 207:8
**deals** 20:21
  132:2
**debris** 170:7
**December** 9:19
  10:16 11:10,12
  12:5,10 59:16
  70:18 90:23
  127:8
**decide** 34:14
  166:16
**decision** 32:7
  88:10
**defendant**
  221:21
**defendants** 1:7
  1:17 3:11
  217:13 223:8
  227:7
**deficiencies**

119:13
**Define** 132:4
**Definitely** 27:5
**definition** 21:14
23:25 24:3
48:18 170:25
**definitions**
20:18 48:19
**delivered** 227:23
**den** 146:22
147:7 148:15
**dependant**
33:21
**depending** 26:6
73:2
**depends** 63:19
**deponent** 228:3
228:4,11
**deposit** 102:22
**deposition** 1:10
1:15 2:7 6:8
9:9 59:4
167:14 221:25
224:3 226:2
227:11,20,22
228:5,12
**depositions**
216:2
**describe** 180:25
**described** 49:12
**description** 4:13
5:2 118:9
191:23
**designate**
220:17
**designated**
221:19,20
**designation** 5:20
8:1 176:15
198:5 213:15
213:16 220:3
220:11
**desk** 92:25
120:20 121:1
**detail** 131:5
215:10
**detect** 135:17

**detects** 135:20
**determination**
33:12,13 93:18
**determine** 58:17
**determined** 34:6
34:8 35:24
**determining**
109:18
**diagram** 82:7,12
83:10 86:11
96:4 99:15
105:24 107:24
107:25 111:11
113:17 118:15
118:18 137:17
138:2 151:6,15
151:16 152:25
153:5,17 177:6
181:15 191:22
**difference** 10:19
11:17 53:10
73:6
**differences**
215:4
**different** 15:5,5
15:8,8 44:5
73:21 76:20
160:23,25
166:13 171:23
173:23 196:16
215:9
**differs** 40:7
**dimensions**
177:24,25
191:24
**dining** 46:8,15
61:7 66:15
71:24 72:10
74:11 75:21
76:3 84:6 85:3
101:23 113:1,6
113:12,16
124:4 130:3,7
139:4,6,13
140:24 146:21
147:5 148:3
**directions**

152:21
**directly** 52:8,25
66:24
**dirt** 53:19 89:2,2
101:10,12,21
**dirty** 94:16
115:23 136:3,6
**disagree** 119:15
220:18 222:15
222:19,24
223:4
**disagrees** 221:13
**discard** 86:12
**disclose** 207:21
208:3
**disclosed** 207:21
**disclosing** 203:1
**discoloration**
100:21,24
101:1
**discount** 141:18
**discovered**
25:13 45:3
214:2
**discuss** 33:3
**discussed** 36:25
**discussion** 125:4
125:16
**dishes** 61:11,15
**disparity** 74:5
**disposal** 34:13
**dispute** 142:24
**distinction** 22:2
201:7
**DISTRICT** 1:1
1:1 227:1,1
**divergence**
73:16 74:2
**DIVISION** 1:2
227:2
**doctor** 51:13,17
51:22 104:10
**document** 31:4
55:20 96:14
106:20 184:5
220:5
**documentation**

30:6 34:23
113:14 145:7
145:21 146:2
177:10,15
180:19 186:24
**documented**
30:25 105:19
113:7 144:21
145:1,2 200:12
201:15
**documents** 6:15
6:17,20 13:13
19:15,17 185:2
216:8 217:13
218:10
**doing** 44:7 59:5
68:13 72:21
90:17 91:9,10
157:16,20
184:1 197:3
198:18 207:5,5
207:6 208:21
**dollars** 10:9
**Dominion** 3:8
**door** 44:13
45:20 124:12
156:10,18,21
**doors** 157:11
**double-check**
141:25 142:1
**doubt** 131:21
**downstairs** 83:5
99:24 111:7,13
115:12 125:7
129:11 180:13
188:6
**draft** 168:22
194:15,18,19
**drafted** 221:5
**draw** 16:1
139:10 213:22
**drawers** 46:12
**drawing** 12:25
13:2 137:14
152:11
**drawings** 15:25
169:7 186:7

194:14
**drawn** 177:20
**dresser** 87:13
126:14,15
**dried** 74:9
**Drive** 3:8
**drop** 181:6,12
**drywall** 63:20
**due** 83:6 142:11
165:6 178:12
189:2 206:24
**duly** 1:17 6:3
227:19
**dust** 53:19 101:9
101:11,21
170:6
**dusty** 60:12,19

**E**
**E** 3:7 88:21
228:23 229:20
**e-mail** 3:6,9,15
5:9,10,11,12
5:13,14,16,17
5:18,19 13:24
167:20 168:17
168:25 169:18
193:22 195:24
210:22 211:4
**e-mail's** 168:14
**e-mails** 12:25
13:7 167:10
173:23 174:13
174:16 175:4
210:10 211:9
212:13
**E-X-H-I-B-I-T**
4:12 5:1
**earlier** 69:8 77:7
83:21 160:19
213:2
**earth** 107:21
**easier** 149:16
151:21
**easily** 79:23
**East** 3:13
**easy** 136:24
**edges** 99:25

eight 130:25
153:22,22
either 22:12
58:18 66:24
78:12 92:24
108:19 113:17
143:9,19
151:11 170:7
181:1 182:10
191:2,5 211:10
either-or 82:3
El 161:1
electronic 17:3
electronically
19:10
elevated 41:15
42:9 43:14,19
43:24 46:3,9
46:19,19 47:15
55:13 56:1,6
58:2 63:9
105:9 144:14
145:1,6 146:14
183:14,18
186:4,23 214:2
eliminate 101:20
else's 172:12
EMLab 71:13
158:3 159:18
160:11
employed
228:14
enclosed 26:15
66:2
encountered
201:10
entered 67:25
entire 48:6,11
58:16 86:18
103:25 115:2
142:13 160:16
182:16 187:5
193:5
environment
22:24
environmental
213:24

EPA 81:3
error 31:14 57:9
114:24 131:12
134:17 145:11
182:4
errors 119:13
153:19 202:13
especially
100:22
established 90:5
estimate 161:12
162:2 164:17
166:18
ET 1:3,6 227:3,6
everybody 37:16
evidence 30:24
55:25 58:18
206:24
exactly 101:11
200:6 203:18
Examination
4:8 6:5
example 28:1
53:14 54:8
71:25 140:23
204:2
examples 14:19
153:22
Excellent 17:2
exception 9:1
129:20 187:4
190:1
excerpt 5:5
20:11,14
executed 226:16
exhibit 4:7,13,15
4:16,17,18,19
4:20,21,22,23
4:24 5:2,4,5,6
5:7,8,9,10,11
5:12,13,14,15
5:16,17,18,19
5:20,22 7:1,2
8:23,24 9:1,7
9:14,15 10:12
10:13 11:6,8
12:1,3,12,14

12:20,21 13:16
13:17 18:2,4
18:19,21 20:6
20:9 21:14
25:2 28:17,21
29:13 37:21
39:18 40:5,24
58:21,23 59:11
59:20,24 63:2
70:10,11 71:20
76:19 89:14
90:2 92:2
119:25 121:17
123:14 127:10
132:14,18,21
132:24 133:15
137:6,7 141:23
154:4,7,12
155:11 159:13
159:24 160:3
163:1,2 167:8
167:13 168:15
168:16 169:16
169:18 172:6,8
172:18 173:7,9
175:12,13,18
193:20,22
195:11,12
198:15 210:20
210:21 211:7,8
211:10,15,20
211:21 212:2,3
213:16 220:1,2
221:18 223:15
223:18
existed 122:1
exists 22:12 69:1
expect 59:3
72:20 73:1
expected 73:8,9
expenses 12:6
experience
43:25 201:24
202:12
expert 5:21 32:4
32:19,21 36:4
36:13,22

212:12 220:11
220:12,15,18
220:22 221:4
222:23
expertise 209:23
Expiration
228:22
Expires 226:25
explain 79:23
195:25 201:6
220:13
explained 81:11
81:11,18
explanation
54:17 60:23
75:9
exposure 33:22
express 182:22
expressed
226:17
extent 35:23
221:10
exterior 137:15
181:10
extra 190:24
extremely 41:15
42:9 43:14,19
43:24 46:3,19
47:15
eye 22:9 43:1
eyes 65:9,11

———————
F
f 228:3
face 160:7
fact 22:21 75:5
78:21 79:21
81:11,19 87:7
87:11 106:21
115:10 119:6
120:4 131:7
161:16 165:22
205:24 215:16
facts 8:14 37:8
38:15 89:24
132:20 175:20
factual 202:18
fair 14:13,14,17

14:18 19:25
20:1 21:10,12
23:4,10,11
28:15,16 45:24
46:1 48:12,13
60:10 64:24
76:4,5 88:7,9
92:17,18 93:21
93:22 117:20
117:21 120:13
120:14 128:11
128:12 150:3,5
156:20 177:4,5
178:25 183:24
184:23 185:22
191:25 192:1
194:5 206:17
218:23
fall 50:25
false 94:14,25
98:24 134:14
familiar 34:25
families 11:20
198:14 202:7
203:16,21
205:3,23
207:11
family 38:6
89:10 167:11
181:25 185:22
205:10 217:7
fan 75:25 76:1,6
76:7,8
fans 75:13,16,20
77:12 80:11
far 83:17 131:24
138:7 157:22
166:12 187:24
197:8,13
210:16 212:22
fashion 87:24
Fax 3:14 228:25
229:22
features 29:21
federal 1:24
221:2
feedback 167:24

feel 153:9
felt 198:21
field 4:23,24
    13:19 17:6
    18:6 19:7,13
    38:19 39:8
    45:6 64:1
    75:18 79:9
    95:19 117:23
    137:5,7,12,18
    137:19 138:13
    138:15 141:22
    175:13 177:18
    178:7 179:22
fields 55:9
figure 107:22
file 180:20
filed 52:11 168:3
    168:8
files 17:15
    184:20 210:16
    212:24
fill 43:4
filthy 101:7
final 223:17
finances 141:12
financially
    228:17
find 19:2,7
    63:13 96:2,14
    174:15 210:15
    213:3
finding 83:16
    141:1 167:18
findings 142:25
finish 19:1 20:8
    194:8
finished 140:3
    194:18,21
Firm 229:22
first 7:2 8:22 9:4
    27:1 40:6,18
    70:3,20 90:9
    92:5,12 133:13
    133:17 141:22
    145:8 176:5
    185:6 213:15

221:1
five 8:2 49:5
    130:25 153:21
    173:22 174:15
    174:19 175:4
    196:11 214:9
    215:20 223:12
fix 96:2
fixed 61:21
    203:17,17
    216:25
fixing 13:2
flippant 26:12
    117:25
flooded 48:15
floor 15:25
    18:16 66:1
    75:22 95:18
    169:6,13
    177:21 181:5
    181:11 184:10
    194:13,21,24
    195:1
flooring 86:10
    181:6
floors 100:1,8
Fluctuates 15:1
fog 83:14 86:19
fogging 84:11
folks 221:10
follow 50:15
    119:4 122:18
    123:15
followed 45:14
following 35:21
    122:13 160:10
    227:17
follows 6:4
Force 210:10
    212:21 213:5
    213:25
foregoing 226:2
    226:15
forgive 9:3
form 21:11,21
    21:24 27:6
    28:12 31:7,15

32:13,23 36:14
41:22 49:19
50:23 51:14
53:21 59:8
77:15 78:6,9
78:20 79:1,25
80:17,23 87:24
88:8 108:7
113:22 116:16
117:15 119:9
119:23 120:10
120:15 122:14
123:2 131:22
132:8 136:4
140:18 150:9
156:15 159:11
161:23 165:3
165:14,19
166:9,19
182:12 185:23
189:22 192:4
199:18 200:20
201:20 202:16
202:23 204:10
204:18 205:11
205:20 206:1,8
206:21 207:18
207:25 213:8
213:12 215:1
216:16 229:10
formal 101:23
    113:5,12,15
former 77:17
Fort 90:12
    198:18 202:1
    208:5 219:15
    219:16
forth 89:22
forward 122:23
found 68:15,18
    98:14 191:24
four 3:8 37:17
    39:17 89:18
    90:2 130:25
    133:2 148:18
    153:21 218:24
FRCP 228:2

frequently 214:1
front 13:24
    82:23 92:6
    128:13 133:14
    137:6 153:15
    162:5
fruit 74:24,25
fulfill 157:12
full 202:13
full-meal-deal
    9:22
fungal 46:11
    61:2 85:2
    99:25 100:20
    103:10 138:12
    151:5 171:4
    177:14 178:1,5
    179:18 180:1
    180:24 200:11
fungi 72:6 94:3
    94:10,14 98:1
    98:14,23 117:7
    135:12,17,24
    139:2 179:10
    180:6
Fungistat 83:14
    84:10 86:19
funny 27:2
furnishings
    113:5
furniture 92:25
    93:8 113:10
    126:22 138:20
further 2:5
    34:11 82:10
    223:24 228:2
    228:13,16

——————
G
gathered 8:15
gears 62:17
genera 42:19
    98:11 109:11
    117:10
general 22:17
    90:5 109:13,19
    126:6 133:5
    198:10 199:4

