**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **MICHAEL J. DANIELS, et al.** | § | |
| | § | |
| **PLAINTIFFS,** | § | |
| | § | |
| **V.** | § | **NO. SA-19-CV-01280-FB-RBF** |
| | § | |
| **AETC II PRIVATIZED HOUSING,** | § | |
| **LLC, et al.** | § | |
| | § | |
| **DEFENDANTS** | § | |

**MOTION FOR PARTIAL SUMMARY JUDGMENT
ON BASIS OF GOVERNMENT CONTRACTOR IMMUNITIES**

Defendants AETC II Privatized Housing, LLC ("AETC Housing") and AETC II Property Managers, LLC ("AETC Managers") (collectively, "Defendants") move this Court to enter summary judgment on their behalf on all tort claims brought against them by Plaintiffs.[1] Because Defendants have been sued for alleged acts and omissions carried out in their performance of contracts with the United States Government, they are entitled to immunity pursuant to *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940) and *Boyle v. United Technologies Corp.,* 487 U.S. 500 (1988), as well as under the Supremacy Clause.

**INTRODUCTION**

The United States Government has made a deliberate policy choice to delegate to government contractors certain authority to manage military housing, an activity for which the United States itself could not be sued if it were directly exercising that authority. *See Wilson v.*

---

[1] Defendants seek immunity from, and dismissal of, all the tort and statutory claims in the First Amended Complaint, but do not seek summary judgment in this motion for Plaintiffs' breach-of-contract claim against AETC Housing based on their leases. [9, at ¶¶ 167–70]. Each lease is a contract between Plaintiffs and AETC Housing, and AETC Housing is not immune from suit based on those contract terms.

*United States*, No. A-11-CA-221-SS, 2011 WL 13324270, at *3 (W.D. Tex. Oct. 13, 2011) (holding United States immune from suit regarding servicemembers' complaints about on-base housing). In the present case, Plaintiffs are trying an end-run around this immunity by suing the United States' contractors who provide housing and property management services.

In so doing, Plaintiffs ask this Court to tread upon ground the judiciary treats with the greatest caution, the federal government's authority over the armed forces:

> The composition, training, **equipping, and management** of our military forces is a matter exclusively within the rights and duties of the federal government and, as a result, **any interference with the federal authority over national defense and military affairs** implicates uniquely federal interests of the most basic sort.

*Bynum v. FMC Corp.,* 770 F.2d 556, 569 (5th Cir. 1985) (emphasis added). "The overriding federal interest at stake here concerns the preservation of **exclusive control over military matters** in the legislative and executive branches of the federal government. Thus, **if state laws permitting or requiring judicial intervention into such matters were applied,** the federal interest would be **entirely frustrated**." *Id.* at 571. That is exactly what Plaintiffs here, and the lawyers funding them, want—to re-direct federal military housing policy, bankrupt all the contractors delegated these responsibilities by the Government, and return all military housing to the Government. In short, they seek by litigation to up-end duly-enacted statutes and reverse policy choices by the Government.

## RELEVANT FACTS

This case arises out of complaints regarding housing conditions on Randolph AFB and Laughlin AFB. Plaintiffs are servicemembers and their families who have resided in either Randolph Family Housing or Laughlin Family Housing. AETC Housing, also known as the Project Owner, is a Delaware limited liability company, 49% of which is owned by the United States, that has a 50-year lease on the base housing at Randolph and Laughlin as part of the Military Housing

Privatization Initiative (MHPI). Ex. 1, Radliff Dec. at ¶¶ 4–7. AETC Managers is a Delaware limited liability company that serves as Property Manager for the Project and provides management, maintenance, and repairs for the Project. At the end of the lease, the entire project and all of its improvements revert to the United States. Radliff Dec. at ¶ 7.

## I.  <u>The MHPI Authorizes the Government to Delegate Authority to Defendants.</u>

The MHPI was passed by Congress in 1996 in order to give the Secretary of Defense flexibility in the provision of on-base housing to servicemembers, to "provide military families access to safe, quality, affordable, well-maintained housing in a community where they will choose to live, " to "give the Air Force the ability to provide quality and affordable housing communities to its members much quicker than traditional methods," and to "open[] the military construction market to a greater number of development firms and stimulating local economies through increased building activity."[2] Codified at 10 U.S.C. § 2871 *et seq.*, the MHPI authorizes private entities to lease certain military housing, while retaining for the Secretary the authority to exercise considerable oversight over how that housing is constructed, renovated, and operated.

Far from pure "privatization" or even "de-regulation," Sections 2884 and 2885 of the MHPI set forth strict reporting, oversight, and accountability requirements for these military housing projects. Under Section 2884(a), the Secretary must report to Congress each contract and its terms, as well as its costs. In addition, Section 2884(b) requires that the Secretary must provide annual reports on monies expended and received, as well as his methodology for evaluating the extent and effectiveness of the authorities of the MHPI, recommendations necessary for improving same in the future, and other information including a report on how to effectively monitor and verify proper performance, schedule, and cash flow and how to ensure the United States can

---

[2]  "Housing Privatization: About MHPI," Air Force Civil Engineer Center website (https://www.afcec.af.mil/Home/Housing/Privatization/), viewed June 9, 2022.

oversee project owners' performance. Section 2885 requires the Secretary to issue regulations for the oversight and management of MHPI projects, which include that the installation asset manager must conduct site visits monthly and report quarterly to the Secretary's designee and that regular meetings must be held to assure that the operating and ground lease agreements are being adhered to; and various other requirements. These regulations include Air Force Instruction 32-6007, §4b, which lists 19 compliance categories for the USAF to monitor, including "random oversight of maintenance work orders to ensure compliance with transaction documents," "random oversight of occupancy initial, pre-termination and final inspection," "[p]rovide oversight of appropriate management plans to ensure target, referral and other eligible tenant rental policies are [in accordance] with transaction documents," and "[a]ssist military members in resolution of tenant complaints." Ex. 2 (Air Force Instruction 32-6007), at §4b.

## II.  <u>The Project Documents Set Detailed Requirements for Defendants.</u>

The Government and AETC Housing, the Project Owner, executed Ground Leases for base housing at Randolph and Laughlin AFBs. Radliff Dec. at Exs. A (Randolph Ground Lease), B (Laughlin Ground Lease).[3] These Ground Leases require the Project Owner to "preserve, maintain, and repair the Leased Premises, and the Leased Premises Improvements, and keep them in good working order and condition." Radliff Dec. at ¶ 8. The Ground Leases require the Project Owner to manage and maintain the project "in an acceptable, safe and sanitary condition," and to ensure that each housing unit is "in habitable condition." *Id.*; Exs. A and B, at §11.1. The Ground Leases

---

[3] Due to the technical limits on ECF file sizes, the voluminous exhibits to the Radliff Declaration are themselves being filed as separate exhibits, with their filenames clearly indicating their relation to the Declaration. Exhibit F to the Declaration itself has 18 exhibits, which are likewise broken out into separate PDFs for ease of filing and reference. All such separate PDFs are part of the Radliff Declaration itself as if included therein. The same procedure is followed with Exhibit 3 to this motion, the Declaration of Michael Knight, which likewise has its own exhibits which are likewise part of the Knight Declaration as if included therein.

require strict adherence to the Project Documents described below. Radliff Dec. at ¶ 9. The Government retains perpetual access to the Leased Premises to, among other things, "confirm[] compliance by the Lessee with the terms of this Lease." Radliff Dec. at ¶ 11; Exs. A and B, at §11.1. The Ground Leases reserve for the Government the right to terminate any Property Management Agreement with the Property Manager, AETC Managers, and require written consent of the Government for any change in Property Manager. Radliff Dec. at ¶ 13. In the Ground Leases, the Government also requires AETC Housing to obtain its permission before making any "material revisions" to the standard lease document entered into between AETC Housing and its tenants. Radliff Dec. at ¶ 12.

