IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| MICHAEL J. DANIELS, ET AL. § | |
| § | |
| PLAINTIFFS, § | |
| § | |
| V. § | No. SA-19-CV-01280-RBF |
| § | |
| AETC II PRIVATIZED HOUSING, LLC, ET AL. § | |
| § | |
| DEFENDANTS § | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON GOVERNMENT CONTRACTOR IMMUNITIES**

Defendants seek partial summary judgment based on government contractor immunity [262], and Plaintiffs have filed their Response [295]. In rebuttal, Defendants offer the following.

On summary judgment, once a contractor shows it meets the elements of an immunity defense, the burden shifts to the plaintiff to raise a genuine issue of material fact precluding application of the defense as a matter of law. *Matter of Crosby Marine Transp., L.L.C.*, 537 F. Supp. 3d 886, 892 (E.D. La. 2021) (citing *Smith v. Xerox Corp.,* 866 F.2d 135 139 (5th Cir. 1989)).

**I.  Defendants Are Immune from Tort Liability Under *Yearsley*.**

The Motion began with *Yearsley* immunity, which the Response seeks to avoid and minimize by sandwiching it in the middle. The Response barely mentions *Taylor Energy*, which is directly on point. Plaintiffs relegate *Taylor Energy* to a footnote, and make no headway distinguishing it. [295, at 23 n.16]. Contrary to their claim, "[t]he Supreme Court's decision in *Yearsley* does not require a public-works contractor defendant to establish a traditional agency relationship with the government." *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 205 (5th Cir. 2009). Moreover, contrary to Plaintiffs' assertion that they have created a fact issue on "what, if anything, Defendants have done to achieve quality housing" [295, at 23 n.16], there is abundant

1

16721161.9

evidence that Defendants were responsive to Plaintiffs' maintenance calls.[1] While Plaintiffs may not be satisfied now, that does nothing to remove this case from the umbrella of immunity provided by *Yearsley* and *Taylor Energy*.

Instead of addressing Fifth Circuit authority on point, Plaintiffs veer off course, spending pages arguing that Defendants "made day-to-day management decisions as opposed to the federal government or any agency or division thereof." [295, at 23]. That is true. But that is what contractors do: provide services so that the Government does not have to do them. *Yearsley* holds that when Defendants act at the direction of the Government, Defendants are entitled to the same immunity as the Government. In the *Campbell-Ewald* case cited by Plaintiffs, the contractor violated a specific directive not to send text messages to persons who had not opted to receive them, thus placing the contractor in violation of both that directive and of the federal Telephone Consumer Protection Act. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016), *as revised* (Feb. 9, 2016). But here, Plaintiffs do not point out a single "instruction" or "directive" from the mass of specifications attached to the Motion that Defendants directly disobeyed.

Rather, Plaintiffs say, again and again, that Defendants "utterly fail[ed] to ensure quality housing." [295, at 23]. As we saw above, perfection is not the standard. Plaintiffs' own single

---

[1] The family-specific Rule 56 motions show that even Plaintiffs conceded that maintenance was provided on numerous occasions. See [252, at 5, 15–17] (Klines); [253, at 5–6, 15–16] (Alexanders); [255, at 12, 14–15] (Wolfs); [256, at 4–5, 15–17] (Daniels); [257, at 3–4, 9–10] (Konzens); [258, at 4–5, 14–16] (Pisanos); [259, at 4–6, 15–17] (Hiatts); [260, at 5, 14–17] (Vinales); [261, at 4–5, 15–17] (Hamiltons). The Hamiltons actually filed a formal complaint criticizing the Humidity Reduction Project work at their house; in a typical instance of oversight, the Government itself inspected the house and determined their complaint was baseless.

Plaintiffs also ignore that thousands of residents have come and gone at Randolph and Laughlin the past 15 years, all of whom required change-of-occupancy maintenance, service calls, and the like. The overwhelming evidence is that Defendants have been doing what the Government contracted with them to do, to the Government's overall satisfaction, even if not always to the satisfaction of Plaintiffs.

citation to *Taylor Energy* concedes that the contractor "eliminated at least some of the sheen" and that was sufficient to invoke immunity. [262, at 23] (quoting *Taylor Energy*, 3 F.4th at 177). *Yearsley* and *Taylor Energy* do not stand for the proposition that the contractor must perform perfectly. The cases stand for the proposition that the contractor's actions will be immunized, even though imperfect, while acting under the direction of the Government, as Defendants did.

