IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MICHAEL J DANIELS, ET AL., | § § § | |
| *Plaintiffs,* | § § | |
| vs. | § § | 5-19-CV-01280-RBF |
| AETC II PRIVATIZED HOUSING, LLC, AETC II PROPERTY MANAGERS, LLC, HUNT ELP, LTD, | § § § § § | |
| *Defendants.* | § | |

# ORDER

Before the Court is the Motion for Summary Judgment Against Vinales Plaintiffs, Dkt. No. 260, and the Motion to Strike Plaintiffs' Declarations and Summary Judgment Exhibit, Dkt. No. 332, both filed by Defendants. The motions have been fully briefed, and the Court held a motions hearing on November 17, 2022, attended by all parties.

For the reasons stated below, the Motion for Summary Judgment, Dkt. No. 260, is **GRANTED IN PART AND DENIED IN PART**. The Court is persuaded by Defendants' arguments on the federal-enclave doctrine and fraudulent misrepresentation, and therefore partially grants summary judgment accordingly. The Motion to Strike, Dkt. No. 332, is **GRANTED IN PART AND DENIED IN PART** as to the Vinales Plaintiffs for the purposes of summary judgment and without prejudice. The Court **STRIKES** the DOJ press release, Dkt. No. 319-12.

In all other respects, the motions are **DENIED** without prejudice to reraising at trial.

## Background

In a deed of cession dated October 4, 1951, the State of Texas officially ceded to the United States "exclusive jurisdiction" over the land that would become Randolph Air Force

Base. Dkt. No. 160-1 at 8, 14. Texas expressly retained for itself "concurrent jurisdiction . . . so far, that all process, civil and criminal, . . . may be executed by the proper officers of the State of Texas" within the ceded land. Dkt. No. 160-1 at 14.

In 2007, the Air Force entered into a 50-year ground lease with Defendant AETC II Privatized Housing, LLC, to operate and maintain the on-base housing residences at Randolph. *See* Dkt. No. 305. The ground lease instructs the lessee to "comply with all Applicable Laws," including local sanitation and building codes, while noting "that the United States presently exercises exclusive federal jurisdiction over the Leased Premises." Dkt. No. 305 at 26-27. The Master Development and Management Agreement also defines the term "Applicable Law" as including "all federal, state and local laws." Dkt. No. 305-2 at 6.

Plaintiffs Shane and Becky Vinales requested on-base housing at Randolph in October 2017.[1] On their first walk-through of the house they would ultimately lease, Plaintiffs say they noticed a "musty smell" and dead cockroaches on the floor. The leasing agent told Plaintiffs that the houses were "old" and smelled like "grandma's house." On October 16, 2017, Plaintiff Shane Vinales signed a lease for military housing at Randolph with Defendant AETC II Privatized Housing, LLC. *See* Dkt. No. 260-2. The lease noted that any landlord-tenant disputes must be resolved "in accordance with the local applicable laws." Dkt. No. 260-2 at 8. The Resident Guidelines incorporated into the lease also state that the landlord will "comply with all applicable building and housing code requirements governing residential rental property in the State of Texas." Dkt. No. 260-3 at 6.

Plaintiffs allege that upon moving into the house, a previous tenant informed them of problems with the house. Plaintiffs explain that they followed up with the leasing office but were

---

[1] The Court draws upon the undisputed facts stated in the parties' briefing and the attached exhibits, including Plaintiffs' deposition testimony. *See* Dkt. Nos. 260, 319.

told that there were "no problems" with the house. Shortly thereafter, according to Plaintiffs, they noticed mold growing on several items in the house and indicated as much on their move-in checklist. Plaintiffs allege a series of requests for routine maintenance due to mold or other housing problems throughout their time at Randolph. And according to Plaintiffs, Defendants would respond to those calls, conduct maintenance, and then inform Plaintiffs that the problem had been fixed, only for Plaintiffs to encounter the same issues later. In early 2019, Plaintiffs agreed to a remediation project for the house and were temporarily relocated, after which Plaintiffs received transfer orders to another base. During and after the move-out process, Plaintiffs noticed mold on personal items and had to discard them. Plaintiffs also paid monthly rent to Defendants while living at Randolph in the form of BAH payments.

