**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| MICHAEL J. DANIELS, et al., | § | |
| | § | |
| *Plaintiffs* | § | CIVIL ACTION NO. SA-19-CA-01280-FB |
| | § | |
| v. | § | |
| | § | |
| AETC II PRIVATIZED HOUSING, LLC; | § | |
| AETC II PROPERTY MANAGERS, LLC; | § | |
| and HUNT ELP, LTD. d/b/a HUNT | § | |
| MILITARY COMMUNITIES, | § | |
| | § | |
| *Defendants* | § | |

**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO**
**EXCLUDE OPINIONS AND TESTIMONY OF KRISTY BECK-MILLER [Dkt. 374]**

Plaintiffs file this Response in Opposition to *Defendants' Motion In Limine to Exclude Opinions and Testimony of Kristy Beck-Miller* [Dkt. 374] (the "Motion"). For the reasons demonstrated herein, the Motion should be in all things denied.

**EVIDENCE IN SUPPORT OF RESPONSE**

This Response is supported by the following evidence, attached hereto and incorporated herein for all purposes:

1. **Exhibit A**: Declaration of Kristy Beck-Miller dated July 8, 2022;

2. **Exhibit A-1**: Kristy Beck-Miller Vinales Report dated April 11, 2019;

3. **Exhibit B**: Report of Mr. Joseph Lstiburek (prepared for Defendants);

4. **Exhibit C**: Reports of Mr. George Coto (prepared for Defendants); and

5. **Exhibit D**: Reports of Mr. Tom Sumner (prepared for Defendants).

**STANDARD FOR ADMITTING EXPERT TESTIMONY**

The admission of expert witness testimony pursuant to Federal Rule of Evidence 702 is a matter left to the discretion of the district court. *See Kuhmo Tire Co. v. Carmichael,*

526 U.S. 137, 152 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993);

*Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194 (5th Cir. 2006).  FRE 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) he testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In determining whether an expert's testimony is admissible under Rule 702, a court should ensure the expert, "whether basing testimony upon professional studies *or personal experience,*" uses the same level of rigor in the courtroom "that characterizes the practice of an expert in the relevant field."  *See Kuhmo Tire*, 526 U.S. at 152 (emphasis added).  In applying Rule 702, the Court "must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case."  *See Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

To be reliable, the expert's opinion must be based on sound reasoning and/or methodology.  *See Daubert*, 509 U.S. at 593; *St. Martin v. Mobil Expl. & Prod.*, 224 F.3d 402, 406-07 (5th Cir. 2002) (expert was entitled to rely upon his own experience); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245-50 (5th Cir. 2002) (expert was entitled to rely on his general knowledge).  The United States Supreme Court's decision in *Daubert* sets forth a series of non-exclusive considerations intended to guide a district court's inquiry into the reliability of an expert's opinion.  *See id.* at 592-94; *see also Kuhmo Tire Co.*, 526 U.S. at 149-50 (acknowledging the *Daubert* factors are guidelines rather than requirements).  The reliability inquiry must remain flexible since "not every *Daubert* factor will be applicable in every situation."  *See Guy*, 394 F.3d at 325.  Indeed, "a court's evaluation of the

reliability of expert testimony is flexible because "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kuhmo Tire Co.*, 526 U.S. at 150.  As such, "a court has discretion to consider other factors it deems relevant to assessing reliability." *See id.*  In many instances, courts conducting a reliability inquiry find it appropriate to determine whether there are any analytical gaps in the expert's opinion by examining whether the opinion "fits the facts of the case." *See, e.g., Hamel*, 444 S.W.3d at 806 (citing *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 235 (Tex. 2010)); *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Regardless, the focus of the inquiry "must be solely on principles and methodology, not on the conclusions that they generate." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997); *see also Moore v. Ashland Chem.*, 151 F.3d 269, 276 (5th Cir. 1998) (proponent of expert testimony need not prove that the analysis is correct, only that it is reliable).

