**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **MICHAEL J. DANIELS and BARBARA HIGH-DANIELS, et al.** | § § § | |
| **PLAINTIFFS** | § § | |
| **v.** | § § | **NO. 5:19-cv-01280-RBF** |
| **AETC II PRIVATIZED HOUSING, LLC; et al.** | § § § | |
| **DEFENDANTS** | § | |

---

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST VINALES PLAINTIFFS

---

AETC II Privatized Housing, LLC ("AETC Housing") and AETC II Property Managers, LLC ("AETC Managers") (collectively, "Defendants") move for judgment as a matter of law, under Fed. R. Civ. P. 50(a) on the Vinales Plaintiffs' breach of contract claim or, alternatively, the damages alleged to have resulted therefrom.

### RELEVANT FACTS

Shane Vinales ("Lt. Col. Vinales" or "Vinales") signed a lease agreement with AETC Housing that began on October 6, 2017 (the "Lease"). Becky Vinales and the minor Vinales children were not signatories to the Lease. The Lease required Vinales to "immediately notify Landlord of any damage to the Premises" and, in turn, required AETC Housing to "make a diligent effort to repair or remedy the condition . . . ." Ex. P-2 Lease, ¶ 19. The Lease further required Vinales to take specific measures to "prevent mold and mildew from accumulating in the Premises" and to report specific conditions that may lead to mold growth. Ex. P-2_ Exhibit 4 to Lease, Mold/Mildew Addendum. The Lease also required Lt. Col. Vinales to allow AETC Housing

1

and its representatives to "enter the Premises at reasonable times, in order to inspect it [and] make necessary or agreed repairs…." Ex. P-2 Lease, ¶ 19.

Plaintiffs claimed knowledge of mold in their master bedroom starting in November 2018, but did not report that claim until February of 2019. Ex. P-32 & D-42 Work Order History; *see also* D-166 (setting forth timeline of events in report to General Lenderman). Lt. Col. Vinales testified that what they believed were mold spores in the maid's quarters and the master bedroom were **"eventually"** reported but he is not sure when. (June 6, 2023 Transcript, Page 66, ln. 16.) Lt. Col. Vinales acknowledged that a few orders were put in for HVAC duct cleaning, however, his wife refused the attempts to clean the air ducts and he further acknowledged he was training at Fort Hood for at least a month in this time frame and Vinales refused to allow repair of the master bedroom to take place until his return. (June 6, 2023 Transcript, Page 166, ln. 6-20). Becky Vinales confirmed that she did not respond to calls to schedule the duct cleaning in the home because she was unwilling to leave her home for the four to five hours that duct cleaning would take; Becky also confirmed that she intentionally delayed the work in the master bedroom until her husband returned from Fort Hood in April. Before access was granted to complete the work order plan, the Vinaleses learned that they would be moving back to Hawaii. At that point, and at the request of the Vinaleses, all efforts turned to the requests for cleaning of their personal property.

Chris Radliff testified as to the timeline of events and efforts by Defendants to address the Plaintiffs concerns as set forth in Exhibit D-166. Prior to Plaintiffs allowing access to the home for duct cleaning and repair, these issues became moot as the family was PCS (moving back to Hawaii) and the Plaintiffs *requested* that the repair work to the home be performed after they moved in June of 2019. Radliff further testified as to the cost either being absorbed by AETC Housing and or paid directly to Lt. Col. Vinales for the time they chose to live in their recreational

vehicle. These payments included a gift card, a per diem, KOA rental fees, rent reimbursement, utility bills, and testing and cleaning of personal property totaling more than $35,000.00. Ex. D-97, D-117, D-169, D-179, D-180 and D-64.

## STANDARD OF REVIEW

The Court may grant Judgment as a Matter of Law ("JMOL") against a prevailing party if a reasonable jury would not have a legally sufficient evidentiary basis to find for the non-moving party on that issue. Fed. R. Civ. P. 50(a)(1). The standard for granting summary judgment "mirrors the standard" for granting JMOL, such that "the inquiry under each is the same." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250-51 (1986)). JMOL is proper where a plaintiff fails to provide sufficient evidence on any element of a claim. *Chimney-Hammond v. Maxum Marine, Inc.*, 38 F.3d 569, 1994 WL 574705, at *2 (5th Cir. 1994) (affirming JMOL where elements of damages not shown).

Because this case has been held to arise on a federal enclave ceded in October 1952, Texas case law predating the cession controls this state-law cause of action. [349, 7-8]. Under pre-cession Texas law, "[t]he burden is upon the plaintiff to establish by proof the existence of the contract sued on, that he has complied with its provisions, or was ready and able to perform it, within the time prescribed, the happening of a condition upon which liability is based, a breach of the contract, and the amount due him under it." *Sutton County v. Sec. Tr. Co.*, 61 S.W.2d 862, 863 (Tex. App.—Amarillo 1933, writ ref'd) (quoting 10 Tex. Jur. § 305a, p. 526).