200:18 201:7
202:9 203:1
205:24 206:4
218:17
generally 38:4
    76:23 83:25
generate 91:10
    91:21 185:21
    192:22
generated
    185:24
George 5:8 70:7
    70:17 221:21
    222:2,17 223:3
    223:6
getting 81:9
    91:8 159:16
    170:11 198:21
give 21:7,8
    26:17 28:5
    31:9 50:24
    51:20 152:21
    162:16 173:4
    176:2 215:12
given 19:18
    119:19 151:12
    176:16 185:8
    185:25 202:5
    226:18 227:21
    229:13
gives 20:24 30:8
    40:6
giving 26:19
    219:22
go 6:24 13:4
    17:23 19:1
    20:7 41:7
    48:12 63:6
    64:13 70:22
    71:9 92:2 96:1
    107:20 115:7
    126:14 130:16
    135:25 137:5
    139:14 145:3
    145:17 148:23
    160:3 169:8
    171:19 173:14

KRISTY BECK-MILLER, VOL. 2                MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

183:5 199:16
199:20,25
214:20 221:18
222:23
**goes** 24:16 33:2
57:18 68:23
125:20 210:16
**going** 8:18,22
12:13 15:6
18:3 19:25
20:2,9 23:13
26:9 28:5,20
29:5,5,12,17
39:11,21 52:22
58:10,22 60:11
62:16 66:1
69:24 70:16
74:6 93:2
105:7 112:9
122:23 124:7
127:10 132:11
141:7 150:20
151:8,13
154:25 157:8
157:12 170:12
172:5,13
173:15 177:9
191:20 192:18
196:24 198:22
201:18 203:18
207:4,11
220:16 222:20
223:19,21
**goo** 87:15
**good** 23:24
54:17 151:23
197:24
**goods** 196:20,22
**gosh** 43:5
**gotcha** 51:4 73:5
109:14 110:3
110:14 191:14
220:25
**gray** 195:17
**great** 100:25
**greater** 149:22
**green** 101:1

**ground** 39:22
133:11
**growing** 126:21
**growth** 14:8,16
21:23 23:19
24:17 25:8,25
25:25 26:9,14
26:17 27:8,16
27:25 28:14
46:11 57:7,17
57:21 58:18
60:2,16 61:3
62:3 65:3,4,8
65:24 68:24
69:5,9 83:23
87:8 92:19
99:25 100:10
100:20 101:16
102:23 103:10
103:19 108:10
108:10 109:13
109:20,21,25
110:19 111:2,5
113:4,10,20
114:12 120:17
120:20,25
121:8,16 125:1
127:17 128:1,3
128:11,22
129:6,16,21,25
130:1 131:6
137:16 138:13
139:16,19,20
140:8,13,16
141:2,5 147:1
151:5 177:14
178:1,5 179:19
180:1,15,24
187:12,20,22
197:11 200:11
**GUERRA** 3:7
**guess** 43:7 73:6
162:3 170:5
183:23 221:1
221:12
**guidance** 35:22
**guide** 34:18,19

35:6
**guideline** 41:20
78:8,15 80:16
116:8
**guidelines** 20:25

## H

**H** 3:12
**half** 15:15 66:21
69:8,11 91:6
185:15
**Hamilton** 195:7
219:1,6,14,20
226:18
**hand** 77:10,13
226:18
**handful** 132:5
**handled** 203:5
204:21,24
205:10
**hands** 169:9
**handwrite** 16:18
**handwriting**
154:12
**handwritten**
5:22 79:10
**happen** 57:24
73:20 93:7
96:17 133:23
200:17
**happened** 54:18
**happens** 60:20
101:19
**hard** 16:15,21
16:23 38:1
62:23 167:18
210:15
**hardwood** 99:25
100:8
**head** 43:4
138:17
**health** 51:5,18
51:20,23 52:1
104:5,6
**health-related**
182:22
**healthy** 209:21
209:24
**hear** 128:6

**heard** 168:4
**heating** 81:12
**heavily** 94:3,7
94:12,13 98:22
135:12 139:1
179:10 180:6
**help** 100:19
105:8 127:6
**helping** 62:17
209:21
**hereto** 2:1,7
**Herrmann**
211:1
**Hiatt** 7:8 9:18
9:21,22 25:1
36:24 39:22
90:5 133:8
143:14,16
215:23
**Hiatt's** 70:22
**Hiatts** 37:2,5,12
38:25 40:3
49:21 91:2
112:3
**high** 63:13,17
65:7 81:2 83:7
83:25 85:1,16
106:20 112:6
131:24 145:19
171:3
**High-Daniels**
167:21 175:1,2
**higher** 42:3
76:23 111:20
149:14
**Highway** 1:23
3:4
**Hill** 4:15 7:3,4
7:13,16,24 8:5
8:9,15 10:16
214:10 219:10
**Hill's** 70:23
**Hills** 12:25 13:2
91:2
**hire** 209:7,18
**hired** 208:4
**Hoffman** 228:23

229:20
**hold** 37:4 119:20
122:7 207:23
**home** 4:23,24
5:4 7:14 9:18
10:16 11:10
13:13,20 18:7
18:23 19:5
21:9 24:9,13
24:16,19 26:3
26:9,13 27:8
27:11,25 48:6
48:11 49:7
55:23 58:17
75:3 79:22
81:14,19 82:23
86:18 87:5,9
87:20 89:7,17
99:16 103:25
106:16 112:6
115:2 121:8,15
132:18 136:3
142:13 157:7
173:17 182:16
184:1 187:5
193:2,5,15
208:11,20,25
209:3,21,24
214:13,19,20
215:9,9,13
216:8 217:21
218:14
**homes** 60:20
112:11 199:21
200:24 201:9
201:13 204:4
208:7 210:5
214:24 215:5
215:17 217:17
219:2,23
**honest** 209:16
**honestly** 128:8
199:13
**Hood** 198:18
202:1 208:5
219:15,16
**hour** 91:6,6

**hourly** 12:16,23
**hours** 13:1
 49:12 91:9,13
 91:22,23,24,25
 105:5 189:7
**house** 14:20
 15:7 21:8
 25:14 26:14
 28:4,9 45:15
 50:12 52:3,21
 53:4,15 67:22
 68:15 70:23
 71:2 72:23
 76:4 77:11
 84:3 85:15
 106:13 111:9
 119:7 126:7
 128:14 140:16
 157:3,9 166:23
 196:20
**housekeeping**
 223:12,17
**houses** 97:17
 156:23 157:1
 206:25 213:25
 214:2,6 217:25
**housing** 1:6
 203:5 205:10
 206:19 227:6
**huge** 43:8 73:1
 160:24
**humidities** 15:9
**humidity** 14:24
 56:17 81:1,10
 81:13 106:15
 106:20 107:3
 191:1,10 218:3
**humidity-rela...**
 106:14
**hundred** 13:10
 138:14
**husband** 75:13
 125:11
**husband's**
 195:23
**hutch** 109:4,4
 115:25 116:25

140:20,21,23
 148:6
**HVAC** 47:17,23
 60:11,19 69:16
 87:2 92:12
 108:23 118:5
 129:21 133:17
 133:21 148:11
 177:13 181:18
 182:14 186:8
 187:4,14 193:1
**hyphae** 110:1
**hypothesis**
 143:9,18

------

**I**

**I-N-D-E-X** 4:1
 4:12 5:1
**idea** 23:12 96:7
 101:16 142:23
 178:17,24
 203:24 204:6
 205:18 206:5
**identical** 163:5
**identification**
 34:22
**identified** 44:20
 55:13 56:20,23
 198:5
**identify** 8:23
 9:16 13:18
 18:5 180:24
**identifying** 6:16
**II** 1:6 227:6
**IIC** 170:23,23
**IICRC** 144:8
**immediately**
 157:6
**impact** 14:3
 56:19 64:7,11
 64:25 106:8
 127:17,22
 129:4,25 130:3
 130:5,11 131:6
 146:17,18
 187:2,9
**impression**
 109:13,19

**inability** 142:11
**inaccuracies**
 202:18
**include** 7:23
 30:6 117:2
 151:2 192:17
**included** 19:20
 107:25 132:18
 153:2
**includes** 9:24
 33:14 141:23
**including**
 195:25
**incorrect** 41:16
 68:21 131:2,18
 147:6 148:19
**incorrectly**
 173:20
**independent**
 7:11
**Index** 4:6,7
**indicate** 117:5
**Indicating** 121:1
 137:20 139:11
 140:1,4
**indication** 49:6
 56:12 88:23
 140:23
**indicator** 112:8
**indoor** 22:23
 117:19 157:16
 157:20
**indoors** 77:18
**industry** 151:18
 166:12 206:25
 207:2
**infinitesimal**
 163:12
**information**
 31:18 32:1,3
 35:5,18,23
 36:21 51:21
 52:7,25 89:25
 138:5 152:25
 203:2,14
 204:15 214:23
**initial** 9:24

**inside** 47:11
 157:8
**insinuate** 210:5
**inspect** 47:21
 92:16 133:21
**inspected**
 217:21
**inspection** 7:4,7
 7:14 9:22
 12:10 45:9
 55:4 58:12
 91:24 104:17
 122:4,7 127:13
 131:5,14
 141:16 180:23
 208:17
**inspector** 173:14
**instance** 1:16
 152:3 157:24
**instances** 120:17
 122:17 132:6
 166:7
**instrument**
 226:15
**intend** 31:9
 172:10 210:4
**intending**
 214:12 215:12
**interested**
 228:17
**interpretation**
 49:11
**interpretations**
 24:5
**interrogatory**
 216:5
**intrusion** 99:5
**inventories** 30:7
**invitation**
 101:12
**invoice** 4:16,17
 4:18,19,20,21
 4:22 9:8,13,18
 10:15,17 11:9
 12:5,23
**invoices** 8:20 9:2
 11:19

**involved** 173:16
**isolated** 106:1
**issue** 82:23 99:7
 138:4 164:24
 196:8,9
**issued** 9:11
 184:24 185:14
**issues** 51:20,23
 52:2,13 55:13
 55:25 56:2,6
 56:19 57:1
 58:19 204:21
 204:22 207:9
**It'd** 43:8
**it'll** 223:12
**item** 34:14
**item-by-item**
 34:6 93:4
**items** 48:1,3
 69:21 87:5,8
 87:23 88:2
 92:20,21 104:3
 147:8 182:19
 187:5 200:10
 200:11

------

**J**

**J** 1:3 227:3
**Jackson** 3:13
**January** 12:15
 12:23
**job** 16:11,16,19
 204:17
**joint** 45:9 58:11
**judge** 116:9
**Julia's** 128:15

------

**K**

**Kassandra**
 193:8,22 195:6
 195:18
**keep** 118:1
**keeping** 164:3
**kids'** 188:5
**kind** 6:23 13:4
 14:10 15:6
 16:1 26:8 49:2
 49:7 50:12

KRISTY BECK-MILLER, VOL. 2                    MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

58:24 59:20
63:19 67:9
72:19 92:2,9
96:19 105:3
112:8 123:14
123:20 147:15
147:22 148:1
161:4 169:1
177:10 181:11
198:11,20
211:9 218:14
**kinds** 30:19
79:15
**kit** 191:11
**kitchen** 44:10
46:16,19 60:5
61:7 66:9 84:6
85:8,12 95:5
96:20,24 97:1
97:9,12,16,19
97:23 109:15
110:4 116:1,24
124:19,23
130:10 146:22
147:7 148:12
181:5,8 187:9
187:17,19
188:15,17,20
**Kline** 219:1,20
**knew** 52:21
174:18,19
**know** 19:12,13
22:4,11 36:18
40:10 43:25
45:11 51:9,11
52:6,11,18
53:2,3 55:19
56:9 58:1
62:23,25 63:25
64:21 70:15
73:15 75:15
89:5 90:12
91:18 98:15
104:9 105:21
107:16 108:14
109:25 112:10
116:9 119:10

131:24,24
135:7 141:4,11
145:16 146:6,7
146:7,8 151:4
151:10 155:15
155:24 157:22
158:21 159:20
162:16 164:12
165:8,10
166:12,12
168:6,8,11,14
169:23 170:19
174:11,11
176:10 177:23
178:4,15,22
183:3,23
184:14,17,18
194:7,17 195:2
195:6 196:8,17
197:1,10
198:22 199:13
203:3,16
204:11 205:6,8
205:13 206:9
207:4,7,12,16
212:22,22
216:13,18,21
216:24 217:2,6
218:2,8 220:12
220:21 221:13
222:8,14
223:13
**knowledge**
32:21 36:12
**known** 226:13
**knows** 7:18
73:14 76:8
**Kristy** 1:11,15
2:8 3:21 4:2
6:2 24:21
49:10 78:3,25
109:17 112:22
115:16 116:15
150:7 166:15
195:25 204:16
206:6 210:1
212:19 225:2