In addition to the Ground Leases, the Government contracted with AETC Housing for the development, financing, and operation of the Project, including Randolph and Laughlin AFBs, in the Master Development & Management Agreement ("MDMA"). Radliff Dec. at ¶ 6; Ex. C (MDMA). Through the MDMA, the Government required completion of a defined scope of work, called the Initial Development Phase, which included precise descriptions of new construction, renovations, and community-wide improvements which would be made at each of the bases. Radliff Dec. at ¶ 15. Under the MDMA, the Government retained the right to certify completion of that work, and in fact did so at both Randolph AFB and Laughlin AFB. Radliff Dec. at ¶ 16. The MDMA was amended twice to add additional assignments for AETC Housing to carry out, such as roof replacements on 43 historical homes at Randolph. Radliff Dec. at ¶¶ 20–21; Exs. D (MDMA Amendment 1), E (MDMA Amendment 2). Through the MDMA, the Government establishes "detailed procedures and requirements to be followed by [AETC Housing] in constructing, renovating, operating and maintaining" the housing. Radliff Dec. Ex. C, at §3.1.2. The Government requires detailed quarterly and annual reporting, plus auditing requirements to

ensure that it is completely apprised as to the Project's operations, management, and finances. Radliff Dec. at ¶¶ 17–18. The MDMA requires AETC Housing to, among other things, conduct tenant satisfaction surveys by a firm chosen by the Government and report to the Government on responses to those surveys. Radliff. Dec. at ¶ 19.

The Government and AETC Housing also executed a Project Operating Agreement ("POA") to "operate and manage the Project, according to good management practices common to the rental housing markets ...." Radliff Dec. at ¶¶ 22–23; Ex. F (POA). The POA attaches 18 detailed "plans," included with exhibit F to the Radliff Declaration, which serve as contractual specifications for how the Project must be operated, managed, and run. Radliff Dec. Ex. F, at §3.1.2. The Radliff Declaration at ¶¶ 24–33 summarizes some of the broad scope and detailed requirements set by these plans, including:

- Construction Management Plan: "sets strict schedules for construction planning, commencement, and completion," including "fixed schedules for renovation and destruction of units, including those units at Randolph and Laughlin which are part of this litigation." Radliff Dec. at ¶ 24.

- Rental Rate Management Plan: details the procedures "to manage the rental and assignment process," including setting caps on rental rates (limited to servicemembers' Base Allowance Housing) and prohibiting most security deposits. Radliff Dec. at ¶ 25.

- Unit Occupancy Plan: requires detailed orientation for each tenant before move-in, specifying the subjects to be covered; submission for Government approval of a detailed Marketing Plan; specific priorities of whom to lease to and how to manage the servicemembers' waiting list; Government rights to terminate any tenant's lease; and regular monthly reports to the Government on the occupancy rate as defined by the Plan. Radliff Dec. at ¶ 26.

- <u>Property Operations and Management</u> Plan ("POMP"): requires housing management team to "have daily interactions with" USAF housing staff and command leadership at each base; creates an oversight committee with "appropriate Air Force leadership" which must "meet periodically and resolve any significant operational issues"; specifies four management positions, with job qualifications and criteria for each; requires that the annual budgets prepared by AETC Housing must be "in a form approved by the Air Force" and must be approved by Government representatives; retains "unrestricted access" by the Government to management and financial data; requires quarterly management meetings with Government personnel to report on finances, service calls and maintenance issues, and community relations; specifies at least ten different kinds of quarterly or annual reports which must be furnished to the Government. Radliff Dec. at ¶ 27. The POMP sets detailed requirements for property management, including "fulfill service requests, clean common areas of buildings and roofs, maintain tot lots and play areas, as well as provide general maintenance of the housing communities' landscaped areas." Radliff Dec. at ¶ 27; Ex. F (POMP). The POMP is so detailed as to require AETC Housing to provide specific recreational facilities (such as basketball and tennis courts) and even to award gift certificates for the Garden of the Month. Radliff Dec. Ex. F (POMP) at §4.

- <u>Facilities Management Plan</u>: "outlines the procedures for maintaining the homes and surrounding common areas in a manner that significantly enhances the quality of life of the military members and their families." Radliff Dec. at ¶ 28; Ex. F. This plan sets detailed requirements for 16 categories of maintenance, including the handling of service calls (24-hour call center, set response times), the conduct of preventive maintenance and repairs, "rigorous inspection schedules and requirements" (daily, weekly, quarterly), what must be done with

each unit between occupancies (including a 41-item checklist), how the grounds are to be kept up, and pest control, security, and various required quality control measures, including follow-up calls to tenants and cards soliciting their rating of satisfaction with repairs. Radliff Dec. at ¶ 28.

- Capital Repair & Replacement Plan: details a 50-year timeline for capital improvements including "systematic repair, renovation and replacement of major building components and community amenities"; must be reviewed annually by the Government, which must approve any changes; sets specific amount of money that must be invested per unit. Radliff Dec. at ¶ 29.

- Reinvestment Plan: ensures that the units are "in an economically viable and marketable condition" when returned to the Government; requires reinvestment of certain income controlled directly by the Government and set forth on detailed renovation schedules, with its approval required for the scope and cost of out-year renovations. Radliff Dec. at ¶ 30.

- Community Development Plan: sets detailed amenities for each neighborhood; specifies that AETC Housing must perform "242 historic renovations" at Randolph with all modifications to comply with rules set by the Department of the Interior. Radliff Dec. at ¶ 31.

- Environmental Management Plan: includes ten pages of detailed requirements regarding asbestos and lead-based paint, radon, soil and groundwater contamination and remediation, hazardous materials and spills, control of dust, noise, and pests, and water control (including sewage issues). Radliff Dec. at ¶ 32.

- Historic Preservation Plan: identifies 262 units at Randolph as protected historic residences and requires special conditions for their renovations, including Government oversight to ensure compliance with these conditions; requires that tenants of these homes be informed of their

historic nature and the attendant restrictions. Radliff Dec. at ¶ 33.