Defendants qualify for immunity under *Yearsley* and *Taylor Energy*.

### II. Defendants Are Immune from Tort Liability Under *Boyle*.

Plaintiffs also take issue with Defendants' arguments for immunity arising out of *Boyle*. While Plaintiffs want to quibble whether Defendants' motion seeks immunity or preemption [295, at 4 n.2], they never explain what material difference that makes, if any, to deciding the Motion. Whether called preemption or immunity, it is evident that *Boyle* applies here.

Before addressing the actual elements of *Boyle* immunity, Plaintiffs make two easily dispelled arguments. First, Plaintiffs assert that this case involves no "uniquely federal interest" [295, at 5–6 & n.7], but the provision and maintenance of housing for servicemembers, at a military base pursuant to a federal statute, is exactly such an interest. As already noted [262, at 2], there is an "overriding federal interest ... [in] exclusive control over military matters in the legislative and executive branches of the federal government." *Bynum v. FMC Corp.,* 770 F.2d 556, 569 (5th Cir. 1985) ("equipping and management of our military forces is a matter exclusively within the rights and duties of the federal government"). Equally, the Response errs in claiming Defendants must first show "significant conflict" between state law and federal policy before reaching the three *Boyle* factors. To the contrary: "The only analysis necessary to determine the application and scope of government contractor immunity is the three-step *Boyle* test," and there is no "threshold inquiry into whether there is a significant state conflict" aside from that test. *In re Katrina Canal Breaches*

3

*Litig.*, 620 F.3d 455, 460–61 (5th Cir. 2010).[2]

**Reasonably precise specifications:** Although Plaintiffs attack the level of detail in the Project Documents, *Boyle* "requires only that the government approve *reasonably* precise specifications." *Xerox Corp.,* 866 F.2d at 138 (emphasis in original). "Reasonably precise" does not mean "specifying every last detail in question." *Haltiwanger v. Unisys Corp.,* 949 F. Supp. 898, 903 (D.D.C. 1996). In the context of managing several hundred housing units, "reasonably precise" cannot mean anticipating and delineating every conceivable thing that can go wrong in a house and dictating in advance the fix for each such thing. *See Russek v. Unisys Corp.*, 921 F. Supp. 1277, 1287–88 (D.N.J. 1996) (where specifications reasonably detailed, no bar to government contractor immunity that they did not anticipate every contingency).

The gravamen of Plaintiffs' complaints is an alleged failure to properly maintain their houses. The 19-page Facilities Management Plan [262-1 ex. F att. E], among other Project Documents, sets "reasonably precise specifications" for how the housing must be maintained. For example, this Plan defines "emergency," "urgent" and "routine" maintenance calls with set response times for each [att. E at 2–3]; lists 41 "standards" each unit must meet before every new resident moves in [att. E, at 7–10]], such as pest control and removal of "foreign matter" (which includes mold); requires preventative maintenance of particular items on set schedules [att. E, at 5–6]; and sets requirements for the pest control plan for basewide housing [att. E, at 15–16]. Each of the other plans also prescribes and specifies what must be done, how, and when.[3] Specifications

---

[2] At subsection I.(d), the Response tries to smuggle in a fourth element, "violation of stated federal policy." [295, at 17]. Its only authority is a dissenting opinion from another circuit, but as the majority correctly held, preemption in military matters does not require direct conflict: "the very imposition of *any state law* created a conflict with" federal policy. *Saleh v. Titan Corp.*, 580 F.3d 1, 13 (D.C. Cir. 2009) (analogizing military to foreign policy interest) (italics in original).

[3] The Environmental Management Plan sets forth precise details on the use of pesticides [att. M, at 8-9]. (The complaint calls pests "a recurring theme in this Complaint," [9, at ¶ 49].) The Capital

that were hyper-specific about how to address mold contamination, for instance, would indeed go into "every last detail." Plaintiffs cite no authority stating provisions for housing management must in effect amount to a library of home-maintenance techniques in order to be "reasonably precise."