On October 29, 2019, Plaintiffs initiated this lawsuit, alleging breach of contract, negligence, fraud, and other state-law causes of action in connection with their housing at Randolph.

**Standard of Review**

On a motion for summary judgment, the moving party bears the initial burden of showing both the lack of any genuine dispute of material fact and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 484 (5th Cir. 2014). Where the moving party bears the ultimate burden of proof at trial, such as a defendant seeking summary judgment on an affirmative defense, then "he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). But where the moving party does not bear the burden of proof, summary judgment may be obtained "simply by disproving the existence of any essential element of the

opposing party's claim." *Id.* Once the moving party has met this initial burden, then the burden shifts to the non-moving party to come forth with "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *accord Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). While courts resolve any factual disputes in favor of the non-moving party, the party opposing summary judgment must come forth with more than "conclusory allegations," as "only a 'scintilla' of evidence" will not suffice. *Little*, 37 F.3d at 1075. Even where an affidavit or declaration "conflicts to some degree with an earlier statement," courts cannot disregard the proffered summary judgment evidence but "must consider all the evidence." *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 472 (5th Cir. 2019) (quotation omitted).

## Analysis

### A.    Many of Plaintiffs' Claims are Barred Due to the Federal-Enclave Doctrine.

When the federal government acquires exclusive jurisdiction over a tract of state land, thereby transferring it into a "federal enclave," the general rule is that "local law not inconsistent with federal policy remain[s] in force until altered by national legislation." *Pac. Coast Dairy v. Dep't of Agric. of Cal.*, 318 U.S. 285, 293 (1943). But state laws enacted after acquisition have no effect within the federal enclave, even if application of those laws would not conflict with federal laws or regulations. *See Paul v. United States*, 371 U.S. 245, 269 (1963) (permitting non-conflicting state price controls in federal enclaves only where "the basic state law authorizing such control has been in effect since the times of these various acquisitions"). A state's reservation of "concurrent jurisdiction for service of civil and criminal process" does not affect this analysis. *Lord v. Loc. Union No. 2088*, 646 F.2d 1057, 1060 & n.6 (5th Cir. 1981).

Plaintiffs do not dispute that Randolph is a federal enclave. In any event, Randolph became a federal enclave when Texas ceded exclusive jurisdiction over the land to the United

States in 1952. *See* Dkt. No. 160-1 (deed of cession); *United States v. Sharpnack*, 355 U.S. 286, 286 (1958) (referring to Randolph as "a federal enclave in Texas"). Plaintiffs even plead "federal enclave subject-matter jurisdiction" in their Amended Complaint and state that all "pertinent events" occurred within a federal enclave. *See* Dkt. No. 9 ¶¶ 8-11. Accordingly, federal law applies within Randolph, in addition to any non-conflicting Texas state law in effect at the time of cession.

Because Defendants have met their initial burden on the federal-enclave doctrine, the burden rests with Plaintiffs to identify some caveat that would allow any otherwise-barred claims to proceed. Plaintiffs do not take issue with the list of claims and damages that Defendants assert were unavailable in 1952 and thus must be dismissed if the Court agree that the federal-enclave doctrine applies. Instead, Plaintiffs raise several arguments urging that some of their claims should be allowed to proceed *despite* the fact that Randolph is a federal enclave. *See* Dkt. No. 319 at 4-13.

Potentially the most persuasive argument Plaintiffs raise urges that Congress authorized the application of state law to any "civil action brought to recover on account of an injury" occurring within a federal enclave. 28 U.S.C. § 5001(b) (titled "Personal injury"). Most district courts faced with this issue have treated the term "injury" in § 5001(b) as meaning only physical injuries. *See, e.g.*, *Kelly v. Lockheed Martin Servs. Grp.*, 25 F. Supp. 2d 1, 8 (D.P.R. 1998) (reviewing legislative history). A few unreported district court decisions have extended this statute to include "purely emotional injuries." *See, e.g.*, *Andersen v. Lewis McChord Communities LLC*, No. 3:21-CV-05391-DGE, 2022 WL 874774, at *4 (W.D. Wash. Mar. 24, 2022) (relying on modern definitions). No court, it appears, has ruled that § 5001(b) encompasses economic injuries. *See id.* at *4-5.