In exercising its discretion, a court must give "proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).  Accordingly, the district court's role is limited to determining the threshold question of admissibility of the opinion, without regard to the credibility of the evidence. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).  To that end, "as a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996).  The aim of the *Daubert* inquiry as to reliability, therefore,

is centered on excluding expert testimony that is based merely on subjective belief or unsupported speculation.  *See Daubert*, 509 U.S. at 592-93.

**ARGUMENTS & AUTHORITIES**

Defendants attack the reliability of Ms. Miller's Vinales report and opinions based on their contention that Miller's opinions contradict particular scientific "standards" and contain certain "errors and falsehoods."  *See* Motion at 3-6 and 7-10, respectively.  But, as shown below, Defendants' arguments are unavailing.  In fact, Ms. Miller's Vinales report and opinions satisfy Rule 702 and *Daubert* scrutiny, and are therefore sufficiently reliable.

I.  **Defendants Mistakenly Construe the Many Different Guidelines Miller Considered as Rigid "Requirements" and "Standards."**

As Ms. Miller discusses in her Declaration, Defendants confuse "references" and guidelines" with rigid "requirements" or "standards."  *See* **Exhibit A**, Declaration of Kristy Beck-Miller.  While it is true that the mold assessment industry is characterized by many studies, white-papers, references and guidelines, there are only two industry standards:  ANSI/IIRC S500 and ANSI/IIRC S530, as promulgated by the American National Standards Institute ("ANSI").  *See, e.g., Taylor v. TECO Barge Line, Inc.*, 642 F. Supp. 2d 689, 691 (W.D. Ky. 2009) (recognizing that the principles the NIOSH "is authorized to develop and establish" are merely "recommended" rather than required); *see also* 29 U.S.C. § 671(c) (explicitly stating that the NIOSH "is authorized to develop and establish [only] *recommended* occupational safety and health standards").  The reason ANSI/IIRC S500 and ANSI/IIRC S530 stand out as influential and prominent standards for how discrete issues should be handled is because there is an industry-wide consensus regarding their prudence and legitimacy.  Other provisions which Defendants refer to as so-called "standards" are mere guidelines and references for experts such as Ms. Miller

– 4 –

to consider, in their professional judgment based on their knowledge, training and experience, when performing mold assessments and forming opinions as to the same.

Defendants' Motion misunderstands how the indoor air quality industry works and how professionals in the industry such as Ms. Miller operate. As Ms. Miller states, "[e]very case is different, every home or building is different, the fungi present are different, and the weather and fungal load outdoors are different as well." *See* **Exhibit A** at 1. Given these variabilities inherent in every site inspection, there is not an accepted standard or "by the book" process for evaluating permissible exposure limits for mold. *See id.* Rather, each mold assessment expert, in their professional judgment, must "identify the various factors that contribute to mold" in a particular environment, "including conditions related to the proliferation of mold," and then assess whether [the particular] house or building contains mold that will require remediation." *See id.* As such, "[t]he mold and indoor air quality industry, like other professions, is not as simple as checking off a list of 'standards' and spending thousands of dollars on unnecessary testing." *Id.* Rather, the assessment of an environment for mold and indoor air quality "requires inspection, testing, and assessment of the situation based on knowledge, training, experience, and the consideration of many different guidelines." *See id.*

## II.   Miller's Methodologies Properly Fell Within Her Knowledge, Training and Experience as a Mold Assessment Consultant.

Defendants want the Court to be distracted by focusing on an array of so-called "standards" which are in reality mere guidelines for mold assessment professionals to apply when, *in their professional judgment*, they deem helpful in particular scenarios. But the bottom line with respect to Ms. Miller's opinions regarding the Vinales' housing unit is much simpler—the Vinales housing unit that Defendants managed had seen recurring

mold growth for years, as Ms. Miller documented in her report on the Vinales' unit. Just a few pictures from her Vinales report tell the story of mold growth found in several areas of the house including the sunroom, downstairs back bedroom, and master bedroom:

    

*(Sun Room Photo)*          *(Master Bedroom Photo)*

*See* **Exhibit A-1**, Vinales Report at 2, 41, 47 (Dkt. 245-7) (photos contained therein).