## ARGUMENT

Defendants are entitled to JMOL with respect to the claims of Becky Vinales and the Vinales children because there is no contract between any Defendant and those parties. Defendants are further entitled to JMOL on Lt. Col. Vinales's claims because (1) Vinales has not proven

performance under the Lease[1], (2) Vinales has not proven AETC Housing breached the Lease's applicable duty to repair, and (3) Vinales has not proven any actual damages resulting from AETC Housing's alleged breach of the Lease.

**I.      There is No Contract Between the Non-Servicemember Plaintiffs and AETC Housing or Any Other Defendant.**

Under pre-cession Texas law, "[t]he burden is upon the plaintiff to establish by proof the existence of the contract sued on . . . ." *Sutton County*, 61 S.W.2d at 863 (quoting 10 Tex. Jur. § 305a, p. 526). The express terms of the Lease define the "Resident" as Shane C. Vinales only and only Lt. Col. Vinales signed the Lease. Ex. P-2 Lease at 1, 10. In the Complaint and throughout trial, Plaintiffs have asserted that Becky Vinales and the children are also parties to the Lease, but have not provided any legal or factual support for the claim. Instead, Plaintiffs implore the Court to disregard the plain language of the contract and improperly read in additional parties. *Citizens Nat'l Bank in Abilene v. Tex. & P. Ry. Co.*, 150 S.W.2d 1003, 1006 (Tex. 1941) ("A contract must be construed in accordance with its language. Its terms, when free from ambiguity and not in conflict with law, establish the rights of the parties."); *Great Atl. & Pac. Tea Co. v. Walker*, 104 S.W.2d 627, 634 (Tex. App.—Eastland 1937) (noting that contract privity usually does not extend to spouses or children), *rev'd on other grounds*, 112 S.W.2d 170 (Tex. 1938).

---

[1] The Lease and the incorporated Mold Addendum required Vinales to provide access for repairs. Ex. P-2 Lease ¶ 21. The proof at trial demonstrated that when duct cleaning was requested in both December 2018 and January 2019, the Vinaleses refused AETC Housing access to make those repairs. Lt. Col. Vinales acknowledged that a few orders were put in for HVAC duct cleaning, however, his wife refused the attempts to clean the air ducts as she wanted them tested prior to doing anything and he further acknowledged he was training at Fort Hood for at least a month in this time frame and Vinales did not want the cleaning to take place until his return. (June 6, 2023 Transcript, Page 166, ln. 6-20.) Mrs. Vinales repeatedly testified that she did not want to leave the house for the four to five hours the duct cleaning would take.

Since the Lease does not define the family members as Residents and none of the family members executed the Lease, Plaintiffs must prove another theory which shows "the existence of the contract sued on . . . ." *Sutton County*, 61 S.W.2d at 863. Plaintiffs have argued that the family members are granted this right because they are third-party beneficiaries. However, "a contract will not be construed as having been made for the benefit of a third person unless it clearly appears that such was the intention of the contracting parties." *Citizens Nat'l Bank*, 150 S.W.2d at 1005-06. The four corners of the Lease do not "clearly" demonstrate that the parties intended the family members to be beneficiaries, as the Lease granted rights to the "Resident" (and not the family members) through the agreement. Plaintiffs point to Paragraph 8, which lists the family members' names. As noted by the Court, "the stated reason for requiring family members' names is 'that the Premises shall be occupied by Resident's immediate family.'" [368 at 12]. The following Paragraph clarifies that the family members are listed in order to limit use of the premises to persons listed as the Resident's family. Ex. P-2 Lease, ¶ 9; [368 at 12]. During their case-in-chief, Plaintiffs cross examined both Mike Knight and Chris Radliff with respect to the Lease and adduced no evidence demonstrating any intent to bestow third party beneficiary status on the family members outside the text of the Lease. In fact, the only reference Plaintiffs made to this issue was having Lt. Col. Vinales read Paragraph 8 of the Lease listing the family names.

Plaintiffs had the opportunity to question two witnesses for the Defendants—Mike Knight and Chris Radliff—and neither provided testimony demonstrating any intent to bestow third party beneficiary status on the spouse or children of the tenant Lt. Col. Vinales. Even if they had been able to do so, such parol evidence cannot be used to "vary the terms of the written contract by oral testimony." *Super-Cold Southwest Co. v. Elkins*, 166 S.W.2d 97, 97 (Tex. 1942).