226:1,7,13
227:11,18

_____

**L**

**L** 1:20 3:23
227:15 228:22
**lab** 109:24
149:16 154:18
163:19 167:1
184:8
**lab's** 164:17
**labeled** 125:12
**laboratory**
91:18 109:12
109:19 134:3,7
134:21 181:21
181:24
**lack** 117:14
**language** 21:17
24:25 25:4
39:23 40:2
43:22 59:4
104:22 135:10
139:2,4 179:10
181:20 194:10
206:12
**large** 199:2
**laser** 40:12 55:1
80:2 190:15
191:12
**Latagne** 195:4,8
195:17
**late** 155:16,19
**latest** 167:24
**laundry** 40:8,14
54:21 143:3
183:6
**lawsuit** 52:10,14
**lawyers** 52:20
**leak** 97:20
178:12,18
179:3,6,10
181:9,10
186:10 188:25
207:11
**leaking** 103:21
105:14 180:13
**leaned** 181:8

**learned** 8:11
54:9
**learning** 220:24
**leave** 76:18
**led** 199:6,10
**left** 70:22 71:1
74:18 75:6
87:17 155:16
155:18,19
213:3
**Leilani** 195:7
**Lenderman**
198:11 199:4
200:18 201:7
202:10 203:1
206:4 211:2
**length** 36:25
**lessen** 77:7
**let's** 11:6 17:21
37:19 41:6
71:20,23,24
72:24 81:22
82:11 89:13
92:2 118:1
143:2 148:23
154:4,21
155:10 159:23
159:25 160:2
175:10 183:5
189:13 199:9
209:16 221:18
**letter** 4:15 12:24
41:4 92:6
94:22 99:18
106:2 133:14
150:14 198:8
198:10 199:6
199:10 200:16
209:10
**letters** 8:3 12:25
13:7
**level** 63:17
64:23 89:2
95:18 151:20
200:23 201:12
**levels** 46:9,20
47:15 65:7

78:17 85:2,16
97:3
**license** 32:7,11
**licensed** 207:7
**lights** 76:10
**likewise** 205:18
**limit** 23:17
**limited** 14:3
141:12
**limits** 81:3
**line** 124:2,3,6,7
124:10,16,18
124:22 125:5,8
125:17,20,23
126:2,5,9,20
222:20,20,23
222:23 225:3
**lines** 106:11
123:23
**link** 211:9
**list** 5:22 7:22,24
8:1 12:8 19:22
40:6,8,15,22
40:24 54:22
70:3 143:3
150:13 151:2
183:6 223:18
**listed** 8:6 18:12
34:2 49:3
68:18 69:8,14
79:13 84:4
105:9 106:18
116:5 117:10
150:11 186:20
211:13
**listing** 15:14
**lists** 29:23
**litigation** 52:22
**little** 13:5 16:10
42:23 181:12
197:21 223:11
**live** 90:12
101:13 156:1,4
156:10
**lived** 54:15
**lives** 156:3
**living** 45:18 46:2

KRISTY BECK-MILLER, VOL. 2                    MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

46:5 50:8,14
50:17,22 51:3
51:3 53:4
66:18 75:22
81:7 84:5,8,25
113:5,9 116:1
125:9 129:18
139:13 140:24
146:21 147:5
148:4 178:9
186:9 187:10
187:16,21
188:6 189:24
**LLC** 1:6 227:6
**LLP** 1:23 3:4,7
3:12
**lobbying** 195:7
**located** 8:20
67:22 69:4
210:14
**location** 23:10
26:2,4,6 27:16
28:14 44:1
63:24 140:13
157:20
**locations** 18:14
21:9 23:7
121:15 164:23
**Locust** 228:23
229:20
**long** 45:25 55:20
84:15 91:4
169:20 184:20
**longer** 87:1
91:20 105:5
189:7
**look** 19:25 20:12
29:7 50:13,17
50:19 55:20
59:11,19 63:25
64:13,16 67:8
71:17,23,24
82:6 107:22
115:7 128:2
134:10 149:16
151:8 155:10
159:3,13

162:25 163:1
163:25 168:20
174:6 176:20
177:1,4,6
182:1 184:24
185:1,5,7,11
194:7 195:13
209:12 223:19
**look-see** 50:5
**looked** 10:20
17:10 28:25
29:1 48:18
60:1,15 61:11
123:11 159:5
167:15 174:12
176:14 184:21
210:10 213:2
**looking** 16:8
22:13 91:25
107:20 109:23
117:18 130:2
187:24
**looks** 61:20
101:2,11
102:21 130:24
137:6 145:4
169:19 171:22
175:14 195:14
196:21
**loop** 211:13
**lost** 160:1
**lot** 39:23 61:15
90:6 97:17
125:16 160:25
181:12 184:12
208:18,25
**low** 47:7 78:12
81:6 145:19
**lower** 76:24
77:20
**lowered** 73:3
**LPC** 190:24
**lunch** 91:8 123:4
123:5,7

**M**

**machine** 26:15
28:4 44:2

**machines** 72:24
**maid's** 43:21
44:9 60:4,5
61:6 83:4,10
83:13 124:15
129:11
**maintenance**
178:16,22
203:6 204:3,8
204:12,25
207:13 216:10
216:19
**majority** 140:2
**makeup** 87:14
**making** 69:17
69:22 83:8
99:2 103:4
138:20 180:22
200:16 229:13
**mapping** 137:24
**margin** 120:24
**margins** 100:7
123:15,19
139:10
**mark** 6:24 8:22
9:14 11:6
18:20 70:10
120:21 128:10
129:25
**marked** 4:13 5:2
7:1 8:24 9:15
10:12 11:8
12:1,12,20
13:16 18:2,4
18:19 20:6
28:17 58:21
67:3 70:11
86:11,13
120:18 154:7
167:8 168:15
169:16 172:6
173:7 193:20
195:11 210:20
211:7,20 212:2
220:1 223:15
223:17
**marking** 136:25

**master** 41:9 42:2
42:13 62:11
66:3 82:5,11
85:19 103:9,14
103:19 114:4
115:8 125:24
126:1,3,15
127:22 128:11
134:25 136:12
136:16,18,20
136:21,25
139:24 146:19
146:19 147:3,4
147:15,17,19
147:22 150:15
179:1,9,18,23
186:9,9 187:10
187:10,14,15
188:7
**matches** 163:10
**material** 86:10
**materials** 33:14
144:18 145:18
**math** 11:1
**mats** 61:3
**matter** 156:10
156:14 223:17
**mean** 15:2 28:8
40:21 56:7
61:6 71:23
73:12 86:18
91:15 112:7,13
113:3 117:25
119:12 138:10
138:14 145:16
146:5 161:13
162:4 166:11
170:18 171:19
171:20 176:22
177:20 184:21
201:2
**meaning** 23:12
104:24 117:18
121:10
**means** 27:3 93:7
115:22 130:19
190:13 192:2

**meant** 14:12
**measure** 53:18
**measurement**
107:4
**measurements**
218:14
**measures** 79:15
**measuring** 80:3
**media** 5:15
195:13
**medical** 52:13
**medium** 47:8
78:12
**meet** 119:7
**meeting** 195:19
199:2,3,7
211:1
**Meetings** 199:11
**memory** 127:20
**mention** 104:5
133:17 200:10
**mentioned**
121:5
**message** 193:22
**messages** 5:15
195:13
**messed** 145:4
**met** 52:6 70:17
207:1,17
**meter** 44:4 56:8
56:14 63:15,18
72:7,11 144:18
145:18 146:9
183:19
**method** 30:13
78:8,15 79:18
93:24,25 94:10
94:13 169:23
**methodology**
41:24 117:13
**Michael** 1:3
167:24 168:3
227:3
**microbial** 14:3
114:12
**microns** 42:22
42:23,24

KRISTY BECK-MILLER, VOL. 2

MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

Page 243

**middle** 156:18
**Military** 1:23
 3:4
**Miller** 6:7 58:10
**mind** 74:6
**mine** 27:1
**minor** 132:3,4
**minute** 156:7
 220:3
**minutes** 44:1
 73:24 223:13
**missed** 110:8
 134:8 168:21
 169:4
**missing** 40:22
 137:12 184:17
 207:22 212:25
**Mississippi** 3:13
**mistake** 20:10
 41:1 65:20,21
 67:12 134:13
 134:15
**mistaken** 31:13
**mistakes** 119:13
**mixed** 150:3
**moisture** 14:17
 26:16 55:13,25
 56:1,6,8,14
 58:3,18 63:9
 63:13,15,17,23
 105:9,17
 144:14,16,17
 145:1,6,18
 146:8,9,14
 171:4 183:18
 183:19 184:6
 186:4,18,23,23
**moisture-based**
 57:1
**mold** 9:24 14:8
 14:16 16:22
 20:22,24 21:23
 23:19 24:9,17
 25:8,13,25,25
 26:9,14,16
 27:8,12,15,25
 28:14,24 32:10

34:8 38:9
50:11 51:1
57:7,17,21
58:18 60:2,16
65:3,4,8,24
68:24 69:5,9
73:16 74:25
79:16 80:6
83:1,7,16,22
84:13,24 85:6
85:9 86:1 87:8
92:19 96:13
97:22 99:22
100:10 101:12
101:16,21
102:6,8,19,23
103:18 106:6
106:24 108:6
108:10,10,19
109:12,13,20
109:21,25
110:19 111:2,4
113:4,10,20,25
119:6,20
120:13,17,20
120:25 121:4,7
121:11,16
126:18 127:17
128:1,3,7,11
128:22 129:6
129:15,20,25
130:1,6 131:6
134:24 137:16
139:16,19,19
140:8,13,16
141:2,5 144:6
144:25 147:1
150:4 151:24
152:2 154:17
154:18 155:25
158:5,7,22
159:19,22,23
160:11 161:5
161:18 162:1
162:15,16,17
163:2,11,14,21
164:5 165:5

166:14,24
167:24 172:25
180:15,23
187:12,19,21
189:17 192:9
192:12,16,19
192:21 195:8
195:19 196:8
197:11,15
204:23,23,25
205:8 207:6
214:1,16 219:2
219:19 221:20
**moldy** 74:19
**moment** 17:24
**month** 160:17
**months** 17:12,12
 17:19,19,19
 54:15 79:23
 185:17
**morning** 9:4
 70:21
**move** 28:20
 37:19 63:2
 76:3,16 81:22
 89:10,13 143:2
 175:10
**moved** 73:2,3
 121:21
**moving** 33:2
 54:20 55:4
 72:22 76:1
 80:2 104:15
 137:2
**mud** 44:10
**multiple** 24:5
 153:19 156:23
 157:1
**multiply** 11:3
**mycotoxin** 97:25
 98:13
**mycotoxins** 98:4
 98:17

**name** 174:22
 226:14
**names** 174:10
**national** 119:21
 120:1,8 122:13
 122:18,25
 144:6 157:14
 157:18 165:10
 165:24 166:3,8
 166:11 202:22
 205:17 207:23
**nationally**
 112:19,23
 115:13 116:7
 116:14 117:12
 119:3,16 164:3
 165:2 170:13
 170:14 192:3
**nature** 35:23
**NBC** 51:12
**necessarily**
 73:12 152:7
**necessary**
 152:15
**neck** 90:13
**need** 26:24 27:1
 36:4,18 37:24
 40:17 82:6
 83:25 84:16,20
 89:7 107:22
 128:18 133:10
 139:9 156:10
**needed** 87:23
 155:24,25
 158:22 185:3,4
 185:9 198:22
 200:17
**needs** 16:2 82:14
 86:16 93:7
 133:23 150:24
 152:4,19,19,20
 191:23,25
**neighborhood**
 10:8 208:16
**neither** 185:20
 228:13
**never** 51:13

57:12 58:1
194:25
**new** 53:7 220:24
**news** 51:12 53:7
**night** 17:9,15
 154:17 155:20
**nine** 130:25
 153:22
**NIOSH** 142:7
 165:11
**noes** 143:6
**non-condition**
 50:7
**non-condition...**
 50:14
**non-control**
 171:2
**nonviable** 183:9
**nook** 26:15
**normal** 90:13
**normally** 90:13
 151:9
**notary** 2:11
 226:23 228:6
**notation** 136:16
 137:10,21
**note** 41:13 81:5
 86:9 107:2
 124:14 125:13
 155:25
**noted** 64:7 65:3
 65:8 102:8
 105:17 106:8
 106:18 116:19
 121:3 127:17
 127:17 128:22
 129:21 145:6
 146:14,17
 147:1 187:2,16
 187:22 226:3
**notes** 4:23,24
 13:19 14:23
 16:1,7 17:6
 18:6 19:7,13
 38:20 39:8
 45:6 64:1
 75:18 79:9

**N**

**N** 66:10,13,16
 66:18
**naked** 42:25

95:20 117:23
137:6,7,12,18
137:19 138:13
138:16 141:22
145:25 175:13
177:18 178:7
179:22 187:25
188:1
**noticed** 40:14
**notification**
140:20
**notified** 229:6,8
**November**
184:23
**now's** 84:21
**NS** 114:10,21
**number** 7:3
10:21 11:6,18
12:3,14,22
13:18 37:21
43:8 58:23
59:12 63:2
70:2 109:7
111:15 112:6
116:4 119:13
132:14 142:6
150:11 154:7,9
159:14,25
160:3 168:17
172:8 173:9
193:22 195:14
204:3 210:22
223:18
**numbered** 1:18
16:10
**numbers** 15:17
73:4,4 76:19
81:1,2 131:24
159:19,22,23
162:25 163:2
176:15
**NW** 1:23 3:4