Pursuant to the above-referenced Project Documents, the Project Owner and Property Manager entered into a Property Management Agreement (PMA), which provides that "management of the Project by the Property Manager, and the duties of the Owner, are subject to the terms and provisions of the Project Documents." Radliff Dec. at ¶ 34; Ex. G (PMA). Under the PMA, the Property Manager is given a number of responsibilities for management of the Project, including but not limited to responsibility to "maintain and repair the Project in accordance with this Agreement and the Project Documents." Radliff Dec. at ¶ 35; Ex. G at §7.1 The specific enumerated responsibilities of the Property Manager include the preparation of the budgets for the Project (§3.20), payment of operating expenses for the Project (§3.3), bookkeeping, accounting and record keeping for the Project (§3.4), solicitation and acceptance of bids for work done and services performed at the Project (§3.7), and leasing of the housing units in the Project (§5.1). Radliff Dec. at ¶ 35. The Government retains the right to terminate the Property Manager, and expressly reserves its status as a third party beneficiary under the PMA, "with the power to enforce the same directly against the parties …." Radliff Dec. at ¶ 36; Ex. G at §2.10.

**III.   Close Government Oversight Has Been Exercised.**

Beyond the meticulous requirements set by the Project Documents themselves, AETC Housing's and AETC Managers' compliance is also the subject of ongoing Government oversight. The Project Operating Agreement designates an oversight body, the majority of whom are Government personnel. Radliff Dec. at ¶ 38. The Government also exercises approval and oversight authority through the Air Force Civil Engineer Center (AFCEC), whose specific task is to provide oversight over AETC Housing's and AETC Managers' compliance with the specifications set by the Project Documents. Radliff Dec. at ¶ 37.

The Government exercises that oversight through many different mechanisms. One such mechanism is the Military Housing Office (MHO) monthly audits, where the Government rates compliance with the Project Documents on a standardized checklist that is forwarded to AFCEC and provided quarterly to AETC Housing. Radliff Dec. at ¶ 39. The Government and Randolph/ Laughlin Family Housing hold weekly and monthly "partnership" meetings to cover day-to-day issues of maintenance and management. Radliff Dec. at ¶ 40. In these "partnership meetings," the Government exercises specific oversight over tenant complaints and management responses. For example, in August 2018, one such meeting covered "monitoring the Klines" maintenance complaints, the upcoming AFCEC briefing, resident concerns about "German roaches," and Government prodding that the project "should be in the red for the same two items, PMs and routine WOs." Radliff Dec. at ¶ 40; Ex. H (minutes of Aug. 15, 2018). Other meetings demonstrate close involvement of AFCEC representatives and base leadership. Radliff Dec. at ¶ 40; Ex. H (minutes of July 25, 2017 & Sept. 13, 2017). These are just a few examples from hundreds or thousands; the Government through these weekly and monthly "partnership meetings" exercises this level of (micro)management and oversight on the smallest of concerns.

The Government also exercises oversight through the submission of quarterly reports and annual budgets. As seen above, AETC Housing also must provide the Government with detailed quarterly reports including income statements, balance sheets, and account deposits and withdrawals, as well as variance reports and explanations for any overages. Radliff Dec. at ¶ 41. Those quarterly reports contain detailed information on a project-wide basis regarding occupancy, maintenance, and financial information, and provide the basis for ongoing oversight by the Government. Radliff Dec. at ¶ 41. The Government must approve all annual budgets, and the budgeting process provides yet another example of Government control and oversight over the

Project. During the budgeting process, the draft budget is submitted to AFCEC, which then responds with detailed written questions dozens of pages long about specific line items. AETC Housing will respond to each question, and often makes adjustments to budget line items as directed.  AFCEC retains veto power over the budget. Radliff Dec. at ¶ 42. The Government uses this budget process to implement changes it sees as necessary. For example, in the 2019 draft budget for Randolph, the Government demanded to know "Why isn't there a higher increase in budget for Roof Repairs especially after the rains?" and AETC Housing responded by increasing the funding in the Capital Repair and Replacement budget. Radliff Dec. at ¶ 42; Ex. J.

Next, the Project Documents create formal oversight structures, such as the Installation Management Review Committee, which at Randolph is composed of representatives of AETC Housing and the Wing Command. Radliff Dec. at ¶ 43. There is a corresponding Installation Management Review Committee for the Project as a whole and all of the bases in the Project, and that committee includes representatives of AETC Housing, AFCEC, and Installation command. Radliff Dec. at ¶ 43. At these meetings, the Government exercises its oversight authority through the exchange of information regarding the maintenance, operation, and finances of the project. Radliff Dec. at ¶ 43.

Finally, the Government has final say over all tenant disputes, and exercises oversight through its control of the tenant dispute resolution process. Radliff Dec. at ¶ 44. Currently, the Government mandates that the tenant and Project Owner engage in a three-stage dispute resolution process, including the Project Owner's informal dispute resolution process, the MHO's informal dispute resolution process, and then the Government's formal dispute resolution process. During this last formal process, the Government has the sole authority to order remedies including remediation or repair, tenant relocation, distribution or withholding of rental payments,

reimbursement of fees or costs, and/or termination of the Lease. According to Radliff, "the Government has the ultimate authority under the formal dispute resolution process to make decisions about eligible tenant disputes." Radliff Dec. at ¶ 44.

Therefore, AETC Housing must use a lease form approved by the Government, must lease to whom the Government directs, must limit rent to what the Government allows, must obey highly specific requirements in maintaining and operating the Project, and must fund repairs, renovations, and rebuilding in amounts acceptable to the Government—all under the direct eye of, and regular "partnership" meetings with, the Government's oversight personnel.

### IV. The Humidity Reduction Project: Government Oversight and Approval in Action.

The nature and degree of Government oversight could be illustrated by any number of examples, but the most relevant for present purposes is the formulation, implementation, and Government approval of the Humidity Reduction Project—an effort by AETC Housing and AETC Managers to address moisture-related issues basewide at Randolph AFB and in five of these Plaintiffs' homes.

September 2018 was "the wettest September for [San Antonio] in recorded history."[4] At Randolph Family Housing, this heavy rainfall and the rains to come in following months were accompanied by an increase in moisture-related complaints by tenants, who also raised their concerns at "town hall" open forums conducted at Randolph. Ex. 3, Knight Dec. at ¶¶ 4–5. Michael Knight, Senior Director of Maintenance and Facilities, was part of the team acting on behalf of the Project Owner to investigate, handle, and resolve the maintenance-related complaints during that

---

[4] Ismael Perez, *Overnight Storms Set Record for San Antonio Making It the Rainiest September Ever*, San Antonio Express-News (Sept. 22, 2018), https://www.mysanantonio.com/news/local/article/September-the-wettest-month-for-San-Antonio-in-13249853.php. The rainfall at that time amounted to 16.82 inches, beating the record set in 1946.

time period. Knight Dec. at ¶ 5.

The Declaration of Michael Knight describes the events leading up to the formulation of the Humidity Reduction Project. Knight Dec. at ¶¶ 4–10. Knight's investigation began with the Alexander and Daniels homes along with one other unit not part of this litigation. After inspections, consultation with the tenants, and installation of data loggers in these homes, Knight concluded that the rooms farther away from the air conditioning returns were not cooling as well as those closer, and "the air was not consistently circulated throughout the homes." Knight Dec. at ¶ 6. Knight and his team evaluated the efficiency of the air ducts, returns, and HVAC systems originally installed by the Air Force prior to privatization, saw that those systems were not producing consistent air changes throughout the homes, and concluded that the air conditioning systems could not perform their normal dehumidification and cooling throughout the homes. Knight Dec. at ¶ 7. The end result, Knight saw, was temperature and humidity differentials throughout the homes. Knight Dec. at ¶ 7.