The first *Boyle* element can be satisfied by "substantive review and evaluation of the relevant design features prepared by the contractor." *Stout v. Borg-Warner Corp.,* 933 F.2d 331, 335–36 (5th Cir. 1991). Here, the MHPI statutory requirements for awarding and overseeing projects and the execution of the Project Documents by the Government should be enough. But further, the Radliff Declaration and the details of the Project Documents satisfy this element: "The 'reasonably precise' standard is satisfied as long as the specifications address, in reasonable detail, the product design feature, alleged to be defective." *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 438 (5th Cir. 2000). The "feature" of housing management at issue in this case, maintenance, is addressed in "reasonable detail."

***Conformity with specifications:*** Plaintiffs misapprehend *Boyle* when they argue that Defendants failed to comply with Government specifications. They point to no provision in the Project Documents that was supposedly breached to their harm. Instead, they make a conclusory argument: "things went wrong in our houses, hence the maintenance was not up to specifications." But as the Motion showed, a contractor need not prove immunity by showing that nothing went wrong with a product or service. Were it otherwise, there would never be immunity, as tort suits always allege that something did go wrong. The Project Documents do not require that every repair and service call be 100% effective in resolving the issue.[4] While Plaintiffs are unimpressed by the

---

Repair and Replacement Plan (att. F) provides for replacement of appliances and major home components on schedules based on industry standards. Each of these "specifications" is directly related to Plaintiffs' claims.

[4] Plaintiffs have no standard-of-care expert for the management of rental housing, and as set forth in the Motion to Strike being filed with this Reply, the expert reports attached to the Response are

fact that the Government proves Defendants' compliance by continuing to use their services without citing any breach of the Project Documents, the case law shows that is a powerful indicator that the second element of *Boyle* immunity has been met. [262, at 25].

Further, the Government exercises close, constant oversight. Plaintiffs do not like the Radliff Declaration [295, at 9 n.9], but it is not "conclusory" to state that oversight is exercised, and then to explain how, when, and by whom. The basis for Radliff's personal knowledge is stated up front: he is Vice President for Operations over Randolph and Laughlin AFBs. Paragraph 40 of his Declaration, describing weekly and monthly meetings with the Government's military housing office at each base, is admissible and **uncontroverted** evidence of close Government oversight.[5] It is difficult to envision how oversight could be more direct. Consistent oversight indicates that the second *Boyle* factor is met. [262, at 26].

***Failure to warn:*** It is unclear what Plaintiffs mean to argue regarding the third *Boyle* factor of failure to warn. But whatever their intent, they raise no genuine issue of material fact. Under *Boyle*, Defendants needed to warn only of dangers or issues of which the Government had no knowledge. *Stout.,* 933 F.2d at 336. Defendants did raise the Humidity Reduction Project as an example of Government oversight, but certainly not the only one. The minutes referenced by the

---

inadmissible under *Daubert* and thus not competent Rule 56 evidence. Fed. R. Civ. P. 56(c)(2). The Response also fails to cite any particular parts, violating Rule 56(c)(1)(A). *See McLane Co., Inc. v. ASG Techs. Group, Inc.*, No. 6:17-CV-00166-ADA-JCM, 2019 WL 590081, at *18 (W.D. Tex. Jan. 2, 2019) ("without citations to the particular portions of Mr. Pinto's report that support summary judgment, McLane's mass-incorporation of two-hundred-plus pages of analysis does not comply with Federal or Local Rules"). The reports thus may, and should, be disregarded, though nothing in them identifies a Government specification that Defendants have supposedly violated.

[5] Plaintiffs also gripe that not **all** the meeting minutes over 15 years are attached to the declaration, but that is not the same thing as controverting Radcliff's declaration. They provide no basis for taking the example minutes as anything other than typical. Plaintiffs know full well that the minutes attached were but examples of the multitudes of minutes which were produced in discovery (AETC - Gen04-10145–10167, 10306–10307, 12367–12449, 13565–13570).

Radliff Declaration, and the multitudes of others produced in discovery, provide other examples of the discussion of maintenance issues and problems at particular homes. In short, Plaintiffs come forward with zero evidence that any specific danger was not disclosed to the Government or was unknown to it.

*Boyle* immunity shields Defendants from tort liability. This Court should so hold.

### III. Defendants Are Immune from Tort Liability Under *Goodyear Atomic*.

While the foregoing shows that Defendants did adhere to the Government's requirements, this Court need not even reach that question to grant summary judgment, because the Motion's third basis for immunity does not involve it. Defendants are entitled to immunity from tort liability (or such liability is preempted) simply because they were carrying out a federal function, the provision of base housing, at two federal installations, Randolph and Laughlin AFBs.