5

Plaintiffs do not bring any claims to recover for "purely emotional injury." *See id.* at *4 (negligent infliction of emotional distress); *Kasperzyk v. Shetler Sec. Servs., Inc.*, No. C-13-3383 EMC, 2014 WL 31434, at *13 (N.D. Cal. Jan. 3, 2014) (intentional infliction of emotional distress). The only claim Plaintiffs reference in conjunction with this argument is their Texas Deceptive Trade Practices Act ("DTPA") claim. *See* Dkt. No. 319 at 10-11 & n.6. But the DTPA is not a cause of action "to recover on account of an injury" under 28 U.S.C. § 5001(b).[2] Indeed, the DTPA's main purpose is "to protect consumers by encouraging them to bring *consumer complaints*." *PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 84 (Tex. 2004) (emphasis added) (citing Tex. Bus. & Com. Code § 17.44(a)). The DTPA's primary focus is redressing economic injuries—damages for mental anguish are only available in limited circumstances. *See* Tex. Bus. & Com. Code § 17.49(e) ("Except as specifically provided . . . , nothing in this subchapter shall apply to a cause of action for bodily injury or death or for the infliction of mental anguish."); *id.* § 17.50(b)(1) (permitting "damages for mental anguish" only for knowing violations, with treble damages available for intentional conduct); *cf. Roberts v. Zev Techs., Inc.*, No. 1:15-CV-309 RP, 2015 WL 7454688, at *5 (W.D. Tex. Nov. 23, 2015) ("Texas appellate courts have repeatedly admonished that the DTPA does not provide relief for personal injury claims."). Plaintiffs cite no cases where a court has allowed claims based on state consumer-protection law to proceed under § 5001(b). This Court is aware of none. Plaintiffs provide no persuasive rationale for this Court to break new ground here.

Plaintiffs' remaining arguments for exceptions to the federal-enclave doctrine are also unpersuasive. *See* Dkt. No. 319 at 4-13. The Court adopts the arguments in Defendants' Reply that take issue with, and dispose of, these various attempts to sidestep the doctrine. *See* Dkt. No.

---

[2] The Court additionally notes that Plaintiffs have already stipulated to the dismissal of all claims to recover damages for physical injury or illness. *See* Dkt. No. 220.

330 at 1-5. To briefly summarize in general terms: there is no applicable choice-of-law clause here; the caveat for service of process in the cession deed is limited to just that; there is no legal distinction between "adopting" and "recognizing" common-law causes of action; and policy arguments are best raised before Congress. And to the extent Plaintiffs invoke a purported factual dispute about whether Defendants' policy decisions occurred (geographically) outside of any federal enclave, the only supporting evidence offered is the signature page of the Declaration of Chris Radliff. *See* Dkt. No. 262-1 at 19. The declarant's business address and where he signed his declaration in June 2022 are immaterial to where Plaintiffs' injuries occurred from 2017 to 2019. Plaintiffs cannot conjure a genuine factual dispute from such speculation.

Accordingly, the Court finds that the federal-enclave doctrine applies, and that Plaintiffs' claims are governed by federal law and non-conflicting, pre-cession Texas law. As a result, any statutory or common-law claims premised on causes of action adopted *after* 1952 are unavailable, as are any forms of damages or relief not recognized at the time. As Defendants have explained, this requires dismissal of Plaintiffs' statutory claims (Counts 1, 2, 5, and 10), common-law claims for implied warranty (Count 2) and negligent misrepresentation (Count 4), damages for personal injury under the lease (Count 3), damages for mental distress, and attorney's fees.[3]

The Court must pause at this juncture to observe a fundamental tension between the federal-enclave doctrine and Defendants' structuring of their remaining summary judgment arguments: Defendants correctly assert that the federal-enclave doctrine limits the available causes of action to Texas substantive law in effect at the time of cession and yet the remainder of

---

[3] Plaintiffs note that if the federal-enclave doctrine applies, then Texas's current statutory cap on punitive damages is inapplicable. *See* Dkt. No. 319 at 13. The Court does not reach this issue but will consider such arguments if and when the issue is squarely presented.