Indeed, it is plainly obvious that visible mold growth exists. Just as Justice Potter Stewart famously opined in describing obscene material--"I shall not today attempt further to define the kinds of material" at issue, *"[b]ut I know it when I see it"*—so too is the case with the mold growing in these homes. *See Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964). Despite Defendants' protestations, they have presented nothing in their Motion that undermines the reliability of Ms. Miller's opinions and testimony that, in fact, our eyes are not deceiving us—there was mold in the Vinales' home and Ms. Miller's inspection and testing confirms that fact. At bottom, the Vinales Plaintiffs had to deal with a veritable epidemic of mold growth in the intimate spaces they called "home" and Ms. Miller's testimony in that regard is as reliable as the existence of mold is obvious.

– 6 –

Yet, instead of addressing the problem, Defendants and their experts have used one band-aid after another to repeatedly conceal the deplorable conditions rather than remedy them.  And that effort now continues with Defendants' attempt to silence Ms. Miller.  But, in truth, the failure to identify industry standards does not disqualify an expert witness or render her testimony and opinion inadmissible. *See Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*, No. SA-16-CA-00485-FB-ESC, 2017 WL 1133506, at *4 (W.D. Tex. Mar. 24, 2017) (Plaintiff argued defense expert's opinions were not reliable "because he fails to identify the industry standards").  Rather, if the expert has sufficient experience (as Ms. Miller clearly does) in a particular field and is otherwise qualified (as Ms. Miller clearly is), courts generally do not grant motions to exclude the testimony.  *See id.*; *see also Magallan v. Zurich Am. Ins. Co.*, No. 16-CV-0668-CVE-FHM, 2017 WL 4012964 at *10 (N.D. Okla. Sept. 12, 2017)(allowing expert testimony despite expert's failure to identify specific source of her industry standards where she had extensive experience in the insurance industry relevant to offering an opinion as to proper claims handling procedures).

Defendants cite to *Jenkins v. Slidella LLC*, No. 05-370, 2008 WL 2649510, at *2-3 (E.D. La. Jun. 27, 2008), for the specious proposition that a failure to follow industry standards is somehow a universal death knell for expert testimony, but the so-called "mold expert" in *Jenkins* was anything but an expert.  "The only actual education experience he received regarding mold sampling and testing amounted from a two-day class." *Id.* at *3.  His "highest degree of formal education was in the counseling field." *Id.*  And the problem in *Jenkins* was not that the expert did not follow particular industry guidelines, but that he testified inexplicably that "the *only* standard he should follow when doing air mold testing is to 'test the air outside and compare it to the air inside.'" *See id.* (emphasis

added).  Last but not least, the "expert" in *Jenkins*—despite being certified as only a counselor and having only two days of mold sampling training—even went so far as to testify as to "general causation opinions about the effects of Aspergillum/penicillium on humans."  *See id.* at *3.  In stark contrast, Ms. Miller is "distinctly more qualified" than the witness who offered the excluded opinions in *Jenkins*.  *See Whitehouse Hotel Ltd. Partnership v. Comm'r of Internal Revenue.*, 615 F.3d 321, 331 (5th Cir. 2010) (albeit referencing witness exclusions in two other cases, including *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 226 (5th Cir. 2007) (involving a vastly under qualified expert whose testimony was therefore excluded by the district court).

### III.   Miller's Methodologies are Reliable and Satisfy *Daubert*.

#### a. Defendants' Arguments As to Supposed Contradictions Between Miller's Vinales Report and Opinions and the Scientific Standards She Professes to Uphold Are Unavailing.