The Lease does contain a single provision that bestows rights upon the servicemember's family members under one circumstance. [368 at 13]. If the servicemember dies or is declared missing in action, the servicemember's family is granted the right to extend the Lease for up to twelve months. Ex. P-2 Lease ¶ 34. This provision makes Mrs. Vinales and the children contingent beneficiaries, but the condition precedent to their accrual of rights under that provision is, thankfully, not at issue here. Pre-cession Texas law did not allow a person "who was not a party to the contract in question and at most only a contingent beneficiary under it, [a] right to maintain a cause of action thereon…." *Ray v. Moxon*, 56 S.W.2d 469, 473 (Tex. App.—Amarillo 1933), *aff'd*, 81 S.W.2d 488 (Tex. Comm'n App. 1935). No rights under the Lease ever accrued to anyone other than Lt. Col. Vinales and, therefore, only Lt. Col. Vinales may sue under the Lease.

## II.     Lt. Col. Vinales Did Not Prove Compliance with His Obligations Under the Lease Agreement.

In order to maintain an action for breach of contract, the plaintiff must prove "that he has complied with its provisions, or was ready and able to perform it, within the time prescribed…." *Sutton County*, 61 S.W.2d at 863 (quoting 10 Tex. Jur. § 305a, p. 526); *Jessen v. Le Van*, 161 S.W.2d 585, 586 (Tex. App.—El Paso 1942, no writ) ("It is elementary, we think, that to recover for the breach of a written contract evidencing concurrent and mutual obligations, that plaintiff must aver compliance on his part. Further, that in order to recover thereon proof must be adduced of the plaintiff's compliance with his obligation under the contract.") (citing 10 Tex. Jur., § 290, p. 499). The Lease imposed several material obligations on Lt. Col. Vinales, including—but not limited to—providing notice of conditions and damages, and allowing access for repairs. At different times throughout Vinales's residency, each of these duties were violated, and those violations prevent Vinales from recovering damages for a breach of that contract as a matter of law. *Acme Pest Control Co. v. Youngman*, 216 S.W.2d 259, 263 (Tex. App.—Waco 1948, no writ)

("As a general rule, a party to an indivisible contract cannot enforce it or recover damages for its breach unless he shows that he has performed the obligations imposed upon him . . . .").

A.  Lt. Col. Vinales did not immediately report conditions.

The Lease and the incorporated Mold Addendum required Vinales to immediately report damage and other specified conditions. Ex. P-2 Lease ¶ 19; Ex. 4 Mold/Mildew Addendum to Lease.[2] The testimony and exhibits in this case demonstrated several instances where Vinales did not immediately report conditions and damages. For example,  Lt. Col. Vinales testified that what they believed were mold spores in the maid's quarters and the master bedroom were **"eventually"** reported but he is not sure when. (June 6, 2023 Transcript, Page 66, ln. 16). Further, according to the MHPI work order tracker spreadsheet, Plaintiffs reported on February 27, 2019 that there was "mold behind bed since Nov." Ex. P 32  and D-42 ("States the paint has been bubbling since Nov."). But, Plaintiffs did not report any suspected mold in their bedroom until February, 2019. Ex. P-32. While Becky Vinales testified at trial that she reported mold in late 2018 with respect to the reported roof leak, she was not able to provide a single piece of paper to corroborate this evidence. Under cross examination, she conceded that she did not believe there was mold in the ducts until January 2019, and still failed to report any kind of mold whatsoever until February 28, 2019.

---

[2] "Resident also agrees to immediately, upon actual knowledge of the condition, report to the Landlord's management office: (i) any evidence of a water leak or excessive moisture in the Premises, as well as in any storage room, garage or other common area; (ii) any evidence of mold-or-mildew-like growth that cannot be removed by simply applying a common household cleaner and wiping the area; (iii) any failure or malfunction in the heating, ventilation or air conditioning system in the Premises; and (iv) any inoperable doors or windows. Resident further agrees that Resident shall be responsible for damage to the Premises and Resident's property as well as personal injury to Resident and occupants resulting from Resident's failure to comply with the terms of this Addendum."

At trial, the evidence demonstrated that there were multiple instances where the Vinaleses knew of damage or conditions and failed to report them. In particular, Becky Vinales was shown a series of pictures that she took between the time of the December 2018 roof leak until the Town Hall meeting in February 2019. Despite documenting what she testified was "growing mold" at no time during this period did she or her husband report their concerns to AETC Housing. When both spoke at the Town Hall on February 27, 2019, work orders were entered the very next day February 28, 2019. Ex. P-32 and D-42. As set forth below, once those conditions were reported (albeit late), a series of delays by the Vinaleses unfolded.