―――――――――――
**O**
―――――――――――
**oath** 6:9
**Object** 50:23
51:14 53:21
59:8 88:8

113:22 116:16
117:15 119:9
119:23 120:10
120:15 122:14
123:2 131:22
132:8 136:4
140:18 150:9
156:15 159:11
161:23 165:3
165:14,19
166:9,19
**objection** 21:11
21:21,24 27:6
28:12 31:7,15
32:13,23 36:14
41:22 49:19
76:5 77:15
78:6,9,20 79:1
79:25 80:17,23
108:7 182:12
185:23 189:22
192:4 199:18
200:20 201:20
202:16,23
204:10,18
205:11,20
206:1,8,21
207:18,25
213:8,12 215:1
216:16 218:22
**observation**
45:3 153:19
**observations**
14:4,20 18:11
82:2 132:2
137:22 151:3
**observed** 213:25
**obtaining** 2:10
**obviously** 22:5
52:20 74:24
176:23
**occasion** 11:23
44:18 185:20
**occupied** 81:19
**occurred** 77:14
90:10 121:20
210:17 217:3

**October** 53:5
**odds** 163:9
**offer** 40:9
120:12 122:24
143:4 221:7
**offering** 221:8
**office** 12:7 139:5
139:13 146:20
147:5,25
226:18
**officer** 227:19
229:8
**Oh** 11:20 43:5
96:22 110:14
116:23 137:17
143:8 148:8
**okay** 6:18 7:10
7:13,20 8:5,12
8:18 9:10
10:25 12:8
15:4 16:8,21
17:2,16 19:3
19:15 20:5
23:17,23 24:7
26:2,5,7,21
27:7 28:3,24
29:11 35:3,13
35:16 36:24
37:25 39:6
40:14,23 41:1
41:9,13 42:24
44:9 45:18,24
46:18 47:1
48:14 51:4,11
52:7,10,15,20
54:6 56:3,11
56:13 57:11
58:4,22 59:13
59:18,24 60:7
60:10,23 61:14
61:21,23,23
62:14,20 63:15
64:4,24 65:3,8
65:23 66:4,23
69:24 71:6,12
71:14,19 73:14
73:23 74:8,13

74:21 75:12,15
75:20 81:16,18
82:3,5,18 83:3
83:15,18 84:2
84:22 85:12,17
85:23 86:15
91:4,7,16,20
91:23 92:2
93:2 94:9 97:5
99:12 100:19
101:5 102:23
103:21,23
105:16 106:15
107:16 109:3,6
109:21 111:6
113:13 114:17
115:12 117:13
119:11 120:6
120:16,25
121:2 122:2
123:22 124:10
124:15 127:3,6
127:14 128:1,6
128:10 129:9
129:24 130:3
130:10,13,21
131:13 132:1
132:10 133:10
134:16,20,24
136:7,12,22,24
138:2,9,19
139:11,18,23
140:1,5,22
141:1,7,22
142:3,24 144:2
145:12,15
146:1,17 148:9
148:11,17
149:15 150:4
150:20 151:11
151:22 152:13
153:8,18 154:4
154:8,24 155:6
155:10 156:6,8
157:1,5,23
158:16,20
159:1,12,21,23

160:4,5,10
161:15,20
162:21,25
164:12,15,22
167:3,12
169:22 171:13
171:25 172:13
174:5,18
175:10,11,15
176:9,11,14,17
177:3,24
178:18 179:5,9
179:25 182:25
183:14 184:2
184:16,19
186:2,15,20,22
187:2,8 188:24
189:10,13
192:21 193:21
194:22 196:18
196:23 198:15
199:6,9,19
200:22 201:6
201:14 202:5
204:2 205:1
206:3 207:10
207:16 208:24
209:3,20
210:17,19
213:22 214:5
215:12,20,22
219:9,11,13,17
219:18,25
220:20 221:12
222:17,22
**one's** 100:25
**ones** 54:22 69:7
76:21 141:15
143:4 183:6
**ongoing** 196:9
**onsite** 91:15
**oOo-** 3:24 5:23
224:4
**open** 74:14
75:22 195:24
**opened** 61:10
**operating** 170:1

KRISTY BECK-MILLER, VOL. 2                    MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

opine 8:15 86:10
  87:22 151:13
  172:10 214:12
  220:16
opined 7:23 57:2
  136:2
opining 7:22
opinion 22:24
  23:3 31:9
  41:17,18 50:24
  68:7 73:18
  78:4 87:2,4
  93:21 103:24
  104:2 106:19
  112:17 122:7
  133:23 152:4
  152:16 182:14
  182:16,20
  200:16 203:9
  206:7 214:24
opinions 8:7
  37:1,4 38:6,11
  39:18 47:19,22
  48:2,8,10 49:9
  50:21 69:18,22
  80:20,20 88:12
  89:17,21 90:1
  92:17 93:6
  99:2 101:24
  103:5 108:22
  115:1,4 118:5
  121:23 122:3
  132:17,24
  133:1,19 135:4
  138:21 172:14
  173:19 175:17
  175:23 176:1
  193:1 196:12
  197:19,21,23
  200:19 215:13
  219:4,22 223:3
opportunity
  207:13 220:17
opposite 78:21
oral 1:10,15
  227:11,20
original 2:7

213:15 227:22
ought 118:19
outcome 228:17
outdoor 77:5
  149:9 154:14
  154:23 157:25
  158:3,6,13
  162:15 164:17
outdoors 77:3
  77:21 149:14
  163:17
outline 145:8
outside 42:3
  47:11 77:8
  95:10 156:12
  157:7,9 160:8
  162:6,11,14,18
  162:22 167:2
  189:15,16,18
overly 126:10

_____
P
P-R-O-C-E-E-...
  6:1
p.m 1:19 224:3
packet 16:10
page 4:2,9,13
  5:2 13:24 14:2
  15:23 16:3,13
  16:14 29:12
  33:3 40:6,18
  54:21 55:5
  59:25 61:1,14
  61:18,22 69:16
  69:25 76:17
  77:24 81:23
  82:12 86:25
  103:23,24
  104:16 115:7
  118:2 123:23
  124:2,3,6,7,10
  124:16,18
  125:5,8,11,17
  125:20,23
  126:2,5,21
  136:23 139:23
  141:22 143:3
  144:14 148:24

149:5 150:12
  150:21 153:3
  153:15 160:10
  189:14 191:21
  195:15 213:23
  225:3 228:9
pages 16:9 18:8
paid 12:9 54:23
  54:23
Paisano 7:8
  11:10 38:6,9
  39:11 87:8
  88:1 91:1
  123:9 127:11
  131:9 143:18
  215:23
Paisanos 37:21
  38:12 39:19
  49:16 51:11
  52:25 53:4
  77:1 88:1
pantry 46:13
  61:7 66:2
  124:8
paper 155:13
paragraph
  208:4
part 23:20 47:11
  47:11 50:10
  51:3 76:16
  106:19 113:9
  114:12 121:19
  127:13 161:16
  179:21 186:8
participate
  197:14
particle 40:12
  55:1 80:3,3
  190:15 191:13
particular 11:20
  13:13 21:4,5,9
  23:10 27:8,11
  29:6 63:23
  68:4,8 93:7
  150:4 162:7
  164:23 190:22
particularly

127:16
parties 2:6
  227:25 228:15
parts 221:13
party 228:5,12
Paso 161:1
pay 142:11
  208:11
PDF 184:12
peach 76:3
pear 74:10,11,18
  75:6
peer-review
  116:8
peer-reviewed
  78:15 80:16
Penicillium 97:4
Penicillium/A...
  97:6
people 141:17
  165:5,9 185:7
  199:5 206:13
percent 13:10
  15:3 138:14
  146:8 203:20
  205:2,5
perception
  150:8
performed 32:4
period 53:20
permission
  199:17,21,23
  202:6
person 32:6
  192:22 226:14
personal 30:7
  48:1,3 69:21
  87:5 92:20,21
  93:12 103:2
  104:3 112:17
  115:5 135:3
  142:17 182:19
  186:5 187:5
  193:2 200:10
  200:11
personally
  226:13

personnel
  210:10
Pertaining 35:9
phone 3:5,9,14
  199:10
photo 110:21
photograph
  102:12 118:12
  121:1,11
  136:17 137:20
photographs
  92:23 95:10
  99:10 105:22
  120:18 121:4
  139:11 140:1,4
  176:6,11,13
  184:7,9
photos 64:14,17
  64:18,21
  100:19 103:18
  113:8,15
  121:16 137:13
  139:5 176:18
  177:23 217:16
  217:19
physical 91:15
physician 51:7
  183:1
pick 80:6
picking 66:24
picture 15:20
  79:8 99:8,12
  100:3,25
  102:14 140:21
pictures 37:24
  38:1 40:18
  102:3 103:12
  126:22 136:21
  139:17 140:7
  140:12,17
  177:4 180:3
  181:1,13
piece 93:8
  113:10 153:3
pieces 155:13
pin 43:4
pitch 198:17

pitching 209:13
place 28:3 82:6
  94:25 97:16
  100:17 157:15
  174:12 197:25
  201:3
places 117:6
  121:15
plain 206:12
plaintiff 32:17
  37:20 217:6
plaintiffs 1:4 3:2
  7:16 26:19
  167:17 174:2,4
  174:20 195:6
  196:4,16
  199:11,16
  213:10 215:20
  216:15 217:17
  218:25 227:4
Plaintiffs' 5:20
  220:10
plan 15:25 18:16
  66:1 75:22
  169:7,13
  177:21 184:10
  194:13,21,24
  195:1
plants 112:7,11
plate 105:14
please 26:24
  84:20 195:24
plowed 39:22
plus 11:24,24
  214:9
point 25:5 26:18
  28:6 52:10
  153:10 200:18
  212:18 221:14
pointed 45:15
  132:6
points 145:9
populated 57:15
porch 66:2
porosity 33:14
portal 19:2
  164:5 169:1

portion 32:22
possible 129:20
possibly 53:13
  60:15 112:9
  134:19
post 16:5
post-clearance
  170:3
post-testing 16:5
potential 40:6
  57:21,21 201:3
potentially
  93:13
pouring 158:21
  158:24
practice 152:24
  153:5
practices 205:14
precipitated
  199:1
precisely 163:11
prefer 151:19
preliminary
  14:3 183:15
  194:7
prepared 160:11
  217:24
presence 21:23
  22:13 25:9,23
  97:22
present 3:20
  27:18 28:15
  44:21 49:7,16
  49:20,23,25
  50:2 57:2 86:1
  88:18 98:9
  109:7 142:20
  180:15
presentation
  21:19 23:18
preservation
  34:13
presumably
  70:22
presume 174:24
pretty 54:17
previously 6:3

primary 22:1
PRIVATIZED
  1:6 227:6
Pro 16:25
probable 25:24
probably 26:1
  87:14 91:22
problem 216:24
  217:2
procedure 1:25
  34:22 113:25
  144:24 170:2
  170:15
procedures
  35:22
proceeding
  228:16
process 34:21,22
  36:19
produce 98:4
  151:19 164:10
  185:21 213:6
  213:11
produced 1:16
  6:19 9:2 19:12
  38:22,25
  151:10 164:8
  167:16 174:4
  194:1,4 212:6
  212:19,20
  217:14
producing 9:10
  17:16 98:1,14
product 91:13
professional
  135:6 151:20
  192:19
program 142:1
project 218:3,11
promised
  195:23
proof 201:15
proper 31:18
  106:5 113:24
  144:24
properly 101:15
property 30:7

93:12
protocol 81:22
  108:2 118:2,23
  118:25 150:20
  151:17,25
  152:6,8,10,14
  152:18 153:3,6
  153:12,15,17
  191:20 192:3,7
  192:17,20,22
provide 54:10
  167:23 223:21
provided 70:7
  193:14 202:9
provides 29:23
  34:11
provision
  157:18
provisions 1:25
  133:7
public 2:11
  226:23 228:6
pull 71:20
Pullen 1:23 3:4
pulling 81:13
Pulman 1:22 3:4
purpose 2:9
  131:4 157:12
  226:16
purposes 8:13
pursuant 1:24
  9:10 228:2
put 7:6 16:6
  44:2 63:21
  103:14 146:9
  152:24 153:22
  154:4 162:14
  176:20 184:11
  184:12,20
  212:24

_____

**Q**
qualified 92:17
  133:22 210:2
  214:22
quality 197:20
quantities 214:2
quarters 43:21

44:9 60:5,5
  61:6 83:4,10
  83:13 124:15
  129:11
question 127:12
  128:10 129:25
  141:8 151:23
  163:18 203:10
  212:15 213:14
questionable
  145:24
questions 29:6
  63:7 89:16
  126:6 132:16
  171:16 175:16
  193:13 223:11
  223:25 224:2
Quite 134:19

_____

**R**
Rachel 5:6
  28:22 221:22
  222:5
rain 77:6,13
  158:21,25
raining 77:3
  154:16 155:16
  155:17,24
  161:14 162:18
  162:20 166:17
  166:22
raise 77:17
raised 73:4
Randolph 12:24
  195:4,9 198:18
  205:10 208:14
  209:7,18
  213:25 214:6
  214:13 217:22
  218:17,18,20
  218:22
range 154:18
  156:1 158:6,7
  158:22 159:22
  159:23 160:11
  161:5,18 162:1
  162:15,16,17
  163:2,11,14,21