Knight, his team, and outside experts focused on the need to install a central dehumidification system in each home to remove excessive moisture in the homes. Knight Dec. at ¶ 9; Ex. A (All Service Bid). In addition to that central component, Knight and his team developed a detailed Scope of Work that would reduce humidity in the homes in several ways: moving water away from the buildings by inspecting gutters and extending downspouts; clearing blockages in the crawl space vents; installing bathroom vents with automatic humidity sensors; installing inline dehumidification systems; sealing crawl-space penetrations; and inspecting, repairing, or replacing windows, as needed. Knight Dec. at ¶ 10; Ex. B (Scope of Work). While finalizing this Scope of Work, AETC Housing began a pilot program in April 2019 to undertake work at ten homes, including the Alexander, Wolf, Hamilton, Daniels, and Vinales residences. Knight Dec. at ¶¶ 11–

13. Throughout, Knight and his team were working with, consulting, and updating the Government. Knight Dec. at ¶ 12.

By mid-2019, the pilot program had been completed, and the data showed that the program met or exceeded goals for reduced humidity in each residence. Knight Dec. at ¶¶ 15, 18. Because of the sizable Scope of Work and the number of residences which would need these repairs, there were not sufficient funds available to fund this project out of the Operating Account or the Capital Repair & Replacement budget. Knight Dec. at ¶ 16.

Thus, on September 24, 2019, AETC Housing sought Government approval to implement the Scope of Work and fund the Humidity Reduction Project across all of Randolph Family Housing for a total of $5.4 million to be paid from the Reinvestment Account. Knight Dec. at ¶ 17; Ex. E (Approval Request). As described above, all expenditures from the Reinvestment Account require express Government approval. The Approval Request also sought reimbursement of the $488,000 which had already been spent on the pilot program, including work at the Alexander, Wolf, Hamilton, Daniels, and Vinales residences. Knight Dec. at ¶ 18. On November 13, 2019, the Government approved the request in full, having "reviewed the Project Owner's disbursement request." Knight Dec. at ¶ 19; Ex. F (USAF Approval).

With the funding and project approved, AETC Housing proceeded to implement the scope of work for the Humidity Reduction Project across Randolph Family Housing. Knight Dec. at ¶ 20. In early 2020, the Government, through AFCEC, employed a "Residential Construction Manager" (RCM) at Randolph for the sole purpose of overseeing the Humidity Reduction Project. Knight Dec. at ¶ 25. The RCM, via his authority as a representative of the Government, has regular oversight of the Humidity Reduction Project work during the initial scope walkthrough, during any work being performed, during or after the remediation (if any), and after completion of the

Humidity Reduction Project scope. Knight Dec. at ¶ 32.

On July 7, 2021, AETC Housing notified the Government of a need to increase funding for remediation expenses in the Humidity Reduction Project, and sought supplemental approval for an additional $1.64 million to address that expense. Knight Dec. at ¶ 21; Ex. G (Supplemental Disbursement Request). The supplemental request was needed because material and labor costs were increasing (due to the pandemic and other factors) and additional work was identified and required such that the original cost projections in April 2019 were no longer accurate. Far from a rubber stamp, the Government approved only $1 million of the $1.64 million request and set additional oversight requirements. Knight Dec. at ¶ 22; Ex. H (USAF Supplemental Request Approval), Ex. I (USAF Disbursement Request Form). As a result of only partial approval, AETC Housing is working to complete as many homes as funding will allow, but the Government will have to decide whether it wants to complete the project by funding the remaining work, or leave the remaining work undone. Knight Dec. at ¶ 23.

## V. **Plaintiffs Attack MHPI as a Whole and the Humidity Reduction Project in Particular.**

Plaintiffs' First Amended Complaint attacks directly and unequivocally the process, procedure, and very existence of the MHPI. Their First Amended Complaint seeks to stop Defendants from leasing to any new tenants, to impose their own inspection and certification process, to release all tenants from their lease agreements on demand, and to surrender every dollar of rent ever collected from any tenant at either base. [9 at ¶ 152].

Likewise, these Plaintiffs' publicly-stated goal is to end privatized housing and "repeal" MHPI through litigation. Sarah Kline routinely ends social-media posts with the hashtag "#EndMHPI." Ex. 4 (Kline Tweets). Plaintiffs' counsel boast they are "leveraging the media,

Congress, and the courts to … seek fair compensation for families who have been harmed."[5] They wish to "[p]ut [privatized military defendants] in jail … or put them out of business, or fire them from the contracts …."[6] They seek to create a "tidal wave of litigation." (*Hill et. al vs. AETC II Privatized Housing, et al.*, Reply in Support of Motion to Intervene [51 at 4 n.2]).

Even more importantly, these Plaintiffs and this lawsuit question the specific decisions which the Government made at Randolph AFB regarding the Humidity Reduction Project undertaken in these Plaintiffs' homes. " 'Our house was actually worse than before they did it,' Hamilton said of the cleaning and upgrades."[7] See also Ex. 5 (S. Kline depo.) at 61:5–16 (questioning efficacy of Humidity Reduction Project work). Moreover, Plaintiffs' own expert, Mike Krismer, believes most of the scope-of-work items in the Humidity Reduction Project approved by the Government were reasonable steps. Ex. 6 (Krismer depo.) at 196:14–24. But even Krismer takes issue with some key components of the Project, and would like for AETC Housing to replace every HVAC system in every house. Ex. 6 at 196:1–24. Thus, Plaintiffs intend to question the operational decisions made by the Government in its housing of servicemembers, and impose liability on these Defendants for complying with those Government decisions.

**VI. The Government Retains Full and Absolute Authority Over Housing.**

The United States retains statutory, regulatory, and contractual authority to manage, and even micromanage, the most routine activities in housing at Randolph and Laughlin AFBs. Nothing further from a "rubber stamp" for AETC Housing's compliance could be imagined.

---

[5] "Military Housing." Moriarty Law Firm, https://www.moriarty.com/militaryhousing/ (viewed on June 10, 2022).
[6] Rose L. Thayer, *Eight military families in Texas sue housing company over water leaks, mold and bugs*. Stars and Stripes (Oct. 30, 2019), https://www.stripes.com/eight-military-families-in-texas-sue-housing-company-over-water-leaks-mold-and-bugs-1.605223.
[7] Thayer, *supra* n.6.

## ARGUMENT

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fairmont Cash Mgmt. L.L.C. v. James*, 858 F.3d 356, 360 (5th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994). "Once the movant does so, the burden shifts to the nonmovant to establish an issue of fact that warrants trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Defendants' right to immunity rests in part on the interpretation of contracts, which presents a question of law. *Paragon Res., Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 695 F.2d 991, 995 (5th Cir. 1983).