Plaintiffs fault Defendants for not beginning with the assumption that Congressional purpose to preempt state law must be clearly shown. [295, at 24]. But Plaintiffs' argument repeats the error made in *Goodyear Atomic* by the Ohio Supreme Court, which

> failed to consider the fundamental distinction between state regulation of private facilities and state regulation of federal facilities. When dealing with state regulation of private facilities, analysis under the Supremacy Clause centers on whether Congress has taken affirmative action to pre-empt the state regulation in question. On the other hand, because the Supremacy Clause immunizes the activities of the Federal Government from state interference, direct state regulation of federal facilities is allowed only to the extent that Congress has clearly authorized such regulation.

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 176 n.1 (1988) (citations omitted). In our case, "state regulation of federal facilities" is at issue, so the default premise is that no such regulation is allowed unless Congress has expressly enacted otherwise.

Similarly, Plaintiffs' insistence that Defendants must show "direct conflict between federal and state law" [295, at 25] overlooks the key to *Goodyear Atomic*: it involved the operation of a

7

16721161.9

federal installation. The Court stated, 486 U.S. at 180, that it applied *Hancock v. Train*, which held that " 'the federal function must be left **free' of regulation**," no matter whether there was direct conflict or not. *Hancock v. Train*, 426 U.S. 167, 179 (1976) (citation omitted; emphasis added).

Although Plaintiffs claim that "it is not clear why Defendants cite to *Goodyear*" [295, at 29 n.18], nothing could be more clear because *Goodyear Atomic* is directly on point. In *Goodyear Atomic*, a federal installation was operated by a private contractor that was sued for alleged violation of state law, just as in the present case. 486 U.S. at 176–77. The Supreme Court held that "a federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation." *Id.* at 181 (footnote omitted). Plaintiffs are correct that the Court held a state law was binding, but omit to state the reason why: Congress had "clearly authorized" the application of state workers' compensation law to the federal installation in 40 U.S.C. § 290. *Id.* at 182–83. Plaintiffs cite no such clear Congressional authorization of their efforts to enforce state law against the contractors performing the Government's military base housing functions, because there is none.

As the Motion notes, direct state regulation includes state tort laws. [262, at 29–30]. The Motion cites the *Garmon* decision for the holding that state common-law torts are indeed regulations subject to preemption. [262, at 30]. Plaintiffs cite *Cipollone*, which in turn cites *Garmon*. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 521–24 (1992). Because the question here, as in *Goodyear Atomic*, is of state regulation of activities **on a federal installation**, the issue is not, as in *Cipollone*, whether state laws do or don't interfere with the federal installation's operations. Because we are dealing with a federal installation, the law is plain that "a State is powerless to condition the means by which the Federal Government carries out its activities."

8

*Laine v. Weinberger*, 541 F. Supp. 599, 604 (C.D. Cal. 1982) (citing cases).[6] It is obvious that the need to conform to Texas statutes and common law, and jury verdicts based on those, would "condition the means" by which base housing "activities" are "carried out." Indeed, that is Plaintiffs' own stated objective in filing suit: "Plaintiffs are attempting to use compatible state law to accentuate and give effect to the MHPI's objectives." [295, at 27]. Plaintiffs are free to believe that would be a good thing, but there can be no doubt that they seek to impose their will on how the Government carries out these functions. As Defendants pointed out by citing to *Torres v. Texas Department of Public Safety,* the Government reserves its military functions to its own judgment and discretion.

Unable to rebut the clear holding of *Goodyear Atomic*, Plaintiffs' Response at subsection (e) prefers stale cases from the 1930s and 1940s. The main exception is the decision in *United States v. Pennsylvania Environmental Hearing Board*, 584 F.2d 1273 (3d Cir. 1978). That case states that "as a matter of federal law [the operator of a federal facility] was not shielded from state environmental proceedings merely because it was operating under a contract made with the federal government." *Id*. at 1277. This holding was correct, but also irrelevant here. In *Pa. Envtl.,* the issue was not Supremacy Clause immunity, but rather "whether a private company operating under federal contract is a federal 'department, agency or instrumentality' for the purposes of section 313" of a federal conservation statute. *Id*. at 1274. That is why *Pa. Envtl.* is an isolated holding cited in only 16 cases. Even had it contradicted *Goodyear Atomic*, the Supreme Court's views would prevail over those of the Third Circuit.