Defendants' briefing relies exclusively on post-cession Texas case law. Defendants thus have not met their initial burden of establishing entitlement to summary judgment under the law in effect in 1952.[4] Nevertheless, as explained below, the Court will consider Defendants' arguments on Plaintiffs' fraud claims, which the parties substantially narrowed at oral argument and appeared to agree upon as to the basic elements.

### B.  Plaintiffs Do Not Identify Any Actionable Fraudulent Statements.

Defendants seek summary judgment on Plaintiffs' fraud claims for failure to satisfy several of the basic elements. *See* Dkt. No. 260 at 11-15, 27. Because the Court has already determined that Plaintiffs' DTPA, negligent misrepresentation, and statutory fraud claims must be dismissed under the federal-enclave doctrine, the only fraud claim remaining is common-law fraud in Count 6. *See* Dkt. No. 9 ¶¶ 180-83. Defendants' arguments that Plaintiffs failed to plead fraud with particularity as required under Civil Rule 9(b) are well-taken.[5] In response, Plaintiffs

---

[4] In particular, the parties have not addressed how the federal-enclave doctrine affects certain defenses, such as the economic loss rule, and whether subsequent developments in *other* areas of federal common law apply within federal enclaves to modify pre-cession state law. The parties have also not sufficiently addressed whether damage to personal property should be treated any differently from purely economic losses, or how the existence of a lease agreement might affect the analysis for law in effect in 1952. The Court would be receptive to further briefing and argument on these questions.

On the other hand, regardless of what the applicable limitations period was in 1952 for each of Plaintiffs' claims, the Court is not persuaded by Defendants' arguments on the statute of limitations. The Court agrees with Plaintiffs' view that discreet harms and causes of action can accrue at different times, including whenever rent is paid, regardless of when Plaintiffs were first aware of any "musty smell." At most, the two-year limitations period, assuming that is what applies, would bar recovery for discreet claims occurring only within the first two weeks of Plaintiffs' occupancy.

[5] Indeed, the Amended Complaint fails to identify any allegedly false statements pertaining to the Vinales Plaintiffs' housing issues. *See* Dkt. No. 9 ¶¶ 88-102. "At a minimum, Rule 9(b) requires allegations of the particulars of 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1297, at 590 (1990)). Plaintiffs insist that Rule 9(b) is a "moot point" given the current summary judgment posture. Dkt. No. 319 at 28.

attach the Declaration of Shane Vinales. *See* Dkt. No. 319-8. Citing only the averments contained therein, Plaintiffs insist that "a fact issue exists" as to each element of fraud. Dkt. No. 319 at 28-29. Plaintiffs additionally assert fraudulent inducement as a defense to avoid the lease contract. *See* Dkt. No. 319 at 16-17 & n.12. At oral argument, the Court further pressed the parties to clarify which allegedly fraudulent statements Plaintiffs believe constitute actionable claims (or defenses) in fraud. Plaintiffs identified two: "grandma's house" and "no problems."[6] As explained below, the Court concludes that neither statement is actionable in fraud.

Claims for fraudulent misrepresentation and fraudulent inducement under the common law involve similar elements, which have remained largely unchanged throughout statehood. To state a claim for fraud, a plaintiff must show:

> (1) That a material representation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; and (6) that he thereby suffered injury.