Defendants claim Miller's Vinales Report and opinions are contrary in a number of ways to the scientific standards she professes to uphold.  *See* Motion at 3-7.  But Miller addresses each such criticism in her declaration dated July 8, 2022 (attached hereto and incorporated herein as **Exhibit A**).

NIOSH 800. First, Defendants claim Miller failed to follow NIOSH 800, but Miller points out that "NIOSH 800 is an analytical method" rather than a "standard" that is "recommended" but "not necessary" due to being cost prohibitive while not adding any additional scientific assurance.  *See* **Exhibit A**, Declaration, Chart Item 1.  In fact, NIOSH 800 "requires three tests per location for mold, mesophilic bacteria and thermophilic actinomycetes per area," which would equate to "9 tests per area."  *See id.*  Indeed, with respect to the NIOSH guidelines, Miller avers that "[t]here are several in our industry

documents to draw from and all are considered when choosing the best route of assessing a property for mold." *See id.* at Chart Items 2-3, 5, 12-16, 19, 21-23.  As Miller puts it, it is not possible "to adhere to ALL" such guidelines because "often they disagree with each other." *See id.*  And, as Miller explains in response to several of Defendants' criticisms, it is not only that NIOSH testing is not required, but it is also that it would have been cost prohibitive for the Plaintiffs, including the Vinales Plaintiffs (who are tenants, not owners). *See id.* at Chart Item 4, 9.

On several occasions, Defendants criticize Miller for not designating a "non-complaint area," but Miller aptly points out that not all homes had a non-complaint area. *See* **Exhibit A**, Declaration, Chart Items 6-8.  Similarly, Defendants argue NIOSH 800 "requires sampling for fungi, bacteria and actinomycetes"—but Miller points out that she rightfully relied upon her professional judgment, knowledge, training and experience when creating a sampling plan and making determinations for the remediation of the buildings. *See id.* at Chart Items 10-11.

AIHA. With respect to AIHA guidelines—which Defendants falsely insist Miller was *required* to follow—Miller points out that AIHA's documents constitute a "field guide" rather than required standards, and that culturable samples are only needed to show viability of mold, which is not required for fungal growth to be problematic, because "it has been proven that fungal growth, viable or not, can be a hazard."  *See* **Exhibit A**, Declaration, Chart Items 24-26, 28.  Contrary to Defendants' contentions, TDLR Rules and Regulations do not require calibration documentation.  *See id.* at  27.

ASTM D7338-10. Where Defendants criticize Miller for not collecting background information, reviewing operations or maintenance histories for the homes she inspected

in accordance with ASTM D7338-10, she responds simply (and accurately) that the servicemember Plaintiffs, including the Vinales Plaintiffs, did not have access to such records.  *See id.* at Chart Items 17-18, 20.

ANSI/IICRC provisions.  Defendants attempt to attack Miller with respect to specified ANSI/IICRC provisions, but Miller repeatedly points out (once again) that she relies, as is appropriate, on her professional judgment and experience when creating a sampling plan, reviewing data, and making determinations for remediation—and that her determination of results is based on such knowledge, training and experience as a licensed mold assessment consultant.  *See* **Exhibit A,** Declaration, Chart Items 37-43. Defendants further question Miller's methodology as it concerns contents remediation under the ANSI/IICRC provisions.  But, as Miller points out repeatedly, "remediation of personal items on an individual level is considered alongside mold remediation contractor and written into the mold remediation work plan by the contractor (due to the fact that the ANSI ICCRC Standard S530 is written for the contractor rather than the assessor").  *See* **Exhibit A**, Declaration, Chart Items 30-36.