B.    Lt. Col. Vinales and the Vinales family denied AETC Housing reasonable access for repairs.

The Lease further provided that AETC Housing was allowed reasonable access to the home for agreed or necessary repairs. Ex. P-2 Lease ¶ 21.[3] Although there were instances throughout the tenancy, during the last six months of Vinales's tenancy Plaintiffs regularly denied access, delayed repairs, and generally obstructed AETC Housing's efforts to repair the very conditions in the home of which Vinales now complains. Ex. D-166.

According to the work order history, Mrs. Vinales requested ductwork cleaning on December 4, 2018 but would not answer phone calls attempting to schedule the cleaning.[4] Despite alleging during trial that there was mold in the air ducts, the Vinaleses refused to leave the home for the cleaning, as required by AETC Housing policy. Ex. P-32 (maintenance note: "At this point

---

[3] "Landlord and Landlord's representatives may enter the Premises at reasonable times, in order to inspect it, make necessary or agreed repairs, decorations, alterations or improvements, supply necessary services or exhibit the unit to prospective new residents, workmen or contractors."

[4] Ex. P-34 (maintenance notes: "robert F; left massage [sic] on voicemail. try to schedule duct cleaning. 12/06/2018"; "danelle m; left message on voicemail, to schedule duct cleaning. 12/07/2018"; "Robert f; left massage [sic] on voicemail to schedule duct cleaning. 12/13/2018").

the resident is refusing to leave her home per the policy."). Lt. Col. Vinales testified that his wife wanted testing done before she would allow any cleaning.

On February 28, 2019, following the Town Hall, four work orders were submitted, including a report of mold in the master bedroom. Ex. P-32. On that same day, AETC Housing called to set up a time for repairs, as the Vinaleses had revoked AETC Housing's permission to enter, but were unable to reach anyone. Ex. P-32 (maintenance notes: "left message on 02/28/2019 @ 15:45"; "NO PTE [Permission to Enter]. Call prior"). When AETC Housing was finally able to reach Mrs. Vinales, she informed them that she would contact Danelle Mageath to schedule an appointment – but "resident never called." *Id.* (maintenance notes: "Housing reached out to Resident, MD was told resident was going to call Danielle warehouse supervisor, resident never called."). The Vinales home was inspected on March 8, 2019 by Nick Reed, an Army representative, Diane Buttler, and Audra Froom while Becky Vinales was present. That same day, contractor McKenzie was called to inspect the master bedroom wall. Thereafter, Mrs. Vinales conducted a separate walk through with Audra Froom and multiple work orders were entered. Ex. D-50. Each of these items were completed as shown by the work orders themselves and warm call emails which followed the completion of each work order. With respect to the master bedroom and the duct cleaning, Mrs. Vinales testified that the group involved in the March 8, 2023 inspection were developing a scope of work for her home. On March 27, 2019, AETC Housing again attempted to schedule repairs on the master bedroom and the air ducts to take place as early as the following day, however, Mrs. Vinales requested that the repairs be delayed until Lt. Col. Vinales returned home in mid-April. Ex. D-55.

Generally speaking, the proof at trial showed several instances of refusal or delay in providing access. Chris Radliff testified as to the timeline of these events set forth in his letter to

General Lenderman. Ex. D-166. Mike Knight testified as to the delays caused by the Vinaleses not allowing the HVAC work to be done until Mid-April and the cancellation of work orders after multiple attempts to schedule. For example, in response to Mrs. Vinales's request for duct cleaning in December 2018, the maintenance staff attempted on three occasions to schedule the work, and only then closed the work order. In January 2019, in response to a renewed request Mrs. Vinales again refused to schedule the actual cleaning and vacate her home for the requested work to be performed. Later, Mrs. Vinales would not provide access for duct cleaning without another condition – the completion of a mold test. In response to the roof leak, Mrs. Vinales refused access to AETC Housing and its contractors. Ultimately, Mrs. Vinales refused to vacate the premises while repairs of the roof leak were done because the Vinales family received their orders, and did not want the repairs done before they left.

In summary, the Vinales family delayed and denied access to the home to make requested and necessary repairs, in violation of the rights granted to AETC Housing under the Lease. These refusals prevent Lt. Col. Vinales from claiming that AETC Housing failed to repair the conditions about which he now complains. *Acme Pest Control*, 216 S.W.2d at 263 ("As a general rule, a party to an indivisible contract cannot enforce it or recover damages for its breach unless he shows that he has performed the obligations imposed upon him….").

### III.  Lt. Col. Vinales Did Not Prove That AETC Housing Breached a Duty to Make a Diligent Effort to Repair or Remedy a Condition of Which AETC Housing Was Given Notice.