KRISTY BECK-MILLER, VOL. 2                    MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

165:5 166:14
166:24 189:17
**rare** 47:5 78:12
112:5 169:14
195:2
**rate** 12:16,24
**rbrzezinski@...**
3:9
**re-plow** 133:10
**reach** 114:10
151:1 192:15
**reached** 78:24
**read** 15:17
114:17 158:17
176:15 216:2,4
217:10 220:4,6
226:1
**reading** 146:10
171:22
**readings** 63:14
63:23 144:16
144:18 184:6
186:5,18
**reads** 27:4,7,11
206:5
**realize** 159:3
208:2
**really** 27:3 82:7
92:23 156:14
206:20
**reason** 45:5
104:6 134:18
166:2,14
176:10 190:5
190:22 225:3
**reasons** 95:3
109:17 228:10
229:12
**rebut** 223:4
**rebuttal** 5:21
220:3,11,12,18
220:21 221:4,9
221:19 222:23
**recall** 15:21
17:14,18 19:14
28:23 44:11
45:16 49:24

55:17 57:25
58:11 60:8
75:14 76:9,13
77:1,2 83:17
95:18 107:15
111:10 112:15
123:9 128:8
136:5 146:4
155:12 156:5
156:17,22,25
158:19 168:1,2
168:7,10,11
169:21 171:12
190:23 193:7
193:12,13,16
194:20 196:7
197:4 199:13
200:6,21 201:8
206:2 210:11
**receipt** 228:7
**receiving** 168:1
**reciting** 229:12
**recognize** 20:14
49:15 97:15
165:12
**recognized**
165:24 192:3
**recollection** 7:11
45:22 59:15
62:21 70:13,21
75:23 84:17
97:11 127:7
169:12 186:5
194:25
**recommend**
209:7,17
**recommendati...**
83:8 86:21
89:1
**recommendati...**
88:13 118:19
**recommended**
182:25
**recommending**
51:6 104:12
209:11
**recontaminated**

195:21 196:6
197:7
**record** 2:1 17:24
63:1 123:7,21
131:7,9 204:3
227:20
**recordings**
191:2
**records** 18:25
216:10
**Reduction** 218:3
**Reed** 2:8 3:3
6:14 7:18 8:25
11:21 12:16,18
17:23 19:13,18
21:11,21,24
26:22 27:6
28:12 31:7,15
32:13,23 36:14
41:22 49:19
54:23 77:15
78:6,9,20 79:1
79:25 80:17,23
108:7 127:1
141:15 182:12
185:23 189:22
192:4 194:4
196:24 199:18
200:20 201:20
202:16,23
203:10 204:10
204:18 205:11
205:20 206:1,8
206:21 207:18
207:25 212:6
212:10,12
213:8,12 215:1
216:16 218:17
218:23 219:7
219:14 221:7
221:15 223:22
223:22 224:1
**Reed's** 212:18
**reference** 34:18
34:19 35:6
41:10 44:10
50:4 63:22

80:6 97:8
110:8 138:19
**referenced** 18:9
37:9 38:16
39:11 59:21
**references** 42:14
106:1
**referred** 60:3
**referring** 99:6
111:14
**reflect** 45:2
84:24 136:9
**reflected** 138:13
144:21 193:17
**reflects** 83:19
**refresh** 45:21
62:21 84:17
127:6 169:12
194:25
**refreshed** 97:11
127:20
**refreshes** 59:14
70:12
**regarding** 6:12
6:15 14:23
31:10 40:1
43:13 48:3
98:23 101:24
106:24 108:23
115:2,4 122:7
193:10
**regards** 43:19
**register** 116:1
116:24 129:21
130:6 134:3,8
134:21 181:22
181:25
**registers** 111:3
**Registration**
229:22
**regs** 50:15,17
**regularly** 53:15
**relate** 176:18
**related** 50:21
60:4 228:14
**relates** 124:15
126:24

**relating** 30:6
48:10 136:21
216:8
**relative** 14:24
15:8 56:16
80:25 81:10
107:2 191:1,10
**relatively** 132:3
156:2,5
**relevant** 214:23
**reliability**
153:25 154:1
**reliable** 120:12
146:15 166:7
202:22
**reliance** 112:23
**relied** 38:16
**rely** 120:7
146:15 161:13
**relying** 8:14
88:6
**remainder** 55:2
66:7
**remediate**
118:20
**remediated**
36:19 192:19
**remediation**
16:6 20:22,24
28:24 29:22
31:10,19,25
32:10,22 33:8
34:9,23 51:1
83:9,22 93:12
135:7 152:2,15
152:18 169:7
192:13,19
196:8 204:25
205:9 207:6
**remediations**
204:23
**remediator**
30:12
**remember** 8:1
13:3,11 20:17
25:1,4 37:22
44:15,23,24

KRISTY BECK-MILLER, VOL. 2                    MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

58:13,19,23,25
59:5 62:6,8
74:9 75:12
81:6 87:11
155:15 167:13
172:17 183:25
197:13 198:5
208:12 210:9
**remind** 81:25
**reminder** 6:7
**removal** 86:11
**remove** 89:2
**removed** 16:2
**removing**
101:24 103:24
104:2 115:1,4
118:4 192:25
193:4
**render** 92:17
133:23 214:23
**Rendering**
219:4
**repair** 217:7
**repaired** 152:19
152:20,21
**repairs** 107:21
217:11
**repeated** 181:5
**report** 4:15 5:6
5:8 7:3,24 8:5
11:2 13:23
15:22 25:2
28:21 29:12
31:13 33:4
35:17 36:24
37:6,9,17 38:5
38:12,16 39:11
39:15,18,22
40:3,7,8 54:20
60:3 63:3
68:14 70:8,13
71:9,10 76:17
82:10 83:18
84:17,23 88:6
88:7 89:14,19
89:22 90:6,9
91:21,22,24

96:5 97:9
104:9,15,16
105:19 106:2
107:17,21
114:18 115:9
118:1,10
119:21 121:12
122:8,12,20
127:11,12
131:9,14 133:2
133:7 134:17
137:3 143:2
147:9 149:6
151:7 153:13
153:14 160:3,7
161:17 162:22
168:20,23
169:20 172:17
175:18 176:6,8
176:21 177:10
178:5 182:5,8
183:5,15,15
184:14 185:22
187:22 191:21
192:8,10 193:5
193:17 194:8
202:21 221:5
221:16 222:9
222:14 223:6,7
**report-genera...**
91:16
**reported** 1:21
178:16 204:8
216:14
**Reporter** 1:20
3:23 213:19
227:16
**Reporter's** 4:10
227:10
**reporting** 51:23
52:1 228:23
229:20
**reports** 7:23 8:2
8:6 25:1 29:1
30:24 35:4
47:19 51:18
63:4 91:10,12

91:25 135:24
154:18 161:25
162:4,5 164:16
164:22 172:25
174:19 177:22
185:5,7,11
196:11 200:25
202:9,13 203:1
207:21 215:16
215:18 217:24
221:25
**request** 131:1
140:6 178:22
**requested** 6:16
228:4,11
**require** 48:12
93:12 135:6
151:24 221:4
**required** 30:9
31:5 33:17
34:12 35:5
93:17 142:6
152:10 207:23
**requirement**
144:6,10
**requirements**
29:21 36:8
99:22 102:6
**requires** 21:3
30:11 33:11
86:11
**reserve** 224:1
**residence** 8:15
123:9 155:8
162:7,23
163:10 175:17
176:2 197:16
214:10
**respect** 25:22
33:8 35:18
36:9 37:2,5
38:6,11 46:3,8
48:1,6 49:9
54:3 68:8 87:2
87:4 89:17
118:5,8 122:3
132:17 158:2

175:17 202:20
207:10
**respective** 2:6
**respond** 207:13
**response** 204:12
216:19,21
**responses** 131:1
146:23 148:18
216:5
**responsible**
164:2
**rest** 19:2 143:6
**restorability**
33:15,20
**restoration**
33:23 34:13
**result** 42:13,16
46:24 54:16,17
72:6 73:7
88:16 98:8
163:15,20
167:25
**results** 37:13
40:17,19 42:7
44:3 51:6,12
53:24 65:17
66:23 67:15
71:13 73:16
75:10 77:24
79:5,8,23
81:10 83:16
91:19 94:2
96:19,20 98:23
113:2 114:14
114:18 115:8
116:10 117:3,6
135:11 138:11
148:23 149:5
155:6 158:9,17
180:7 183:1
184:8 193:14
215:8
**returned** 163:17
228:7,8 229:15
**returning** 163:9
**returns** 150:11
**review** 30:23

169:19 229:9
**reviewed** 216:7
218:10
**reviewing** 55:20
91:18 95:10
99:10 220:5
**revisited** 184:22
**rid** 89:3 171:7
**right** 7:8,14,17
8:9 9:5,13,20
9:25 10:2,11
10:11,22,25
11:6 12:17
13:8,12,14,21
13:24,25 14:5
14:19 15:10,23
16:3,11,16,18
17:21 18:8,12
18:14,18 20:2
20:7,11 22:4,9
22:18,21 23:6
23:9 24:1,1,24
25:7,9 26:13
27:20,21 28:8
28:18 29:10,20
30:1,17,21,22
31:17 33:2,25
34:1,4,17 35:1
35:12 36:3,6
36:19,20,22,23
37:14,15,19
38:13 39:5,19
39:21,24,25
40:5 41:3,4,6,7
41:8,16,18
42:13 43:9,12
43:22 44:14
45:1,6,7,9,10
45:12,13 46:6
46:9,10,13,14
46:16,17,21,22
47:5,15,25
48:16,17,20,21
48:23,24 49:3
49:4,13,17,18
49:22,25 50:1
50:2,3,4,8,9,16

KRISTY BECK-MILLER, VOL. 2                     MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

52:11,12,23
53:7,8,14,20
54:2,4,13,20
55:4,7,8,12
56:23,24,25
57:2,3 58:5
59:2 60:17,18
60:24 61:8,9
61:12,13,16,18
61:22,24,25
62:1,10,22
63:4,8,10,11
63:16 64:5,6,9
64:10,19,20
65:12,15 66:10
66:13,16,21,22
67:6,7,14,19
67:20 68:23,24
68:25 69:2,5
69:16,20,22
70:4,5,18,25
71:1,21 72:3,4
72:7,11,14,17
72:18,25 73:12
74:1,4,16,21
74:24,25 75:1
75:3,4,7,9,18
75:19 76:11,14
76:21,22,24
77:5,14,16,23
79:5,6,10,11
79:13,16 80:4
80:5,7,8,9,10
80:25 81:22
82:12,15,22,25
83:12,19,20
84:7,15 85:1,3
85:18 86:9,20
86:23 87:2,3
87:22 88:15,16
88:21 89:9,22
89:23 90:2,3
90:10,11,14,15
90:18,19,21,24
90:25 91:2,3
91:11,12,25
92:1,7,8,10,11

93:10,15,16,23
94:16,17,19,20
95:13,20,23,24
96:2,23 97:13
97:14,22,23,24
98:6,18,20,24
99:3,4,13,16
100:7,13 101:6
101:21,22,23
102:5,9,10,16
102:25 103:4,7
103:8,9 104:3
104:4,13,14,15
104:20,21
105:2,7 106:5
106:21 107:5,6
108:3,4,9,16
108:21 109:11
109:12,18
110:3,5,9
111:11,15,18
111:23,24
112:1,16,19
113:1,18,21
114:5,6,8,19
115:19,23,24
116:13,17,25
117:1 118:2,6
119:1,18
121:12,13,19
122:18,19,21
122:22 123:1
123:11,12,17
123:18,25
124:8,12,23
125:5,6,9,10
125:21,22,24
125:25 126:3,4
126:7,11,12,16
126:17,19
127:4,5,10,15
127:19,25
128:13,15,16
129:9,13,19,23
130:17,19,20
130:22,23
131:2,20

132:16,21
133:15,16
134:4,25 135:1
135:8 136:1
137:2,8,9,16
137:24 138:5
138:13,14
139:2,3,12,25
140:6,9 141:8
141:9,11,12
142:3,13 143:1
143:2,8,15,17
143:19,24,25
144:3,12,19
145:3,19 146:9
146:11 147:11
147:23 148:3
149:3,6,7,18
149:23,25
150:6,8,15,17
150:18,24,25
151:6,14 152:3
152:4,22
153:19,20,23
153:24 154:4
154:15,16,22
154:22 155:23
156:1,18,24
157:9,9,10,23
158:4 159:6,7
160:6,8,9,15
160:18,25
161:1,2,5,6,12
163:15 164:2
165:16,21
166:16,20,22
166:25 167:3
167:18,20
168:3,13,22,23
169:1,4,5
170:16,20,21
171:8 172:7,15
172:16,21,23
173:8,12,15,24
173:25 174:2,3
174:12,20,21
174:22,23,25