## I.   **The Law of Government Contractor Immunity.**

The policy basis for sovereign immunity and for its extension to government contractors has been well summarized by the Fourth Circuit:

> **Sovereign immunity exists because it is in the public interest to protect the exercise of certain governmental functions.** This public interest remains intact when the government delegates that function down the chain of command. As a result, courts define the scope of sovereign immunity by the nature of the function being performed—not by the office or the position of the particular employee involved. *See Barr v. Matteo*, 360 U.S. 564, 572–73 ... (1959) (plurality opinion). **Imposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work. As a result, courts have extended derivative immunity to private contractors**, "particularly in light of the government's unquestioned need to delegate governmental functions." *Mangold v. Analytic Servs., Inc.,* 77 F.3d 1442, 1448 (4th Cir. 1996); *see also City of Worcester v. HCA Management Co., Inc.,* 753 F .Supp. 31, 37–38 (D. Mass. 1990) ( "[P]ursuant to sovereign immunity, a private company which contracts with the federal government to perform the duties of the government will not be held liable for its actions on behalf of the government.").

*Butters v. Vance Int'l, Inc.,* 225 F.3d 462, 466 (4th Cir. 2000) (emphasis added). The logic of derivative immunity applies equally to subcontractors such as AETC Managers, and courts therefore have held that subcontractors are no less entitled to immunity where they are likewise

performing work specified by the government. *See, e.g., Jackson v. Avondale Indus., Inc.,* 469 F. Supp. 3d 689, 705 (E.D. La. 2020) (collecting cases).

Because "[g]overnment contractor immunity is derived from the government's immunity from suit where the performance of a discretionary function is at issue," government contractors are therefore "entitled to assert the government's sovereign immunity in suits arising from [discretionary function] activities." *Contango Operators, Inc. v. United States*, 965 F. Supp. 2d 791, 813 (S.D. Tex. 2013), *aff'd sub nom. Contango Operators, Inc. v. Weeks Marine, Inc.*, 613 F. App'x 281 (5th Cir. 2015) (quoting *Bynum*, 770 F.2d at 564).

In the present suit, servicemembers and their families are dissatisfied with the quality of maintenance performed by AETC Managers on behalf of AETC Housing,[8] and have sued under Texas common law and various Texas statutes. They have alleged not merely breach of contract, but negligence, fraud, and other claims seeking compensatory and punitive damages, all based upon their allegations that Defendants did not adequately maintain their military housing. Defendants are immune from tort liability pursuant to three categories of government contractor immunity: *Yearsley* immunity, *Boyle* immunity, and immunity under the Supremacy Clause of the Constitution of the United States.

## II.  **Defendants Are Entitled to *Yearsley* Immunity.**

The United States Supreme Court established immunity for government contractors carrying out government-directed work. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940). The test for immunity derived from *Yearsley* has two elements: was the work done by the contractor "authorized and directed by the Government of the United States," and was it

---

[8] They have also sued AETC Housing's parent company, which did not contract with the United States and which has not played any role in the acts or omissions alleged by Plaintiffs. A separate Rule 56 motion will show that Hunt ELP, Ltd. should be dismissed from this suit.

"performed pursuant to [an] Act of Congress." *Taylor Energy Co., L.L.C. v. Luttrell*, 3 F.4th 172, 175 (5th Cir. 2021) (quoting *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160, *as revised* (Feb. 9, 2016)). Although *Yearsley* dates back to 1940, the Court affirmed its continued vitality when the Court addressed contractor immunity and applied *Yearsley* as recently as 2016. *Campbell-Ewald Co.*, 577 U.S. at 165. As the *Taylor* case shows, *Yearsley* immunity is alive and well in the Fifth Circuit.

In *Taylor*, the U.S. Coast Guard sought to remediate an oil spill and replaced one contractor with another, leading the first contractor to sue the new one. *Taylor*, 3 F.4th at 174. The new contractor pled *Yearsley* immunity, and the district court dismissed the suit on that basis. *Id.* at 175. Affirming, the Fifth Circuit held that the two elements of the defense were clearly met, because the Clean Water Act gave the Coast Guard authority to retain the contractor, and the work done was both authorized and directed by the Coast Guard:

> The Government's directives to Couvillion are contained in three sets of documents—the Basic Ordering Agreement, Authorizations to Proceed, and the Statement of Work. **Taylor argues that the documents lack specificity** and thus indicate that the Government neither authorized nor directed Couvillion's actions.
>
> **The Statement of Work refutes Taylor's argument.** The Statement of Work describes the MC20 Incident, the MC20 Site, and the conditions surrounding the site like water depth and currents, condition of the seafloor, and the location of the fallen jackets. The Statement of Work says "[t]he purpose of this effort is [to] eliminate the surface sheen at Mississippi Canyon Block 20 (MC20)."
>
> The Statement of Work **details the expectations of Couvillion and its subcontractor**s. It lists nine tasks and eleven deliverables (to be completed at various checkpoints during the life of the agreement). . . .
>
> **Given the specific expectations and due dates** outlined in the Statement of Work, we agree with the district court's conclusion that **there was no material factual dispute about the Government's authorization of and direction over Couvillion's work**.

*Id.* at 176 (emphasis added). The same holding should result in the present case. We have seen above that Congress did authorize the MHPI, and Plaintiffs' own complaint concedes the point.

[9, ¶¶ 13–14]. "Authorization" is clear on the face of the MDMA, the POA, the Property Management Agreement, and all the Project Documents. AETC Housing, and its contractor AETC Managers, were undeniably authorized by statute to maintain and repair the housing of which Plaintiffs complain. Those Project Documents contained specific and detailed requirements for how the Project would be maintained and operated, and the Government has exercised, and continues to exercise, daily oversight and (micro)management of the housing project at issue.

As for the phrase "directed by," the facts recited above leave no genuine issue of material fact on this part: the Government directed the hows and whats of maintenance and repair in painstaking detail, and placed its officers in a position to provide oversight under the Project Documents. AETC Housing has no choice in what its leases say, whom it leases to, or how much it may charge. AETC Housing must spend on maintenance what the Government says to spend, maintain what the Government says to maintain and in the manner directed by the Government, and cannot do anything more or less than what the Government directs. As to the specifics of repairing, maintaining, and operating the housing project, the Government directed how much to spend on roof repairs, monitored specific families' maintenance complaints, granted initial approval and funding for Humidity Reduction Project work, and later denied full supplemental funding to continue that project.

Plaintiffs may say that Defendants did not comply with their obligations under the Project Documents, and there is some basis in the law for that argument. "For actions to be authorized and directed by the Government, the contractor's actions should comply with federal directives." *Taylor*, 3 F.4th at 175–76. But here, the undisputed proof is that Defendants were in complete and full compliance with the Project Documents, and the Government has never said otherwise. Radliff Dec. at ¶ 46. Like in *Taylor*, Defendants acted pursuant to detailed requirements, those set by the

Government in the Project Documents. Like in *Taylor*, Government personnel "routinely met with" Defendants' employees to monitor the work being done:

> Captain Luttrell issued several memoranda that describe the Government's oversight of Couvillion's work. She described the **meetings where various Government officials received progress report**s on Couvillion's progress. In particular, she **assigned several personnel to oversee** different parts of the project, and **Coast Guard teams were available to consult** and provide their expertise. Her documents and memoranda indicate where she approved and monitored Couvillion's progress.