---

[6] Plaintiffs think *Laine* is somehow irrelevant because of the broad relief sought: "to enjoin *all operations* at a naval station." [295, at 30]. But Plaintiffs own First Amended Complaint seeks to prohibit new tenants from moving into base housing and to put the Air Force's chosen housing managers "out of business"? [262, at 15–16]. The resulting standstill for military operations at Randolph and Laughlin is self-evident.

9

16721161.9

Plaintiffs do not like aspects of how Randolph and Laughlin AFBs have been managed, and they want to use state law to punish the Government's contractors, impose their own will, and choose how to "give effect to the MHPI's objectives." [295, at 27]. The Supremacy Clause puts the Government in charge (above the states and these Plaintiffs, their lawyers, and their tort suit), as *Goodyear Atomic* and the other cases cited in the Motion hold.

**IV.     Recognizing Defendants' Immunity Does Not Leave Plaintiffs Without Recourse.**

At several points, Plaintiffs appeal to this Court's sense of public policy, but the government contractor immunity defense itself has an "inescapable function in the deflection of unwarranted judicial oversight over matters of procurement and defense." *Tozer v. LTV Corp.,* 792 F.2d 403, 409 (4th Cir. 1986). "If state laws requiring judicial intervention into such matters were applied, the federal interest would be entirely frustrated." *Bynum*, 770 F.2d at 571. However, immunity from liability under state tort or statutory law does not leave Plaintiffs or other tenants without recourse. The Government requires AETC Housing to enter into leases with tenants, and tenants thus are able to sue for breach of contract should any obligations to them be violated.

For all the above reasons and those stated in the Motion, all statutory and tort claims against Defendants should be dismissed with prejudice.

Respectfully submitted, this the 24th day of August 2022.

/s/ *Walter H. Boone*
Walter H. Boone, MS Bar No. 8651
(*admitted to W.D. of Tex. on 7/28/2020*)
Jennifer J. Skipper, State Bar No. 24076171
Balch & Bingham LLP
188 East Capitol Street, Suite 1400
Jackson, Mississippi 39201-2133
Telephone:  601-965-8182
Facsimile:  866-501-9984
E-Mail: jskipper@balch.com
              wboone@balch.com

                    Julia W. Mann, State Bar No. 00791171
                    Erica Benites Giese, State Bar No. 24036212
                    JACKSON WALKER LLP
                    112 East Pecan Street, Suite 2400
                    San Antonio, Texas 782015
                    Telephone: 210-978-7761
                    Facsimile: 210-242-4646
                    E-Mail: jmann@jw.com
                            egiese@jw.com
                    ***Attorneys for Defendants***

## **CERTIFICATE OF SERVICE**

  I hereby certify that on the 24th day of August 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

  Randall A. Pulman, Esq.
  Ryan C. Reed, Esq.
  Matthew J. McGowan, Esq.
  Sarah Jackson, Donahue, Esq.
  PULMAN, CAPPUCIO, & PULLEN, LLP
  2161 NW Military Highway, Suite 400
  (210) 222-9494 Telephone
  (210) 892-1610 Facsimile
  E-Mail: rpulman@pulmanlaw.com
   rreed@pulmanlaw.com
   mmcgowan@pulmanlaw.com
   sdonahue@pulmanlaw.com

  James R. Moriarty, Esq.
  LAW OFFICES OF JAMES R. MORIARTY
  4119 Montrose, Suite 250
  (713) 528-0700 Telephone
  (713) 528-1390 Facsimile
  E-Mail: jim@moriarty.com

  Francisco Guerra, IV
  Jennifer Arlene Neal
  Robert E. Brzezinksi
  WATTS GUERRA, LLP
  Four Dominion Drive, Bldg. 3, Suite 100
  San Antonio, TX 78257
  (210) 477-0500
  E-Mail: fguerra@wattsguerra.com
   jneal@wattsguerra.com
   rbrzezinski@wattsguerra.com

      /s/ *Walter H. Boone*
      Walter H. Boone, MS Bar No. 8651
      (*admitted to W.D. of Tex. on 7/28/2020*)

16721161.9