*Wilson v. Jones*, 45 S.W.2d 572, 573 (Tex. Comm'n App. 1932); *accord Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983). The same elements must be established to avoid a contract on the grounds of fraudulent inducement, with an additional showing of "a promise of future performance made with no intention of performing at the time it was made." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015); *accord Turner v. Biscoe*, 171 S.W.2d 118,

---

The Court disagrees. If anything, Rule 9(b) supplies a more lenient standard by which pleadings are judged at the motion-to-dismiss stage. If Plaintiffs cannot satisfy Rule 9(b) at this late stage, where their claims have benefitted from significant discovery, then the fraud claims must be dismissed.

[6] While Plaintiffs insist that statements on Defendants' websites also contained misrepresentations, counsel effectively conceded at the hearing that such language was "puffery." Moreover, as Defendants point out, the Vinales Plaintiffs stated under oath that they never looked at any websites or advertising before signing the lease. *See* Dkt. No. 332-1 at 56-57.

119 (Tex. Comm'n App. 1943). It is a "well-settled rule" that "a statement of opinion cannot constitute fraud and form a basis for recovery." *Wilson*, 45 S.W.2d at 574; *accord Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995). Thus, whether applying present common law or that in effect at the time of cession, Plaintiffs must introduce some evidence to show a "material representation," as opposed to mere opinion, as well as falsity and reliance, to survive summary judgment.

> The first allegedly fraudulent statement is outlined in the Declaration of Shane Vinales:
>
> When we were offered a house at Randolph AFB, we did have the ability to walk through the house. However, it was not a true inspection, but simply a walk through. We immediately noticed a "musky" smell when we entered the home and when we inquired about it, we were told by a Hunt representative that "these homes are old, and this is what grandma's house smells like". We never had an opportunity to delve deep into anything before we signed a lease, let alone hire an inspector with knowledge and training to inspect the house before we signed a lease. Further, we were pressured to sign the lease promptly, as Hunt's representatives told us that there was a long list to get a house and if we did not take the house that was available, we may not get another house.

Dkt. No. 319-8 ¶ 6. Plaintiffs also assert that Defendants' leasing agent, Terri Hefford, explained that "the musty 'old house' was normal." *Id.* ¶ 7. Becky Vinales likewise described this exchange during the first walk-through of the house at Randolph:

> Q. Okay. You said you do remember a conversation in the walk-through? What do you remember?
> A. Yes. So, both homes were actually dirty. The one that we ended up with, we asked them to re-clean it because there were cockroaches on the—like, dead cockroaches on the floor. And both buildings smelled musty. And I actually brought it up to her, to Terri, and her response was so vague. It was just like, "Oh, it smells like grandma's—grandma's house." Like, an old smell.
> . . .
> Q. And—and your walk-through of the unit that you eventually lived in, you didn't see any kind of mold, moisture stains, leaks, standing water? None of that?
> A. I didn't see any standing water or any of that, no. Just the cockroaches and musty smell.

Dkt. No. 286-1 at 5; Deposition of Becky Vinales at 48:2-24 (Oct. 12, 2021).

10

The Court is unconvinced that there is any actionable misrepresentation here. The only representations are: (1) the house is "old"; (2) the house smells like "grandma's house"; and (3) the house is "normal." Plaintiffs do not explain sufficiently how any of these representations are false. Defendants concede that the homes at Randolph are indeed "old." Plaintiffs do not assert that "grandma's house" smells the way it does because it isn't moldy. As for what "normal" means, this is obviously a statement of opinion and too vague to form any basis for fraud, as is the "grandma's house" comment. And although Plaintiffs contend that they felt "pressured to sign the lease promptly" due to a long waiting list for on-base housing, Plaintiffs do not allege any falsity in the waiting-list representation.[7]

The second alleged misrepresentation—"no problems"—is first identified by Defendants in their Motion; Plaintiffs do not actually rely on the "no problems" statement in their Response. This allegedly false statement arose during the following deposition exchange:

> Q. And how did you know Ms. Dyer?
> A. So, I've never met her. I met her husband, actually the day the movers were coming into the house. He showed up in his car and . . . came in like, "Hey, I was a previous tenant and we had some problems with this house," and walked us in. And that was interesting.
> So, I went to Housing after that and told them that he came by and inquired like, are there problems with this home, like this previous tenant came and told us that they had problems. And I remember this day clear. It was Audra and it was the brunette that works up front, I cannot remember her name, but they were looking at the computer. They were like, no, there's no problems. Like, nothing was ever previously wrong with this home.
> Q. Okay. So, when you said, "the day the movers arrived," you're talking about the day the movers arrived to move y'all into the home, not move you out?
> A. Right.
> Q. Okay.