While Defendants decry that Miller allegedly failed to take outside air control samples in her testing of the Vinales' home, Miller reveals that "EmLab's mold range can be used when the weather is inclement [such as rain] for the outside sample."  *See id.* at 44-46.  As she points out, "MoldRANGE™ is a compilation of data from thousands of outside air samples" which "enables you to get statistical information about, and easily communicate to your clients, the types and amounts of fungal spores that are typically present in the outside air both by time of year and region of the country."  *See id.*

> **b.  Defendants Hypocritically Complain About Alleged Deficiencies Which Apply As Much to Their Experts as to Miller.**

As fervently as Defendants complain about particular aspects of Ms. Miller's methodology, many of Defendants' criticisms apply to their own experts as well— namely, Joseph Lstiburek, George Coto and Tom Sumner.  For starters, Joseph Lstiburek (who inspected only the Alexander, Pisano, Hiatt, and Daniels homes) admits the conditions in the homes had changed by the time he did his inspections and cites no industry standards or guidelines.  Moreover, as an aside, Lstiburek lists actions that need to be done to remedy problems in the homes (and which he says have been implemented by Hunt), such as the removing damaged plaster, decontaminating moldy surfaces, addressing site drainage, installing supplemental dehumidifiers, sealing ductwork to reduce air pressure imbalances and reducing crawl space moisture levels by providing sealed ground covers.  *See* **Exhibit B**, Lstiburek Report, attached hereto and incorporated herein for all purposes.

Similarly, George Coto authored reports on only three of the Plaintiffs' homes (Pisano, Hiatt and Wolf).  Coto cites to an EPA document (with "Guidelines" in the title as opposed to "Standards" or "Requirements") and notes that "criteria for determining the scale of mold growth and *recommended* response actions" are "adopted" from this document.  *See* **Exhibit C**, Coto Report, attached hereto and incorporated herein for all purposes (emphasis added).  Coto also references "industry standard *guidelines*" recommend humidity below 65%, citing ASHRAE and EPA guidelines.  In his reports, Coto makes statements such as:

> Currently, there are *no specific state or federal standards* for concentrations of mold spores. J.S. Held utilizes *guidance* from articles published in a journal of the AIHA, The Synergist, which was updated in 2003, that identifies normal background levels for surface mold. Concentrations of mold spores above these

*recommended guidelines* for normal background may be considered elevated and could indicate mold impact.

*See id.* (emphasis added).

Tom Sumner, meanwhile, performed **no** inspections of any of the Plaintiffs' homes.  *See* **<u>Exhibit D</u>**, Sumner Report, attached hereto and incorporated herein for all purposes.  Rather, Sumner reviewed documents only.  *See id.*  Sumner cites numerous documents and journals as being relied upon, only one of which is titled as a "standard" (The ASHRAE Standard "Ventilation for Acceptable Indoor Air Quality 62.1").  *See id.* Sumner makes statements in his reports such as:

> The AIHA guideline confirms that there are no standards for "acceptable" concentrations of mold in buildings, and the lack of definitive correlation between exposure concentrations and health effects makes interpreting the data difficult if not impossible.

*See id.*  In the end, Sumner concludes Hunt acted appropriately and offers various criticisms of Plaintiffs' experts and the independent labs who did various tests in the Plaintiffs' homes—again, without having set foot in any of them.  *See id.*

### c. Defendants' Claims About Supposed "Errors and Falsehoods" In Miller's Vinales Report Are Misguided.

Defendants also attack Miller by pointing to alleged "errors and falsehoods" in her Vinales Report.  *See* Motion at 7-10.  But, here again, Miller addresses each one in her declaration dated July 8, 2022.  *See* **<u>Exhibit A</u>**.  Specifically, Ms. Miller makes it clear that any alleged "mistakes" were due largely to copy-and-pasting issues but do nothing to change her conclusion (nor the validity thereof) that mold was present in the Vinales home and that the home required mediation by a TDLR-licensed mold remediation contractor.  *See* **<u>Exhibit A</u>**, Declaration, Chart Items 51-93, 95-140.