As this Court has noted, "a landlord has no implied duty to repair, absent express agreement otherwise." [368 at 4] (citing *Yarbrough v. Booher*, 174 S.W.2d 47, 48 (Tex. 1943)). The relevant Lease provision required Lt. Col. Vinales to "immediately notify Landlord of any damage to the Premises" and then required AETC Housing to "make a diligent effort to repair or remedy the

condition . . . ." Ex.P-2 Lease, ¶ 19. JMOL is proper on Lt. Col. Vinales's breach of contract claims because he has not presented evidence of AETC Housing's failure to make a diligent effort to repair or remedy any specific condition of which it was given notice.

The plain language of ¶ 19 makes the immediate notice a condition precedent to AETC Housing's duty to repair. Under pre-cession Texas law, a "condition precedent to an obligation to perform immediately calls for the performance of some act or the happening of some event after a contract is entered into and upon the performance or happening of which its obligation to perform immediately is made to depend." *Cozby v. Edwards*, 203 S.W.2d 569, 575 (Tex. App.—Fort Worth 1947, writ ref'd n.r.e.). Here, no recovery can be had by Vinales where he failed to give proper notice of a condition requiring repair because no duty to repair arose.[5]

When the Vinaleses actually did provide notice, AETC Housing's only obligation was to "make a diligent effort" to repair or remedy. Diligence means the degree of care "which would be exercised by a person of **ordinary** prudence and foresight and possessed of **ordinary** skill and ability…under the same or similar conditions." *Jacob v. Stephenson*, 254 S.W. 1117, 1118 (Tex. App.—San Antonio 1923, writ dism'd w.o.j.) (emphasis added); *Correll v. E. L. White & Co.*, 81 S.W.2d 1095, 1096 (Tex. App.—Fort Worth 1935, writ dism'd) ("The trial court defined reasonable diligence as follows: 'Reasonable diligence, as that term is used in this charge, means that degree of diligence that an **ordinary** diligent person would use under the same or similar circumstances.'") (emphasis added). The effort to undertake repairs only needs to be diligent. Pre-

---

[5] In addition to the plain language of the contract, the duty to report status as a condition precedent to a duty to repair makes logical sense. Lt. Col. Vinales had possession of the home and AETC Housing was unaware of any conditions without either notice or unfettered access to the home. Defendants take great care to ensure that all tenants have a sense of privacy in their homes, but in return, Defendants must be able rely upon their tenants to report issues early so that they may be quickly resolved instead of compounding over time.

cession Texas case law equated diligence with ordinary effort and skill. As a matter of law, the repairs did not have to be perfect, and the repairs did not have to fix the issue permanently. Here, the testimony at trial was that the Vinaleses requested duct cleaning toward the end of 2018, AETC Housing made diligent efforts to undertake duct cleaning, and the Vinaleses refused those repairs. This constitutes an ordinary and "diligent effort to repair or remedy."

On the afternoon of June 12, under cross examination, counsel for Defendant walked Mrs. Vinales through the work order history for her home (Ex. D-42) and in each instance Mrs. Vinales confirmed that the items on the work order history were complete, and that a response had been made to every single work order. Further, on cross examination, Mrs. Vinales admitted that there were no missing work orders and that there might even be more work orders than she recalls making. If this was not enough, Mrs. Vinales was shown eighteen separate warm call emails following up on the work performed in her home and specifically soliciting her feedback whether it be positive or negative. Mrs. Vinales did not reply to a single one. Nor did Mrs. Vinales respond to any of the Yardi surveys sent following completion of repairs for each and every work order. Ex. D-2 & D-23. If there was in fact an issue with any of the repair work, Mrs. Vinales has multiple opportunities at the time of the events to note deficiencies and she simply did not. Her contemporaneous silence on those issues is dispositive.

In addition, when the Vinaleses complained of a roof leak, as testified to by Mike Knight and shown on the work order history, AETC Housing engaged a roofing contractor, and that roofing contractor came twice to make roof repairs. Ex. P-32 & D-42. This constitutes an ordinary and "diligent effort" to repair or remedy. AETC Housing's conduct was reasonable, diligent, and cannot support a breach as a matter of law. In fact, Lt. Col. Vinales acknowledged under cross examination that it is possible to fix an issue, whatever that may be that comes up in housing, and

later down the road, whether it be a week, a day, or a year from then, that same issue could occur again through some cause unrelated to improper maintenance or improper repairs. Mrs. Vinales' cross examination yielded similar testimony from their own experience as a landlord, that a repair issue does not necessarily equate to a landlord's failure to make diligent effort to repair.

While Plaintiffs testified that they requested that the carpet be removed in their MIMO form, no expert, defense witness or third-party witness confirmed the Vinaleses belief that the musty smell in the carpet was mold. Mrs. Vinales acknowledged that she is not a mold expert, and it was never confirmed that there was in fact mold on the carpet. Nevertheless, a work order on the carpet was entered in December, and the carpet was removed.  The next time mold was reported to AETC Housing was the day after the Town Hall meeting in February 2019. All attempts to repair the conditions of the home after that date were denied or delayed by the Vinaleses.