175:4,5,6,16
175:21,24
176:5,22 177:7
177:8,11,12,19
178:2,3,5,7,21
179:14,15,16
179:17 180:1,4
180:7,10,11,13
180:14,17,18
180:20,21
181:1,2,4,14
181:22,23
182:3,10,14,17
182:18,20,21
183:1,2,5,9,12
183:16 184:5
184:25 185:16
185:18,19
186:2,16 187:6
187:7,12,18
188:2,12,13,14
188:18 189:12
189:13,25
190:5,8,10,13
190:16,18,19
190:20,21,24
191:2,6,7,8,9
191:11 192:3,9
192:11,17,25
193:2,3,5,6,7
193:18,19
194:2,3,9,12
194:15,16
195:3,15
196:13,14
197:12,14,20
197:24 198:6,7
198:19,25
199:24,25
200:1,5,7,10
200:13,25
201:1,4,5,9
202:6,7,8,17
203:4,19
204:20 205:15
205:16 206:7
206:14 207:20

208:3,5,6,8
209:6,8,13,18
210:8,18 211:2
211:3,6,11,17
211:19 212:18
212:21 213:4,6
214:15,17,18
214:20 215:7
215:10,11,14
215:15,24,25
216:8,9,11,22
216:23,25
217:1,9 218:5
219:16,20,21
219:23 220:8
220:10 221:2,3
221:25 222:1,3
222:4,5,13
223:6,10,22,23
ring 195:5
RLU 79:7
  150:11
RLUs 138:7
ROBERT 3:7
roof 103:21
room 15:4 41:7
  41:7 44:10
  45:18 46:2,5,8
  46:15 61:7
  62:8,23 63:6,6
  64:18 66:15,18
  71:24 72:10,21
  73:21 74:11,21
  75:10,22,23,25
  76:3 84:3,5,6,8
  84:25 85:3
  101:23 103:5,7
  107:3 108:11
  108:12 113:1,5
  113:6,9,12,16
  113:21 116:2
  123:15 124:4
  125:9,13,18
  128:14,15
  129:1,18 130:3
  130:7 137:14
  137:20 138:8

KRISTY BECK-MILLER, VOL. 2                           MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

138:23 139:4,6
139:7,13,13,16
139:22 140:8
140:24,24
145:17,17,18
146:21,21
147:5,6,14,16
148:3,4 150:24
178:9 186:9
187:10,16,21
188:6 189:24
195:23
**room-by-room**
92:9 131:5
**rooms** 15:5,8
64:8,12 65:1,5
65:25 66:5
67:3 68:1,4,9
69:2,4 70:3
79:13 82:1
85:23,24 86:2
86:5,14,17
105:10 106:9
108:14,16
118:9 130:21
146:18 147:2
149:19 151:2
152:20 186:23
187:3 191:24
**rotted** 75:6
**rotten** 74:19
76:2
**roughly** 91:14
91:25
**rreed@pulma...**
3:6
**ruined** 28:10
**rule** 126:14
189:4 228:3
**rules** 1:25 50:15
50:16 51:1
119:1 192:15
221:4
**running** 189:3
**Ryan** 2:8 3:3
11:21 12:16,17
17:11 52:5

54:23 127:1
141:15 185:2
212:25

**S**

**S** 114:21
**S-T-I-P-U-L-...**
2:3
**S500** 29:2 33:3,8
33:11 34:11
35:5 36:8
67:18 188:25
**S520** 5:5 20:11
20:15,21 29:3
29:20 30:11
31:5 36:9
68:23 170:24
**SA-19-CA-01...**
1:5 227:5
**safe** 50:13
**sample** 10:9,23
10:24 22:12,12
22:13 40:19
41:24 42:2,3
43:12 44:3
46:23,25 47:1
47:14 65:6
66:23 67:10,14
72:9 77:6,23
79:4 80:3
83:16 95:5,22
96:8 97:8,12
98:8 109:2,24
110:5,8 111:14
111:15,17,25
113:2,2 114:3
114:4,14,18
115:8 117:2
129:8 141:10
141:19 148:23
155:2 156:11
157:2,6,11,16
157:25 158:3
158:14 159:2
159:17 161:19
162:6,11,13
163:10,19
165:6 166:24

170:8,8 171:24
183:9 188:16
188:18 189:16
201:23
**sampled** 171:21
**samples** 10:7,21
11:2,2,3,18
15:14,16 40:15
40:23 41:10,10
41:11 56:17
65:6,14,17,18
66:24,25,25
67:2,5 70:2
78:12 79:12
83:24 84:2,12
85:2 86:4
108:21,25
109:1,15 110:4
110:17 111:8
112:18 115:19
115:25 116:20
116:24 117:6
117:19 136:13
138:23 141:24
142:4,7 143:5
147:11,22,25
148:18 149:2,8
151:4 164:23
165:23 183:8
188:2,10
**sampling** 10:2
18:14 19:4
37:13 40:13
55:1,1 69:24
70:20,25 85:24
121:20,24
157:21 171:7,9
171:14 173:16
179:11 189:14
**San** 1:2,24 3:5,8
227:2 228:24
229:21
**satisfactory**
77:25 78:17,25
80:15,15
109:16,22
112:4,20

114:15 115:10
115:10,14,22
116:2,10,11
150:1,8 190:6
190:12
**satisfied** 217:7
**saw** 27:15 44:21
45:12,16 55:18
55:22 56:4
58:17 65:9,11
65:24 69:5
72:13 74:17
81:2 84:24
87:20 99:19,25
108:14 120:24
121:4,8,11
127:7,21 128:6
129:1 131:17
139:21 140:8
141:14 153:18
186:15 188:25
194:10 202:1
215:5,8,8
216:14
**saying** 24:3,21
25:11,12,22
27:9,13,15,17
27:20 50:22
51:20 57:20
59:6 65:20
73:8 93:13
112:24 118:15
149:21 166:17
175:7 196:7
203:16 221:17
**says** 13:2,7 14:2
15:1 16:14
23:2 24:1,22
29:13 30:5,11
30:23 31:17
33:11,20 34:11
46:11 48:14
56:13,25 59:25
61:1 62:11
67:14 86:9
97:9 109:7,10
109:12,24

111:25,25
113:1,12 115:9
118:18 120:3
122:20 125:12
145:6,10
147:11 151:19
153:14 154:14
160:7 167:23
168:3,19 169:6
172:4 179:18
187:21,22
188:20 189:15
189:18 194:10
195:19 200:23
204:20 205:17
206:12,14,15
209:20 213:23
220:16,18
221:18
**SCHULTZ** 1:20
3:23 227:15
228:22
**scientific** 41:19
42:5,10 43:16
78:8,15 120:13
**scientifically**
24:2,4
**score** 159:19
**screen** 15:18
**screwed** 163:19
**scrub** 86:19
**se** 136:8
**seal** 178:12
179:6,21
180:12 226:18
**seals** 178:18
**search** 175:5,8
211:4,10,24
212:4,15
**searched** 174:10
174:24 210:13
**second** 25:4
45:21 82:12
134:2
**section** 14:20
33:4 41:7 48:6
55:5 81:23

118:2 131:11
131:13 132:2
142:13,18
150:12,23
154:3 191:20
220:4
**sections** 193:4
**see** 10:25 14:11
17:16 18:4
19:2 20:12
21:10,13 22:8
26:8 27:25
30:24 31:20
33:4,9 35:6
38:1 42:25
51:7 52:16
55:24 56:1
59:14 60:1,13
61:23 62:19
64:4,11,17
65:4 69:8
70:12 77:25
82:18,22 83:9
84:20,23 86:1
86:15 87:7
94:3 98:1
100:1,10,19,21
100:23 102:25
103:10,13
106:18 107:13
108:11 110:7
110:16,19
111:1 112:6
116:23 126:10
126:13 127:17
127:21 128:14
134:5,7 137:3
137:11,25
139:16 140:13
141:3 143:8
145:9,10,19,23
146:18 151:22
160:12 168:20
169:3 171:21
176:6 180:24
186:3 187:12
191:1,5 193:23

195:15 196:2
199:20 200:15
203:6 214:3
221:8,22
**seeing** 9:3 28:23
61:15 84:13
101:3 102:19
113:15,20
145:24 163:16
184:8,8,9,9
188:16
**seeking** 209:10
**seen** 15:22 28:22
57:12 63:4
90:16 97:1
116:5 126:21
168:17 194:23
198:13 199:21
200:12 201:23
202:4 204:2
206:25 214:6
214:25 217:16
220:8 222:2,6
223:7
**select** 30:12
**selected** 40:21
81:25
**send** 17:14
155:2 173:1
184:13 223:22
**sent** 2:8 17:11
17:17 155:6
159:17,18
163:20 167:1
168:23 172:21
194:23 202:25
**sentence** 134:2
134:12 200:23
209:20
**sentimental**
33:24
**separate** 7:14,17
8:9 34:19
**separately** 8:19
**series** 8:19 211:9
**served** 227:25
**service** 34:12

63:19 228:23
229:20
**set** 89:22 211:1
**settled** 21:19
83:6
**seven** 130:25
153:21
**severe** 27:4
**severity** 215:8
**sewage** 48:20
88:24 104:23
**SFC** 77:24
116:20
**share** 51:12,17
182:25
**shared** 51:7
**shocks** 74:5
**Short** 18:1 58:7
89:12 167:7
198:2 223:14
**show** 8:18 9:13
10:13 12:2,13
12:21 13:17
18:3 20:9
28:21 47:2
58:10,22 92:23
121:12 123:8
133:13 139:18
154:6 167:9
168:16 169:17
172:7 173:8
193:21 195:12
210:8,21 220:2
**showed** 51:13
79:24 88:18
94:2,13 97:3,5
135:12
**shower** 28:1,5
102:14
**showing** 115:20
**shown** 221:25
227:25
**shows** 100:25
**side** 29:1,1 61:4
74:15 220:17
**side-by-side**
71:6,18 72:20

**sides** 72:23
**sign** 229:11
**signature** 2:10
4:9 225:1
226:2 228:3,6
228:9 229:14
**sill** 105:14
**similar** 33:7
214:1
**simple** 64:14
**single** 27:16
28:14 107:14
**single-pane**
105:13
**sink** 95:14,15,16
96:24 97:1,9
97:13,16,23
98:14 110:5
116:1,24
**sinks** 97:19
**sir** 19:8 41:12
82:9 140:4
169:14 174:17
**sit** 60:20
**sit-down** 198:11
**site** 96:4
**sitting** 10:25
36:3 74:14
113:11 223:2
**situation** 30:13
77:10 191:22
199:12
**six** 91:9,24
130:25 153:21
173:23 174:15
214:6,24 215:5
215:13,17
217:22,25
218:15
**six-by-three-f...**
177:17
**size** 42:21 43:3
178:4
**skip** 148:11
**slash** 25:8
**slight** 59:25
128:3

**small** 43:10
**social** 5:15
195:13
**soft** 181:12
**softness** 129:2
**solely** 206:13
**somebody** 50:5
73:2,12 75:6
172:12 198:22
209:12
**someplace** 201:4
**son's** 137:2,10
137:11,20,22
138:6,7 146:20
147:4,16,19
**sorry** 41:11
96:24 170:11
203:12
**sort** 22:6
**sounds** 179:5
**source** 54:25
**space** 48:14,15
50:8,14,25
51:3 67:23
79:3 81:7
88:16 97:20
**spaces** 50:18,20
50:22
**speaking** 38:4
76:23 156:2
218:20,22
**species** 98:3,6,9
163:7
**specific** 118:20
152:21 154:21
223:3
**specifically**
96:14 221:21
222:18
**specify** 92:21
105:16
**spit** 16:14
**split** 126:2
**spontaneous**
137:16
**spore** 22:8 42:17
42:21 71:9

72:1,5,9,13
76:19 77:18,20
111:14 117:5
149:19 155:2
163:11 164:17
**spores** 21:19
22:14,17,25
23:13 25:9,23
27:12 28:15
43:3 44:4 46:6
47:7,7 72:6,10
72:14,16 76:2
77:7 83:6
109:7,25 116:5
149:11 161:7,8
171:4 201:18
**spot** 68:16,18
**squiggly** 186:12
**Stachybotrys**
171:5
**stack** 13:12
213:18 219:7
219:10
**stand** 221:9
**standard** 20:22
24:20 29:23
30:3,15,21
33:18 34:3,19
34:25 41:19
42:11 43:16
78:8,14 104:22
109:18 112:24
116:8,14
117:12 144:11
150:7,18
157:14,19
170:1,9,10,22
190:9 191:10
**standards** 29:2
31:5 36:17
42:5 48:12
78:22 80:16
93:18 106:24
112:20 115:14
119:3,7,16,22
120:1,8 122:13
122:18,25

142:9 144:6,9
164:3 165:2,10
165:18,24
166:4,8,11,12
170:18 202:22
205:18 207:23
**standing** 56:12
62:24
**start** 64:19
72:24 163:21
195:24 199:9
**started** 130:4
198:6 212:23
**starting** 19:22
41:3
**state** 1:21 77:24
160:20,21,25
164:18 170:17
180:24 196:13
226:9,24
227:16 229:2
**stated** 1:25
**statement** 26:10
27:24 31:2
48:2 51:5
93:21 94:6,12
94:21 98:13,23
104:7 135:2
181:17 203:4
203:21 206:19
206:20,20
229:12
**statements**
43:13 51:19
55:7 133:6
135:23 154:2
**STATES** 1:1
227:1
**status** 178:22
**stays** 26:16
**stenographic**
1:21
**step** 152:12
**sticky** 172:5
**stipulate** 7:19
**stipulated** 2:5
**Stipulations** 4:4