*Taylor*, 3 F.4th at 174 (emphasis added). As shown above and in the Radliff Declaration, AETC Housing is directed through the Government's monthly MHO audits, weekly and monthly "partnership meetings," budget submission, negotiation, and approval process, and Randolph and AETC-wide Installation Management Review Committee meetings, among others. Radliff Dec. at ¶¶ 38–43.

Plaintiffs may complain that Defendants are guilty of a violation of state law, but such is the case every time an immunity claim is made and opposed. As the Fourth Circuit correctly observed, there would be no such thing as immunity if a violation of law were sufficient to overturn it: "The purpose of *Yearsley* immunity is to prevent a government contractor from facing liability for an alleged violation of law, and thus, it cannot be that an alleged violation of law per se precludes *Yearsley* immunity." *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 648–49 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 417 (2018). The logic here is evident. Were a contractor not potentially liable on the merits, it would have little or no need for the protection of immunity. The purpose of immunity therefore must be to insulate government contractors from suit even where there is a colorable claim that they would be otherwise liable.[9]

---

[9] The logic is the same as the Supreme Court recognized in a case upholding immunity for government officials:

As the Radliff Declaration shows, AETC Housing has provided housing and maintenance services to more than 1500 and 2500 servicemembers' families at Randolph Family Housing and Laughlin Family Housing, respectively, Radliff Dec. at ¶ 47, only a tiny fraction of whom are suing over their dissatisfaction. Immunity under *Yearsley* does not depend on whether the contractor is entirely successful in carrying out its work for the United States, provided that material progress was made: "The Statement of Work says that the 'purpose of this effort is [to] eliminate the surface sheen …. Couvillion's actions eliminated **at least some of** the sheen …." *Taylor*, 3 F.4th at 176–77 (emphasis added). Nor does it matter who drew up the specifications that the government ultimately approved:

> Taylor misunderstands the *Yearsley* analysis. *Yearsley* did not focus on whether the Government designed the river dikes that led to the plaintiffs' injuries, but whether the contractor's work was "done pursuant to a contract with the United States Government, and under the direction of the Secretary of War and the supervision of the Chief of Engineers of the United States …."

*Id*. (quoting *Yearsley*, 309 U.S. at 19). The issue is not success or failure, but whether Defendants have worked "pursuant to a contract with the United States Government and under the direction

---

the official's act must have been within the scope of his powers; and **it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim**, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that **that cannot be the meaning of the limitation without defeating the whole doctrine**. What is meant by saying that the officer must be acting within his power cannot be more than that **the occasion must be such as would have justified the act**, if he had been using his power for any of the purposes on whose account it was vested in him.

*Barr v. Matteo*, 360 U.S. 564, 572 (1959) (emphasis added) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, J.)). It is the "occasion" of the act that indicates whether it falls within a protected scope; there is no sound basis to apply this rule to government actors but not to the government contractors they work through. *See Boyle v. United Techs. Corp*., 487 U.S. 500, 505 (1988): "The present case involves an independent contractor performing its obligation under a procurement contract, rather than an official performing his duty as a federal employee, but there is obviously implicated the same interest in getting the Government's work done."

… and the supervision" of the Government. There is no room for doubt that this is the case. Government contractors who meet this *Yearsley* test and whose work is authorized by federal law enjoy "derivative sovereign immunity" from suit. *Id.* at 175. AETC Housing and AETC Managers meet this test. This Court should so hold.

### III. Defendants Are Entitled to Immunity Under *Boyle*.

A similar theory of government contractor immunity was announced by the Supreme Court in *Boyle v. United Techs. Corp.*, 487 U.S. 500, 505 (1988). In *Boyle*, a private litigant sought to sue a government contractor for defective design of a government-specified helicopter. The underlying theory for *Boyle* immunity is somewhat different than in *Yearsley*, as is the test for immunity, which in the Fifth Circuit has three elements: "(1) the government must have approved 'reasonably precise' specifications; (2) the equipment must have conformed to those specifications; and (3) the supplier/contractor must have warned of those equipment dangers that were known to the supplier/contractor, but not to the government." *Kerstetter v. Pac. Sci. Co.,* 210 F.3d 431, 435 (5th Cir. 2000).[10] "The first two elements of the test ensure that the Government, and not the contractor, is exercising discretion in selecting the design. The third element is necessary to eliminate any incentive that this defense may create for contractors to withhold knowledge of risks." *In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570, 574 (5th Cir.), *as amended sub nom. Perez v. Lockheed Corp.,* 88 F.3d 340 (5th Cir. 1996). "[A]ctive governmental oversight is relevant to all three elements of defendant's burden" in asserting immunity under *Boyle*. *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 701 (4th Cir. 1989).

---

[10] Although *Boyle* was a case about an alleged design defect in military equipment, the defense applies equally to contractors for services. *See Boyle*, 487 U.S. at 505–06 ("The federal interest justifying this holding surely exists as much in procurement contracts as in performance contracts; we see no basis for a distinction."); *Hudgens v. Bell Helicopters*, 328 F.3d 1329, 1331, 1334 (11th Cir. 2003); *Saleh v. Titan Corp.,* 580 F.3d 1, 4 n.3 (D.C. Cir. 2009). *Cf. In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 456 (5th Cir. 2010) (applying *Boyle* to contractor for services).

Here, the specifications set forth in the Project Documents cannot be described as anything less than "reasonably precise." The maintenance and operation of the military housing project were governed by the voluminous and detailed Project Documents, which included 18 specific plans governing every aspect of the project, from facilities management to property management to capital repair to historic preservation. Radliff Dec. at ¶¶ 23–33. The monthly, quarterly, and annual submissions submitted to, and approved by, the Government call for delineation down to the dollar spent and task accomplished. As to the Humidity Reduction Project, Defendants outlined the scope of work to be done and the cost to be approved, and the Government approved that initial scope and cost. The undisputed evidence is that the Project Documents set forth how the Project Owner must make the request, Defendants explained the problem and the proposed scope of the fix, and the Government expressly approved the project. *Boyle* immunity protects the government contractor in this situation—when the Project Owner is held liable for a decision the Government made.

While *Boyle* does require "reasonably precise" specifications, it does not require that the contracting authority issue standards which remove all compliance discretion from the contractor. *See Smith v. Xerox Corp.,* 866 F.2d 135 (5th Cir. 1989). In *Xerox*, the government provided its desired specifications, which were incorporated into Xerox's production contract, and the unrebutted evidence was that the government reviewed and approved Xerox's final drawings and specifications; the Fifth Circuit held that this satisfied the first element under *Boyle*. *Xerox*, 866 F.2d at 138. The same kind of process was followed here. Prior to privatization, the Government expressed its need and solicited responses to its Request for Proposal. Radliff Dec. at ¶ 4. The Project Documents, and all of the plans contained therein, were the negotiated result of that back and forth.