---

[7] Moreover, this description appears to be contradicted by the deposition testimony, which explains that it was Fort Sam Houston that had a "six-month wait" for housing, whereas at Randolph "there was availability immediately," and that Plaintiffs chose on-base housing because they "like[d] the military feel of being on base, the security," and therefore "chose not to" even consider looking at "civilian housing." Dkt. No. 286-1 at 2; Becky Vinales Depo. at 44:9-25 (Oct. 12, 2021).

> A. So, I had no reason to not trust what the Hunt employee said. I mean, they seemed really friendly when we moved in.
> Q. Okay.
> A. So, I took their word. I went, I asked, they said everything was fine, and that was that.

Dkt. No. 286-1 at 85-86; Deposition of Becky Vinales at 231:19-232:21 (Oct. 12, 2021).

There are several shortcomings with this argument. First, there is no actual representation identified here, just Plaintiffs' generic description of a conversation as conveying the sense that there were "no problems" with the house. The Court cannot distinguish between what was said, which might be actionable, as opposed to Plaintiffs' subjective belief, which is not. Second, such a vague representation as "no problems," without context, is indistinguishable from an expression of opinion. Third, and perhaps most importantly, there is no indication that Plaintiffs relied on this representation. Indeed, this conversation purportedly occurred "the day the movers were coming," or in other words *after* Plaintiffs signed the lease. Even if this did constitute a false statement, Plaintiffs cannot argue fraudulent inducement based on after-the-fact representations.

The Court also observes that dismissal of Plaintiffs' fraud claims may implicate some of the other claims seeking equitable relief. Defendants assert that the existence of a valid lease agreement bars any claims for unjust enrichment or money had and received. Plaintiffs do not disagree but insist they can properly plead these equitable doctrines in the alternative because "the lease was fraudulently induced." Dkt. No. 319 at 30. Indeed, the case Plaintiffs cite in response explicitly states that "unjust enrichment is unavailable when a valid, express contract governing the subject-matter of the dispute exists." *Gordon v. Sig Sauer, Inc.*, No. CV H-19-585, 2019 WL 4572799, at *16 (S.D. Tex. Sept. 20, 2019) (quoting *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 112 (Tex. App. 2013)). While the Court agrees that Plaintiffs are generally permitted to plead in the alternative, Plaintiffs offer no rationale why their unjust enrichment

claim, premised solely on their payment of BAH for housing at Randolph, *see* Dkt. No. 9 ¶ 184, can proceed independent of their fraudulent-inducement defense to the lease agreement. The Court thus concludes that Counts 6 (fraud) and 7 (unjust enrichment/money had and received) must both be dismissed.

### C.     The Motion to Strike Is Granted in Part.

Defendants move to strike a DOJ press release announcing a settlement against different entities in a different military base for unrelated fraud allegations, which is attached to Plaintiffs' Response as Exhibit L. *See* Dkt. No. 319-12. Defendants seek to exclude that evidence on grounds of relevance, hearsay, and settlement offer. *See* Dkt. No. 332 at 7-8; Fed. R. Evid. 402, 408, 801. The Court agrees that the press release is simply not relevant. The press release describes a recent settlement reached between the DOJ and Hunt Companies, Inc., for allegedly submitting false information to the Air Force regarding housing operations at the Dover Air Force Base in Connecticut. Plaintiffs argue that the press release is admissible to establish a "pattern and practice" of fraud. *See* Dkt. No. 333 at 5-6. But the Hunt entity in the release is not a party to this case; nor do Plaintiffs allege in this case that Defendants made any fraudulent representations to the government. Moreover, because the announced settlement was without admission of fault, the Court struggles to see how the press release helps to establish any facts related to Plaintiffs' (now-dismissed) claims of fraud here. To the extent Plaintiffs attempt to conflate different Hunt entities, the evidence would be confusing, misleading, and unfairly prejudicial under Rule 403.