While Defendants allege Ms. Miller "reached conclusions on humidity but didn't document what her humidity readings were" (*See* Motion at 7) Miller responds that based on her knowledge, training, and experience as a licensed mold assessment consultant, it is known that many fungi can and will grow in the 50% range under such conditions, and that all standards, guidelines and relevant documents show contradictory levels of acceptable humidity.  *See* **Exhibit A**, Declaration, Chart Item 66. Miller further points out that EPA has no standards for mold but that the EPA recommendation is "ideally between 30%-50%."  *See* **Exhibit A**, Declaration, Chart Items 47, 66 (for item 66, adopting comments made in Item 47).  Moreover, Miller points out that ASHRAE guidelines state:

> Ensuring that indoor surfaces of both occupied and unoccupied spaces are not cooled to temperatures so low as to create an average surface RH of over 80% that lasts for more than 30 days or surfaces cold enough to allow visible condensation (ASHRAE 2009a). Note that the relative humidity of air measured in the occupied space or return air does not indicate the RH in the thin boundary layer of air in contact with cool surfaces. Monitoring and controlling indoor dew point compared to indoor surface temperatures is the more useful metric for humidity control decisions. For example, in buildings that are being mechanically cooled during hot or humid weather, keeping the indoor air dew point below 55°F (12.8°C) nearly always ensures that surface RH will stay below 80% even on cool surfaces. In contrast, if the indoor air RH is 55% at 78°F (25.6°C), any surface cooled below 66°F (18.9°C) will have an RH above 80% (Harriman and Lstiburek 2009).

*See id.*  Miller adds, "ASHRAE recommends that requirements be specific to the local climate, the type of building, and the magnitude of the building's internal humidity loads."  *See id.*

With respect to Defendants' claim that Miller "failed to include her diagram of the Vinales home and noted areas of moisture problems rendered her report an incomplete protocol," Miller makes it clear that "TDLR does NOT require a floorplan for the mold assessment protocol."  *See* **Exhibit A**, Declaration, Chart Items 67 and 72.

d.       **Defendants' Cited Caselaw is Inapposite at Best.**

The case law Defendants cite is unconvincing.  For example, while Defendants cite *Koenig v. Beekmans*, No. 5:15-CV-0822-OLG, 2017 WL 7732878, at *2 (W.D. Tex. Mar. 30, 2017), for the rather pedestrian proposition that reliable testimony must be without analytical gaps, they fail to show impermissible analytical gaps exist in with respect to Miller's testimony and the underlying data forming the basis of her expert opinion.

Additionally, Defendants point to *Matosky v. Manning* for support, but the expert in *Matosky* was excluded because his opinions ran demonstrably counter to the facts he claimed to be relying upon.  *See* 428 Fed. App'x 293, 298 (5th Cir. 2011).  Indeed, almost *literally*, the expert in *Matosky* testified "X" when seemingly the rest of the world testified "Y."  *See, e.g., id.* (expert testified "the 1.5-inch needle . . . penetrated through [plaintiff's] breast" but "the ultrasound technician who monitored the needle . . . testified that the 1.5-inch biopsy needle never went past the lesion in [plaintiff's] breast").

Lastly, while Defendants cite to *Nucor v. Requenez* for the proposition that experts should not rely on "cherry-picked data," it turns out that specific quote from *Nucor* is cherry-picked.  In reality, *Nucor* did not exclude the expert testimony at issue and its "cherry-picking" admonition was sandwiched between numerous other admonitions suggesting, as is true, that exclusion of expert testimony is the exception, not the rule:

> [T]here is no definite formula for determining whether expert testimony is reliable or unreliable "and the court must judge admissibility based on the particular facts of the case."  "Certain more specific factors, such as testing, peer review, error rates, and 'acceptability' in the relevant scientific community . . . might prove helpful in determining the reliability of a particular scientific 'theory or technique.'"  Reliance on studies that do not support a contention, <u>cherry-picked data</u>, or a dubious methodology may be grounds to reject expert testimony. The test is, at bottom, "a flexible one," so "[t]rial judges retain 'broad latitude' both in deciding how to determine whether an expert's testimony is reliable, and ultimately, whether the testimony is, in fact, reliable."

*See Nucor Corp. v. Requenez*, No. 7:20-CV-00345, 2022 WL 36095, at *5 (S.D. Tex. Jan. 4, 2022) (internal citations omitted) (emphasis added); *see also* FED. R. EVID. 702, Adv. Comm. Notes 2000 ("the rejection of expert testimony is the exception rather than the rule"); *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) (the *Daubert* framework was "not intended to serve as a replacement for the adversary system.").

### e. Recent Case Law From the Western District of Texas Supports Denial of Defendants' Motion.

The sufficiency of Miller's Vinales report and opinions in this matter is demonstrated by the recent opinion in *Kahlig Auto Group v. Affiliated FM Ins. Co.*, No. SA-19-CV-01315-DAE, 2021 WL 148056 (W.D. Tex. Jan. 15, 2021). *Kahlig*, a first-party insurance dispute between Kahlig Auto Group and its insurer, involved extensive hail damage at Kahlig's car dealerships. *See id.* at *1. Kahlig's engineering expert, Mr. Phelps, opined that the hail damage required complete replacement of the dealerships' asphalt/gravel roofs. *See id.* at *2. The defendant insurer's adjuster and engineering expert, on the other hand, concluded there was no damage whatsoever to the roofs. *See id.* In its motion to exclude, the insurer argued in pertinent part that Phelps's report was unreliable because of the type of testing he performed—namely, a "water column" test and an "asphalt release" analysis in connection with "delamination testing." *See id.* at *3. The insurer argued the proper method of testing was that which its expert performed, "delamination testing" but without the accompanying "asphalt release" analysis. *See id.* at *4 (explaining the insurer's argument that the asserted method was ***"the standard"*** within the relevant scientific community for determining roof damage). Unconvinced, the court denied the defendant's motion to exclude, and succinctly explained its decision this way: "That Defendant's expert reached different conclusions based on delamination

testing does not make Phelps's testimony unreliable." *See id.* at \*4, 5.  In essence, *Kahlig* recognized that an expert, by virtue of their professional knowledge, training and experience, is not necessarily bound—as Defendants would have this Court believe—by "standards" recommended by others (or, relatedly, so-called "standards" promulgated by every industry organization).  Indeed, this fact generally stems from being recognized and qualified as an expert who is qualified to use his or her professional  judgment in determining appropriate methodology and formulating opinions.  *See generally* Motion (not challenging Miller's qualifications).

### IV.   Any Alleged Deficiencies as to Miller's Methodology Go to Weight Rather than Admissibility.

Defendants seek to convince this Court that, based on the alleged deficiencies they outline in their Motion (which Plaintiffs dispute), the only viable alternative is exclusion. But Defendants' misunderstand the law.  For example, in *Whitehouse Hotel Ltd. Partnership v. Comm'r of Internal Revenue*, the claimant argued the district court erred in admitting expert appraisal testimony by pointing to a number of "instances where [the IRS's expert] report allegedly fail[ed] to comply with USPAP standards."[1]  *See* 615 F.3d 321, 332 (5th Cir. 2010).  But the Fifth Circuit did not take the bait.  Instead, *Whitehouse* held an expert's nonconformance with USPAP standards did not preclude a finding of reliability.  *See id.* Rather, as the court held, the lower court "acted within its ample discretion in considering USPAP compliance as relevant to the weight [the expert's] report should be given, instead of whether it should be admitted."  *Id.*

Likewise, in *United States v. Fama*, the defendant argued for exclusion of expert

---

[1] USPAP stands for Uniform Standards of Professional Appraisal Practice.

testimony because it was "refuted by scientific principles and the prevailing technological industry standards." *See* No. 12-CR-186 (WFK), 2012 WL 6102700, at *3 (E.D.N.Y. Dec. 10, 2012). But the federal district court held the claimants' various concerns "go to the weight of [the] testimony, not the reliability." *See id.* at *4 (citing *United States v. Allums*, No. 2:08-CR-30 TS, 2009 WL 806748, at *2 (D. Utah Mar. 24, 2009)); *see also U.S. ex rel. Barron v. Deloitte & Touche, LLP*, No. SA-99-CA-1093-FB, 2008 WL 7136868, at *3 (W.D. Tex. Sept. 26, 2008) (criticisms of an expert's methodologies go to weight, not admissibility) (citing *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)); *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 802 (N.D. Tex. 2013) (holding methodological criticisms relating to the sufficiency of testing go to weight, not admissibility); *Person v. Ford Motor Co.*, No. 3:09CV133-MPM-DAS, 2011 WL 10501606, at *4-5 (N.D. Miss. 2011) (same); *Retractable Technologies, Inc. v. Becton, Dickinson & Co.*, No. 2:07-CV-250 (DF), 2009 WL 10741545, at *2 (E.D. Tex. Oct. 7, 2009) (same). As *Daubert* made clear, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof" are the appropriate means for Defendants to attack Plaintiffs' evidence. *See Daubert*, 509 U.S. at 596. This is because "reliability does not require certainty." *See* Harvey Brown & Melissa Davis, *Eight Gates for Expert Witnesses: Fifteen Years Later*, 52 Hous. L. Rev. 1, 42 (2014) (citing *Daubert*, 509 U.S. at 590 ("arguably, there are no certainties in science.")). Defendants' criticisms of Miller go, at most, only to the weight, not the admissibility, of Miller's opinions and report on the Vinales Plaintiffs. *See U.S. ex rel. Barron v. Deloitte & Touche, LLP*, No. SA-99-CA-1093-FB, 2008 WL 7136868, at *3 (W.D. Tex. Sept. 26, 2008) (citing *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

## CONCLUSION

– 17 –

At bottom, this Court's "gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *See Hanak v. DynCorp, Inc.*, No. SA-09-CA-752-FB, 2013 WL 12385017, at *2 (W.D. Tex. June 18, 2013) (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Thus, "the rejection of expert testimony is the exception rather than the rule" (*see* FED. R. EVID. 702, Adv. Comm. Notes 2000)) and the *Daubert* framework was "not intended to serve as a replacement for the adversary system." *See United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996).

As such, Plaintiffs pray that the Court deny Defendants' Motion in all things and grant Plaintiffs all relief to which they may be justly entitled.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By:     /s/ Ryan C. Reed
        Randall A. Pullman
        Texas State Bar No. 16393250
        rpulman@pulmanlaw.com
        Ryan C. Reed
        Texas State Bar No. 24065957
        rreed@pulmanlaw.com


**WATTS GUERRA LLP**
Mikal C. Watts
Texas State Bar No. 20981820
mcwatts@wattsguerra.com
Francisco Guerra, IV
fguerra@wattsguerra.com
Texas State Bar No. 00796684
Robert Brzezinski
Texas State Bar No. 00783746
rbrzezinski@wattsguerra.com
Jennifer Neal

Texas State Bar No. 24089834
jneal@wattsguerra.com
4 Dominion Dr.
Bldg. 3, Suite 100
San Antonio, TX 78257
(210) 447-0500 Telephone
(210) 447-0501 Facsimile

**MORIARTY SKIVER PLLC**
James. R. Moriarty
Texas State Bar No. 14459000
jim@moriarty.com
4119 Montrose, Suite 250
Houston, Texas 77006
(713) 528-0700 Telephone
(713) 528-1390 Facsimile

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on this the 24th day of May 2023, a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(b). Therefore, this document was served on all counsel who are deemed to have consented to electronic service.

*/s/ Ryan C. Reed*
Ryan C. Reed