For those claims where notice of a condition was properly given and AETC Housing was permitted to access to perform the work, Vinales has failed to present sufficient evidence of how AETC Housing failed to make a diligent effort to repair or remedy that condition.

**IV.    Lt. Col. Vinales Has Not Proven Damages Caused by a Breach of the Lease.**

Lt. Col. Vinales claims that, due to AETC Housing's breach of the Lease, he has suffered property damages and is entitled to a return of all rents paid under the Lease. For the reasons explained below, Vinales has not proven either.

A.   Lt. Col. Vinales has not proven property damages.

Plaintiffs here allege damage to their personal property caused by mold, but offer only lay testimony to support their claims. There was no expert at trial who opined as to damage to their personal property. Yet, experts for both Plaintiffs and Defendants agree that only an expert can

make determinations about whether mold has caused damage and what needs to be done in response. Here, Plaintiffs have not provided the expert analysis.

Federal Rule of Evidence 701 governs opinion testimony by lay witnesses and expressly disallows lay opinion testimony that is "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Federal courts have held that the "cause of any specific mold infestation is not a subject within the general experience or common sense of a lay person." *Cagle v. Allstate Texas Lloyds*, 2005 WL 2076145 at *2 (S.D. Tex. Aug. 25, 2005); *Qualls v. State Farm Lloyds*, 226 F.R.D. 551, 554 n. 1 (N.D. Tex. 2005) (holding, in the context of damage caused by mold, that "even if Texas law did not substantively require expert proof of causation, federal Rule 701 might preclude lay opinion on causation.").

This requirement of expert testimony in matters of science outside the common knowledge of laypersons is not new. Pre-cession Texas law similarly holds that where a case concerns a "matter of science or specialized art or other matter, of which a layman can have no knowledge, the jury must base their conclusion upon the testimony of the experts." *Gulf, C. & S.F. Ry. Co. v. Young*, 284 S.W. 664, 669 (Tex. App.—Dallas 1926, no writ) (quoting *Moratsky v. Wirth*, 76 N.W. 1032 (Minn. 1898)).[6] Here, it is undisputed among the experts that the determination of whether damage was caused by mold can only be done by an expert because it requires specialized knowledge—specifically, the application of the S500 and S520 standards. However, Vinales only

---

[6] Mold assessment and remediation is a relatively new science. Indeed, the first edition of IICRC S520 was released in 2003. Therefore, unsurprisingly, Defendants have been unable to identify a pre-1951 Texas case specifically holding that expert testimony is required to establish causation of mold damages. That lone fact should not foreclose this argument because the standard expressed by the *Young* case is applicable to this scientific field. The court's concern in *Young* was that where a matter is outside of a layperson's knowledge (like mold assessment and remediation), the jury cannot base their decision on the potentially unreliable evidence offered by another layperson.

offered lay testimony to establish his claim for these damages. Both the federal rules and the application of Texas substantive law make clear that this is insufficient, as a matter of law.

At summary judgment, the Court correctly pointed out that everyone is capable of determining whether there is visible mold on a piece of furniture.[7] That is certainly true. Yet, the only items that the Vinaleses itemized as to value were those left behind at Randolph (*see* Exhibit D-178), and Mrs. Vinales testified that there was no visible mold on any of those items. Even if the Court correctly concluded that a lay person can tell whether there is mold on furniture or not, can a lay person then testify that the furniture is still damaged even if there was no visible mold? That line has now been crossed in this case. If the Vinaleses are going to claim that although their furniture did not appear to be damaged, it actually was, they will need an expert. They have none.

But even if they had seen visible mold on their furniture after cleaning (and they did not), the question here is "what now?"  If there was visible mold on furniture (and there was scant evidence at trial), an expert must tell the jury what caused the mold, whether it can be cleaned, how it can be cleaned, the cost to clean it, or whether the item must be thrown away. Indeed, federal courts have held that Rule 701 likely precludes lay testimony on this very issue. *Qualls*, 226 F.R.D. at 554 n. 1. Here, the Vinaleses threw away many pieces of their personal property when expert testing only showed four items with possible mold and the only one of these items identified was a yoga mat. Plaintiffs presented no expert testimony saying that there was no way to clean those items.

Even if this Court holds that expert testimony is not required for property damage claims related to mold, Vinales has not shown that his property damage, if any, was the "direct and

---

[7] "The Court is not persuaded that *whether* a piece of personal property is contaminated by visible mold growth is a matter for which lay jurors "can have no knowledge" or experience." [368, at 15].

immediate result of the breach by [AETC Housing.]." *Clay v. Richardson*, 38 S.W.2d 849, 852 (Tex. App.—Amarillo 1931, no writ). The only specific evidence identifying which items of personal property belonging to the Vinaleses were not adequately remediated are set forth in Exhibit 178, an email from Angela Unterbrink to Becky Vinales. In this email, Ms. Unterbrink identifies the four items identified by Argus' limited contents sampling. All other personal property which was cleaned was certificated by Argus and moved to Hawaii. Ms. Unterbrink offered to re-clean the items and ship when certified as cleaned or to pay the Vinales $8,000 for the four items and the soft goods that were not cleaned. The Vinales never responded to this offer.

Most importantly, Mrs. Vinales testified there was no visible mold on these items. No mold on the sofa, the reclining chair, the office chair, the accent chair, the five dining room chairs, the four king pillows, the sixteen standard pillows, the eleven decorative pillows, the three humidifiers, the master bedframe, the dining room table, the rugs, the mattresses, the seven wicker baskets, the entertainment center, and the sectional couch. Similarly, Mrs. Vinales testified there was no visible mold on the family's clothing or her LuLaRoe clothing. Without even lay testimony as to visible mold, there are no recoverable damages and this does not even take into consideration multiple intervening causes after spending multiple weeks traveling across the ocean.

As outlined above, the Lease obligates AETC Housing to make a diligent effort at repair on specific conditions. First, Vinales has not shown what conditions, existing due to AETC Housing's breach, directly and immediately resulted in the damage to those four items – or any others. For example, if the yoga mat had to be disposed of, how was that the responsibility or fault of AETC Housing, and what failure to "make a diligent effort to repair or remedy" caused that damage to the yoga mat? Vinales's property damages claim must fail. Even more removed is the claim of mold after personal items arrived in Hawaii (for which there is zero evidence other than

the Vinaleses recollections). These items had been stored for weeks, shipped across the Pacific Ocean, and then stored again in Hawaii. Even if they were mold damaged, this is zero proof, and only suspicion, that the mold, if any, on the items came from the Unit at Randolph Family Housing. Plaintiffs did not present a single piece of evidence as related to these items.

Lt. Col. Vinales could not even identify a single piece of personal property on which he, in fact, saw mold after remediation and before it was shipped to Hawaii. Counsel for Defendants inquired about a laundry list of personal property items that were left behind, and for each item Vinales testified that he could not recall there being any visible mold. At best, he merely suspected there was mold.

Becky Vinales offered testimony as to an approximate cost of replacement of three categories of items; however, she even contradicted herself when testifying. Mrs. Vinales failed to provide testimony as to each specific item or the value or cost of replacement of any specific item. Mrs. Vinales did not offer a single picture of any of these items she claimed had mold on them when they arrived in Hawaii. Mrs. Vinales did not offer a single receipt for the replacement of any items. Finally, with respect to her LuLaRoe clothing, she testified that these items could not be sold and, even though this was her "business," she did not offer a single sheet of paper to support its claimed value. This testimony, at best, is speculation and is insufficient as a matter of law to support Plaintiffs' claim for damages.

B.  Vinales is not entitled to a return of rents paid under the Lease because the Lease provided an exclusive remedy.

Although not ever mentioned during Plaintiffs' case-in-chief by pleading, the Vinaleses claim a return of rental payments made under the Lease. This claim fails as a matter of law because the Lease provided a remedy for the alleged breach, but Vinales chose not to exercise that right. Vinales is claiming that AETC Housing's failure to repair or remedy conditions under the Lease

caused his rental home to become unfit for occupancy. In such a situation, the Lease provided an exclusive remedy:

> In case any buildings on said Premises, or any part thereof, without any fault or neglect of Resident, shall be destroyed or so injured by the elements, or other cause, as to be unfit for occupancy, **Resident may thereupon surrender possession of the Premises to Landlord, and thereupon this Lease shall terminate and Resident shall have no further obligations hereunder.**

Ex. P-2 Lease ¶ 22 (emphasis added). "[W]hen the parties to a contract agree upon the remedies that accrue for a breach of it, these remedies constitute the only relief in the particular that the purchaser has, and he must look to his contract and be governed by its stipulations." *Oltmanns Bros. v. Poland*, 142 S.W. 653, 656 (Tex. App.—Austin 1911, writ ref'd) (citation omitted). Vinales claims the home was unfit for occupancy, and the Lease expressly provided him a remedy for that alleged wrong. But Vinales presented no evidence that he attempted to exercise his rights under ¶ 22. Instead of doing so, Vinales chose to retain possession of the home and used all parts thereof—but now, citing no Lease provision, wants every dollar paid in return.

### C.   Vinales has not proven any reduction in rental value.

Assuming a breach, and that ¶ 22 was not Vinales's exclusive remedy, Vinales still must present some proof of how a condition existing due to the breach reduced the rental value of his home. *Mitchell v. Weiss*, 26 S.W.2d 699, 701 (Tex. App.—El Paso 1930, no writ) (holding that, in a partial breach of a landlord's duty to repair, "[t]he proper measure of the tenant's damage in this case is the reduced rental value, if any…."). Proof of market values for real estate, rented or otherwise, typically is shown by the testimony of experts. *See Reeves v. City of Dallas*, 195 S.W.2d 575, 579 (Tex. App.—Dallas 1946, writ ref'd n.r.e.) (expert on real estate values would consider "location and environment of the property, the purchase and sale price in an open market of similar property in the same or near-by vicinity, the price that was voluntarily paid for the property taken, the availability of the property for similarly zoned business, the kind and character of occupancy,

the encumbrances, contracts, liens, leases, etc., and many other elements"); *Foley v. Houston Belt & Terminal Ry. Co.*, 110 S.W. 96, 98 (Tex. App. 1908, no writ) ("the proof of his long residence near the property, together with the fact that he had been engaged in the real estate business–that is, in negotiating sales and purchases of real estate–the prosecution of which business necessarily required a peculiar and expert knowledge of the values of improved real estate in the city in which he prosecuted his business, qualified him to testify as to the value of the entire property"). Vinales has not offered any expert opinions regarding the rental value of the home and cannot proceed without them.

Vinales did not present even sufficient lay testimony to establish a reduction in rental value due to breach. Vinales was required to show what condition he believes reduced his home's rental, how the condition affected the value, and, critically, when the condition began and how long it existed. *Umscheid v. City of San Antonio*, 69 S.W. 496, 498 (Tex. App. 1902, no writ) ("For we have seen that the measure of damages for such injury is the difference in the rental value of the land immediately before and after the injury, and there was no evidence as to what this difference in value was.").

At summary judgment, the Court warned Plaintiffs that "Defendants are free to raise specific objections in a . . . motion for judgment as a matter of law should Plaintiffs fail to elicit *any* admissible testimony on damages." [368 at 17]. Vinales has offered no such proof at trial. Vinales offered no proof that he received no value for his rent payments. Defendants are entitled to judgment as a matter of law on the claims for rents paid.

## **<u>CONCLUSION</u>**

Plaintiffs have put on their best evidence, and have failed as a matter of law to show any liability on behalf of Defendants. This Court should grant JMOL on Plaintiffs' breach of contract claim.

Respectfully submitted, this the 13th day of June 2023.

/s/ *Walter H. Boone*

Walter H. Boone, MS Bar No. 8651
(*admitted to W.D. of Tex. on 7/28/2020*)
Jennifer J. Skipper, State Bar No. 24076171
Balch & Bingham LLP
188 East Capitol Street, Suite 1400
Jackson, Mississippi 39201-2133
Telephone:  601-965-8182
Facsimile:  866-501-9984
E-Mail: jskipper@balch.com
          wboone@balch.com

Julia W. Mann, State Bar No. 00791171
Erica Benites Giese, State Bar No. 24036212
JACKSON WALKER LLP
112 East Pecan Street, Suite 2400
San Antonio, Texas 782015
Telephone: 210-978-7761
Facsimile: 210-242-4646
E-Mail: jmann@jw.com
          egiese@jw.com
***Attorneys for Defendants***

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 13th day of June 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Randall A. Pulman, Esq.
Ryan C. Reed, Esq.
Matthew J. McGowan, Esq.
Sarah Jackson, Donahue, Esq.
PULMAN, CAPPUCIO, & PULLEN, LLP
2161 NW Military Highway, Suite 400
(210) 222-9494 Telephone
(210) 892-1610 Facsimile
E-Mail: rpulman@pulmanlaw.com
 rreed@pulmanlaw.com
 mmcgowan@pulmanlaw.com
 sdonahue@pulmanlaw.com

James R. Moriarty, Esq.
LAW OFFICES OF JAMES R. MORIARTY
4119 Montrose, Suite 250
(713) 528-0700 Telephone
(713) 528-1390 Facsimile
E-Mail: jim@moriarty.com

Francisco Guerra, IV
Jennifer Arlene Neal
Robert E. Brzezinksi
WATTS GUERRA, LLP
Four Dominion Drive, Bldg. 3, Suite 100
San Antonio, TX 78257
(210) 477-0500
E-Mail: fguerra@wattsguerra.com
 jneal@wattsguerra.com
 rbrzezinski@wattsguerra.com

/s/ *Julia W. Mann*
Julia W. Mann