**stopping** 197:24
**stored** 19:9
87:24
**Street** 3:13
**strike** 146:13
**strongly** 209:7
209:17
**studio** 139:6,8
146:21 147:6
147:14,14
148:7,10
**study** 78:15
80:16 116:8
**stuff** 16:18 61:3
61:11 77:12
80:9 87:13
91:8,9 172:10
197:11
**subject** 19:19,23
24:4 173:23
219:25
**submitting**
122:11,11
**subpoena** 6:21
9:11 19:19,24
173:24 176:23
184:24 185:14
**subscribed**
226:14 229:16
**substance** 6:12
6:17 107:17
229:11
**substitute**
162:18
**suffice** 156:19
**suggestion** 144:8
**Suite** 1:23 3:4,8
3:13
**sum** 37:1
**summarize**
148:24
**summary** 4:15
131:17
**sunroom** 46:23
92:19 93:1,23
109:1,5 112:14
120:21 125:2,4

**super** 43:10,10
59:5 83:25
136:6
**support** 145:7
186:24
**suppose** 7:9
85:20 206:22
207:19
**supposed** 50:17
83:12 96:11,13
108:18 114:1
**sure** 13:10 29:9
89:11 155:4
167:6 185:25
197:2 198:1
220:23 221:15
223:12,13
**Surely** 199:15
**surface** 16:25
54:9 55:1 56:9
77:23 87:17
116:20 171:6
**surfaces** 79:24
**surprise** 185:13
**suspect** 171:3,4
**sustained** 181:5
**swab** 11:3 22:13
40:19,23 46:25
47:1 66:25
78:11 79:12
109:24 115:25
116:23 134:11
**swabs** 10:4
**SWB** 116:20
**sweating** 102:2
**swelling** 64:15
**switch** 62:16
132:11
**sworn** 1:17 6:3
216:4 227:19
229:16
**system** 47:18,23
60:19 61:25
69:17 81:12,12
87:2 92:12
108:23 118:5
129:21 133:18

133:22 181:18
182:14 187:4
193:1
**system's** 60:12

---

**T**

**table** 17:21
74:15 108:15
**tables** 161:19
**take** 15:20 16:11
16:15 24:18
29:6 43:4 50:5
51:21 58:6
59:11 67:9
68:17 76:2
79:8 89:9 91:4
91:20 107:20
110:16 123:4
140:12 141:10
142:3,6 157:15
157:19 163:19
165:6 166:18
166:23 167:4
169:8 176:11
192:7 194:7,14
197:25 220:3
**taken** 1:17 77:6
95:6 137:7
138:6 147:13
147:17 162:6
162:11,13
165:1 176:13
228:16
**talk** 8:10 13:22
13:22 37:20,24
41:6 55:6
61:24 70:16
82:11 124:10
150:23 170:24
178:9 189:13
198:12,20
199:16
**talked** 20:8
24:25 77:6
79:21 86:22
122:2,10
142:10 190:9
214:9 217:22

KRISTY BECK-MILLER, VOL. 2                    MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

Page 253

**talking** 9:20
14:8 20:18
28:19 29:2,17
35:14 57:4
68:14 72:2
82:8 102:15,17
114:18 123:16
125:8 131:14
159:24 160:18
171:9,14
177:13 196:19
196:20,22
200:8 207:3,4
211:2 218:15
**talks** 34:17,21
**tape** 11:2 22:12
40:15 41:10
46:23 66:25
97:8 109:2,24
115:25 116:24
129:8 136:13
138:23 141:10
170:8 171:14
171:22,24
172:3
**taught** 23:21
**TDLR** 168:4
192:23 204:22
205:15
**tech** 58:9
**technically**
41:16
**Telephone**
228:24 229:21
**tell** 9:6 10:14
11:7 12:4,14
12:22 16:9
18:21 36:22
40:7 52:2
54:22 55:5
58:17 62:16
64:25 65:23
95:11 98:8
99:11,19
120:23 151:1
152:18 161:22
162:1 163:2

196:4,15 197:4
198:8 199:20
200:15,18
222:18 223:2
**telling** 24:8,14
76:7 158:8
162:21 186:6
206:13
**tells** 78:16,16
94:18
**temperature**
81:5
**ten** 47:6 157:11
**tens** 44:4
**term** 171:17
**terms** 19:16
27:23 116:4
215:7 220:24
**terrible** 59:9
**TERRY** 1:20
3:23 227:15
228:22
**test** 42:16 43:25
44:2 73:20
94:18 98:17
116:10 134:11
140:25 148:5
148:16 155:6
157:6 163:15
172:12 193:14
215:8
**tested** 93:24
156:12 198:13
**testified** 6:3
**testify** 213:24
**testimony** 6:12
40:1 90:5
133:6 227:21
**testing** 22:6
23:10 39:10,14
40:12 51:12
53:24 54:3,8
54:25 58:16
71:4,7 73:17
74:22 82:2
85:6,9 90:17
131:25 157:7

166:6 193:9,10
195:8 221:9
**tests** 85:11 136:9
136:13 218:13
**Texas** 1:1,21,24
3:5,8 32:15
50:15,16 119:1
151:19,24
158:7 160:14
160:16,24
164:18 170:18
192:15 227:1
227:16 228:22
228:24 229:2
229:21
**Texas-compli...**
151:17
**texture** 125:23
126:3
**thank** 6:18
218:21
**Thanks** 173:2
**thereon** 2:10
**thing** 29:7 30:18
33:22,23 42:6
43:18 47:14,25
81:16 85:4,8
92:5 93:3
108:10 133:17
147:2 161:20
166:21 185:6
188:3 205:9
**things** 7:22
19:23 20:8
21:3 29:8,23
30:3,8,19
33:17 34:2,5
40:9,9 53:18
54:22 79:15
90:6 91:19
96:10 119:15
119:16 123:16
143:3 171:5
180:23 183:7
198:4,12
201:23 202:1
204:7 206:14

206:14,15
207:8,22
222:21 223:18
**think** 7:18 13:4
22:16 29:7
37:12,23 41:14
45:19 48:5
52:24 53:2
61:21 62:2
70:6 71:25
80:22 81:16
96:20 102:12
124:14 129:1
159:18 161:16
184:10 185:12
197:9 206:6,16
209:22 214:15
223:10
**third** 11:11 14:2
**thought** 9:2 57:4
65:8 83:21
134:10 153:8
158:11,13
185:8
**thousand**
208:19
**thousands** 44:4
**three** 11:20 13:1
39:7 90:9
130:25 148:17
153:21 161:22
164:21 166:7
184:13 191:17
198:13 202:6
202:13 203:15
203:21 204:3
205:2,9,23
206:25 207:21
**threw** 88:1
**tile** 102:20
**till** 7:6 203:10
**time** 9:4 12:3
17:21 33:21
45:25 53:20
71:3,4 72:10
72:22 79:10
81:20 84:21

97:19,19 105:1
137:7 138:6
141:19,23
152:12 167:18
178:10,19,19
189:2,2 193:15
200:7 203:3
208:2 217:3,3
221:1
**timeline** 199:9
**timely** 216:22
**times** 11:3 15:5
73:21 161:18
161:22 184:12
**title** 192:7
**today** 7:6 36:3
53:8 185:13
201:15 202:13
223:2
**toilet** 178:12,18
179:6 180:12
188:25 189:3
207:11
**told** 10:7 22:16
29:8 53:2
57:14 59:15
70:6 83:21
88:3 112:3
151:12 158:3
158:13 177:25
203:21,25
204:24 205:3
205:23 208:7
210:13 214:15
220:23 222:2,5
**tool** 191:11,15
**tools** 191:11,12
191:13
**total** 12:8 37:1
72:6,14,16
88:18,23 117:7
141:20,23
149:11,18
150:3 161:7,8
214:6
**touch** 215:16
**toys** 138:20

**training** 32:7
**transcript** 5:7
  59:2 62:18
  123:14 227:19
  227:22 228:8
  229:9
**transcription**
  1:22
**translate** 172:24
**transmittal** 41:4
  60:4 92:6
  94:22 99:18
  106:2 133:14
  137:11 142:14
  150:14 176:5
  179:14
**transmittals**
  48:7
**transmitted**
  201:4
**trap** 71:9 72:2,5
  72:9,13 76:19
  111:14 117:6
  155:2
**travel** 9:8 12:6
**trial** 224:2
**tried** 121:10
**triggers** 56:5
**true** 8:7,8,16,17
  12:10,11 23:7
  23:8 26:10,11
  26:19,20 30:1
  30:9,10 31:2
  31:10,11,14,16
  31:22 32:15,16
  32:19,20 34:9
  34:10,15,16
  35:8 37:10,11
  38:9,10,17,18
  39:15,16 40:3
  40:4 41:25
  42:1,3,4,7,8,11
  42:12 47:23,24
  49:7,8 53:16
  53:17,25 54:1
  54:18 60:21,22
  68:1,2,4,8,21

69:2,3,14,15
70:8 78:8,10
78:18,19,22
79:24 80:1,12
80:13 81:20,21
86:2,3,5,6 87:9
87:10,17,18,24
87:25 88:3,4
88:13,14 89:7
89:8,19,20
90:7,8 92:14
92:15 93:8,9
93:18,19 96:8
96:9,15,16
97:17,18,20,21
98:15,16 99:22
99:23 101:13
101:17,18
102:6,7 106:25
107:1,10,18,19
108:12,13
114:1,2,22
116:11,12
117:16,17
119:17 120:4,5
121:8,17
122:13 131:18
131:19 132:3
133:3,24,25
135:7,15 138:6
139:2 143:11
148:21,22
151:17 157:3,4
162:9 165:9,15
165:18,20
179:11 180:7
182:3,10
186:25 189:20
201:17,18
203:2,25
204:19 205:19
207:17 209:24
209:25 212:8
214:7,8 216:19
216:20 222:15
222:16 223:4,5
226:3 227:20

**try** 140:12
**trying** 26:7
  55:19 155:15
  186:17 211:1
**turn** 33:3 44:1
**turned** 49:1,1
  75:13 80:12
  81:13
**turning** 76:10
**two** 1:13 8:3
  22:2 29:2 39:3
  46:6 54:15
  79:22 85:17,23
  90:17 91:22,23
  91:24 100:19
  103:12 110:22
  116:19 129:9
  130:24 131:1
  146:23 147:8
  148:17 149:2
  153:21 194:23
  227:13
**type** 34:12 87:14
  180:16 192:12
**types** 33:23
**typical** 126:14
**typically** 23:20
  24:15 50:10,13
  106:12 145:23
  173:13 176:20

**U**

**Uh-huh** 44:19
  138:18 174:9
**Uh-uh** 52:19
**ultimately** 88:15
  89:6
**unacceptable**
  109:22
**unclean** 54:9,11
  54:16 79:24
  115:23
**unclear** 62:15
**uncover** 211:4
  211:10,24
  212:4,15
**underneath**
  67:22 89:7

95:15,17 97:12
97:16,23 101:3
101:10 110:5
**understand** 6:9
  21:18 24:7
  57:13 82:7
  105:8 107:9
  113:19 154:24
  196:10
**understanding**
  214:5
**Understood**
  141:13 221:15
**undertaken**
  31:19,25
**undertook** 39:10
**Unfortunately**
  23:24
**unhealthy** 210:5
**UNITED** 1:1
  227:1
**unoccupied**
  53:15 60:21
  77:11 79:22
**unpack** 156:6
**unsatisfactory**
  78:18 112:23
**up-to-date** 19:16
**upstairs** 46:18
  47:13 62:2,12
  66:12 67:8,10
  67:15 84:6
  85:13,18,20
  102:8,17 114:3
  115:8 125:13
  130:14 180:9
  186:10 187:9
  187:15 188:8
  188:12
**use** 41:15 56:8
  59:20 157:2
  158:8,17 159:1
  161:18,21
  163:20 165:5
  165:12,17
  166:13 170:8
  170:13,25

171:6,24
179:13 189:23
191:15
**utility** 123:24

**V**

**vague** 24:4
**vaguely** 44:23
**value** 33:23,24
**variability** 72:19
  73:2
**varies** 63:21
  202:3
**vent** 124:19,23
  129:22 130:8
  130:12,13
**vents** 61:25
  110:20
**verification**
  142:21 170:1
  170:19 171:1
  171:18
**verifications**
  208:22
**verify** 181:13,15
**version** 17:3
  37:22
**versus** 157:8
**video** 5:7 59:19
  62:18 123:8
  130:2 131:17
  228:23 229:20
**videographer**
  58:12,24
**videotape** 45:2
**videotaped**
  44:24
**view** 73:7 89:7
**Vinales** 5:4
  18:23 19:4,7
  19:13 50:2
  89:14,17 90:20
  99:15 104:5
  112:12,13
  119:20 121:21
  122:3 135:11
  143:21 154:14
  155:3,7,8

156:4 157:25
158:4,9,14,17
159:1,4,17
162:14,20,21
162:23 163:10
163:14,19,22
166:23 190:20
191:8 198:14
199:14 200:2,8
202:21 215:24
**visible** 14:8,16
23:19 24:9,17
25:8,13 26:9
26:14,16 27:15
27:25 28:13
46:11 58:18
68:24 69:5,9
83:16,22 84:13
84:24 85:6,8
87:7 92:19
100:10 102:8
102:19,23
103:10,18
109:23 110:19
111:2,4 113:4
113:9,20
114:11 120:17
120:20,25
121:4,7,11,16
130:5 131:6
134:24 138:12
139:16,19,19
140:8,13,16
141:2 177:14
179:1,18 180:1
180:15 187:19
197:11 200:11
**visual** 40:11
45:3 67:4
127:13 131:4
132:2 151:3,4
153:19
**visually** 170:6
171:6 198:13
**VMG** 14:7
100:13 111:5
113:2 139:21

**VOLUME** 1:13
227:13
**VS** 1:5 227:5
———
**W**
**Wait** 187:19
203:10 219:5
**walk** 6:23 58:16
59:20 92:3
123:20
**walk-through**
44:16,22 56:23
59:16 105:8
123:8 130:18
131:14 132:6
**walked** 84:15
**walking** 52:21
58:24 118:1
**wall** 86:10
100:22 114:13
137:16 138:4
179:2
**walls** 61:4,4
103:12
**Walter** 3:12
8:25 17:23
212:6
**want** 6:14 20:7
29:9 51:20
58:8 59:20
70:15,16 71:17
72:1 86:7 89:9
120:6,21
121:14 122:24
123:20 132:10
133:13 139:15
139:18 146:15
154:6,24 167:9
169:8 176:2
197:25 209:9
213:14,22
214:5
**wanted** 6:23
20:11 28:19
45:11 127:11
134:1 142:4
154:20 198:17
198:20

**wanting** 13:5
**wants** 166:16
**warped** 95:6
**warranted**
192:13
**was/was** 229:14
**wash** 83:14
84:10 86:8,19
**washing** 26:14
28:4
**wasn't** 122:1
143:16,22,24
144:1 151:23
162:19 166:22
194:11 197:2
198:21
**water** 14:3,17
33:21 40:12
44:11 48:15,22
49:2,7,10,16
54:25 55:19,24
56:4,12,19
58:19 59:25
60:6 61:19
64:7,11,25
67:19,22,25
68:4,7,16
82:20,24 83:1
95:25 97:17,20
99:5 103:10,20
104:23,24,25
105:3 106:8
114:11 124:11
127:16,21
129:4,24 130:3
130:5,10 131:6
134:24 138:12
146:17,18
177:14 178:1
179:1,2 181:5
184:3 186:10
186:13,15
187:2,9 188:24
189:1,7 196:8
**WATTS** 3:7
**way** 16:8,9
50:12 55:20

62:17 63:1
73:11 92:3
96:10 107:21
108:18 113:25
144:22 182:5
186:4 209:1
**wboone@balc...**
3:15
**we'll** 7:19 8:19
9:14 13:22
18:20 45:20
50:13 58:9
115:7 224:1
**we're** 29:17
35:14 41:3
61:21 62:2,23
70:16 72:2
91:25 123:6
124:14 132:11
159:24 185:13
196:24 197:24
218:15
**we've** 29:2 54:21
66:9 86:22
90:16 91:24
92:3 119:12
120:25 138:10
142:9 143:21
144:5 149:18
151:15 173:22
177:13 189:14
191:21 196:10
200:12 214:9
215:9 217:22
**weather** 165:7
**week** 9:9
**weekend** 169:8
194:14
**weird** 126:2
**went** 7:21 8:2
37:12 45:14
55:21 57:25
133:7 143:14
144:11 171:23
174:9,10
176:14 185:2
222:9

**weren't** 59:4
72:21 86:4
132:7 156:21
173:16
**WESTERN** 1:1
227:1
**wet** 62:5 178:10
186:8 197:9,10
**whatnot** 29:7
33:24 53:19
**whatsoever**
84:25 219:23
**whom's** 174:22
**wide** 74:2
**willing** 51:12
**willingness**
173:3
**window** 83:1
99:7 107:14
129:2,7 138:8
**window-related**
106:13
**windows** 62:4
82:24 92:20
93:24 102:2
105:13 106:12
107:13,22
125:1 148:16
**windowsill**
64:15 105:15
**withdraw** 59:10
**withdrawing**
47:18 48:1,7
87:1 92:13
93:21 99:2
108:22 135:3
142:14,17
145:13 181:17
182:13,16,19
187:6
**withdrawn**
86:21 133:18
**witness** 1:16 2:9
2:10 3:22 4:2,9
5:21 7:20 11:9
21:12,25 27:1
31:16 32:24

36:15 50:24
51:15 53:22
76:9 77:16
78:10 79:2
80:1,24 88:9
108:8 113:23
119:10,24
122:15 131:23
132:9 136:5
140:19 150:10
153:9 156:16
159:12 161:24
165:4,15,20
166:10 167:4
185:24 192:5
194:6 200:21
201:22 202:24
203:12 204:19
205:12,21
206:2,9,22
207:19 208:1
213:13 215:2
216:17 218:19
219:6,9,16
220:12,15,18
220:22 221:19
227:18,21,25
229:5,6,10,11
229:13
**witness'** 229:14
**Witness's** 5:22
**witnesses** 220:11
222:23
**Wolf** 4:24 18:6
39:4 144:1
159:8 175:17
176:2,6 181:25
182:5,22 191:4
193:2,5,8,15
193:23 195:7
195:18 197:16
200:8 215:23
**Wolfs** 18:18
49:23 90:21
175:10 176:19
177:3 182:3
183:7 198:14

**wonder** 167:23
**wondering**
81:10 134:16
141:4 171:15
196:15
**wood** 63:20 95:6
96:8
**woods** 90:14
**word** 117:14
170:14 200:25
201:2
**words** 41:15
43:14 181:1
196:7
**work** 21:1 51:2
91:13,16 93:4
93:17 122:15
192:18 197:15
197:20 198:21
198:23
**worked** 58:9
218:7,7
**working** 12:25
**worse** 202:1
**worst** 201:10
202:4
**Worth** 90:13
**wouldn't** 43:8
64:21 106:5
140:15 171:25
**wrapping** 36:24
**write** 15:11
16:24,25 63:22
75:15 86:16
100:5,7,13
110:23 111:4
123:15 136:20
137:25 139:10
139:12,15,19
139:21 179:25
187:25 199:10
199:25
**writes** 29:20
**writing** 12:24
**written** 14:4,15
78:14 140:7,8
143:9 145:8

146:5,6 153:2
179:22 215:18
**wrong** 16:9
66:21 188:22
197:21 209:15
221:11
**wrote** 138:1
168:19

---

**X**

**X** 146:8,8,8

---

**Y**

**Y** 66:4,9,12,15
66:18 145:6
**y'all** 125:13
**yeah** 7:9 17:20
62:13 71:4
73:25 87:16
103:11 128:5
136:18 137:14
137:19 149:17
152:9 154:10
156:22 159:10
160:24 161:18
186:7,12
193:11 197:13
208:15 220:15
220:24
**year** 160:16
185:14 212:24
213:2
**Yep** 206:23
**yesterday** 14:10
19:23 20:9,10
20:17 22:16
29:9 36:25
53:3 57:5,14
70:6 174:9
213:17 214:16

---

**Z**

**zero** 205:5
**ZIP** 160:19,19

---

**0**

---

**1**

**1** 16:14 23:7
43:12 49:1
66:3 82:22
128:13 228:3
**10** 4:18 42:23,24
123:23 148:24
149:5 159:14
175:12,18
189:14
**100** 3:8 47:7
203:20 205:2
**100,000** 43:6
**104** 72:14
**10th** 11:12 12:15
59:16 70:18
90:23 127:8
**11** 4:19 69:25
104:16 149:5
**12** 4:20,21,22
37:21 39:18
40:5,24 63:2
71:20 76:17
77:24 91:13
124:3 127:10
**12/31/22** 228:22
**13** 4:23 11:10
12:5 115:7
126:20 132:14
132:18 133:15
154:4 160:3
163:2
**13th** 9:19 10:16
**14** 63:20 124:6,7
198:15
**1400** 3:13
**1475** 10:18
11:24
**15** 34:18 44:1
123:24 124:10
150:21 153:3
191:21
**150** 10:5
**1500** 141:16
208:16
**1550** 9:22 11:24
**157** 111:25
**16** 81:23 89:14

90:2 92:2
119:25 121:17
126:20 155:11
159:25 163:1
**167** 5:9
**168** 5:10
**169** 5:11
**16th** 12:23
**17** 124:16 125:8
126:5
**172** 5:13
**173** 5:12
**176** 208:7
**18** 4:24 5:4
118:2 125:17
**1800** 12:6
**183** 112:1
**188** 3:13
**1925** 11:16,24
**193** 5:14
**195** 5:15

---

**2**

**2** 4:4 16:14
21:18 22:5,11
22:24 23:4,14
23:18,22,25
24:4,12,18
25:8,23 26:1
43:18 49:1,11
59:25 66:3
68:7 83:3
123:23 124:2
125:12,14,18
128:25 150:12
213:23
**2.1** 55:5
**20** 5:5 73:25
125:20
**20-year** 201:10
**2019** 9:19 11:10
12:6 13:20
59:16 90:10,18
90:24 210:18
**2020** 12:15,23
184:24
**2022** 1:12,19
225:2 227:12

KRISTY BECK-MILLER, VOL. 2                              MICHAEL J. DANIELS, ET AL v. AETC II PRIVATIZED HOUSING, LLC, ET AL

Page 257

**206** 228:23
  229:20
**21** 86:25 124:2
  126:9
**210** 3:5,9 5:16
  228:24,25
  229:21,22
**211** 5:17,18
**212** 5:19
**2161** 1:23 3:4
**220** 5:20
**222-9494** 3:5
**223** 5:22
**226** 4:9
**227** 4:10
**24** 49:12 91:25
  105:5 124:18
  125:23 189:7,9
  189:10
**24-hour** 189:4
**26** 4:15 7:1,3
**27** 4:16 8:23,24
  9:1,7
**28** 4:17 5:6 9:14
  9:15,16
**29** 4:18 10:12,13

—————
**3**

**3** 3:8 4:5 16:14
  21:22 23:16,21
  23:22 24:10
  25:7,20 29:12
  48:15,19,22
  49:2,3,10,13
  49:16 61:1
  67:21 68:3,15
  68:24 69:1,14
  82:25 103:24
  104:23,25
  124:3,6 126:2
  189:1,11
**30** 4:19 10:9
  11:6,8 73:25
  199:4 228:3,7
  229:7
**31** 4:20 12:1,3
**32** 4:21 12:12,14
**33** 4:22 12:20,22

**34** 4:23 13:16,18
  137:6,7 141:23
**35** 4:24 18:2,4
  175:13
**36** 5:4 18:19,21
**3600** 190:4
**37** 5:5 20:6,9
  21:14
**38** 5:6 28:17,21
  29:13
**380** 154:7,12
**39** 5:7 58:21,23
  59:12,20,24
  123:14
**39,000** 161:10
**390,000** 72:6
  73:7 74:3
**39201** 3:13

—————
**4**

**4** 4:6 16:14
  61:14,18,22,24
  111:15 124:7
  124:10,16,18
  125:5 126:2
**4-5** 4:7
**4:11** 1:19 224:3
**40** 5:8 10:9
  70:10,11 76:19
**400** 1:23 3:4
**41** 5:9 167:8,13
  173:10
**42** 5:10 168:15
  168:17
**43** 5:11 169:16
  169:18 172:19
  172:22
**43,000** 161:8
**44** 5:12 172:9
  173:7,9
**45** 5:13 172:6,8
  172:18
**450** 208:20,24
**46** 5:14 193:20
  193:22
**47** 5:15 15:2,3
  195:11,12
**477-0500** 3:9

**48** 5:16 49:12
  105:5 189:9,10
  210:20,22
**49** 5:17 211:7,8
  211:10,15

—————
**5**

**5** 1:12 16:14
  33:3 61:24
  125:5,8 225:2
  227:12
**50** 5:18 211:20
  211:21
**50,000** 74:3
**500** 209:3
**51** 5:19 212:2,3
**52** 5:20 220:1,2
  221:18
**52,000** 72:10
  73:8
**53** 5:22 223:15
  223:18
**550** 141:21,23
**57** 15:1,3
**58** 5:7
**59** 195:14
**5th** 1:18 13:20
  90:10,18

—————
**6**

**6** 4:8 16:14
  125:11 143:3
  213:16
**601** 3:14,14
**60s** 81:6
**650** 9:25

—————
**7**

**7** 4:15 54:21
  125:17,20,23
**70** 5:8
**7042** 228:22
**736-3555** 228:24
  229:21
**736-6679** 228:25
  229:22
**75** 10:24 11:3
  141:19

**750** 10:2
**78212** 228:24
  229:21
**78213** 1:24 3:5
**78257** 3:8
**7851** 150:16

—————
**8**

**8** 4:16 126:2,5
**800** 142:7
  165:11
**85,000** 209:4
**8900** 72:16

—————
**9**

**9** 4:17 25:2 55:5
  126:21 144:14
**9.3.2** 30:5
**9:12** 1:19
**90** 170:12
**93** 229:22
**961-4466** 3:14
**961-9900** 3:14