Likewise, the second element, the conformity of AETC Housing's performance to the specifications, is evident. "Where the military procurement process involves this kind of continuous exchange between the contractor and the government, **the process itself becomes persuasive evidence of product conformity to precise specifications**. Here, the government maintained discretion over the design of the product throughout; it did not simply turn over such discretion, and the military decisions inherent therein, to the private contractor." *Kerstetter*, 210 F.3d at 702 (emphasis added). "The government contractor can then prove that it conformed to the government specifications by showing '[a]cceptance and use of an item following its production.'" *Zeringue v. Crane Co.*, 846 F.3d 785, 790 (5th Cir. 2017) (quoting *Miller v. Diamond Shamrock Co.,* 275 F.3d 414, 420 (5th Cir. 2001)), *overruled on other grounds by, Latiolais v. Huntington Ingalls, Inc.,* 951 F.3d 286, 292 (5th Cir. 2020)). The Government's partnership with AETC Housing at Randolph and Laughlin is more than 15 years old, and AETC Housing has remained in full compliance with the Project Documents. This is "acceptance and use" in spades.

Plaintiffs may counter that the ultimate goal of the Project Documents, safe and habitable housing, has not been met (in their view). However, "[n]onconformance with a specification means more than that the ultimate design feature does not achieve its intended goal. The alleged defect must exist independently of the design itself, and must result from a deviation from the required military specifications." *Kerstetter*, 210 F.3d at 435. Nor is such a deviation shown by anything but reference to a specific provision as opposed to general, aspirational goals: "requirements such as an ability to withstand normal loads and prohibitions against operational failures represent little more than the hopes of participants that the project on which they are about to embark will turn out well. General qualitative specifications must be distinguished from the 'detailed, precise and

typically quantitative specifications for manufacture of a particular military product.' " *Kleemann*, 890 F.2d at 703 (quoting *Shaw v. Grumman Aerospace Corp.*, 778 F.2d 736, 745 (11th Cir.1985)). "[S]uch vagaries as a failsafe, simple or inexpensive product" are not relevant. *Id.* Thus, for instance, the general goals of "safety" and "habitability" set by the Ground Leases are not the kind of specifications relevant to *Boyle* immunity. *See In re Aircraft Crash Litig.*, 752 F. Supp. 1326, 1352–53 (S.D. Ohio 1990) (contract's call for "safe" aircraft held not to affect *Boyle* defense), *aff'd sub nom. Darling v. Boeing Co.*, 935 F.2d 269 (6th Cir. 1991). If the product or service had not proved to be imperfect in some way, there would be no need for immunity. *Kleeman*, 890 F.2d at 703 (immunity "illusory" if perfect results required). Plaintiffs here can make no showing of any material deviation from the Government's specifications.

Likewise, the case law applying *Boyle* demonstrates that the presence of military personnel who were present at the site and "had the power to change the manner in which [the work] was performed" indicates compliance with specifications. *Williams v. Todd Shipyards Corp.*, 154 F.3d 416 (5th Cir. 1998). As discussed above, the Government and AETC Housing and AETC Managers engage on a daily, weekly, monthly, quarterly, and annual basis at every level on the operation and maintenance of the military housing at Randolph and Laughlin. Radliff Dec. at ¶¶ 37–43; *see Sylve v. K-Belle Consultants, LLC*, 2021 WL 6072502, at *3 (E.D. La. Dec. 23, 2021) (agreeing with defendants that "the work conformed to those specifications because the [Government] maintained oversight of the project and inspected it to ensure compliance"). The *Sylve* court noted that "[g]iven the level of supervision the [Government] maintained over Defendants' work, the [Government] could have informed Defendants if [their work] did not conform to the [Government's] preferences, but there is no indication that the [Government] did so." *Id.* at *4. The exact same is true here. Plaintiffs have not shown any material dissatisfaction

of the Government's with AETC Housing's and AETC Managers' performance, and their constant engagement on these issues demonstrates otherwise.

Finally, the third prong of *Boyle* immunity, that AETC Housing warned of problems that it knew and the Government didn't, is also met here. The third *Boyle* element "eliminate[s] any incentive that this defense may create for contractors to withhold knowledge of risks." *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 421 (5th Cir. 2001) (third prong met where government well informed). The best example of this type of disclosure is the Humidity Reduction Project. As discussed in the Knight Declaration, AETC Housing and AETC Managers disclosed to the Government the temperature and humidity differentials at Randolph homes, the likely cause of those differentials, and the proposed Scope of Work necessary to fix those problems. Knight Dec. at ¶¶ 17–18. The Government considered the initial scope of work and funding request, and approved it in full. Knight Dec. at ¶ 19. Even when AETC Housing disclosed that it would take additional supplemental funding to complete the project, AETC again disclosed the situation to the Government, and requested $1.6 million in supplemental funding, only $1 million of which was approved. Knight Dec. at ¶¶ 21–22. As discussed above and in the Radliff Declaration, the Government and AETC Housing and AETC Managers are consulting about housing problems large and small on a daily basis. There is no daylight between what AETC Housing and the Government know on this, or any other, housing issue. Clearly, these problems were disclosed to, and expressly addressed by, the Government.

Because the elements of the *Boyle* immunity defense are satisfied in this case, this Court should hold that Defendants enjoy that immunity from tort.

   **IV.** **Defendants Are Immune Under the Supremacy Clause.**

Apart from the foregoing categories of immunity, a third category applies that focuses less

on the contractor's working under detailed specifications, and more on the **place** and **function** of the services in question: here, housing servicemembers on military installations. The First Amended Complaint alleges only state-law causes of action, and Plaintiffs are suing to enforce Texas law against Defendants in their role as contractors who operate, maintain, and manage military base housing. But the Supreme Court has held that "a **federally owned facility performing a federal function** is shielded from direct state regulation, **even though the federal function is carried out by a private contractor**, unless Congress clearly authorizes such regulation." *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 181 (1988) (emphasis added). The "shield" which provides that immunity from state regulation is the Supremacy Clause. *Id.* at 180.

There is no question that Air Force bases perform such "federal functions" as housing servicemembers and their families. Applying Texas law in this case would effectively place the State of Texas in the position of dictating housing rules, regulations, and policies to the Government. But the states have no power to "in any manner control, the operations of the constitutional laws enacted by [C]ongress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. 316, 436 (1819). That includes the operations of the MHPI statutes and of the contracts the United States enters into pursuant to those statutes.

A recent decision by the Supreme Court, addressing the limits of states' sovereign immunity from suit, is relevant here for the light it casts on the limits of state sovereignty where the armed forces are concerned. In *Torres v. Texas Department of Public Safety*, No. 20-603, 597 U.S. __ (June 29, 2022), the Court held that that " 'when the States entered the federal system, they renounced their right' to interfere with national policy" in the area of "Congress' power to build and maintain the Armed Forces." *Torres*, slip op. at 7 (quoting *PennEast Pipeline Co. LLC v. New Jersey*, 594 U.S. __, 141 S. Ct. 2244, 2259 (2021)). Thus, "as part of the plan of the

[Constitutional] Convention," "the States agreed that their sovereignty would 'yield … so far as is necessary' to national policy to raise **and maintain** the military." *Id.* at 11–12 (quoting *PennEast*, 141 S. Ct. at 2259) (emphasis added). Providing housing for servicemembers is one of the myriad ways in which Congress sets "national policy" to "maintain the military," and state laws that would "interfere with national policy" thus must yield to Congress' sole power to decide how it wishes to "maintain" members of the armed forces.

Therefore, the manner in which Defendants manage base housing under those contracts is not subject to state laws:

> SB 990 **directly interferes** with the functions of the federal government. It **mandates the ways in which Boeing renders services that the federal government hired Boeing to perform.** The state law replaces the federal cleanup standards that Boeing has to meet to discharge its contractual obligations to DOE with the standards chosen by the state. It **overrides federal decisions as to necessary decontamination measures**. Unlike the tax cases, SB 990 **regulates not only the federal contractor but the effective terms of [the] federal contract itself**.

*Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014) (emphasis added). In the *Boeing* case, the applicable state law, SB 990, provided for cleanup above and beyond the federal "reasonably foreseeable use" standard and contradicted the federal law and contractual obligations Boeing was otherwise responsible for. 768 F.3d at 837–38. The Supremacy Clause trumped the state law because, in *Boeing*, the contractor could not serve two masters. As the First Amended Complaint amply demonstrates, Plaintiffs seek to impose Texas state law statutes, regulations, requirements, and liability on Defendants although the Government has set forth its own specific requirements for how the project should be operated, managed, and run.

This principle applies beyond literal regulation: "Courts have recognized that the imposition of damages under state tort law amounts to a form of regulation and is therefore subject to the Supremacy Clause." *Burge v. Jones*, 1992 WL 415263, at *1 (S.D. Tex. Nov. 18, 1992)

(citing *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959)). "The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy. Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme." *Garmon*, 359 U.S. at 247. Further, for the laws of one state to affect a federal program would risk forcing inconsistency on the Government's operations from state to state, and the Supremacy Clause stands against such interference: "Such dominancy is required also to avoid a breakdown of administration through possible conflicts arising from inconsistent requirements." *Mayo v. United States*, 319 U.S. 441, 445 (1943). The AETC II project extends across multiple states, Radliff Dec. at ¶ 4, adding force to the proscription in *Mayo*.

As one district court held:

> The Supreme Court has ruled on numerous occasions that **a State is powerless to condition the means by which the Federal Government carries out its activities**. Plaintiffs ask this Court to enjoin the activities of a Federal military installation until the installation conforms to California public nuisance laws. Not surprisingly, the plaintiffs offer no authority to support this ill-conceived and baseless request. The cases are clear on the point. **This Court simply may not apply the California public nuisance laws to the operations of a Federal military installation.** The Supremacy Clause of the United States Constitution, Article VI, Clause 2, forbids it.

*Laine v. Weinberger*, 541 F. Supp. 599, 604 (C.D. Cal. 1982) (citations omitted & emphasis added). Plaintiffs here seek to "enjoin the activities of a Federal military installation," and even allege three separate counts of nuisance under Texas law against Defendants as the mechanism to do so. [9, at ¶¶ 152, 185–202]. The Supremacy Clause forbids not only those claims, but all claims seeking to hold Defendants liable, in the shoes of the Government, for how base housing at Randolph and Laughlin has been managed.

In the present case, Plaintiffs for instance have designated an expert witness (Mark

Eberwine) who opines that Defendants have not adhered to local building codes. But as another district court held: "To the extent the State of Montana, by the enforcement of its building codes, **is attempting to exercise authority over the plans and specifications for construction projects at federal military installations**," the Supremacy Clause forbids it. *United States v. State of Mont.,* 699 F. Supp. 835, 838 (D. Mont. 1988) (emphasis added) "Exercising authority over construction projects at federal military installations" is of course what Plaintiffs seek to do by invoking Texas law and thus subjecting federally protected conduct to state regulation. *See also City of Des Moines v. Sec'y of Hous. & Urb. Dev.*, 2000 WL 33666936, at *4 (S.D. Iowa Sept. 22, 2000) (rejecting attempt to "apply [city] housing code to HUD property," even where property allegedly "dangerous" and prone to "rodent habitation"; Supremacy Clause barred suit).

A third court's observation in a criminal case is relevant here: "The Supremacy Clause of the U.S. Constitution states that the federal law 'shall be the supreme Law of the Land.' ... '[T]his consideration is **particularly heightened where federal interests are at their peak**, such as here **where the actions alleged took place on a federally-controlled military base** with sensitive military assets.' " *United States v. Bennett*, 2011 WL 4116721, at *3 (M.D. Fla. Sept. 15, 2011) (quoting brief for U.S.) (emphasis added). The military's "interests are at their peak" in the provision of on-base housing for servicemembers. The Supremacy Clause bars the application of state tort law in this suit. This Court should so hold.

## CONCLUSION

Defendants AETC Housing and AETC Managers are thus immune from suit for tort liability. This Court should grant partial summary judgment and dismiss all tort and statutory claims averred in the First Amended Complaint on the basis of the immunities described in this motion.

Respectfully submitted, this the 6th day of July, 2022.

By: */s/ Walter H. Boone*
Walter H. Boone, MS Bar No. 8651
*(Admitted to W. D. of TX on 7/28/2020)*
Jennifer J. Skipper, State Bar No. 24076171
BALCH &BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, Mississippi 39201
Telephone: (601) 961-9900
Facsimile: (601) 961-4466
E-mail:      wboone@balch.com
             jskipper@balch.com

By: */s/ Julia W. Mann*
Julia W. Mann, State Bar No. 00791171
Erica Benites Giese, State Bar No. 24036212
JACKSON WALKER LLP
112 East Pecan Street, Suite 2400
San Antonio, Texas 782015
Telephone: 210-978-7761
Facsimile: 210-242-4646
E-Mail:      jmann@jw.com

***Attorneys for AETC II Privatized Housing, LLC, AETC II Property Mgrs., LLC, and Hunt ELP, LTD.***

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of July, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Randall A. Pulman, Esq.
Ryan C. Reed, Esq.
Sarah Jackson Donahue, Esq.
PULMAN, CAPPUCIO, & PULLEN, LLP
2161 NW Military Highway, Suite 400
San Antonio, TX 78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile
E-Mail: rpulman@pulmanlaw.com
        rreed@pulmanlaw.com
        sdonahue@pulmanlaw.com

James R. Moriarty, Esq.
LAW OFFICES OF JAMES R. MORIARTY
4119 Montrose, Suite 250
Houston, TX 77006
(713) 528-0700 Telephone
(713) 528-1390 Facsimile
E-Mail: jim@moriarty.com

Mikal C. Watts, Esq.
Francisco Guerra, IV, Esq.
Jennifer Arlene Neal, Esq.
Robert E. Brzezinski, Esq.
WATTS GUERRA, LLP
Four Dominion Drive, Bldg. 3, Suite 100
San Antonio, TX 78257
(210) 477-0500
E-Mail: mcwatts@wattsguerra.com
        fguerra@wattsguerra.com
        jneal@wattsguerra.com
        rbrzezinski@wattsguerra.com

*/s/ Walter H. Boone*
Walter H. Boone, MS Bar No. 8651
*(Admitted to W. D. of TX on 7/28/2020)*