Defendants also ask the Court to strike the declarations attached to Plaintiffs' responses to each of the eight plaintiff-specific summary judgment motions filed by Defendants. As it pertains to the Vinales Plaintiffs, Defendants attack the Declaration of Shane Vinales, Dkt. No.

319-8, on grounds of personal knowledge, hearsay, and contradiction with prior testimony. *See* Dkt. No. 332-1 at 50-61. Defendants fault Plaintiffs for utilizing "template, cookie-cutter Declarations from one Plaintiff in each family" with minor adjustments. Dkt. No. 332 at 1. But Defendants identify no authority for such broad relief and cite no cases where other courts struck an entire declaration for similar deficiencies.[8] Even accepting *arguendo* Defendants' objections, the Court is disinclined to strike entire declarations based on evidentiary concerns as to individual statements or even in the aggregate. Indeed, it appears that the proper remedy in such a situation where a declaration fails to point to admissible evidence or evidence capable of being presented in admissible form is simply to grant summary judgment. *See* Fed. R. Civ. P. 56(e). The Court—without having to strike every declaration as Defendants request—is fully capable of determining which statements are not afforded any weight on summary judgment.

## Conclusion

For the reasons stated above, **IT IS ORDERED** that the Motion for Summary Judgment, Dkt. No. 260, is **GRANTED IN PART AND DENIED IN PART**. In particular, the Court **GRANTS** summary judgment on the federal-enclave doctrine, as well as Defendants' arguments

---

[8] Defendants direct the Court to the following passage from *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455 (5th Cir. 1998), in support of their requested relief:

> Needless to say, unsubstantiated assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.

*Id.* at 458 (citations and quotations omitted). But *Ragas* did not involve striking declarations. It involved a grant of summary judgment for failure to identify sufficient evidence to withstand summary judgment. *See id.* In other words, per *Ragas*, the proper remedy where the non-moving party only cites a declaration full of conclusory or vague statements is granting summary judgment—there is no need to strike the declarations to reach that result. *See also Hinds v. Dallas Indep. Sch. Dist.*, 188 F. Supp. 2d 664, 676 (N.D. Tex. 2002) (affording no weight to tendered affidavit full of speculation and conjecture as opposed to striking affidavit entirely).

pertaining to fraudulent misrepresentation. Accordingly, the Court **DISMISSES** Counts 1, 2, 5, 6, 7, and 10, as well as claims for personal injury in Count 3, negligent misrepresentation in Count 4, attorney's fees, and damages for mental distress from the Amended Complaint, Dkt. No. 9, as it pertains to Plaintiffs Shane Vinales and Becky Vinales, individually and as next friend of Landon Vinales and Savannah Vinales. In all other respects, the Court **DENIES** summary judgment on the grounds raised in the motion without prejudice to reraising at trial in a motion for judgment as a matter of law. To clarify, the causes of action remaining at issue are: Count 3 (breach of contract), Count 4 (negligence), Count 8 (intentional nuisance), Count 9 (negligent nuisance), and Count 11 (gross negligence). Plaintiffs also assert claims for exemplary damages and joint liability.

Additionally, the Motion to Strike, Dkt. No. 332, is **GRANTED IN PART AND DENIED IN PART** as to the Vinales Plaintiffs for the purposes of summary judgment and without prejudice to reraising inconsistencies and evidentiary objections at trial or in a motion in limine. The Court hereby **STRIKES** as not relevant the DOJ press release attached as Exhibit L to the Vinales Plaintiffs' Response, Dkt. No. 319-12, but in all other respects, the requested relief is **DENIED**.

**IT IS SO ORDERED**.

SIGNED this 4th day of January, 2023.

RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE