1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF TEXAS
                        SAN ANTONIO DIVISION
3

4   SHANE VINALES and BECKY VINALES,)
    Individually and as Next of       )
    Friend of L.V. and S.V.,          )
5                                     )
6          Plaintiffs,                )
                                      )
7             v.                      )   No. 5:19-CV-01280-RBF
                                      )
    AETC II PRIVATIZED HOUSING,       )   San Antonio, Texas
8   LLC, ET AL,                       )   June 5, 2023
                                      )
9          Defendants.                )
    _____

10

11                TRANSCRIPT OF TRIAL TRANSCRIPT
             BEFORE THE HONORABLE RICHARD B. FARRER
12                 UNITED STATES MAGISTRATE

13  A P P E A R A N C E S:

14  FOR THE PLAINTIFFS:
    Ryan C. Reed
15  Pulman, Cappuccio, Pullen, Benson & Jones, LLP
    2161 NW Military Highway, Suite 400
16  San Antonio, TX 78213

17  Francisco Guerra, IV
    Jennifer Arlene
18  Neal Robert E. Brzezinski
    Alexis R. Garcia
19  Bailey VanNatta
    Julie Matsen
20  Watts Guerra LLP
    4 Dominion Drive
21  Bldg. 3, Suite 100
    San Antonio, TX 78257

22

23

24

25

```
1    FOR THE DEFENDANTS:
     Walter H. Boone
2    Jennifer J. Skipper
     Kye C. Handy
3    Balch & Bingham, LLP
     188 E. Capitol Street, Suite 1400
4    Jackson, MS 39201

5    Julia Wommack
     Mann Jackson Walker, LLP
6    112 E. Pecan, Suite 2400
     San Antonio, TX 78205
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1   (In open court.)
2              THE COURT SECURITY OFFICER:  All rise.
3              THE COURT:  Good morning.  You may be seated.
4              THE DEPUTY CLERK:  Vinales v. AETC II Privatized
5   Housing LLC.  Case Number SA:19-CV-1280.
6              MR. REED:  Good morning, Your Honor.  Ryan Reed with
7   the law firm of Pulman, Cappuccio & Pullen.  I am joined today
8   by my colleagues at Watts Guerra:  Francisco Guerra, IV,
9   Jennifer Neal, Robert Brzezinksi, Bailey VanNatta, Alexis
10  Garcia, Caleb Rackley, Julie Matsen.
11             I'm also joined by our paralegal Laurie McEntire, and
12  our clients, Becky Vinales and Lieutenant Colonel Shane
13  Vinales.  Good morning, Your Honor.
14             THE COURT:  Good morning, Your Honor.
15             MR. REED:  We are present and ready to proceed.
16             THE COURT:  All right.
17             MR. BOONE:  Good morning, Judge. Walter Boone at the
18  law firm of Balch & Bingham.  And with me this morning is
19  Jennifer Skipper, Kye Handy, of course Julia Mann from Jackson
20  Walker.
21             This is Chris Radliff, and this is Mike Knight, and
22  Michelle Larson.  Chris and Mike are the corporate
23  representatives for the defendants today and will be here
24  throughout trial.
25             THE COURT:  Okay.  Good morning to everyone.  I
```

1    understand we have some preliminary matters.  Do you want to

2    just take care of those before we get going?

3         MR. BOONE:  Yes, sir.  As the Court will recall at

4    the pretrial conference, we filed a Motion in Limine to -- to

5    exclude witnesses or parties in this case from either coming to

6    testify in their uniforms or attending trial in their uniforms.

7    And this morning Lieutenant Colonel John Klein is sitting on

8    front row.  He is one of the plaintiffs in the larger case.  Is

9    here in uniform.  He is certainly welcome to attend, but he

10   should be dressed like the rest of us so that he does not call

11   out his status to anyone on the jury.

12        The sole purpose for that of course is to influence

13   these proceedings, is to influence this Court, and is to

14   influence this process.  If he wants to listen to the

15   testimony, he's welcome.  And he can wear civilian clothes like

16   he's entitled to do anywhere else in the planet.  Of course

17   there are -- each service has their own rules and regulations

18   about that.  But the overriding emphasis of those rules and

19   regulations is they do not want their fact of military service

20   to be of unfair prejudice to -- in any environment when they

21   go.  And if there is a risk of that, then they should not wear

22   the uniforms.  We think that's precisely the case here.  And

23   we'd ask -- certainly invite Lieutenant Klein to come.  But he

24   just needs to go home and change his clothes.

25        MS. GARCIA:  Good morning, Your Honor.  We took a

1    deeper look into there and found that both of defendants'

2    arguments do not work in this instance or in any instance going

3    forward, for the record.  In particulars, there's no undue

4    prejudice here.  That is disingenuous for the defendants to

5    say.  In their Motion in Limine from before, they said that

6    they wanted this case heard on the facts.  It's a fact that

7    this case is about military housing.  It's a fact that the

8    plaintiffs and witnesses in this case are military members.

9    This jury will be well aware of those facts and know those

10   facts prior, so there's no prejudice in the sense that these

11   aren't -- that there are facts in this case that the jury will

12   be aware of.

13        More importantly, Captain Jonathan Klein is here as a

14   mere observer.  He is not testifying.  He is not a witness in

15   this case.  So there's certainly a more clear level of lack of

16   prejudice in -- for the specific Vinales trial.

17        And with regard to the violation of an Army

18   regulation, that defendant cited or referenced today and cited

19   in their Motions in Limine.  They're citing to a small portion

20   that states:  Wearing Army uniforms is prohibited in connection

21   with and in furtherance of political or commercial interest.

22   That's what it says.

23        They did not provide any case law or any particular

24   cite from that regulations that stated that the regulation

25   prohibits uniforms at civil trials.  A civil trial is not a

1    commercial interest, especially not merely observing a civil

2    trial.

3            And, furthermore, if there's any doubt on this issue

4    as to whether or not it prohibits an Army regulation, we have

5    received written permission from his supervisor that's Colonel

6    Blackman, that says that he -- and I have a copy of it for the

7    court at this time.  It says he's allowed to wear his uniform

8    in civil trials, particularly this one.  And that it is not a

9    regulation violation to wear their military uniforms in civil

10   trials.

11           THE COURT:  Okay.  So are you all drawing a line,

12   Ms. Garcia, between parties in the trial and witnesses in the

13   trial.  Who I think we've agreed aren't going to appear in

14   uniform and spectators who can wear uniforms.  Is that the line

15   we're drawing?

16           MS. GARCIA:  For this trial, yes.  But for this trial

17   we have made that agreement.  I understand last week we made

18   those agreements that we're not going to have the plaintiffs or

19   witnesses in uniform.  Captain Jonathan Klein is merely going

20   to stay in the pews and observe this trial in uniform.  So we

21   are making that distinction for this trial.  Importantly, for

22   the record, we'd like to point the out that -- and we have

23   copies of that case briefing for you as well -- case law for

24   you as well.  Multiple federal courts have found that military

25   members are allowed to wear their uniforms in civil trials.

```
 1              A very specific one I wanted to point out to the

 2    Court is the Federico case 2016, Federal case in Virginia.  And

 3    I have that motion briefing here, which is also -- it was a

 4    motion to preclude a plaintiff to testify in his military

 5    uniform.  Here, of course, we've made agreement that's not

 6    going to happen in the Vinales trial.  We merely want Captain

 7    Klein to observe in his uniform.  But in that case the judge

 8    did find that there was -- or did not find any prejudice based

 9    on the facts that it was a military housing issue case.  And

10    the plaintiffs and the witnesses were military members.

11    Similarly, that's the case here.  And the judge thought there

12    was no violation of any regulations there.  It was the Marine

13    Corp and the Department of the Defense.  Here it's the Army.

14    But I have that with me as well, and you'll see, Your Honor,

15    that that is -- it's very similar.  It's almost verbatim.  The

16    same language from the Department of Defense.  And there the

17    judge did not find that there's any regulation violation.

18              And another real important fact of that case is that

19    plaintiff also received permission, written permission, from

20    his supervisors stating that it's not a rule violation, and he

21    is permitted to wear his uniform at a civil trial.  And the

22    judge pointed to that in his order, which I have copies of here

23    for your clerks' convenience.

24              THE COURT:  Okay.  Let me talk to Mr. Boone again

25    real quick.  And then if needed, we can take a look at that
```

1    authority.

2            MS. GARCIA:  Yes.

3            MR. BOONE:  Judge, it seems like to me there's been

4    some, as we call it in my neighborhood, laying behind the log

5    on this issue.  We raised this issue by Motion in Limine.  We

6    didn't hear about any of this business about their permission

7    from the supervising officer or the case law or anything else.

8    We heard basically crickets in response.  And then at the

9    pretrial conference --

10           THE COURT:  Didn't your Motion in Limine take up the

11   issue of the parties and witnesses?  I don't recall talking

12   about people in uniforms, the public, or people in attendance.

13   And isn't there a difference there?  I mean, in other words,

14   what's the authority requiring me to restrict somebody from

15   appearing in uniform to witness -- to watch as a spectator as

16   opposed to somebody participating in trial I can see is

17   different.  And I think we've all sort of agreed on that.  And

18   there doesn't seem to be any dispute about that.  But is this

19   just a matter of discretion for me or what's the reason for

20   barring somebody from appearing in whatever they want to wear

21   as long as it's -- you know, meets the dress code.

22           MR. BOONE:  It is in your discretion.  It is I

23   believe exactly the discretion that you referenced in the

24   pretrial conference not to make this into a circus.  It is

25   exactly your discretion to prevent unfair prejudice.  The one

1    thing that we don't -- that this jury will not know is that

2    there are other people with similar claims or claims that are

3    lumped together in this lawsuit.  The risk here of course is

4    they see other people in uniform, is that they're going to

5    think exactly that.  That there are other people.  And what

6    happens if all nine of these families show up one each in

7    uniform?  What happens if all 15 of them with -- including the

8    Hill case.  What happens if the other five in --

9            THE COURT:  But that's a great point.  Do I have the

10   basis here, sufficient basis to prophylactically bar any and

11   all those people to showing up to these trial proceedings in

12   uniform.

13           MR. BOONE:  They are actually parties in this case.

14   Yes, you do.  You have control over the parties witnesses.

15           THE COURT:  I know.  Right.  But we've gotten to

16   great lengths in this case and addressed at several different

17   junctures the propriety of having this case lumped together in

18   a single trial or separating it for trials.  We're now at

19   separate trial, so although they're parties to the case and I

20   suppose in that sense I have authority over them.  But also the

21   gentleman here today is a spectator for this trial.  Right.

22   He's not participating in this trial.  Right?  I mean, should I

23   do that?  Do I have authority to do that?

24           MR. BOONE:  I think you can ask him to do it.  I

25   think you can rule him to do that.  I believe you can under

1    your inherent discretion to control your courtroom and to

2    control the people that are parties to this lawsuit.  For

3    example, on the press statements motion that we filed, that was

4    also directed to the parties.  You have absolute authority to

5    restrict parties from speaking to the press in the same way

6    like whereas a normal citizen could speak to the press about

7    anything they wanted to.  First Amendment.  You were all over

8    it last week.  Same thing with respect to the decorum in this

9    courtroom, exactly the same principles.

10            THE COURT:  Okay.  Understood.  And, look, I don't

11    doubt that I in some sort of generic sense have authority to

12    direct parties to do something.  What I mean is authority

13    exercised appropriately.  And I think on this one there's one

14    individual here today who showed up in uniform.  I don't think

15    that's going to be a big issue if we don't make it a big issue.

16    I'm going to allow it.  I will note that, look, there's a

17    disconnect I think here a little bit between sort of what we

18    discussed and what we're expecting today and what's happened

19    and that's noted.  And so that's just a piece of information

20    for me to if this balloons or changes or alters or moves, then

21    we can address it.  But I'm not understanding that there's

22    authority directing me to bar prophylactically people from

23    appearing to witness these trial proceedings in uniform.  I

24    haven't heard anything telling me that that's something that's

25    absolutely necessary in order to prevent this -- these

1  proceedings from de-involving into a quote, unquote circus.  I

2  don't think we can expect that.  And if we take any stops along

3  those lines, then rest assured I'll put a stop to it.  But I

4  think we can move along.  I think we got bigger and things to

5  take care of today.

6          MR. BOONE:  Understood, Your Honor.

7          THE COURT:  Okay.  Any housekeeping matters before we

8  bring in the panel?

9          MR. REED:  No, Your Honor.

10          MR. BOONE:  No, Your Honor.

11          THE COURT:  Well, then we can pause the record.  And

12  we can go ahead and let Ms. Sweeney know that we're bringing

13  the panel.  I think we're going to use that side of the

14  courtroom to seat the jury panel.  So folks who are watching

15  will just have to switch over.  And as I understand, some

16  people might be moving around.  So y'all do whatever you need

17  to do.  I'll probably just stay up here on the bench.  But

18  people can feel free to move about as they may need.  But we

19  can go off the record.

20          (Pause.)

21          THE COURT:  Do we have any idea when we're going to

22  get the questionnaire filled out by the jurors yet?

23          THE DEPUTY CLERK:  I think she's going to bring it up

24  shortly.

25          THE COURT:  Do we know will she bring it up before

1    she brings up the --

2              THE DEPUTY CLERK:  Yes.

3              THE COURT:  Okay.  Great.

4              THE COURT SECURITY OFFICER:  All rise.

5         (Prospective jurors enter the courtroom.)

6              THE COURT:  Please be seated, everyone.  All right.

7    Let's go on the record, please.  Ladies and gentlemen, good

8    morning.  I'm United States Magistrate Judge Richard Farrer,

9    and I'm presiding in this civil case.  You're here as a jury

10   panel in the case of Shane Vinales et al v. AETC II Privatized

11   Housing L.L.C. et al.  Case number SA:19-CV-1280-RBF.

12             This is a civil case as opposed to a criminal case.

13   This process that we're about to go through is called jury

14   selection or voir dire or voir dire.  I just say voir dire.  At

15   the end of this process, we shall take maybe a couple hours

16   this morning.  We'll try to speed things up a tiny bit but it

17   does take some time.  Eight jurors from this group will be

18   chosen to serve on the jury in this case and the others will be

19   excused.  Now, the trial in this case will start later today

20   and the parties expect that the trial will last approximately

21   ten days, maybe as many as 12, although it could take less time

22   as well.

23             The schedule, roughly speaking, all for this week

24   will be roughly y'all coming at 9:00.  We'd start at about

25   9:30.  Take a break at lunch and finish at 4:00.  We will need

1  to finish a little early on Wednesday at about half past 2:00

2  for a prior commitment that I have.  Then the following week

3  the first three days of the week we can proceed that same way.

4  Then if we're not done by then, when we break Thursday Friday

5  across the weekend then also that following Monday, which is a

6  Federal holiday.  Then we'd start up again on the Tuesday.

7          Just some brief introductions.  The plaintiffs which

8  filed this lawsuit are Shane and Becky Vinales and also their

9  two minor children.  The defendants in the case are AETC II

10  Privatized Housing L.L.C. and AETC II Property Managers L.L.C.

11  The lawyers and I may refer to the defendants collectively as

12  AETC or simply defendants.  Then I guess we might refer to the

13  Vinales family as the Vinales family instead of individually by

14  name.

15          So now for some general information about the case.

16  The Vinales family lived in housing provided to them on

17  Randolph -- Randolph Air Force base here in San Antonio.  The

18  house is part of a community called Randolph family housing.

19  That community of properties was owned and operated or is owned

20  and managed by defendants.  Mr. Vinales signed a lease for a

21  house in Randolph family housing and lived there with his

22  family.  They experienced various issues with the house related

23  to things they felt needed to be repaired or remedied by the

24  defendants pursuant to the lease agreement.  Ultimately, the

25  family moved out and eventually filed this lawsuit in which

1    they allege that the defendants breached the lease.

2              This is obviously only a brief summary of the case,

3    just to make you aware of the nature of the case and to assist

4    you in responding to questions put to you during this jury

5    selection with respect to the attorneys will elaborate on their

6    positions a little later and provide much more detail about the

7    case as the case goes on.

8              A civil lawsuit like this starts with the filing of a

9    document called a complaint.  You should understand that the

10   fact that a complaint was filed by the plaintiffs should not be

11   given any evidentiary weight, not the slightest as to the

12   question of the liability of the defendants.  The complaint is

13   merely a formal document by which the plaintiff provides notice

14   of the claims so that the case may be brought to court or

15   before a jury for resolution.

16             It's my responsibility this morning to aid the

17   parties in picking a jury that will be fair and impartial to

18   both sides.  So I'll be asking you some questions concerning

19   your background and personal beliefs as well as your knowledge

20   of the facts of and the various participants in this case.  And

21   the lawyers will also get a chance to speak to you and ask you

22   some questions a little bit later.  The information you provide

23   is necessary for two reasons:  First, to assure that none of

24   you is disqualified from serving as a juror in the case.  And,

25   second, to enable the attorneys for the plaintiff and

1  defendants to intelligently exercise the right to strike the

2  names of certain number of prospective jurors from the jury

3  panel list.  Some of the questions I ask might be personal.

4  Your answers to them are, however, important to the case.  If

5  you prefer to answer a question up here at the bench with me

6  privately, you may do so.  Please just let me know.  And we can

7  do it just up here so that it's just me and you and the lawyers

8  up here, and you don't have to answer out in front of

9  everybody.

10         Most of the initial questions that I ask will just

11  require a yes or no answer.  If you have a yes response to a

12  question that I ask, please just raise your hand.  I'll then

13  ask you to stand and state your juror number.  Please try to

14  remember just to state your juror number before you start,

15  before you start talking, just because that's the way we'll

16  remember you.  And that's the way the lawyers are keeping track

17  of who is who as well.

18         I may at that time ask you to provide more

19  information or I may not.  I may just take your yes answer and

20  note it.  If you don't raise your hand, then the attorneys and

21  I will presume that your answer to the question is no.  And if

22  a few minutes later, after I've asked a question you realize

23  that you actually had an affirmative or a yes answer to a

24  question, just raise your hand, and I can go back and talk to

25  you and we can clear it up.  That's perfectly fine.

```
 1              So, now let's start with a little more detailed
 2    instructions.  Why don't I start with you, Mr. Reeves.  Would
 3    you please introduce yourself and your clients and those with
 4    you here today.
 5              MR. REED:  Thank you very much, Your Honor.  Good
 6    morning, ladies and gentlemen.  My name is Ryan Reed.  I'm with
 7    the law firm of Pulman, Cappuccio & Pullen here in San Antonio,
 8    Texas.  I'm joined by a number of colleagues from the law firm
 9    of Watts Guerra:  We have Francisco Guerra IV, Robert
10    Brzezinksi, Jennifer Neal, Julie Matsen, Bailey VanNatta,
11    Alexis Garcia, Caleb Rackley, our paralegal Laurie McEntire.
12    We are joined by our clients, Becky Vinales and Lieutenant
13    Colonel Shane Vinales.  Did I miss anyone?  All right.  Thank
14    you very much.
15              THE COURT:  Thanks, folks.  And now to just everybody
16    out there:  Does anyone know or is anyone have or have any
17    business dealings with Mr. Reed or any of the folks that he's
18    just introduced?  Yes, sir, would you please stand up and hang
19    on, and we're going to need you to talk into this microphone.
20    And then just tell your number, please.
21              PROSPECTIVE JUROR:  Juror 21.
22              THE COURT:  Okay.  And what's your relationship here?
23              PROSPECTIVE JUROR:  Colonel Vinales, he was my
24    immediate supervisor for several years at Fort Sam Houston.
25              THE COURT:  Okay.  Thank you, sir.  You can pass that
```

1    back down.  Okay.  And, Mr. Boone, would you like to introduce

2    yourself and your team.

3          MR. BOONE:  Yes, sir.  Good morning, everyone.  My

4    name is Walter Boone.  We're with the law firm of Balch &

5    Bingham.  And with me is Jennifer Skipper and Kye Handy.  There

6    she is.  And our clients are also here:  Chris Radliff and Mike

7    Knight. They're with companies called AETC II Privatized

8    Housing and AETC Property Managers.  Last but not least, and

9    our fearless leader, Julia Mann of Jackson Walker.  We're kind

10   of scattered around here so that we can all be here as best for

11   you.  That's our team, Judge.

12         THE COURT:  All right.  Thank you.  And so now does

13   anybody know or has anybody had or have any business dealings

14   or other dealings with Mr. Boone or any of the folks he's just

15   introduced.  Yes, sir.  Why don't you please stand up and get

16   that microphone and start off with your juror number please.

17         PROSPECTIVE JUROR:  Yeah, I'm juror number 16.  So

18   not direct business dealings, but I was the deputy civil

19   engineer for AETC from 2010 to 2013.  I was a deputy civil

20   engineer at an Air Force base which is an AETC installation.  I

21   was also the acting AFCAT installations director.  And I'm

22   familiar with military family housing and all the issues

23   associated with them that have been in the press lately.

24         THE COURT:  Very good.  Thank you, sir.

25         All right.  So along those lines, does anybody -- any

1  of you or any close relative of yours, apart from juror number

2  16, ever worked for or with or had any business dealings or

3  contact with AETC II Privatized Housing L.L.C. or AETC II

4  Property Managers L.L.C.?  All right.  What about Hunt Limited,

5  which does Hunt Military communities?  Okay.  Other than juror

6  16.  And we've got you, sir.  Thank you.

7          All right.  As I mentioned earlier, folks, the case

8  is expected to take about ten to 12 days to resolve.  Does

9  anyone on the jury panel have a personal situation such as a

10  medical or physical problem, which would make it difficult or

11  impossible for you to sit as a juror in the case?  Okay.  We

12  got a couple of folks.  Just both near you.  There you go.  Do

13  you want to come up and tell me?  Sure.  Why don't you come on

14  up.

15          THE COURT SECURITY OFFICER:  Juror number 18.

16          THE COURT:  Eighteen.  1-8.  Yeah.  Just come on up

17  here.  And counsel you can come up too.

18          PROSPECTIVE JUROR:  Sorry.

19          THE COURT:  It's okay.  Here.  Hold on.

20          (At sidebar.)

21          PROSPECTIVE JUROR:  I have an appointment on

22  Wednesday.

23          THE COURT REPORTER:  I can't hear.

24          THE COURT:  You can't hear?

25          All right.  So juror number 18.  1-8 just mentioned

1  that she has a biopsy appointment on Wednesday and then I asked

2  her if she has any follow-up appointment.

3          PROSPECTIVE JUROR:  I'll know more on Wednesday I

4  guess.  I don't know.

5          THE COURT:  Okay.

6          PROSPECTIVE JUROR:  Because --

7          THE COURT:  All right.  Do you y'all need to ask her

8  anything on that?

9          MR. REED:  No.

10         MS. MANN:  No.

11         THE COURT:  Okay.  Thank you.  I appreciate it.  You

12  can go back.

13         (Juror leaves the bench.)

14         THE COURT SECURITY OFFICER:  Thirty-seven.

15         THE COURT:  Thirty-seven, 37.

16         PROSPECTIVE JUROR:  If my dates are correct, I have a

17  cardiologist appointment.  I have to wait every six months to

18  do it on the 23rd.

19         THE COURT:  Okay.  Can you reschedule or is that

20  something that's --

21         PROSPECTIVE JUROR:  I would have to check because I

22  have to make it every six months, and so I'll have to see if

23  that's a possibility if I can't because I'm a teacher.  I only

24  can do it at certain times.

25         THE COURT:  Any follow up?

1          MS. MANN:  No.

2          THE COURT:  Thank you.  I appreciate it.

3          PROSPECTIVE JUROR:  Thank you.

4          (End of sidebar.)

5          THE COURT:  Okay.  Does anyone out there on the jury

6    panel know any of the other members of the jury panel?  And

7    does anyone know me?  Okay.  I also need to ask more

8    specifically about your physical and mental capacity to serve

9    as jurors.  The purpose of these questions obviously is not to

10   embarrass anybody but instead to determine if anybody might

11   need special assistance in order to understand the facts and

12   the law as they're presented to you.  So do any of you have

13   difficulty with your hearing or vision?  And do any of you have

14   difficulty reading, understanding, or speaking the English

15   language?

16          Does anyone know anything about this case either from

17   personal knowledge, hearsay, or the media including social

18   media, television, radio, newspapers?  Okay.  And that's number

19   16?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Is that right?  Okay.  And without

22   telling me the substance of what you may have heard.  You just

23   heard about this case in the media; is that correct?

24          PROSPECTIVE JUROR:  As well as through my experience

25   at AETC and CAT.

1           THE COURT:  Okay.  Thank you, sir.  Do any of you or

2     does any member of your family follow or serve as a member of

3     any type of social media group or social account that advocates

4     for military members?  Is there anyone on the jury panel who

5     could not because of the subject matter of this lawsuit be fair

6     and impartial?  Okay.

7           Now, we're going to go over witnesses, so at this

8     time I'm going to ask the attorneys to inform you of the

9     witnesses they intend call at the trial.  The names of

10    prospective witnesses are announced to see if you might know

11    any of the potential witnesses personally.  And if so, would

12    your association affect your fairness in hearing this case.

13          MR. REED:  Thank you, Your Honor.  Ladies and

14    gentlemen of the jury panel, we anticipate calling as witnesses

15    our Client Lt. Col. Shane Vinales, his wife Becky Vinales.  We

16    also anticipate calling the defendants' representatives

17    Ms. Kristy Beck-Miller and Mr. Michael Knight.  We may call

18    other witnesses for rebuttal purposes, if necessary.  But at

19    the present time we anticipate that those will be the primary

20    witnesses.  Just to give you some names of some other folks who

21    may be called as witnesses:  Leilani Hamilton, Michael Krismer,

22    and Kristy Beck-Miller.

23          Your Honor, I think those are the names.

24          THE COURT:  Okay.  Thank you.  And do any of you

25    prospective jurors know or have you had any business dealings

1    with any of those folks whose names have been announced by

2    Mr. Reed?  Okay.  And now we'll do the same process with

3    Mr. Boone's team.

4              MR. BOONE:  Thank you, Judge.  I'm going to list off

5    some folks in alphabetical order.  All of them may not come but

6    I want to check just to see if you know any.

7              Rachel Adams.  She's a restoration professional with

8    a company JS Held.

9              Leah Anderson.  Historic preservation expert in

10   Providence, Texas.

11             Eric Benitas, who is EB Extreme Electrical Services.

12             Robert Faircloth.

13             Mark Freemyer is with a company called Argus

14   Environmental.

15             Audra Froom, who is the Community Director at

16   Randolph Housing for a number of years.

17             Mike Knight, who you have already -- have been

18   already introduced to you too.

19             Joseph Lstiburek.  He's a building and scientist

20   expert.

21             How about Danelle Megeath, an employee of Randolph

22   Family Housing.

23             Nicholas Miglieri, also with Randolph Family Housing.

24             How about Martin Olivares, who's one of the owners of

25   2M.  Does roof repairs and other things.

1              Chris Radliff, you have already met.

2              Nick Reed.  What about also employee -- or a person

3     with Randolph Family Housing.

4              Ann Reisch, property manager expert.

5              Leigh Shoop, who is with MacKenzie Restoration

6     Contractor.  Anybody know Mr. Shoop?

7              Allison Stock, the toxicologist.

8              Tom Sumner, Certified Industrial Hygienist.

9              Keith Thomson, who's with All Service AC, air

10    conditioning person.

11             And Angela Unterbrink, who is the former Director of

12    Operations with oversight over Randolph Family Housing.

13             THE COURT:  Okay.  Thank you, Mr. Boone.  And just to

14    confirm, raise your hand if any of you know or had any business

15    dealings with any of the folks who Mr. Boone just named.

16             All right.  Now, the jury will be the judges of the

17    facts.  You must consider and weigh the testimony of all

18    witnesses who will appear before you.  And you alone are to

19    determine whether to believe any witness and the extent to

20    which any witness should be believed.  You may as jurors accept

21    or reject the testimony of any witness in whole or in part.  It

22    is your responsibility to revolve any conflicts in testimony

23    which may arise during course of the trial and to determine

24    where the truth lies.

25             Your answers to the Court's questions at the end of

1   the case will be the verdict and form the basis for the

2   decision in the case.  This verdict must be based solely upon

3   the evidence presented in this courtroom and cannot be based on

4   bias, sympathy, or prejudice.  The jury must hear all of the

5   evidence from both sides before making its decision.

6           All matters of law will be determined by the Court.

7   This includes rulings during the trial on such matters as the

8   admissibility of evidence and the contents of the legal

9   instructions in the Court's jury charge that you'll receive in

10  the latter stage of the case.  It will be your sworn duty as

11  jurors to follow the law as given by the Court regardless of

12  any personal opinion you may have about what the law is or

13  ought to be.

14          Is there anyone on the jury panel who cannot promise

15  to reach a verdict based solely upon the evidence presented in

16  court?  And is there anyone on the jury panel who cannot

17  promise to follow the law as given to you by me, the judge?

18          In a civil case such as this, the plaintiff in order

19  prevail, must prove its case by a preponderance of the

20  evidence.  The standard of proof is different from and lower

21  than the standard in a criminal case in which the prosecution

22  or the government must prove the guilt of the defendant beyond

23  a reasonable doubt.

24          To establish something by a preponderance of the

25  evidence means to prove that it is more likely so than not so.

1    This means that for any claim plaintiff has made the plaintiff

2    must prove each element of that claim is more likely true than

3    not true.  If plaintiff does not do this, then you must find --

4    or if plaintiff does this, then you must find in plaintiff's

5    favor on that claim.  However, if you find that the plaintiff

6    has failed to prove any element of a claim by a preponderance

7    of the evidence, then the plaintiff may not recover on that

8    claim.  As the Court, I will give you more detailed

9    instructions on the subject at the conclusion of the trial, if

10   you are selected as a juror in this case.

11           Is there anyone who would find it different to apply

12   the preponderance of the evidence standard in this case?

13           All right.  Has anyone on the jury panel or is any

14   member of your immediate family ever participated in a civil or

15   criminal lawsuit in federal or state court either as party or a

16   witness.  So we're talking about the folks who have been a

17   party or a witness in a case.  Okay.  Now, let's get the

18   microphones over to you.

19           PROSPECTIVE JUROR:  Juror number one.

20           THE COURT:  Okay.  Juror number one, can you just

21   tell me what role you had in the case.

22           PROSPECTIVE JUROR:  I was a child in a car accident

23   and a drunk driver hit my mother's car that she was driving.

24           THE COURT:  Okay.  And is there anything about that

25   experience that would make it difficult for you to be fair and

1    impartial in this case?

2            PROSPECTIVE JUROR:  No.

3            THE COURT:  All right.  Thank you.  Who is next down

4    there?  Anybody close to you?  All right.

5            Sir, what's your number?

6            PROSPECTIVE JUROR:  Number 11.

7            THE COURT:  Number 11.

8            PROSPECTIVE JUROR:  And I was witness in my cousin's

9    case brought against a mental health facility.

10           THE COURT:  Okay.  And was there anything about that

11   experience that would make it difficult for you to be fair and

12   impartial in this case?

13           PROSPECTIVE JUROR:  No.

14           THE COURT:  Okay.  And that was a civil case.  Is

15   that right?

16           PROSPECTIVE JUROR:  Yes.

17           THE COURT:  Okay.  Thank you, sir.  I think somebody

18   close to you right in front of you.  There you go.

19           PROSPECTIVE JUROR:  Juror number two.

20           THE COURT:  Okay.

21           PROSPECTIVE JUROR:  I was a character witness to the

22   Court Marshal in 2002 on Randolph.

23           THE COURT:  Okay.  And anything about that experience

24   that you feel would about make it difficult for you to be fair

25   and impartial in this case?

1          PROSPECTIVE JUROR:  No, sir.

2          THE COURT:  All right.  Thank you.  Okay.  I think

3     somebody close to you there.

4          PROSPECTIVE JUROR:  Juror 31.  I was a plaintiff or a

5     participant in a trial at Fort Raines in college.  A dispute

6     similar kind of to this situation so.  I guess, I'm not sure.

7     I could be -- could be swayed.

8          THE COURT:  Okay.  Well, given that you participated

9     in that, do you think you can be fair and impartial in this

10    case?

11         PROSPECTIVE JUROR:  I mean, I would think so. I would

12    like to hope so, but I guess I'm not sure.  I mean, of course I

13    have my own personal kind of background.  I was sued for rent

14    in college for a similar situation that that I evacuated.

15         THE COURT:  Okay.  And if I were to tell you that you

16    need to decide this case based solely on the evidence that you

17    hear in this court and based on law as instructed by the Court,

18    would you be able to put aside those past experiences and serve

19    as a fair and impartial juror?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Okay.  Thanks.  And tell me your number

22    again.

23         PROSPECTIVE JUROR:  Thirty-one.

24         THE COURT:  Okay.  Okay.  Anybody else?  We got

25    everybody.  Has anyone on the panel ever served as a member of

1  the grand jury in either state or federal court?  One here in

2  the front.

3          THE COURT SECURITY OFFICER:  Juror number nine.

4          THE COURT:  Number nine?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Okay.  And so the function of a grand

7  jury is to investigate and review evidence to determine by

8  using a lessor standard of proof, probable cause, to see if a

9  crime was committed.  And if so, whether there's probable cause

10  to find a particular person committed the crime.

11          Do you understand that this standard of proof is not

12  applicable in a civil trial?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Okay.  And was there anything about your

15  service on that grand jury that you feel would make it

16  difficult for you to be fair and impartial in this case?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Thank you.  Has anyone served on a jury

19  panel or -- sorry, anyone on the jury panel ever served as a

20  juror, excuse me, in a regular jury case, civil or criminal, in

21  either state or federal court.  Anyone who we haven't already

22  spoken to obviously.  We got one.

23          THE COURT SECURITY OFFICER:  Juror number 33.

24          PROSPECTIVE JUROR:  Good morning.  I was on a jury

25  for a capital murder.

```
1                   THE COURT:  Okay.  And do you remember was that in
2       state or federal court?
3                   PROSPECTIVE JUROR:  It was state.
4                   THE COURT:  Okay.  And were you selected as a
5       foreperson?
6                   PROSPECTIVE JUROR:  No.
7                   THE COURT:  All right.  And did that case go to a
8       verdict?
9                   PROSPECTIVE JUROR:  Yes.
10                  THE COURT:  All right.  Was there anything about that
11      service that would make it difficult for you to be fair and
12      impartial in this case?
13                  PROSPECTIVE JUROR:  No, sir.
14                  THE COURT:  All right.  Thank you.
15                  PROSPECTIVE JUROR:  Juror 42.
16                  THE COURT:  Forty-two.
17                  PROSPECTIVE JUROR:  I participated in a mental
18      competency murder trial.
19                  THE COURT:  Okay.
20                  PROSPECTIVE JUROR:  And --
21                  THE COURT:  Was that in state court?
22                  PROSPECTIVE JUROR:  State court.  Yes, sir.
23                  THE COURT:  Okay.  Were you selected as the
24      foreperson?
25                  PROSPECTIVE JUROR:  No, sir.
```

1          THE COURT:  And did that jury, were they able to

2   reach a verdict?

3          PROSPECTIVE JUROR:  Yes, they were.

4          THE COURT:  All right.  And was there anything about

5   that experience that you feel would make it difficult or

6   impossible for you to serve as an impartial fair and impartial

7   juror in this case?

8          PROSPECTIVE JUROR:  No, sir.

9          THE COURT:  Thank you, sir.  I think this gentleman

10  up here on the second row.

11         PROSPECTIVE JUROR:  Juror number 11.

12         THE COURT:  Okay.

13         PROSPECTIVE JUROR:  I served in a jury, not the

14  foreman, I believe it was state.  I know it was not federal.

15         THE COURT:  Okay.

16         PROSPECTIVE JUROR:  And it was for a DUI case.

17         THE COURT:  All right.  And was the jury able to

18  reach a verdict?

19         PROSPECTIVE JUROR:  It was a hung jury and dismissed.

20         THE COURT:  Okay.  Thank you, sir.  Anything about

21  that experience that you feel would make it difficult for you

22  to be fair and impartial if you were to serve as a juror in

23  this case?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  Thank you, sir.  And now just to confirm

```
 1   again for those of you who were jurors in criminal cases, do --
 2   is there anybody who had service in a criminal case and who
 3   does not understand that the burden in this case is different.
 4   Right.  The burden of proof in this case is preponderance of
 5   the evidence, as previously described, which is different from
 6   beyond a reasonable doubt, which is the standard that applies
 7   in a criminal case.
 8            Is there anybody who served on a jury in a criminal
 9   case who feels they would have difficulty understanding that
10   difference?  All right.  Is there anyone here who is a lawyer
11   or who studied law or is married to a lawyer or has worked or
12   currently works in a law office?  Right up in the front.
13            THE COURT SECURITY OFFICER:  Juror number five.
14            PROSPECTIVE JUROR:  Number five.  I work in a
15   district attorney's office so I'm a paralegal over there.
16            THE COURT:  Okay.  Do you feel that you could be fair
17   and impartial, if you were to serve as a juror?
18            PROSPECTIVE JUROR:  Yes.
19            THE COURT:  Thank you.  Okay.  Now I'm just going to
20   take a minute to give each of you a chance to speak, and I'm
21   just going to -- we'll just kind of go down the line from one
22   and just sort of go by numerical order.  And what I'm going to
23   ask you -- and you all will catch on pretty quickly is I just
24   like for you, if you could, start off with giving me
25   information about your educational background.  How far in
```

```
1    school you went, to what level you completed.  What your
2    employment status is meaning full-time, part time, laid off,
3    maybe you're unemployed.  You could be a homemaker, work
4    multiple jobs, just your employment status.  So educational
5    background, employment status.  And then if you are working,
6    just what your occupation is, who your employer is.  Or if
7    you're not currently working, who your last employer was.  And
8    I'll remind you as we go through.  If we could just start down
9    there with number one.
10            THE COURT SECURITY OFFICER:  Juror number one.
11            THE COURT:  And I might also ask you how long you
12   have been in the community as well.  So just your educational
13   background.
14            PROSPECTIVE JUROR:  I have a Bachelor's in chemical
15   engineering.
16            THE COURT:  Okay.  And are you employed currently?
17            PROSPECTIVE JUROR:  I am full-time.
18            THE COURT:  And who do you work for?
19            PROSPECTIVE JUROR:  I work for U.L.  They used to be
20   known as Underwriters Laboratories.  State deep testing.
21            THE COURT:  Okay.  And your job title.
22            PROSPECTIVE JUROR:  Operations leader for a print
23   circuit board testing.
24            THE COURT:  And how long have you been in the area?
25   How long have you worked there?
```

1               PROSPECTIVE JUROR:  Almost 19 years.

2               THE COURT:  Okay.  Great thank you.  If you'll hand

3     to number two.

4               PROSPECTIVE JUROR:  Number two, retired Air Force

5     2004.  I have a Master's degree in computer operation systems.

6     I currently work for Pearson education as a business analyst

7     for IT and been there since 2004.

8               THE COURT:  Great.  Thank you.  I think that will do.

9     Next to number three.

10              PROSPECTIVE JUROR:  Juror number three.  I have two

11    Bachelor's degrees in psychology and criminal justice.  I

12    currently work full-time for a Transportation Security

13    Administration as a front line officer.

14              THE COURT:  And how long have you been in our

15    community?

16              PROSPECTIVE JUROR:  About 25 years.

17              THE COURT:  Great.  Thanks.

18              PROSPECTIVE JUROR:  Juror number four.  I have an

19    Associate's degree in Applied Science.  I work for mobile

20    company called Car Care Express.  I'm an automotive painter.

21              THE COURT:  Okay.  And how long have you been here?

22              PROSPECTIVE JUROR:  For about ten years.

23              THE COURT:  Great.  Thanks.

24              PROSPECTIVE JUROR:  Juror number five.  I'm currently

25    employed for the Bexar County District Attorney's office as a

1    paralegal in the CPS Unit.  And I'm currently going to school

2    for criminal justice.  And I've been here all my life, but

3    worked for the county for 16 years.

4              THE COURT:  Thank you.

5              PROSPECTIVE JUROR:  Juror number six.  I have a two

6    Master's degrees, one in business, one in leadership and

7    management.  I'm currently a clinic director for a local mental

8    health authority in Karnes County.  Been in the area for about

9    25 years.

10             THE COURT:  Thank you, sir.

11             PROSPECTIVE JUROR:  Juror number seven.  Bachelor's

12   degree in education.  Let's see, I work for USAA as an Asset

13   Recovery Manager -- not manager, but recovery specialist.  Been

14   here 20 years.

15             THE COURT:  Okay.  And how long have you been in that

16   job?

17             PROSPECTIVE JUROR:  Thirty-two years.

18             THE COURT:  Great.  Thank you.

19             PROSPECTIVE JUROR:  Juror number eight.  I have a

20   Bachelor's degree in education.  And I work for USAA as an

21   operations manager.

22             THE COURT:  Okay.  And how long have you been here in

23   our community?

24             PROSPECTIVE JUROR:  My whole life.

25             THE COURT:  Very good.

```
 1            PROSPECTIVE JUROR:  Probably 20 years.
 2            PROSPECTIVE JUROR:  Juror number nine.  I have a
 3    Bachelor's degree in accounting.  I'm retired currently but I
 4    was a management director for an accounting unit at USAA.  And
 5    I've been in the area about 44 years.
 6            THE COURT:  Very good.  Thank you.  We'll go back
 7    down just so we can go in numerical order.
 8            PROSPECTIVE JUROR:  Juror number ten.  I have a high
 9    school diploma.  Some college, almost a degree.  I work at
10    Frost Bank as a product operations specialist.  And I've lived
11    in the community for 20 years.
12            THE COURT:  Thank you.
13            PROSPECTIVE JUROR:  Juror number 11.  I have a
14    Bachelor's degree in business analysis from Texas A&M.  I work
15    for United States Postal Service as a financial manager for 11
16    years up until '99.  Since then I've been a small business
17    owner and investor.  And I've been in the community about 35
18    years.
19            THE COURT:  Thank you.
20            PROSPECTIVE JUROR:  I am juror number 12.  I have a
21    Bachelor's degree in accounting.  I work currently work for
22    NISD in the payroll department, so all year round.  I've been
23    there 31 years.  I've been in San Antonio my whole life.  And
24    what was the other question?
25            THE COURT:  That's good.
```

```
 1              PROSPECTIVE JUROR:  Okay.

 2              THE COURT:  Thank you.

 3              PROSPECTIVE JUROR:  Juror number 13.  And I have

 4    Bachelor's degree and two Master's degrees.  Grew up in San

 5    Antonio for 17 years.  Retired Air Force.  I've been back for

 6    about five years.  I'm in real estate.

 7              THE COURT:  Thank you, sir.

 8              PROSPECTIVE JUROR:  Juror number 14.  I have a

 9    Master's degree in counseling.  I'm retired from the education

10    profession.  And I've lived in San Antonio all my life.

11    Fifty-plus years.

12              PROSPECTIVE JUROR:  Juror number 15.  I have a

13    Bachelor's in biomedical science.  I work at a Zachary Group in

14    facilities management and been a native of San Antonio.  I've

15    been here my whole life.

16              PROSPECTIVE JUROR:  Juror number 16.  I have a

17    Bachelor's of Science degree in civil engineering.  A Master's

18    in Public Administration.  I'm a licensed professional engineer

19    in the state of North Carolina.  I retired in July of 2021

20    after 35 years of civil service primarily doing CE type work.

21    That was with the Air Force.  I've been in the area for 13

22    years.  I retired -- I don't know if I mentioned that earlier,

23    AFCAT.  I spent ten years at AFCAT.

24              THE COURT:  Thank you, sir.

25              PROSPECTIVE JUROR:  Juror 17.  High school diploma.
```

1   I work for City Public Service as a substation electrician.

2            THE COURT:  How long have you been in the community?

3            PROSPECTIVE JUROR:  About 40 years.

4            THE COURT:  Very good.

5            PROSPECTIVE JUROR:  Juror number 18.  We moved back

6   like in 2008, and I have a Master's degree in education.

7            PROSPECTIVE JUROR:  Juror number 19.  I have a

8   Bachelor's in kinesiology.  And I currently work as registered

9   behavior technician providing behavioral services or therapy

10  for children diagnosed with autism in home previously and

11  currently in clinic primarily with military families.  And I've

12  been in the community my whole life so 27 years.

13           THE COURT:  Thank you.

14           PROSPECTIVE JUROR:  Juror number 20.  I work for La

15  Estrella as a Home Health Provider.  I have an Associates in

16  General Science.  I've been in the community for 23 years.

17           THE COURT:  Thank you.

18           PROSPECTIVE JUROR:  Juror 21.  I have some college.

19  Retired out of the military for 27 years.  And also I've been

20  living in the area for eight years.

21           THE COURT:  Very good.

22           PROSPECTIVE JUROR:  Juror number 22.  Been with H-E-B

23  for 35 years working an IT field.  Been here all my life.

24           THE COURT:  Thank you, sir.

25           PROSPECTIVE JUROR:  Juror 23.  I was born and raised

1  here in San Antonio.  Self-employed.  I'm an insurance agent,

2  and I have been in the insurance business for -- going on 19

3  years.

4          PROSPECTIVE JUROR:  Juror number 24.  I have a

5  Master's degree in Public Administration, and I work full-time

6  for the UT Health Science Center in San Antonio.  I'm a manager

7  of research compliance, and I've been in San Antonio for about

8  37 years.

9          THE COURT:  Thank you.

10         PROSPECTIVE JUROR:  Juror number 25.  I have a

11 Bachelor's degree in criminal justice, and I currently work as

12 a banking compliance manager at USAA.  And I've been in the San

13 Antonio area for about seven years.

14         PROSPECTIVE JUROR:  Juror number 26.  I have some

15 college.  I work at Central Federal Services.  My occupation is

16 a software engineer.  And I've been here my whole life.

17 Thirty-one years.

18         THE COURT:  Great.  Thank you.

19         PROSPECTIVE JUROR:  Juror 27.  I have a Bachelor's

20 degree in IT, and I've been here since 2017.  And I just

21 recently started a job at an automotive group.  I'm an

22 inventory specialist.

23         THE COURT:  Very good.  Thank you.

24         PROSPECTIVE JUROR:  Juror number 28.  I have a

25 Bachelor's in psychology.  I currently work for an autism

1    clinic company called Action Behavior Center as a registered

2    technician.  And I've lived in the area about ten years.

3                THE COURT:  Thank you.

4                PROSPECTIVE JUROR:  Juror 29.  I have some college

5    experience.  Right now I work at Toyota manufacturing.  I've

6    been there about 14 years.  I've been here all my life too.

7                PROSPECTIVE JUROR:  I'm juror 30.  I have a

8    Bachelor's in economics and a medical degree MD.  I currently

9    work as a pulmonary intensive care physician at UT Health San

10   Antonio and the VA hospital.  I've been in San Antonio about 12

11   years.

12               THE COURT:  Thank you.

13               PROSPECTIVE JUROR:  Juror 31.  I have a Master's

14   degree in nutrition.  I'm a bariatric dietitian for Sage

15   Bariatric and Dietetic Intern Preceptor for Be Well Solutions.

16               PROSPECTIVE JUROR:  Juror 32.  I'm a financial

17   specialist at UT Health San Antonio.  I've been there for 13

18   years.  I have some college experience.  And I've lived in the

19   area my whole life.

20               THE COURT:  Very good.

21               PROSPECTIVE JUROR:  Juror 33.  I have a Bachelor's in

22   Accounting, a Master's.  I've been -- I was born and raised

23   here in San Antonio except for college in Pennsylvania.

24   Recently retired from USAA after 35 years mostly in the

25   accounting department.

```
 1                THE COURT:  Thank you.
 2                PROSPECTIVE JUROR:  Juror 34.  High school education
 3     only.  Born and raised, San Antonio.  Served ten years in the
 4     Marine Corp Reserves.  Retired from Structural Steel
 5     Fabrication.
 6                PROSPECTIVE JUROR:  I'm juror number 35.  I'm working
 7     on a Bachelor's degree in graphic design.  I work full-time as
 8     an administrative assistant and a personal assistant at a
 9     company that does upscale weddings.  And I've been in San
10     Antonio about ten years.
11                PROSPECTIVE JUROR:  Hi.  I'm juror 36.  I'm a high
12     school graduate.  I'm a truck driver.  Full-time.  Lived in San
13     Antonio all my life.
14                PROSPECTIVE JUROR:  Juror 37.  I have two Bachelor's
15     degree, one in speech communication and one in accounting.  I
16     work for Laverne ISD as a special education teacher.  And I've
17     lived here my whole life.
18                PROSPECTIVE JUROR:  I'm juror 38 -- yeah.  I'm --
19     Bachelor of information systems with UTSA.  Retired from the
20     federal court system with 28 and a half years.  Currently, I'm
21     a subcontractor with Century Federal Services to the treasury
22     department.  San Antonio native.
23                THE COURT:  Thank you.
24                PROSPECTIVE JUROR:  I'm juror number 39.  I have a
25     Bachelor's of Science in Anthropology.  I currently am employed
```

1  at Pluckers wing bar.  I've been there a little over a year.

2  I'm a hostess and a trainer.  And I've been in San Antonio 17

3  years.

4          PROSPECTIVE JUROR:  Juror number 40.  I work

5  full-time at Walmart as an entertainment team associate.  I've

6  been here for about 18 years.  And high school is highest

7  education.

8          THE COURT:  Thank you.

9          PROSPECTIVE JUROR:  Juror 41.  I have an Associates

10  in Computer Science.  Currently unemployed.  I've been here my

11  whole life.

12          PROSPECTIVE JUROR:  Juror 42.  Retiree from AT&T as

13  an outside plant technician.  I've been here since I took my

14  first breath.

15          THE COURT:  Thank you.

16          PROSPECTIVE JUROR:  Juror 43.  I have an Associates

17  in Interior Design.  I've been in the community about 30 years.

18  And I'm currently a homemaker.

19          PROSPECTIVE JUROR:  Juror number 40.  I've been in

20  the area for 54 years.  I have an Associates in computer.  And

21  I work full-time at BioBridge Global in their IT Department.

22          PROSPECTIVE JUROR:  Juror number 45.  I currently

23  work full-time to -- bingo house one evening and one late-night

24  hall.  I've been a native of San Antonio my whole life with the

25  exception of a few years ago where I lived in Colorado County.

1  Columbus, Texas as a supervisor of operations for a bible

2  college and summer camp.

3          THE COURT:  All right.  Thank you.  Okay.  So now

4  just back to some other questions.  The first one is -- and I

5  know that juror number 31.  So apart from you, because I know

6  you're going to have a yes answer to this.  But does anybody

7  else have a yes answer to:  Have you ever been involved in a

8  dispute over a contract?  All right.  And 31 was my person who

9  was involved in a landlord tenant dispute.  Is that correct?

10 Okay.  This gentleman has got something.  And just give me the

11 nature of the dispute, just very generally.

12         PROSPECTIVE JUROR:  Yeah, so juror 16, just in

13 general I've been involved in contract issues throughout my

14 entire career.

15         THE COURT:  Okay.  Thank you.

16         THE COURT SECURITY OFFICER:  Juror 45.

17         PROSPECTIVE JUROR:  Juror 45.  It was just a credit

18 card dispute contract.

19         THE COURT:  Okay.

20         THE COURT SECURITY OFFICER:  Juror 13.

21         PROSPECTIVE JUROR:  I'm currently in real estate, and

22 we have a small business.  We've done some eviction notice

23 small claims courts, that I have been part of that discussion.

24         THE COURT:  Okay.  Thank you.  All right.  Has

25 anybody ever been accused of breaching a contract?  Have you or

1   anybody close to you ever been accused of breaching a contract?

2   Has anybody seen any news reports in any form:  Newspaper, TV,

3   radio, or social media, any other type of internet source

4   regarding military housing in general?  Okay.  Let's just go

5   ahead and give me your numbers.  We don't need to get into the

6   details.  Number seven.  Okay.  Seven.  Who else?  Just raise

7   your hand.  Okay.  Number one, number 16.  And in the back

8   what's your number, sir?  All the way in the back.

9           PROSPECTIVE JUROR:  38.

10          THE COURT:  Thirty-eight.

11          PROSPECTIVE JUROR:  Forty.

12          THE COURT:  Forty.  Okay.

13          PROSPECTIVE JUROR:  Thirteen.

14          THE COURT:  Thirteen.

15          PROSPECTIVE JUROR:  Forty-four, sorry.

16          THE COURT:  Forty-four instead of 40.  Okay.  Or is

17  40 also a yes?  No.  40 is not a yes.  Just 44.  Thank you.

18  Appreciate the clarification.

19          Have any of you read or seen any news reports, again,

20  in any form:  Newspaper, TV, radio, social media, any type of

21  internet source regarding military housing at Randolph Air

22  Force Base?  Number 16 and number 17 are both yes.  Number 44

23  again.  Okay.  Number 44.  Anybody else?  What's your number,

24  sir?

25          PROSPECTIVE JUROR:  Twenty-one.

```
 1                    THE COURT:  Twenty-one.  Okay.  Thank you.  All
 2      right.  Has anyone heard of the Armed Forces Housing Advocates?
 3      Number 16.  Have you or any member of your family ever served
 4      in the military?  I know we have a lot there.  So let's see.  I
 5      may not be -- put your hands up.  Who has not served in the
 6      military and has nobody in their family who has served in the
 7      military?  That's a little bit easier.  Okay.  So why don't we
 8      just start.  Just stand up and tell me your number.
 9                    PROSPECTIVE JUROR:  Ten.
10                    THE COURT:  Ten.  No military ties.  Twelve.
11                    PROSPECTIVE JUROR:  Twenty-three.
12                    THE COURT:  Twenty-three.
13                    PROSPECTIVE JUROR:  Twenty-five.
14                    THE COURT:  Twenty-five.
15                    PROSPECTIVE JUROR:  Twenty-six.
16                    THE COURT:  Twenty-six.
17                    PROSPECTIVE JUROR:  Twenty-eight.
18                    THE COURT:  Twenty-eight.  What was the other one?
19                    PROSPECTIVE JUROR:  Thirty.
20                    THE COURT:  Thirty.
21                    PROSPECTIVE JUROR:  Thirty-two.
22                    THE COURT:  Thirty-two.
23                    PROSPECTIVE JUROR:  Thirty-one.
24                    THE COURT:  Thirty-one.
25                    PROSPECTIVE JUROR:  Thirty-three.
```

```
 1                THE COURT:  Thirty-three.

 2                PROSPECTIVE JUROR:  Thirty-five.

 3                THE COURT:  Thirty-five.

 4                PROSPECTIVE JUROR:  Thirty-seven.

 5                THE COURT:  Thirty-seven.

 6                PROSPECTIVE JUROR:  Thirty-nine.

 7                THE COURT:  Thirty-nine.

 8                PROSPECTIVE JUROR:  Forty-one.

 9                THE COURT:  Forty-one.  Okay.  I think that was less

10      than half that way.  Okay.  Thanks.  And have you or a family

11      member ever lived in military housing?  Okay.  One and two.  Is

12      that five.  And six.  Sixteen and 17, and 18.

13                What's your number, sir?

14                PROSPECTIVE JUROR:  Thirteen.

15                THE COURT:  Thirteen.  And behind, what's your

16      number?

17                PROSPECTIVE JUROR:  Twenty-four.

18                THE COURT:  Twenty-four.

19                PROSPECTIVE JUROR:  Twenty-seven.

20                THE COURT:  Twenty-seven.  And behind him.

21                PROSPECTIVE JUROR:  Thirty-six.

22                THE COURT:  Thirty-six.  Forty-four, right?

23                PROSPECTIVE JUROR:  Yes.

24                THE COURT:  Okay.  Anybody else?  All right.  Now, if

25      selected as a juror, will you be able or willing to render a
```

1    verdict based solely on the evidence presented at trial and the

2    law as given to you by the judge, me, disregarding any other

3    ideas, notions, or beliefs about the law that you may have

4    encountered.  That's the question.  Is there anybody for whom

5    that answer is no?

6            Is there any reason at all for any of you, if there

7    is, raise your hand, if any of you have a reason whether I

8    asked it or not that would keep you from being fair and

9    impartial as a juror if selected to serve as a juror in this

10   case?  Is there anybody who needs to say yes to that?  Okay.

11           All right.  So next up is -- we're going to give the

12   lawyers a little bit of a turn.  And I wonder if we should

13   take -- take a quick break.  Yeah, looks like we've got time to

14   take maybe a ten-minute break, five or ten-minute break just to

15   let everybody stretch their legs.  And then we can come back.

16   Please keep in mind what I mentioned to you earlier about not

17   having any discussions with anybody about the substance of this

18   case.  So please don't talk about the case to each other while

19   you're taking a break or talk about it with anybody else.

20   Certainly, don't talk -- if you happen to bump into any of the

21   other lawyers or other folks while you're taking a break.

22   Don't talk to them.  We'll come back here in here.  We'll

23   reconvene after five after 12, which is just a little bit less

24   than ten minutes.  And when we come back the lawyers will be

25   able to talk to you.  We'll take a break now.

```
1              (Break.)

2              THE COURT SECURITY OFFICER:  All rise.

3              THE COURT:  Please be seated.  Okay.  You all set,

4   Mr. Reed?

5              MR. REED:  Yes, Your Honor.  Mr. Guerra is going to

6   do the voir dire.

7              THE COURT:  Okay.  So we're back on the record.

8              MS. MANN:  If we can approach before Mr. Guerra

9   begins.

10             (At sidebar.)

11             MS. MANN:  With respect to numbers 16, 21, and then

12  18, 16, 21, and 18.

13             THE COURT:  You can talk louder.

14             MS. MANN:  Sixteen, 18, and 21.  I'm sorry, 18 was

15  the one with the health issue.

16             THE COURT:  M-hm.

17             MS. MANN:  Sixteen was the one who worked at AET.

18             THE COURT:  M-hm.

19             MS. MANN:  And 21 is the one who Mr. Vinales was his

20  supervisor.  Can we go ahead and move to strike those for cause

21  so we don't have to ask them questions.  I'm just afraid of

22  asking questions that might taint the rest of the jury.

23             THE COURT:  Okay.

24             MS. MANN:  Or do we need more information?

25             MR. GUERRA:  I'm okay on 16 and 18.  But 21 hasn't
```

1    said anything that caused him to show bias.

2              THE COURT:  Okay.  He didn't say that the plaintiff

3    was his supervisor.

4              MR. GUERRA:  I'd like to ask him questions about it.

5    But if you would rather not, we can bring him up here.

6              MS. MANN:  I just don't know what he's going to say,

7    Your Honor.  The military is based upon rank.

8              THE COURT:  Do you want to talk to him up here?

9              MR. GUERRA:  Sure.

10             THE COURT:  Why don't we do that.  Let's just talk to

11   him right now, and we'll see.  The other two are fine.  You

12   want me to excuse them now?

13             MS. MANN:  I don't think so.  I just didn't want to

14   have to ask questions.

15             MR. GUERRA:  Do I ask 16 questions, Your Honor?

16             THE COURT:  No.  16 and 18 I think y'all agree are a

17   going to be out for cause.  It's 21 is the number of the

18   supervisor.  Do you want to talk to him up here to determine

19   the amount of extent that -- we can call him up.  Okay.

20             (End of sidebar.)

21             I got foiled by the technology.  So just before we

22   start having the lawyers talk to everybody, if we could have a

23   couple of questions for juror number 21.  If you could just

24   come on up, and the lawyers are going to ask you some questions

25   up here at the bench here by me.

```
 1                 (At sidebar.)

 2            MR. GUERRA:  Thank you.  May I proceed, Your Honor?

 3            THE COURT:  Yes.  You can talk out loud.  That mic

 4    knows -- well, actually does a pretty good job, and just so the

 5    reporter can hear.  This is the mic right here.

 6            MR. GUERRA:  I'm one of the attorneys for Shane

 7    Vinales.  And so you mentioned that he was your supervisor at

 8    some point in time.

 9            PROSPECTIVE JUROR:  That is correct.

10            MR. GUERRA:  All we're trying to figure out is if you

11    could be a fair and impartial juror.  Okay.  So let me ask you

12    straight up:  Are you willing to listen to the evidence that's

13    presented only from the witnesses and any evidence and decide

14    whether or not this breach contract case is valid or not.  And

15    would you be able to find against your former supervisor, if

16    you just don't believe he met his burden.  Or do you believe

17    your prior relationship with him is just so significant that

18    you can never overcome it?

19            PROSPECTIVE JUROR:  I believe that, yeah, it's so

20    significant.  I've been to his residence several times for

21    holidays.  I've been to that house.  I've heard about the

22    complaint and about issues that he had with them so.

23            THE COURT:  That's all we have then.  Thank you.  You

24    can go back and sit down.  Thank you.

25                 (End of sidebar.)
```

1          THE COURT:  Okay.  Mr. Guerra.  And, folks, I've

2    given each side 30 minutes that they can use to talk to them.

3    They may or may not use all of the time.  And I'm just going to

4    be a stickler on the time, just so that it's completely fair to

5    everybody.  So once the 30 minutes is up I'll stop them.  It

6    may mean I have to interrupt.  Please give no significance to

7    the fact that I have to stop somebody.  The only thing it means

8    is that their time has run out, and they're eager to keep

9    talking.  But just to make everything fair, we're going to stop

10   them right at 30 minutes.  Go ahead, sir.

11          MR. GUERRA:  Good morning, everyone.  Thank you.

12   It's actually good afternoon now.  First of all, thank you for

13   showing up on behalf of Mr. and Mrs. Vinales.  So let me -- I'm

14   going to ask some follow-up questions from the judge.  My name

15   is Frank Guerra.  And I'm one of the attorneys that represents

16   the plaintiffs.  But before I ask you questions, I'm going to

17   be telling you a little bit about me.  I grew up in South Texas

18   in a little county called Starr County.  I went to Texas A&M

19   undergrad then UT law school.  I've lived here in San Antonio

20   since 1996.

21          So what's the reason we're asking all of these

22   questions, right?  All we're trying to find out is if we can

23   have jurors sit in the box that instead of feeling one way or

24   another, no matter what, can actually listen to all of the

25   evidence from the witnesses, from the documents, from the

```
 1   exhibits and only base their decision based on that.  That's

 2   all we're trying to do.  Now, all of us have biases.  So, for

 3   example, I grew up around my grandfather's concrete plant.  It

 4   was a cement business.  If for some reason this was a lawsuit

 5   against somebody versus the defendant was a concrete plant

 6   maker or manufacturer or had concrete trucks, I probably

 7   couldn't be fair and impartial.  Make sense to everyone?

 8            All right.  So a couple of quick questions.

 9   Obviously, I represent a member of the military, a lieutenant

10   colonel.  There's a lot of you folks that know people in the

11   miliary based on you questionnaire.  So, first of all, not

12   folks that know those in the military but people that were

13   actually in the military, please raise your hand and identify

14   your juror number please.

15            PROSPECTIVE JUROR:  Juror number two.

16            MR. GUERRA:  Number two.

17            PROSPECTIVE JUROR:  Juror number six.

18            MR. GUERRA:  Six.

19            PROSPECTIVE JUROR:  Thirteen.

20            MR. GUERRA:  Thirteen.

21            PROSPECTIVE JUROR:  Eighteen.

22            MR. GUERRA:  Eighteen.

23            PROSPECTIVE JUROR:  Thirty-four.

24            MR. GUERRA:  Thirty-four.

25            PROSPECTIVE JUROR:  Forty-four.
```

1          MR. GUERRA:  Forty-four?  All right.  Thank you for

2     your service.  But here is the question I need to ask all of

3     you to see if I have to ask specific questions.  Now, by virtue

4     of the fact that I represent somebody that is in the military,

5     a lieutenant colonel, just that fact all by itself, are you

6     willing to listen to all of the evidence and base your verdict

7     only based on what you hear?  Or is the fact that you have a

8     fellow military member as plaintiff enough to sway you towards

9     his side no matter what?  Is there anybody that feels they

10    can't listen to the evidence or cannot be fair and impartial,

11    if so please raise your hand.

12         Okay.  So I see no hands raised.  And so that means

13    if you're in the military, even though I represent somebody in

14    the military, everybody can listen to the evidence and be fair

15    and impartial.  Right?

16         Second general question.  There's a lot of you that

17    you checked off yes to either a family member living in

18    military housing or you living in military housing.  First of

19    all, raise your hand if you actually lived in military housing

20    at some point in time.  Okay.  Let's start with numbers again,

21    please.

22         PROSPECTIVE JUROR:  Juror number two.

23         MR. GUERRA:  Yes, sir.

24         PROSPECTIVE JUROR:  Juror number six.

25         MR. GUERRA:  Thank you.

```
 1                    PROSPECTIVE JUROR:  Juror number 13.

 2               MR. GUERRA:  Thirteen.

 3                    PROSPECTIVE JUROR:  Sixteen.

 4               MR. GUERRA:  Sixteen?

 5                    PROSPECTIVE JUROR:  Seventeen.

 6               MR. GUERRA:  Seventeen.

 7                    PROSPECTIVE JUROR:  Eighteen.

 8               MR. GUERRA:  Eighteen.

 9                    PROSPECTIVE JUROR:  Twenty-four.

10               MR. GUERRA:  Twenty-four.

11                    PROSPECTIVE JUROR:  Yes.

12               MR. GUERRA:  Okay.

13                    PROSPECTIVE JUROR:  Forty-four.

14               MR. GUERRA:  Forty-four.

15                    PROSPECTIVE JUROR:  Twenty-seven.

16               MR. GUERRA:  Twenty-seven.  Anybody else?  Okay.

17  Same general question.  This case involves a home on Randolph

18  Air Force Base.  And the allegations are that the defendant

19  breached a contract for failing to do certain things in that

20  home.  Does the fact that you folks actually lived at a

21  military base house at some point in time, are you again

22  willing to listen to all of the evidence and the witnesses and

23  the exhibits and solely base your decision on what you hear

24  about that evidence versus your past experiences or what you

25  may have?  Is there anybody not willing to listen to all the
```

1    evidence, and if so raise your hand.  Again, no hands are

2    raised.  By that I can assume you will.

3              All right.  Third thing:  There's been a lot of you

4    that checked off the box about reading reports, media, news,

5    having to do with military housing in general.  Okay.  And,

6    again, let me ask you folks just if you have actually heard

7    some about it and read something about it, let me make it

8    specific to Randolph.  Who here has actually heard stories

9    about military housing and/or issues at Randolph Air Force

10    Base.  Raise your height hand, please.  Okay.  And, again, let

11    me ask you to please identify your numbers.

12              PROSPECTIVE JUROR:  Sixteen.

13              MR. GUERRA:  Sixteen.

14              PROSPECTIVE JUROR:  Twenty-one.

15              PROSPECTIVE JUROR:  Seventeen.

16              MR. GUERRA:  Seventeen.

17              PROSPECTIVE JUROR:  Twenty-one.

18              MR. GUERRA:  Twenty-one.

19              PROSPECTIVE JUROR:  Forty-four.

20              MR. GUERRA:  Forty-four.  So 16, 17, 21, and 44.  All

21    right.  And just a broader picture:  Who has heard about

22    military housing issues in general, not only Randolph but

23    others.  Please raise your hand.  If you've already given me

24    your number, you don't have to give it again.  Okay.  So any

25    new numbers.  Yes, sir.

```
 1                    PROSPECTIVE JUROR:  Seven.

 2              MR. GUERRA:  Seven.  Okay.

 3                    PROSPECTIVE JUROR:  Thirteen.

 4              MR. GUERRA:  Thirteen.  Okay.  And there's one in the

 5    back over there.

 6                    PROSPECTIVE JUROR:  Thirty-three.

 7              MR. GUERRA:  33.  Okay.  Same question.  It's easy to

 8    believe what you read in the media, and there's been a lot of

 9    information out there.  But the judge will instruct that you

10    can only base your verdict based on what you hear here.  So

11    those of you that have heard stuff out there in the media,

12    whatever it may be, is there anybody who is unwilling to set

13    that aside and say, no, I'm only going to base my verdict based

14    on the witnesses here, based on the evidence here.  Anybody

15    that cannot set that aside?  Number 16.  Okay.  Thank you, sir.

16    Anybody else?

17              Okay.  Juror number one.  Ms. Cote.  Is it Cote or

18    Cote?

19                    PROSPECTIVE JUROR:  Cote.

20              MR. GUERRA:  Have you ever -- you said you have a

21    family member that lived in military housing?

22                    PROSPECTIVE JUROR:  My husband.

23              MR. GUERRA:  I'm sorry.

24                    PROSPECTIVE JUROR:  My husband.

25              MR. GUERRA:  Your husband.  Were you ever -- and this
```

1    may sound interesting.  But did you live there with him at any

2    point in time?

3              PROSPECTIVE JUROR:  No.

4              MR. GUERRA:  Okay.  So you were never actually on the

5    military house facility.

6              PROSPECTIVE JUROR:  No.

7              MR. GUERRA:  Okay.  That's all the questions I have,

8    ma'am.  Juror number two, Mr. Allen.  So, again, you retired

9    Air Force?  Yes, sir.

10              PROSPECTIVE JUROR:  Yes.

11              MR. GUERRA:  And you lived in military house.

12              PROSPECTIVE JUROR:  Yes, sir.

13              MR. GUERRA:  But never at Randolph.

14              PROSPECTIVE JUROR:  Yes, sir.

15              MR. GUERRA:  Okay.  You did.  Okay.  So same question

16    to you, you have got some experience.

17              PROSPECTIVE JUROR:  Let me make sure -- I apologize.

18    I have lived on Randolph in housing.

19              MR. GUERRA:  Okay.  I think they want you to hold the

20    mic.

21              PROSPECTIVE JUROR:  Sorry about that.  Yes, I have

22    lived in base housing.  And Randolph is one of those locations.

23              MR. GUERRA:  Okay.  So in general, I don't want to

24    you give me specifics.  But to the extent you have had personal

25    experiences with your own military housing experience, whatever

1    that may be, is there anything in that past that cause you to

2    feel that you can listen to the evidence in this case and not

3    only be fair to Lt. Col. Vinales and his wife but also to the

4    Defendant AETC.  Anything at all?

5            PROSPECTIVE JUROR:  No.

6            MR. GUERRA:  Okay.  So you can set all that aside and

7    wait for the evidence here and only decide based on what the

8    evidence is in this case?

9            PROSPECTIVE JUROR:  Yes, sir.

10           MR. GUERRA:  Thank you, sir.  That's all I have.

11           Is it Ms. Dunkleberger?

12           PROSPECTIVE JUROR:  Yes.

13           MR. GUERRA:  Yes, ma'am.  So I notice that you have

14   had experience with mold and/or other things in -- somewhere

15   that you lived.  Now did you have experience with mold

16   specifically or was it mildew and rodents or pests?

17           PROSPECTIVE JUROR:  All pests.

18           MR. GUERRA:  Okay.  No issues with mold in the past?

19           PROSPECTIVE JUROR:  No, sir.

20           MR. GUERRA:  Okay.  Thank you, ma'am.

21           Juror Number 5, Ms. Garcia.

22           PROSPECTIVE JUROR:  Yes.

23           MR. GUERRA:  Also, I see that you have at some point

24   had a family member that lived in military housing.

25           PROSPECTIVE JUROR:  Yes, in Fort Hood.

1           MR. GUERRA:  Did you ever go visit that family

2   member?

3           PROSPECTIVE JUROR:  Yes.

4           MR. GUERRA:  Okay.  Several times?

5           PROSPECTIVE JUROR:  Yes.

6           MR. GUERRA:  Is Fort Hood the only military housing

7   facility you have been to?

8           PROSPECTIVE JUROR:  Yes.

9           MR. GUERRA:  Okay.  So is there anything about that

10  experience in the past with your cousin that cause you to say:

11  I can't set that aside and not live to the evidence in this

12  case?

13          PROSPECTIVE JUROR:  No.

14          MR. GUERRA:  Okay.  Now, you also said you had

15  experience with problems in a rental home or apartment.  Tell

16  me very general what those problems were.

17          PROSPECTIVE JUROR:  Oh, just with my apartment just

18  no security.  Broken into my truck, just came out in the news.

19  Just that part.

20          MR. GUERRA:  No mold issues.

21          PROSPECTIVE JUROR:  No.

22          MR. GUERRA:  Thank you, ma'am.

23          Mr. Faulkner.

24          PROSPECTIVE JUROR:  Yes, sir.

25          MR. GUERRA:  So there's a lot of stuff in your

1    questionnaire.  You either know folks in the military or lived

2    in the military housing community.  You also have -- know

3    people or you follow social media accounts about military

4    housing.  In general, all of things related to the military.

5    Yes?

6                PROSPECTIVE JUROR:  Yes, sir, that's correct.

7                MR. GUERRA:  So let me ask you straight up, sir.  To

8    the extent you have a body of knowledge that you may have

9    personally because of your experiences in the past, as you set

10   forth in your questionnaire, are you willing to set all of that

11   aside and only listen to the evidence in this case specific to

12   Lt. Col Vinales and his wife and this defendant as to whether a

13   contract was breached or not, only what's presented to you

14   here.

15               PROSPECTIVE JUROR:  Yes, sir.

16               MR. GUERRA:  And you can be fair to both sides?

17               PROSPECTIVE JUROR:  Absolutely.

18               MR. GUERRA:  Okay.  Quick question about you also had

19   a dispute with a landlord or management company.  Generally,

20   what was the dispute about?

21               PROSPECTIVE JUROR:  It was the Schofield Barracks in

22   Hawaii.  They took care of it.  It was on military housing.  I

23   know you hadn't asked the question earlier.  It was about mold.

24               MR. GUERRA:  Okay.  So let me follow up on that a

25   little bit.  Like I said, you've talked about mold.  You talk

1   about a dispute with the landlord or management company.  Was

2   that a military housing defendant?

3          PROSPECTIVE JUROR:  Yes, that was correct.

4          MR. GUERRA:  Okay.  So like I said, only you know the

5   answer to this.  We have a dispute here between a military

6   member about things in a home against a military housing

7   defendant.  If for some reason we don't present evidence enough

8   to you sufficient from the witnesses or from the documents

9   where you believe we did not meet our burden, that Lt. Col. did

10  not prove that they breached the contract based on the

11  evidence, are you able to set aside your experiences from the

12  past and find against the Lt. Col. if you have to?

13         PROSPECTIVE JUROR:  Yes, sir.

14         MR. GUERRA:  Even if the defendant is a military

15  housing defendant.

16         PROSPECTIVE JUROR:  Yes, absolutely.

17         MR. GUERRA:  Thank you, sir.

18         Mr. Vonlehe.

19         PROSPECTIVE JUROR:  Vonlehe.

20         MR. GUERRA:  Mr. Vonlehe, one of the questions you

21  said is characterizing your respect for military service

22  members, you characterize it moderately.  You have a lot of

23  experience in the military.

24         PROSPECTIVE JUROR:  No, I do not, other than I've

25  been on every base in San Antonio.

```
 1              MR. GUERRA:  Okay.

 2              PROSPECTIVE JUROR:  As a basketball official.

 3              MR. GUERRA:  Oh, as a basketball official.

 4              PROSPECTIVE JUROR:  Correct.

 5              MR. GUERRA:  Just generally, to the extent that it's

 6    right in the middle, neither low nor high, is there any reason

 7    that you have either a negative experience?

 8              PROSPECTIVE JUROR:  It's really not -- I've just

 9    really been -- my father was in the military but that was prior

10    to my being born.  Never really been around military till I

11    moved to San Antonio, so I'm just an in-betweener.

12              MR. GUERRA:  Okay.  Anything about that experience

13    that would cause you told it against the Lieutenant Colonel and

14    say, I'm not going to give him a fair shot during this trial.

15              PROSPECTIVE JUROR:  No.

16              MR. GUERRA:  You're willing to listen to all the

17    evidence?

18              PROSPECTIVE JUROR:  Right.

19              MR. GUERRA:  Thank you, sir.

20              Juror number 11, Mr. Dobson, just a real quick

21    question about your experience as a landlord.  I think you told

22    us a little bit.  You own commercial real estate.

23              PROSPECTIVE JUROR:  Two properties.  Yes.

24              MR. GUERRA:  Okay.  And you've never been involved in

25    any kind of legal dispute or anything like that.
```

```
1              PROSPECTIVE JUROR:  No.

2              MR. GUERRA:  When it comes to the contracts that are

3    being negotiated for those properties, do you do so on your

4    own?  Do you hire lawyers?

5              PROSPECTIVE JUROR:  They're small properties.  I did

6    it on my own.  Well, with advice from not attorneys but real

7    estate -- real estate professionals.

8              MR. GUERRA:  Okay.  To the extent that some of those

9    contracts may require repairs or certain things for you to do

10   as a landlord, do you negotiate those things on your own?

11             PROSPECTIVE JUROR:  I did.  Because most -- the

12   initial tenants were my own businesses.

13             MR. GUERRA:  You were negotiating with yourself.

14             PROSPECTIVE JUROR:  Exactly.

15             MR. GUERRA:  Okay.  All right.

16             PROSPECTIVE JUROR:  Initially.  Then a new tenant

17   came in later, and we used the same contract.

18             MR. GUERRA:  Okay.  All right.  So some of the

19   evidence in this case is going to involve contracts, what the

20   contracts say, and that sort of stuff.  Are you willing to set

21   aside your personal contractual experience both against

22   yourself and other folks aside and just rely on the evidence in

23   this case?

24             PROSPECTIVE JUROR:  Yes.

25             MR. GUERRA:  Is there anything you've heard so far
```

```
1    that would cause you to feel that you cannot be fair and

2    impartial?

3              PROSPECTIVE JUROR:  No.

4              MR. GUERRA:  Thank you, sir.

5              Juror number 12.  Is it Kobernat.

6              PROSPECTIVE JUROR:  Kobernat.

7              MR. GUERRA:  Yes, ma'am.  You also have experience as

8    a landlord?

9              PROSPECTIVE JUROR:  Very short.  It was very brief.

10   I was trying to sell a condo and needed to rent it out for like

11   two months.

12             MR. GUERRA:  Okay.

13             PROSPECTIVE JUROR:  But, yeah, not a whole lot of

14   nothing much going on.

15             MR. GUERRA:  No issues with tenants, complaints, or

16   anything like that?

17             PROSPECTIVE JUROR:  No.

18             MR. GUERRA:  Thank you, ma'am.

19             PROSPECTIVE JUROR:  Um-hmm.

20             MR. GUERRA:  Juror number 13, Mr. Spitzer.  So we've

21   talked about the military and the military housing stuff and

22   the social media, right.  Same thing.  There's nothing in there

23   that would cause you to not be fair and impartial to both

24   sides.  Right?

25             PROSPECTIVE JUROR:  No, sir.
```

```
 1          MR. GUERRA:  Now, you have a lot of experience on

 2   some of the issues in this case to involve mold testing,

 3   property management, landlord disputes, all that sort of stuff.

 4   Right?

 5          PROSPECTIVE JUROR:  I'm a real estate agent.  I've

 6   been doing that for about five years, family business.  My mom

 7   is my broker.  She's been doing it for 47, so we've got about

 8   40 properties that we manage.  But nothing directly on mold

 9   other than just general knowledge that you would have as an

10   agent.

11          MR. GUERRA:  Okay.  And that was going to be my

12   question was:  To the extent you have all these properties --

13   first of all, have you ever had to deal with a mold issue?

14          PROSPECTIVE JUROR:  I have not directly.  Correct.

15          MR. GUERRA:  I mean, as part of your job.

16          PROSPECTIVE JUROR:  No mold issues in terms of

17   negotiations or any complaints from clients.

18          MR. GUERRA:  Okay.  And you're not the guy that goes

19   in there and inspects it and tries to make a determination in

20   one way or another.

21          PROSPECTIVE JUROR:  No, sir, I'm not an expert.  I'm

22   just a general knowledge.

23          MR. GUERRA:  Okay.  And you're willing to set aside

24   your kind of pseudo expertise in what you do and listen to the

25   folks testifying in this case and only rely upon the evidence
```

1    here?

2              PROSPECTIVE JUROR:  Yes, sir.

3              MR. GUERRA:  Thank you, sir.

4              Number 14, is it Ms. Tschirhart?

5              PROSPECTIVE JUROR:  Yes.

6              MR. GUERRA:  Okay.  I saw that you checked off

7    experience with mold, mildew, rodents, the question.  But

8    didn't explain which one it was.  Was it mold or was it

9    something else?

10             PROSPECTIVE JUROR:  It was, you know, bugs, you know.

11             MR. GUERRA:  No mold specific issues.

12             PROSPECTIVE JUROR:  No.

13             MR. GUERRA:  Okay.  Thank you, ma'am.

14             Juror number 15.  Is it Mr. Lasswell?

15             PROSPECTIVE JUROR:  Yes.

16             MR. GUERRA:  Okay, sir, same questions for you as I

17   just had for Mr. Spitzer.  It seems like you have a lot of

18   experience, training or education in all of these areas but

19   that includes both mold testing and remediation and also

20   property management and landlord stuff.

21             PROSPECTIVE JUROR:  Primary in facilities management.

22             MR. GUERRA:  Okay.  So just help me understand.  And

23   so that I get specific to the mold testing and remediation

24   issue.  What experience do you have as a part of you job?

25             PROSPECTIVE JUROR:  As part of managing commercial or

1    institutional buildings, rodents, mold, those kinds of things

2    come up.  If you're in the industry long enough you'll

3    encounter it.

4              MR. GUERRA:  Okay.  To the extent an issue comes up,

5    how involved are you in the process of actually evaluating it,

6    trying to figure out what's there, was it fixed, was it not

7    fixed.  That sort of thing.

8              PROSPECTIVE JUROR:  Yeah, not an expert myself but

9    engaged with those who are.

10             MR. GUERRA:  Okay.  So you hire folks to go and --

11   but you're involved in the process.

12             PROSPECTIVE JUROR:  Yes.

13             MR. GUERRA:  Okay.  Anything about that process that

14   would make you feel to the extent mold is an issue in this

15   case, you wouldn't be willing to set it aside and only

16   listening to the evidence here.

17             PROSPECTIVE JUROR:  No.  No issues.

18             MR. GUERRA:  Thank you, sir.

19             Juror number 20.  Ms. Rodriguez.

20             PROSPECTIVE JUROR:  Yes.

21             MR. GUERRA:  Seems like as part of your job maybe in

22   your experience you have experience with mold and some of the

23   conditions that folks experience with mold.

24             PROSPECTIVE JUROR:  Yes.

25             MR. GUERRA:  Okay.  Now, the Lieutenant Colonel and

1    Becky Vinales are not claiming injuries from the mold.  Okay.

2    This is breach of contract.  So to the extent that you have

3    certain experience with what mold does to people, some of the

4    symptoms, are you willing to set that aside and only listen to

5    the evidence in this case about what this case is about?

6                    PROSPECTIVE JUROR:  Of course.

7                    MR. GUERRA:  And you're willing to be fair both to

8    the Lt. Col. and Ms. Vinales and also to AETC.

9                    PROSPECTIVE JUROR:  Yes.

10                   MR. GUERRA:  Those are all the questions I have, Your

11   Honor.

12                   THE COURT:  Thank you.

13                   MS. MANN:  Good afternoon, ladies and gentlemen.  I

14   promise you really are to the end if you're to me.  My name is

15   Julia Mann, and I along with Walter Boone, Jennifer Skipper,

16   and Kye Handy have a privilege of representing the defendants

17   in this case.  And before I begin my portion, I want to first

18   thank you for being here.  What we're doing here today is a

19   special part of what we here in America have is a jury by our

20   peers.  I know many of you probably had other places that you

21   wanted to be or needed to be.  But on behalf of all of us, all

22   of the parties and the attorneys, we thank you for that time.

23                   Because I'm going to ask you a few questions too, I'm

24   going to tell you a little bit about myself.  So I grew up in a

25   company town southwest of Houston.  And I came to San Antonio

1    about 30 years ago to study law at St. Mary's University school

2    of law.  When I came to San Antonio, I didn't think that this

3    would necessarily be my home.  But it has become my home.  And

4    my husband and I have raised our three daughters here.  Yes,

5    three daughters with the name of Mann.  There are some jokes

6    out there.  And as you have been told, we represent the

7    defendants in this case.

8              Sometimes they've been referred to as Hunt

9    Communities.  Sometimes as Randolph Housing.  Hunt Communities

10   is just a brand name.  The actual names of the two defendants

11   are AETC II Property Management LLC, which is the manager.  And

12   then AETC II property -- I'm sorry Privatized Company LLC,

13   which we sometimes refer to their landlord.  We also refer to

14   them as the project owner because they are a 51 percent private

15   company and 49 percent owned by the U.S. government.  We refer

16   to this community as Randolph Family Housing.  Have any of you

17   worked in partnership, other than number 16, with the U.S.

18   government?

19             Have any of you, other than 16, worked as a

20   government contractor?  Now, the corporation -- oh, I'm sorry,

21   I couldn't see that hand way back there.  Number 38,

22   Mr. Thompson.

23             PROSPECTIVE JUROR:  Yes.

24             MS. MANN:  And, sir, I remember what your education

25   and your experience was, so thank you.  I should have included

1  you.  We have two more hands.  We can pass on number 38.  We

2  have two more hands raised.

3      PROSPECTIVE JUROR:  DOD concept contractor before my

4  court time.  And I'm a Treasury Department contractor now.

5      MS. MANN:  Thank you, Mr. Thompson.

6      PROSPECTIVE JUROR:  Juror 30.  I don't know if this

7  is applicable but I work currently for the VA Hospital.

8      PROSPECTIVE JUROR:  A long time ago, worked at a

9  subcontractor for government contracts dealing with lithium

10  batteries.

11      MS. MANN:  Juror number one, was that here in San

12  Antonio?

13      PROSPECTIVE JUROR:  No, California.

14      MS. MANN:  Thank you.

15      PROSPECTIVE JUROR:  Thank you.

16      MS. MANN:  I think there's one more hand in the

17  middle.

18      PROSPECTIVE JUROR:  Number 24.  I'm not sure if this

19  is applicable but I'm a contractor with the DOD Army, just as

20  part of my job with Health Science Center to access DOD

21  websites, so I'm a paid contractor.

22      MS. MANN:  Thank you.

23      PROSPECTIVE JUROR:  Job number 26.  I don't know if

24  this is applicable.  I work for Central Federal Services, and

25  I -- we work for -- well, in my project I work for the Bureau

1    of Land Management under the Department of Interior.

2             MS. MANN:  Thank you.  That's helpful.  I appreciate

3    that.  Any others that we missed?  Now, both the defendants are

4    corporations.  And under the eyes of the law, a corporation is

5    considered just like a person.  By a show of hands, will you

6    all agree to treat the defendants, even though they're

7    corporations, just like a person?  Is there anyone that

8    believes that because the defendants are corporations they put

9    profits over individuals?

10            And is it fair for me to assume by the lack of raised

11   hands that each of you will consider the evidence presented in

12   this court in answering the questions directed to you by Judge

13   Ferrer?  Now, you have heard a lot today, and we've asked a lot

14   of questions.  Based upon what you have heard so far, are there

15   any of you that just have that gut feeling this case just is

16   not right for me?  Thank you, number 16.  Is there anyone else

17   that because of some relevant experience or opinion or belief

18   that you feel like you cannot sit as a juror on this case?

19            One of the other topics that Judge Ferrer spent a

20   little bit of time with you about is the burden of proof.  And

21   Judge Ferrer told you that the plaintiffs are going to have the

22   burden of proof in this case.  Is there anyone here who thinks

23   that just because we spent this whole morning together we're

24   here at the courthouse, that somehow the Vinales family must

25   have been wronged or else we would not be here in this court

1    today?  That's great.  You listened to the judge's instructions

2    because you haven't heard any evidence yet.  And none of you

3    should have an opinion about that one way or the other.

4           Does anyone believe that the defendants in this case

5    have a burden of proof?  Again, you guys are paying great

6    attention.  The defendants do not.  The defendants do not have

7    to prove anything.

8           We also spent some time talking about a lease

9    agreement, and several of you have shared that experience with

10   you -- experience with us.  There's a lease agreement between

11   Mr. Vinales and my clients.  Both of the parties have

12   obligations under that lease agreement.  By a show of hands,

13   will all of you hold both of the parties to their obligations

14   under the terms of the written lease agreement?

15          Thank you.  Did anyone not raise their hand?  Does

16   anyone believe that you would hold a party to the agreement to

17   more than what's written down?  More than what's in the written

18   terms of the contract, neither party?

19          Now, Ms. Rodriguez, number eight, I think you said in

20   your questionnaire that you had some responsibilities for

21   writing contracts.

22          PROSPECTIVE JUROR:  Yes.

23          MS. MANN:  Do we want to give her the microphone,

24   number eight.

25          PROSPECTIVE JUROR:  Yes.  My experience is with

1    writing and negotiating third-party vendor contracts.

2              MS. MANN:  And is it important to clearly state what

3    the obligations of all the parties to that contract.

4              PROSPECTIVE JUROR:  Yes.

5              MS. MANN:  Thank you.  And I believe it was number 13

6    that said he had some experience in property management, real

7    estate.

8              PROSPECTIVE JUROR:  Yes, ma'am.

9              MS. MANN:  One of the things you're going to hear

10   about in this case is the diligent effort to repair or remedy.

11   In your experience, does a diligent effort to repair or remedy

12   guarantee that every item is fixed every time.

13             PROSPECTIVE JUROR:  No.

14             MS. MANN:  In your experience, have you had

15   situations where you've gone to repair something, done your

16   best but for no reason you had to go back later and fix the

17   same problem?

18             PROSPECTIVE JUROR:  It happens.  Yes.

19             MS. MANN:  Based on your experience as doing this

20   type of property management work, do you feel that you can be

21   fair and impartial in this case?

22             PROSPECTIVE JUROR:  Yes, ma'am.

23             MS. MANN:  And while you're standing, sir, you also

24   said that you lived in military housing.

25             PROSPECTIVE JUROR:  I did?  Twice.

1          MS. MANN:  And what was that?

2          PROSPECTIVE JUROR:  A1 Air Force Base 1997 and '98.

3    Mountain Air Force Base 2001 to 2004.

4          MS. MANN:  And that was before military housing was

5    privatized, correct?

6          PROSPECTIVE JUROR:  Correct.

7          MS. MANN:  Do you have any personal experience with

8    the facilities at Randolph Housing?

9          PROSPECTIVE JUROR:  Never stationed there.  No

10   experience with them.

11         MS. MANN:  You also said in response to question --

12   actually, I'm sorry, sir, I misread that.  If I understood your

13   answers earlier today, you have had issues with property

14   maintenance but none of them have had to do with mold.  Is that

15   correct?

16         PROSPECTIVE JUROR:  Correct.  It's just a general

17   knowledge from being a licensed agent.

18         MS. MANN:  Thank you very much.  Now, we've asked a

19   lot of questions about mold, and I am reading your

20   questionnaires.  A lot of you answered one of the questions

21   that you thought that black mold was a serious health risk.  So

22   I want to talk to you a little bit about those experiences in

23   more depth.  How many of you had an experience with mold in the

24   place in which you lived?

25         Number one, number two, six, nine.  I can't tell

1    numbers once we get to the back row.

2            THE COURT SECURITY OFFICER:  This first row call

3    out -- call it out.

4            PROSPECTIVE JUROR:  One.

5            THE COURT SECURITY OFFICER:  Call out your number.

6            PROSPECTIVE JUROR:  Six.

7            PROSPECTIVE JUROR:  Nine.

8            THE COURT SECURITY OFFICER:  Anybody else on the

9    second row, call out your number.  Third row, please call out

10   your number.

11           PROSPECTIVE JUROR:  Twenty.

12           THE COURT SECURITY OFFICER:  Call out your number.

13           PROSPECTIVE JUROR:  Thirty.

14           THE COURT SECURITY OFFICER:  Next person, call out

15   your number.

16           PROSPECTIVE JUROR:  Thirty-one.

17           PROSPECTIVE JUROR:  Forty-two.

18           PROSPECTIVE JUROR:  Thirty-nine.

19           PROSPECTIVE JUROR:  Forty-five.

20           ATTORNEY:  Through who.  Ms. Cote, I'll go ahead and

21   start with you.  And I believe you said that your husband is

22   the one who lived in military housing.  Correct?

23           PROSPECTIVE JUROR:  Correct.

24           MS. MANN:  How long ago was that?

25           PROSPECTIVE JUROR:  So probably I don't know, fifty

1   years ago.

2          MS. MANN:  From just him sharing his experience with

3   you, do you have any opinions, good, bad or indifferent with

4   respect to military housing.

5          PROSPECTIVE JUROR:  No.

6          MS. MANN:  But you did say you had some experience

7   with mold.

8          PROSPECTIVE JUROR:  Yes.

9          MS. MANN:  And that was in your home.

10         PROSPECTIVE JUROR:  Yes.

11         MS. MANN:  How long ago was that?

12         PROSPECTIVE JUROR:  Probably 15 years ago.

13         MS. MANN:  And as part of that process, did you have

14  to hire a third-party service to come in and help clean your

15  home.

16         PROSPECTIVE JUROR:  Yes.

17         MS. MANN:  Did you discover what the source of the

18  mold was?

19         PROSPECTIVE JUROR:  Yes.

20         MS. MANN:  As part of that process, were you able to

21  eliminate that source.

22         PROSPECTIVE JUROR:  Yes.

23         MS. MANN:  Did you stay living in the home after the

24  repairs?

25         PROSPECTIVE JUROR:  Still there.

1          MS. MANN:  Were there any of your personal effects

2     that you had to discard and could no longer use because of this

3     process.

4          PROSPECTIVE JUROR:  No.

5          MS. MANN:  Is there anything about that experience

6     that makes you believe that you would be unable to sit as a

7     juror in this case and be impartial?

8          PROSPECTIVE JUROR:  No.

9          MS. MANN:  Thank you.  If you will go ahead and pass

10    it to number two.

11         PROSPECTIVE JUROR:  Number two.

12         MS. MANN:  Mr. Allen, thank you.  I'm going to ask

13    pretty much the same questions of you because I don't think we

14    talked about how long ago it was that you lived in military

15    housing.  I think you said there were three separate occasions.

16         PROSPECTIVE JUROR:  The last occasion was -- I'm

17    sorry, 2000.  June through September 2001 and that was on

18    Randolph Air Force Base.

19         MS. MANN:  And was it in one of the historic homes

20    that is part of the Circle Drive area?

21         PROSPECTIVE JUROR:  Yes.

22         MS. MANN:  Do you remember what unit number that was?

23         PROSPECTIVE JUROR:  77 Outer Octagon.

24         MS. MANN:  And during that time, did you have any

25    experience with mold?

1          PROSPECTIVE JUROR:  Yes.

2          MS. MANN:  And was that an issue that you reported?

3          PROSPECTIVE JUROR:  Yes.

4          MS. MANN:  Was it remediated?

5          PROSPECTIVE JUROR:  We were provided moisture

6   absorbing canisters.  That was primarily the tool that we were

7   given.

8          MS. MANN:  And this was before the time of privatized

9   housing before my client AETC was working with the properties

10  on base.  Correct?

11         PROSPECTIVE JUROR:  I had never heard of that

12  contractor, that agency before now.

13         MS. MANN:  Had you ever heard of Hunt Military

14  Communities before now?

15         PROSPECTIVE JUROR:  I have not.

16         MS. MANN:  Based upon the experience that you have

17  had actually out at Randolph Air Force base, are you going to

18  be able to put aside, sir, that personal experience that you

19  lived in one of these homes and be completely fair and

20  impartial in this case?

21         PROSPECTIVE JUROR:  Yes.

22         MS. MANN:  What other -- what were the other two

23  military bases that you lived in besides Randolph?

24         PROSPECTIVE JUROR:  Pease Air Force base 1985 through

25  1986.  That's New Hampshire.  Bolling Air Force Base D.C.  1988

1    through 1991.

2         MS. MANN:  Thank you.  And one other thing that you

3    answered on your questionnaire is that you follow social media

4    accounts that advocate for military members.

5         PROSPECTIVE JUROR:  That may have been misread by me.

6    As far as advocating for military members, no.  I just keep up

7    with aircraft, other sorts ever things.  There is no -- no

8    military -- I'm sorry, no social media as far as advocating for

9    military that I keep up with.

10        MS. MANN:  Thank you, sir.  Appreciate your answers.

11   And now number six also raised his hand with respect to this.

12   Mr. Faulkner, when did you live in military housing?

13        PROSPECTIVE JUROR:  That would be twice.  One in

14   2011-2012 in Fort Hood in Gordon Georgia and from 2012-2014

15   Schofield Barracks, Hawaii.

16        MS. MANN:  And -- Your Honor, may we approach for

17   this juror?

18        THE COURT:  Sure.  Why don't you come on up.

19        (At sidebar.)

20        MS. MANN:  Thank you, Mr. Faulkner.

21        PROSPECTIVE JUROR:  Yes.

22        MS. MANN:  One of the answers that you gave earlier

23   to Mr. Guerra is that you had experience with mold and military

24   housing when you were at Hawaii.

25        PROSPECTIVE JUROR:  Yes, ma'am.

1          MS. MANN:  And that is obviously going to be an issue

2    in the case.  One of the questions that we have asked --

3          PROSPECTIVE JUROR:  Yes, ma'am.

4          MS. MANN:  Is it possible, sir, to completely put

5    aside your own personal experience with this mold and make a

6    determination in this case only on the evidence from the stand?

7          PROSPECTIVE JUROR:  Absolutely.  I work in mental

8    health, and we treat everybody with a blank slate.  So being

9    fair and impartial is something that I really think I can do.

10         MS. MANN:  And I just need to ask you a couple more

11   questions about your experience.  Was a third-party cleaning

12   service hired for that?

13         PROSPECTIVE JUROR:  The military -- I think it was

14   privatized at the time.  They took care of the situation.  It

15   was in the HVAC.  They sealed it up and provided us with window

16   units to accommodate.  Reduced rent housing, so we knew that

17   going in that there would be some structural issues.  They

18   found it and took care of it later.

19         MS. MANN:  Did they take care of it as soon as you

20   reported it?

21         PROSPECTIVE JUROR:  Absolutely.

22         MS. MANN:  And you said you think it was privatized.

23   Do you recall the entity that you might have dealt with there?

24         PROSPECTIVE JUROR:  That's a good question.  I was

25   18, 19, 20 years old at the time.  The only thing the Army

1   community living comes to my mind.

2           MS. MANN:  Is there anything -- do you remember at

3   all the name Hunt associated with that?

4           PROSPECTIVE JUROR:  Not at all.  No, ma'am.

5           MS. MANN:  And did you or any of your family members

6   at that time suffer any personal injuries from?

7           PROSPECTIVE JUROR:  Other than allergies.  But no

8   personal injuries.  Nothing that would be substantial.  Maybe

9   some sniffle noses.  But who knows what that could be

10  attributed to.

11          MS. MANN:  And personal injuries are not an issue in

12  this case but I wanted to make sure that wasn't part of your

13  issue.

14          PROSPECTIVE JUROR:  Yes, ma'am.

15          MS. MANN:  Is there any -- and I'm trying not to pry

16  too much about this.  But is there anything else that would be

17  relevant for the Court to know about this personal experience

18  that you had with the military housing in Hawaii that make come

19  up in this case?

20          PROSPECTIVE JUROR:  Not -- not to my knowledge.  No,

21  ma'am.

22          MS. MANN:  Thank you.

23          THE COURT:  Thank you.  Thank you, sir.

24          (End of sidebar.)

25          MS. MANN:  Now, based upon your questionnaire

1    answers, is there anyone here who is simply afraid of mold?

2    They see mold and they think I've got to get out of this house?

3    Have any of you had situations where you have dealt with mildew

4    in your homes?  And for those of you who raised your hands, was

5    that something that you were able to address just with

6    over-the-counter products?  Is there anybody that I have not

7    talked to specifically that had an issue with mold in their

8    home and they brought in a third-party remediation service,

9    service to work on that?

10              Mr. Dobson, number 11.

11              THE COURT:  We'll see if we can get you that

12    microphone.  Hang on.

13              PROSPECTIVE JUROR:  Yes.

14              MS. MANN:  You indicated that you had experiences

15    with mold, mildew, or rodents in your place where you lived.

16    Which was the issue.

17              PROSPECTIVE JUROR:  That was actually my mother's

18    house, and there were some -- a few rodents and they had their

19    air ducts cleaned for the mold.

20              MS. MANN:  And when you say "their air ducts

21    cleaned," do you mean your mother's?

22              PROSPECTIVE JUROR:  Yes.

23              MS. MANN:  Did she stay living in the home at that

24    time?

25              PROSPECTIVE JUROR:  Yes.

1              MS. MANN:  Thank you, sir.

2              Number 13, as you're passing the microphone, and I'm

3    sorry, Mr. Spitzer, I covered that with you.

4              Number 17.

5              PROSPECTIVE JUROR:  Yes.

6              MS. MANN:  You indicated that you also lived in

7    military housing.

8              PROSPECTIVE JUROR:  Yes.

9              MS. MANN:  What was that?

10             PROSPECTIVE JUROR:  In the 80s.  Like '82 to '85.

11             MS. MANN:  Was that here at Randolph?

12             PROSPECTIVE JUROR:  No, it was in Germany.

13             MS. MANN:  And you indicated that you have seen some

14   news reports, and I don't want to really hear about the news

15   reports.  But were they specific to this case?

16             PROSPECTIVE JUROR:  Yes, it was -- as a matter of

17   fact, it was this morning.

18             MS. MANN:  Can we ask number 17 to approach?

19             THE COURT:  Sure.  Why don't you come up here for

20   some more questions.

21             (At sidebar.)

22             MS. MANN:  Tell us what you heard this morning?

23             PROSPECTIVE JUROR:  I mean, it was just what was

24   covered on news on  Channel 5 was all I heard.  I happened to

25   be watching the news this morning.

1          MS. MANN:  And do you recall how the case was

2     described in that news story?

3          PROSPECTIVE JUROR:  Not specifics.  I mean, I just

4     heard talking about Randolph, and they were showing various

5     pictures and stuff.

6          MS. MANN:  Given the pictures that were shown in that

7     news story, did you reach any conclusions about whether or not

8     there might have been issues with the Vinales' home during

9     their residency?

10         PROSPECTIVE JUROR:  I mean, I live right down the

11    street from Randolph.  I mean, I've heard that things going on

12    for years, so I mean I kind of am close to it a little bit but

13    not specifics.

14         MS. MANN:  You say you're close to it a little bit

15    and live right down the street.  Are you able to set aside what

16    you have heard outside of this courtroom in determining the

17    questions that the judge will ask you at the end of this case?

18         PROSPECTIVE JUROR:  Yes, ma'am.

19         MS. MANN:  Have you heard anything specific about the

20    Vinales family?

21         PROSPECTIVE JUROR:  No.

22         MS. MANN:  Have you heard anything specific about my

23    client Top Military Communities?

24         PROSPECTIVE JUROR:  Never heard of them.

25         MS. MANN:  Are there any other media stories that you

1  have seen other than what may have been on the news this

2  morning?

3          PROSPECTIVE JUROR:  No.  It was just what I heard

4  this morning.

5          MS. MANN:  So nothing prior to that.

6          PROSPECTIVE JUROR:  Not that I can think of.

7          MS. MANN:  What you heard down the street, what is

8  the source?

9          PROSPECTIVE JUROR:  Well, I mean I grew up in the

10  area.  We saw the buildings come down and everything.  We heard

11  why they were coming down, different scenarios and stuff.

12          MS. MANN:  And did you hear that some of those

13  buildings were coming down because they had mold in them?

14          PROSPECTIVE JUROR:  We heard theories of asbestos.

15  We heard stories of mold.  That was kind of the things we

16  heard.

17          MS. MANN:  In this case, will you hold the plaintiffs

18  to their burden of proof and make them show you what was in

19  their home and not take into consideration the knowledge that

20  you have, being a neighbor of Randolph Air Force base?

21          PROSPECTIVE JUROR:  Yes, I would.

22          MS. MANN:  Do you have any questions, Mr. Guerra?

23          MR. GUERRA:  Just to clarify, Your Honor, I just want

24  to make sure the record is clear:  At the point in time that

25  the Vinales started living in the home in 2017 and they lived

1    there for almost two years, okay.  We filed a lawsuit.  We have

2    the burden of proof to prove that under the contract the

3    defendants did something not in the course of that contract and

4    they breached during that time.  Okay.  You say you've heard

5    stuff in the past, whatever that may be, for years and years,

6    and years.  You heard stuff in the news, whatever that may be.

7          Are you telling the judge that you can set all that

8    aside and only rely upon the evidence presented in this court

9    and nothing else to decide, Did I meet my burden or not meet by

10   burden.  You're telling the judge you can do that?

11          PROSPECTIVE JUROR:  Yes, sir.

12          MR. GUERRA:  Thank you, sir.

13          THE COURT:  Thank you, sir.

14          (End of sidebar.)

15          MS. MANN:  Juror number seven, I believe you were

16   standing up when I went to the front were you trying to get my

17   attention.

18          PROSPECTIVE JUROR:  No, I was not.

19          (Laughter.)

20          MS. MANN:  All Right.  I just wanted to be sure I was

21   not ignoring you, sir.  All right.  Number nine.  One of the

22   items you provided us in your questionnaire was that you had

23   mold in your ductwork.

24          PROSPECTIVE JUROR:  Yes.

25          MS. MANN:  How long ago was that?

1              PROSPECTIVE JUROR:  Within the last five years.

2              MS. MANN:  And was that remediated by a third-party

3    company?

4              PROSPECTIVE JUROR:  Well, it was my air conditioning

5    company, and they replaced the ductwork.

6              MS. MANN:  So did you have that air conditioning

7    company come out for routine maintenance?

8              PROSPECTIVE JUROR:  And that's when they found it.

9    Yes.

10             MS. MANN:  And did you leave your home during that

11   time period?

12             PROSPECTIVE JUROR:  No.

13             MS. MANN:  Did you have any damage to your home or to

14   your personal property during that time period?

15             PROSPECTIVE JUROR:  No.

16             MS. MANN:  Thank you.

17             PROSPECTIVE JUROR:  You're welcome.

18             MS. MANN:  Now, I think it was number 19 who

19   indicated that as part of her work that she works with military

20   families.  Is that correct, ma'am?  And, Ms. Olvera, is it?

21             PROSPECTIVE JUROR:  Yes.

22             MS. MANN:  As part of your work with military

23   families, are you able to sit and be impartial in this case or

24   because of your experience with them, do you hold the military

25   to a higher place of esteem?

1          PROSPECTIVE JUROR:  Yes.

2          MS. MANN:  Can you be fair and impartial given

3     holding the military to a place of higher esteem?

4          PROSPECTIVE JUROR:  Yes.

5          MS. MANN:  Thank you.  We asked a few questions to

6     you all about lawsuits.  And thank you for sharing your

7     experience in this.  But in terms of lawsuits, generally, are

8     there any of you that feel that the amount of money awarded in

9     lawsuits is too high?  How about too low?

10          Before I wrap up, is there a question that any of you

11     wish the lawyers would have asked you, knowing what we're

12     trying to do by this process, and that is to ensure that those

13     who sit in this case are fair and impartial.

14          Now, you've likely heard the phrase, "Equal under the

15     laws."  Will each of you place both the plaintiffs and the

16     defendants at the same place -- same place on that starting

17     line as you begin to hear the evidence?  I take it by the nods

18     of the heads that's a yes.  And the starting line is just as

19     important as the finish line because just like in this process

20     today the plaintiffs are going to get to go first.  And the

21     defendants are going to have to a wait to put on their

22     evidence.  By a show of hands, will each of you wait until you

23     have heard from all the witnesses that sit here at this witness

24     stand, received all of the exhibits, before deciding the issues

25     in this case?  Will everyone do that?

1             Now, I told you I had three daughters.  And any of

2    you who have been parents might have had this same experience.

3    If there was an issue amongst the girls, and I went with what

4    that oldest daughter said, I'm pretty sure the middle one would

5    not be alive today.  It was important, and I've learned this

6    probably slower than I should have, to listen to all three of

7    my girls to really understand the full story.  And that's what

8    the defendants and the parties are asking you in this case.

9    Will all of you wait, hear every side to the story before

10   deciding this case.  By a show of hands, are you willing to do

11   that?  And now because the plaintiffs have the burden of proof,

12   if you are undecided which way to go, will you still make the

13   plaintiffs stick to that burden by the end of the case?

14           I want to thank you again for your time.  And we have

15   no further questions.

16           THE COURT:  All right.  Thank you.  Okay.  So I think

17   what we need to do now is I need to talk briefly to the lawyers

18   up here at the bench one last time.  If y'all are like me,

19   you're starving, so hang in there.  I can promise you that we

20   won't stick to this kind of a schedule every day.  But it's

21   just a couple more minutes to go here, and we'll be able to

22   wind all this down to the eight that are going to sit.  And

23   then everybody will be able to go.  That's why I'm kind of

24   pushing forward here.  So just hang tight.  Let me talk to the

25   lawyers up here one last time at the bench.

1              (At sidebar.)

2              THE COURT:  Okay.  Folks, so we all agree or have

3    previously agreed that 16, 18, and 21 are out for cause.  Okay.

4    Do you all have any others you feel need to be struck for

5    cause?

6              MR. GUERRA:  Not from the plaintiff Your Honor.

7              MS. MANN:  From the defendant, number two.  He is the

8    one who specifically lived out at Randolph in a home that was

9    similar.

10             THE COURT:  Um-hmm.

11             MS. MANN:  It had similar issues.  I know he said

12   that he thought he could be fair and impartial, but we believe

13   that that experience is too close to home.

14             THE COURT:  So you have two.  Who else do you have to

15   strike for cause?

16             MS. MANN:  Number six.  He was the one with the mold

17   in Hawaii.  And then I think the other one was 17.

18             THE COURT REPORTER:  I didn't hear.

19             MS. MANN:  And then 17.

20             THE COURT:  So y'all are seeking two, six and 17,

21   kind of similar reasons for all three but not exactly identical

22   obviously.

23             MS. MANN:  And I feel like they described very

24   personal, specific experiences that would be despite what they

25   said difficult to set aside--

1          THE COURT:  Okay.

2          MS. MANN:  -- those biases.

3          THE COURT:  Let's take these up from the top.

4    Mr. Guerra, so two.

5          MR. GUERRA:  We show juror number two was questioned

6    extensively about each of the things that are supposed to be

7    close to his life.  And the issue is, Did he show material bias

8    in the responses to the questions based on the totality of the

9    circumstances.  In response to our questions, he very clearly

10   said, "I'm going to set everything aside and only base my

11   verdict based on the evidence I hear in this court based on the

12   testimony here and based on the exhibits here."

13         There's no evidence before the court or on the record

14   that he showed material bias at all, certainly not material

15   bias, so for that reason we believe the challenge for cause

16   should be denied.

17         THE COURT:  Okay.  Anything else for number two?

18         MS. MANN:  No, Your Honor.  I think we described the

19   basis.  And if it had been another Air Force base, if it had

20   been a different kind of house but it's the same.

21         THE COURT:  Okay.  And for six what's your -- just

22   get into some more detail on that.

23         MS. MANN:  So six is the one who experienced --

24         THE COURT:  In Hawaii.

25         MS. MANN:  Hawaii.  He wasn't sure who it was.  It

1    could have been -- I don't know who it was either, in deference

2    to the Court.  But he believed it was a privatized housing

3    provider at that time.  The type of help that he was provided

4    may be something that we're talking about in this case and

5    whether that really was enough or not enough.  And I don't know

6    how he could truly sit as an impartial juror when he had mold

7    in his military housing that he believes is privatized within

8    the last ten years.

9            THE COURT:  On six, counsel, any response?

10           MS. MANN:  Oh, I'm sorry.  And Ms. Skipper is

11   reminding me that the Vinales also lived at that same military

12   base in Hawaii twice.

13           MR. GUERRA:  May I respond?

14           THE COURT:  Yes.

15           MR. GUERRA:  So, again, Your Honor, what evidence

16   does the Court have before it that shows material bias based on

17   the totality of the experiences?  Mr. Faulkner was brought up

18   here.  He was asked very specific questions about his

19   experiences, about what he thought of those experiences, and

20   specifically whether he can set them aside and only look at the

21   evidence in this case to make a final decision.  He said

22   absolutely.  He said he's in the business of mental health.  He

23   takes them as he sees them.  So the evidence you have before

24   you, Your Honor, is that he can be fair and impartial.  There's

25   no evidence to the contrary.  For that reason we ask that the

1  motion be denied.

2        THE COURT:  Okay.  And then the last one is 17.

3        MS. MANN:  And this was the last individual that came

4  up?

5        THE COURT:  Um-hmm.

6        MS. MANN:  That heard the news.

7        THE COURT:  Heard that news reports.

8        MS. MANN:  This morning.  But also talked about

9  living next door to Randolph Air Force base.  Has known about I

10  think he said what's been going on there for years about

11  buildings being torn down.  His proximity to the actual issues

12  in this case I believe make him not impartial -- I'm sorry, I'm

13  saying this wrong.  Would make it very difficult for him to set

14  aside his experience living there for the last 17 years and

15  hearing rumors constantly as he said about Randolph and decide

16  just on the facts of this case.

17        THE COURT:  Mr. Guerra, any response on 17?

18        MR. GUERRA:  Yes, Your Honor.  We just talked to him

19  ten minutes ago.  Again, the issue is not what's happened in

20  the past or what he knows about it.  The issue is if he shows

21  material bias because of it.  And he very clearly was asked

22  based on everything that he knows, based on everything that

23  he's heard, he's lived right by it, he's heard all of these

24  stories.  Is he able to set that aside, which is the operative

25  term, and only base his evidence based on what he hears in this

```
1   court of law.  And he unequivocally said yes.  So, again, based
2   on the totality of circumstances, that's the burden they have
3   to meet.  There's no evidence before you that they've met that
4   burden, so we ask that the challenge for cause be denied.
5            THE COURT:  Okay.  Well, I agree on six and 17 and
6   with the challenge for cause but not on two.
7            MR. GUERRA:  Not on which one?
8            THE COURT:  Not on two.  Six and 17.
9            MR. GUERRA:  Granted.
10            THE COURT:  So it's 6, 16, 17, 18, 21.  All right.
11   Okay.  And I'll give them a ten-minute break.  Let y'all
12   discuss your numbers amongst yourselves and then we'll come in
13   and sit them and swear them in and then we'll take a break.
14            MR. GUERRA:  So how long do we have to do our
15   challenges?
16            THE COURT:  I mean, I like to say ten minutes.  But
17   if it ends up being that you need a little bit more, just let
18   us know.
19            MS. MANN:  I'm sorry, do you want us to turn them in
20   to Ms. Jackson when we're done.
21            THE COURT:  Yes, just let Ms. Jackson know.
22            MR. GUERRA:  So give them to her by 12:20 or 12:30.
23            THE COURT:  I don't want to rush you, so 12:30.  All
24   right.
25            (End of sidebar.)
```

1              THE COURT:  Okay, folks.  So now we're going to take

2    another short break.  Not long enough for y'all to run and get

3    lunch probably.  There are some vending machines down on the

4    first floor.  But just long enough for the lawyers to talk

5    amongst themselves and make final decisions.  So probably about

6    a 15-minute break.  Then we'll come back in and we'll let you

7    know who is going to be on the jury for this case.  At that

8    time then everybody else can go ahead and be excused.  And then

9    once we know who the folks are, we just have probably one or

10   two more minutes with them, and then we can take a break and

11   everybody can have some lunch.

12             And then for the eight who are sitting on the jury

13   after that hour or maybe even a little bit longer than an hour

14   long break, we'll come back and get things started this

15   afternoon with the beginning of the trial.  Okay.  So the next

16   step is about a 15-minute break.  But you have a question,

17   ma'am?

18             PROSPECTIVE JUROR:  Yes, I'm sorry.  They had said

19   downstairs that if after you had let us know the time frame of

20   the trial, if we had a conflict that we should let you know.

21   Nobody had asked that.

22             THE COURT:  Okay.

23             PROSPECTIVE JUROR:  Is there an appropriate time, if

24   we have a conflict within the two-week period?

25             THE COURT:  No.  Why don't you tell me now.  You want

1  to come up here and tell me or you can tell me from there if

2  you're comfortable.

3          PROSPECTIVE JUROR:  I have some follow-up doctor's

4  appointments that had been scheduled for months, and I'm also

5  responsible for an intern that's coming next week from another

6  state.

7          THE COURT:  Tell me your juror number, please.

8          PROSPECTIVE JUROR:  Thirty-one.

9          THE COURT:  Thirty-one.  Okay.  Thank you for that.

10  Hang tight.  And -- yes.

11          PROSPECTIVE JUROR:  Sorry, juror 30.  I have a

12  similar situation where I have a prenatal medical appointment

13  on Friday.  And I'm also a practicing physician, so I have

14  patient panels that have been scheduled several months in

15  advance.

16          THE COURT:  Okay.  Number 30.  Somebody else had

17  their hand up or -- yes.  Right in the back.  Sir, tell me your

18  number.

19          PROSPECTIVE JUROR:  Forty.

20          THE COURT:  Forty.  Okay.

21          PROSPECTIVE JUROR:  And I have two doctor's

22  appointments in the next week.

23          THE COURT:  Two doctors appointments in the next

24  week.  Got you.  Thank you.  Anybody else?  Yes, ma'am, your

25  number?

```
1              PROSPECTIVE JUROR:  Eighteen.

2              THE COURT:  Yeah, we talked about it.  Okay.  All

3    right.  So we'll come back right back at half past.  And then

4    just give us a few minutes after that, and then you'll know

5    what's going on.  Okay.  Thanks, everyone.

6              (Break.)

7              THE COURT:  You may be seated, folks, sorry.  We just

8    have a tiny bit of paperwork to do.  Just stand by.  Okay.

9    Ms. Jackson is just going to read out the names of the folks

10   which have been selected.  As your name is called, please come

11   up here, and we'll show you where to sit up here in the jury

12   box.  And then I'll just need to talk to the lawyers one last

13   time briefly.  And then we'll be able to let everybody go.  So

14   stand by.  It's just a couple more minutes, folks.

15             THE DEPUTY CLERK:  Okay.  Juror number one, juror

16   number three, juror number eight, juror number nine, juror

17   number ten, juror number 11, juror number 12, and juror number

18   14.

19             THE COURT:  And while they're getting settled,

20   counsel, would you please just approach.

21             (At sidebar.)

22             THE COURT:  Okay.  Do you all have any objections

23   regarding the matter of this jury we selected?

24             MR. GUERRA:  No objections from the plaintiffs, Your

25   Honor.
```

```
 1              MS. MANN:  No objections from the defendant as well.

 2              THE COURT:  Are y'all satisfied with this jury?

 3              MS. MANN:  Yes.

 4              THE COURT:  Very good.

 5              (End of sidebar.)

 6              THE COURT:  Okay.  So we're going to need to swear in

 7    the jury.  But for everybody else that ends our need for your

 8    time.  Thank you very much for your time and patience.  I

 9    really appreciate y'all being here to participate today, in

10    particular being able to participate really without complaint

11    through a pretty long morning session.  That's pretty out of

12    the ordinary, and I really appreciate that.  I know everybody

13    else does as well.  Thank you so much for your service. Y'all

14    are excused.  You probably got instructions about what to do

15    when we are excused.  If you didn't, please just make sure to

16    check in with Ms. Sweeney because we need to get your juror

17    number tags, and she may need to see you. So just make sure you

18    check in with her before you go.

19              Is she waiting on them, Ms. Jackson?

20              THE DEPUTY CLERK:  They can either take their tags to

21    her or just leave them.

22              THE COURT:  Okay.  All right.  If you want, you can

23    take your tags off and just put it on the seat right there

24    where you are now, and then we'll just comply with whatever

25    instructions she gave you.  If she said you can go, then you
```

1    can go.  And that's all we need.  Thank you so much.

2                (Prospective jurors excused.)

3                THE COURT:  And, Ms. Jackson, do we have Ms. Sweeney

4    who will be able to swear these folks in?

5                THE DEPUTY CLERK:  I'll do it.

6                THE COURT:  We'll let these guys file on out.  Okay.

7    All right.  Everyone can be seated.  And Ms. Jackson is going

8    to swear in the jurors.  What we'll do as soon as you're sworn

9    in, I'm going to check with the lawyers and make sure there's

10   nothing else.  But I think we'll just take a break.  I'll give

11   the preliminary instructions after we come back after our lunch

12   break, and then we can start with opening arguments.  And

13   that's probably all we'll get done today.  So, counsel, why

14   don't we go ahead and get them sworn in.

15               THE DEPUTY CLERK:  Please stand and raise your right

16   hand.

17                (Jury panel sworn.)

18               THE JURY:  I do.

19               THE COURT:  All right.  Thanks, folks.  You may lower

20   your hands and sit back down.  And with counsel let me check

21   with each of you.  Anything else that we need to take care of

22   here either up at the bench or otherwise before we take a break

23   here for lunch.

24               MR. REED:  No, Your Honor.

25               MR. BOONE:  No, Your Honor.

1            THE COURT:  Okay.  And then just regarding timing,

2     it's now a quarter to 2:00.  Should we break for an hour?

3            MR. REED:  Works for us.

4            THE COURT:  Okay.  So we'll take a full hour.  So if

5     everybody can get back ready to go at a quarter to three.

6     We'll have opening arguments from each side.  Let me just

7     before y'all go, let me please just reiterate now that you have

8     been impaneled and sworn in, please do take care that you must

9     not discuss the case in any manner among yourselves or with

10    anybody else.  You must not permit anyone to attempt to discuss

11    it with you or in your presence.  You're further instructed

12    that in order to avoid even the appearance of impropriety you

13    should have no conversation whatsoever with either of the

14    lawyers in the case or with anyone you may come to recognize as

15    having some connection with the case.

16           You must also avoid reading any newspaper articles

17    that might be published about the case, avoid listening to or

18    observing any broadcast news program or either television or

19    radio because of the possibility that mention might be made of

20    the case during such broadcast.  And then, finally, I think

21    most pertinent to us in a modern era is please don't consume

22    any internet information regarding the case.  Don't Google the

23    case.  Don't Google the participants in the case.  Really, from

24    now until the case is over you'll need to avoid that type of

25    activity and just take special care regarding the internet

```
 1   because it is such a fountain of information that really you
 2   want to avoid having any of that information come in and infect
 3   you or your duty as a juror.  We've talked about that a lot
 4   today.  Okay.  All right.  Thank you.  That's all that we have,
 5   so we'll see everybody back in one hour at a quarter till.
 6   We'll be in recess until then.  Thanks, everyone.
 7               THE COURT SECURITY OFFICER:  All rise.
 8               (Lunch.)
 9               THE COURT SECURITY OFFICER:  All rise.
10               THE COURT:  Please be seated everyone.  Okay.
11   Counsel, I think we need the start out by having a chat up here
12   again.  We should be on the record here.
13               (At sidebar.)
14               THE COURT:  So I got a note that one of the jurors
15   needs to talk to me, so I don't know what this is about.  So
16   we're going to go and see what's going on.
17               MR. GUERRA:  Okay.
18               MS. MANN:  Okay.
19               (Juror approaches the bench.)
20               THE COURT:  Okay.  So I just got a note that you
21   needed to talk to me.
22               THE JUROR:  I don't want to be that person that ruins
23   everything, sir.  And I want to apologize in advance.  I'm so
24   sorry so -- but earlier this morning when we were talking about
25   things that might prevent us from being able to sit on the
```

1  jury.

2          THE COURT:  Um-hmm.

3          THE JUROR:  It didn't occur to me how far in

4  advance -- I know you said ten, 12 days.  On the 17th of this

5  month I will be out of town.

6          THE COURT:  During what?  17.

7          THE JUROR:  The 17 of this month I'll be traveling

8  out of month for a week.  It was all of my paperwork.  But when

9  we were here today it didn't occur to me that ten to 12 days.

10 It seems far in advance than what it actually might be

11 considering what we are looking at for this trial.

12         MR. BOONE:  So that's next Thursday.

13         THE JUROR:  That's next Saturday.  So it is a

14 weekend, that's why it didn't occur to me because we work

15 during the week so.

16         THE COURT:  Okay.  Thoughts.

17         THE JUROR:  I know it's coming in really close, I'm

18 so sorry.

19         MR. BOONE:  We'd rather know now than later so thank

20 you.  My thoughts are of course is there is a chance we could

21 finish, although we have that one witness that's not going to

22 be here that week.

23         THE COURT:  Um-hmm.

24         MR. BOONE:  But we might just if Your Honor is

25 willing keep her here.  Let her listen.  And we can gauge that

1    as we go.  And then if she does have to leave and we do have

2    witnesses that maybe we just release her then.

3           THE COURT:  Yes.  We'll go ahead with seven then.  Is

4    everybody okay with that?

5           MR. GUERRA:  Yeah.  That's what I was going to

6    suggest as well.

7           THE COURT:  Okay, counsel, that sounds like a good

8    plan.

9           Does that work for you?  We're going to keep you on.

10    They're going to do their best -- you know, there's a lot of

11    factors at play here.  They'll present their cases, and we'll

12    see how it looks as we approach that Friday.  There's a chance

13    that they will be done, in which case you can sit all the way

14    up and deliberate.  But if it looks like it's going to be

15    something that we can't finish, then at that time we'll take it

16    up.  And if it looks like it's okay, then I'll release you at

17    this time.  And we can go forward with seven.  Okay.  But we're

18    going to ask you to sit this week.

19           THE JUROR:  Of course.

20           THE COURT:  But we'll have in our mind that you'll

21    need to be traveling.  And you need to travel that Saturday,

22    not that Friday?

23           PROSPECTIVE JUROR:  That Saturday is when we --

24    Friday I'm in the clear.

25           THE COURT:  Okay.  So that's what we'll do.  We'll

1    keep you up through Friday, okay.

2              THE JUROR:  Okay.

3              THE COURT:  Thank you for letting us know.

4              THE JUROR:  Appreciate it so much.  I'm so sorry.

5              MR. BOONE:  No, you did exactly what you were

6    supposed to do.  Thank you.

7              (End of sidebar.)

8              THE COURT:  Okay.  Thanks, counsel.  Okay.  So next

9    is just I have some preliminary instructions that I'm going to

10   give to the jury, which won't take very long at all.  And then

11   once we've taken care of that, then we can hear opening

12   argument from the parties.  And that's probably all -- well,

13   that is as far as we'll get today.  All right.  So why don't I

14   go ahead and provide for you all these instructions.  So as I

15   mentioned before we took our break, you all have been -- you

16   have been sworn in.  And so you're going to be the folks who

17   will serve as a jury to try the case of Vinales et al. v. AETC

18   II Privatized Housing LLC et al.  Trial is going to begin today

19   here shortly.  And we'll always be here in Courtroom E on THE

20   3rd floor of this building.

21             So now anything you may have heard scene, or read

22   outside the courtroom is not evidence and must be disregarded.

23   You are here to decide the case solely on evidence presented

24   here in the courtroom.  Now, there are two kinds of evidence:

25   Direct and circumstantial evidence.  Direct evidence is direct

1    proof of a fact such as testimony of an eye witness.

2    Circumstantial evidence is proof of facts from which you may

3    infer or conclude that other facts exist.  I'll give you

4    further instructions on these as well as other matters at the

5    end of the case.

6         It will be up for you to decide which witnesses to

7    believe, which witnesses not to believe or how much of any

8    witness's testimony to accept or reject.  I'll give you some

9    guidelines into determining credibility of witnesses at the end

10   of the case.

11        During the course of the trial, do not speak with any

12   witness or with the parties or with any lawyer in the case.

13   Please don't talk to them about any subject at all.  You may be

14   unaware of the identity of everyone connected with the case,

15   therefore in order to avoid even the appearance of impropriety,

16   please don't engage in any conversations with anybody in or

17   about the courtroom or in the courthouse.  It's best that you

18   remain in the jury room during breaks in trial and don't linger

19   in the hallway.

20        In addition, during the course of the trial, don't

21   talk about the trial with anyone else, not your family, not

22   your friends, not the people with whom you work.  Also, do not

23   discuss this case amongst yourself until I have instructed you

24   on the law and you have gone to the jury room to make your

25   decision at the end of the trial, otherwise, without realizing

1    it, you may start forming an opinion before the trial is over.

2         It's important that you wait until all the evidence

3    is received, and you have heard my instructions on the rule of

4    law before you deliberate amongst yourself.  Let me add that

5    during the course of trial you will receive all of the evidence

6    you properly may consider in the matter.  Please do not try to

7    find out information from any source outside the confines of

8    this courtroom.

9         Do not seek or receive any outside information on

10   your own, which you think might be helpful.  Do not engage in

11   any outside reading or research about this case or the law

12   involved.  Do not attempt to visit any place that might be

13   mentioned in this case, whether in person or via map or some

14   kind of online resource.  You must not read about the case in

15   any particular online source or publication or watch or listen

16   to any TV news about this either, should there be any of those.

17   Please don't use the internet for any purpose regarding this

18   case during your service as a juror.

19        The trial is going to begin, as I said, in just a few

20   minutes here.  First, the plaintiffs will make an opening

21   statement, which is simply an outline of what they intend to

22   prove.  Next, the defendants will make an opens statement.

23   Opening statements are not evidence nor are the arguments that

24   will be made at the conclusion of the case.  The plaintiffs

25   will, after the opening statement, present their witnesses and

1    the defendants may cross-examine them.  We expect that this

2    start tomorrow.

3              Following the plaintiff's case, the defendants will

4    present witnesses whom the plaintiffs may cross-examine, and

5    the plaintiffs may then introduce rebuttal evidence.  After all

6    the evidence is in, the parties will present their closing

7    arguments to summarize and interpret the evidence for you.  And

8    the Court will then instruct you on the law.  After that,

9    you'll retire to deliberate on your verdict.

10             Thank you in advance for your attention to this

11   matter.  With that, why don't I turn things over to counsel for

12   plaintiffs for opening.

13             MR. REED:  Thank you very much, Your Honor.

14                     PLAINTIFF'S OPENING STATEMENT

15             MR. REED:  Thank you very much, ladies and gentlemen

16   of the jury.  This is a case about service, whether it is

17   serving in the U.S. Army, whether it is serving a military

18   family, or whether it is serving on a civil jury.  Your

19   presence here today, your service on this jury is of paramount

20   importance to the way our system works.  Judge Ferrer decides

21   issues of the law.  But you all decide issues of fact.  You all

22   decide issues of credibility of the witnesses.  And so your

23   time, your attention, your thoughtfulness as we present our

24   cases to you is critical to my clients as well as the

25   defendants.  And we all want to thank you for being here and

1     giving us your time.

2              I'm going to try to have a presentation, a PowerPoint

3     presentation.  And you have screen in front of you so you may

4     be able to see as I begin this opening statement.  The Vinales

5     family is a proud Army family.  They had the courage to stand

6     up to their landlord, AETC II Privatized Housing LLC, a Hunt

7     military community.  And I'm going to get into who the players

8     are here in just a little bit.

9              My clients leased a house at Randolph Air Force base,

10    and the problems they experienced in that house were

11    exacerbated by the substandard service that they allege that

12    they received from the defendants in this case.  That's what

13    you're going to hear about for the next several days.  I'd like

14    to introduce you to the Vinales family.  I'm joined here in the

15    courtroom by a number of colleagues of mine from Watts Guerra

16    who you met earlier during the voir dire selection.  You have

17    also met Lieutenant Colonel Shane Vinales who has served the

18    Army for over 20 years.  Sitting next to him is his boss and

19    his wife Becky Vinales.  They have two children, Landon and

20    Savannah ages 11 and nine.  From 2017 to 2019 the Vinales

21    family lived in a house at Randolph Air Force base.

22              For those of you who are not familiar with military

23    life, military families move every two to three years.  They

24    receive orders from their respective branch of the service, in

25    this case, the Army with the Vinales family.  And they were

1  ordered to move to San Antonio.  In the process, they uproot

2  their families.  They move their children out of schools.  They

3  mover all of their household goods and their cherished

4  possessed onto the next location.  In this case the Vinales

5  family went to Randolph Air Force base to inquire about housing

6  there.  And they ended up leasing one of the very few houses

7  that were available for lease.

8       It was the community at Randolph Air Force base that

9  truly attracted the Vinales family there.  It's a small

10  community of approximately 317 homes.  There's everything you

11  need to live on that base in a very comfortable environment.

12  And you're surrounded by other families with other young

13  children who experienced the same type of lifestyle that the

14  Vinales family does--moving, uprooting their family, starting

15  over and making new friends again.  That's what they found so

16  attractive about Randolph Air Force base.  So placing their

17  hands in the U.S. Army and the United States government and the

18  contractual partners of in this case the United States Air

19  Force, the Vinales family leased from AETC II privatized

20  housing.  They leased a home that you see here in front of you

21  at 3 Southwest Road.

22       So the question you might be asking yourself is who

23  is AETC II privatized Housing?  What does that stand for.

24  Well, I'll tell that AETC II in the military world stands for

25  Air, Education, Training and Command.  But the evidence in this

1    case is going to show you that AETC II privatized Housing is

2    not in fact the government.  It's not the United States

3    military.  It's not the Army.  And it's not the United States

4    Air Force.  AETC II privatized Housing as the name implies is a

5    private company that was formed to be a partner with in this

6    case the United States Air Force to own, manage, and lease the

7    houses at Randolph Air Force Base.

8            AETC II has an affiliated company called AETC II

9    Property Managers LLC.  The evidence will show that AETC II

10   Property Managers was the management part.  And so we have a

11   house.  It's owned by the landlord, and the property management

12   company takes care of all of the maintenance needs at that

13   property.

14           Now here is the rub.  And you've already heard about

15   it in voir dire.  Who is Hunt Military Communities?  What is

16   Randolph Family Housing?  The evidence is going to show you

17   that you Randolph Family Housing is simply a colloquial name

18   used to describe the houses at Randolph Air Force Base.  It's

19   not an entity.  It's not an employer.  It doesn't own or

20   operator the housing.  It's just a name that's used, Randolph

21   Family Housing, to describe houses at Randolph Air Force base.

22           Hunt Military Communities, on the other hand, the

23   evidence is going to show you that it is in fact the trade name

24   or the doing business name of all of the players involved.

25   You'll hear testimony that any time a service call was

1    requested somebody rang a Hunt Military Community's showed up

2    to service the house.  Any time the family went into the

3    housing office they saw signs that said Hunt Military

4    Communities.  We heard in voir dire that Hunt is a brand name.

5    And Hunt brags that it is the largest provider of military

6    housing throughout the country.  So when we talk about AETC II

7    privatized housing, and we talked about AETC Property Managers,

8    and you hear the name Hunt, they are for all intents and

9    purposes are functionally synonymous.  That's the company that

10   leased the house to my client at 3 Southwest Road.  That's the

11   company who entered into a company with the United States

12   government for the purpose of providing good and safe housing

13   to military families like the Vinales family.

14          Let me tell you a little bit about what the evidence

15   will show in terms of how housing works at a military base like

16   Randolph.  Lieutenant Colonel Vinales completes an application.

17   If housing is available, he is then put on a list.  And the

18   evidence will show that he was able to go and look at two

19   houses that were in the inventory at the time that he and his

20   family moved to San Antonio.  After walking through the houses,

21   they inquired about applying to live in one of the houses.

22   They completed a lease application.  And in the course of

23   completing that lease application, he was requested to provide

24   his BAH or basic allowance for housing.

25          Now, basic allowance for housing is a part of a

1    service members compensation provided by the United States
2    Army.  That basic allowance for housing is dependent on the
3    rank of the individual, the location of where they're living,
4    and how many dependents they have.  What's unique about this
5    situation is that with AETC II, they directly receive
6    Lieutenant Colonel Vinales entire BAH at the beginning of each
7    month, and there was no ability for Lieutenant Colonel Vinales
8    to then pay that rent over if he was having a problem.  That
9    money was guaranteed by the United States government to be paid
10   directly to AETC II privatized housing.

11          So October of 2017 the Vinales family completes their
12   lease.  They walk through the house.  They observe some
13   conditions with the house.  They let the housing company know.
14   And by the end of the month their goods arrive.  They've moved
15   into the house, and they're requested to complete a move-in and
16   move-out form on which they note a variety of issues with the
17   house.  Another family had previously vacated the home.  The
18   Vinales family moves in and begins their life.  And a number of
19   issues that are reported on the form do not get resolved for a
20   great period of time.  The evidence will show that the family
21   was complaining about a moldy smelling carpet from day one.
22   And it took approximately six months for that carpet to be
23   replaced.  There were a variety of other issues that the family
24   then began to encounter once they moved into the house.
25          Over the course of the next 18 months the Vinales

1   family repeatedly put in work orders for a variety of issues at

2   their home.  Insects.  The Vinales family had ants repeatedly

3   coming into the home and biting their children in bed.  Any

4   time there was rain, the Vinales family would find puddles of

5   water at the doors and other thresholds in the house.  They

6   would repeatedly put in work orders to have those types of

7   issues fixed.

8        They found mold growing on window seals.  They found

9   a bedroom wall that had all types of discoloration and

10  disfiguration.  And they repeatedly made requests for their

11  landlord to resolve these issues.  The evidence will show you

12  that many times the landlord canceled those work orders without

13  completing the work.  Or when they did perform work, they were

14  Bandaid fixes, whether it's painting over or simply slapping

15  something on the problem to hide it or mask it for some period

16  of time.  The issues recurred and they recurred.

17       About a month after moving into the house, the

18  Vinales family was hosting a number of family members around

19  the Thanksgiving time and having a party for Lieutenant Colonel

20  Vinales who had been recently promoted.  At that time the

21  electricity for the house went out.  They had a fridge full of

22  items for the party.  They had to run an electrical outlet

23  outside.  That electrical outlet powered the fridge while they

24  attempted to have their guests -- and when the issued were

25  reported to their landlord, the landlord sent workers over.

1    They hacked into the wall, and they attempted to redo the
2    electrical box.
3            Now, there were a couple of problems.  Number one, we
4    have no idea that these workers were qualified to in fact do
5    what they were doing.  They left a gap where wires came out of
6    the electrical box that was at eye level for young children.
7    The Vinales family was told to sign an asbestos addendum
8    advising them that there may be asbestos problems when they
9    moved into the house.  And yet these workers came over with
10   saws, hammers, and they began hacking into the wall spreading
11   dust all over the Vinales' goods without laying down any type
12   of containment or protective covering at all.  Those are the
13   types of issues that the Vinales family would encounter over
14   the months that they lived in the house.
15           By the time they'd been in the house for a good nine
16   months they started to have concerns about a variety of issues
17   with the house that weren't getting fixed.  The evidence is
18   going to show you photographs like you see on your screen.
19   Problems with the master bedroom wall, discoloration, and
20   disfiguration.  Mold and other growth on the HVAC air events.
21   These are the types of issues that were never properly
22   remediated.  Mrs. Vinales, frustrated, finally got her
23   husband's attention.  The evidence is going to show that he had
24   to go to the top levels of his chain of command to try to get
25   attention to their family house and the issues that they were

1    encountering.

2            So the question will be, as the judge will instruct

3    you on the law, and he's going to tell you by the time we get

4    to the charge conference in this case, what the law is.  But I

5    suspect he's going to charge you with respect to the lease.

6    And the question will be whether the landlord complied with its

7    lease obligations.  So I'd like to show you briefly some of the

8    language from the lease.  The lease says that the residence

9    shall make no repairs to the premises or fixtures located

10   within the premises without the written consent of the

11   landlord.  Residents shall immediately notify the landlord of

12   any actual damages to the premises.  Landlord shall make a

13   diligent effort to repair or remedy the condition of the

14   premises in accordance with the maintenance procedures provided

15   in the resident guideline.  So what does the resident guideline

16   have to say?  When you look at Section 2.1 of the resident

17   guideline, which you'll see in the evidentiary portion of the

18   trial, it says that the landlord agrees to maintain all

19   electrical, plumbing, heating, ventilating, air conditioning,

20   appliances, and other facilities and common areas in a good and

21   safe working condition subject to the covenants and duties

22   undertaken by the resident.

23            I want to pause a moment to talk to you about the

24   burden of proof in this case.  My clients are the plaintiffs in

25   this case.  And as you heard from, Ms. Mann during voir dire,

1    we bear the burden of proof.  Our burden of proof, as Judge

2    Ferrer will instruct you, is to prove our case by a

3    preponderance of the evidence to prove that the landlord failed

4    to comply with the lease by a preponderance of the evidence.

5         To be clear, the preponderance of the evidence

6    standard is our burden, which we glady embrace, to show that

7    the landlord failed to comply with these provisions by

8    basically tipping the scales.  It's our burden to present you

9    enough evidence where you say, you know what, the scales lean

10   in favor of the Vinales family.  With those scales tipped in

11   favor of the Vinales family, that's the standard that you are

12   looking at when you evaluate the evidence in this case.

13        I'll say another word about credibility.  You as the

14   jury are the sole judges of credibility.  You get to decide

15   who's telling the truth, whose testimony is more credible.  So

16   as we turn to the witnesses in this case, it's your job to

17   determine who is being truthful, who is being honest, and who

18   is more credible.

19        You're going to hear from Lieutenant Colonel Shane

20   Vinales.  And he's going to describe to you much of what I have

21   just told you, what their experiences in the house were like.

22   He's going to tell you about the process of moving in.  He's

23   going to tell you what they observed when they moved into the

24   house.  And he's going to tell you about a number of the events

25   that they encountered as their time in the house went on.

1          He'll detail for you what happened by March of
2     2019 when things started to get real bad in the house, when
3     they discovered issues like the mold in the HVAC vents.  When
4     they discovered the repeated water intrusions when he woke up
5     on the couch sitting there on the weekend and saw a crack in
6     the wall in the living room where the light was shining in big
7     enough for insects and ants to crawl through.

8          You're going to hear from Mrs. Becky Vinales who will
9     detail all of the times that she called maintenance, all of the
10    issues that she encountered, and how her worries about the
11    conditions in the house increased over time.  How every time
12    they discovered a bandaid fix was applied, she grew more and
13    more worried about whether her family was living in a safe
14    home, again, culminating in the spring of 2019 when the family
15    couldn't take into any more, when Lieutenant Colonel Shave
16    Vinales went to base leadership General Underman and began
17    requesting further inspections.

18          You'll hear about the number of inspections and the
19    people that came into their home and about the attempts to
20    repair when those issues were finally spotlighted by high-level
21    base leadership.  What you'll then learn is that the Vinales
22    family was dislocated from their house.  They were forced to
23    move out of their house so that repairs could be done to the
24    house.  They choose to live in their travel trailer while those
25    repairs were being done.  They would never return to that house

1  again.

2          Now, while they're living in their travel trailer,
3  all of their household goods are locked up in their house.  The
4  landlord changes the keys, reportedly for the safety of their
5  home.  So the Vinales family cannot easily get to their goods.
6  And yet they would come by the house and they would find a
7  number of young unqualified workers working in the house
8  without protective gear.  On occasion they would come by the
9  house -- and by this point in time, so that their household
10  goods could be transported to their next base station, a mold
11  remediation became necessary.

12          What you'll hear is evidence about the mold
13  remediation that took place.  Again, you're the sole judges of
14  credibility.  You get to listen to the witnesses and determine,
15  Did this mold remediation take place in accordance with any
16  standards?  Was it done properly?  The testimony from the
17  Vinales family is that they walked into their home and they
18  found the containments that were set up having fallen down.
19  Having peeled away from the wall.  Having seen people walk
20  through rooms that were supposed to be clean rooms.  Bathroom
21  floors between other rooms and back into the clean rooms.
22  You'll hear testimony from the Vinales family that when they
23  came to their house and the locks had been changed, the lock to
24  the side door was not in fact locked, so anyone could have come
25  into their home.

1    At the end of the day, it comes down to the

2    credibility of the witnesses.  You'll hear what Shane and Becky

3    Vinales went through.  And you'll hear that by the time they

4    got to their next duty station they had to discard many of

5    their household goods because despite this purported

6    remediation of their household goods, many of their items still

7    had mold growth on them.

8    Now, you're going to hear from the defendants as

9    well.  And you heard in voir dire that the defendants have a

10   whole host of witnesses here they may bring before you.  I'd

11   like to briefly describe for you what we expect the evidence

12   will show when you hear from these witnesses.  Prepare yourself

13   to hear the blame game.  AETC II is a professional landlord.

14   They entered into a contract with the United States government,

15   and they brag about being the largest military housing provider

16   in the country.  When their witnesses take the stand, listen to

17   see if they take responsibility for their own actions.

18   Instead, what I suspect is that you're going to hear about

19   Extreme weather in San Antonio at the time.  Be the judge of

20   the credibility of that testimony.  Does Extreme weather cause

21   the types of problems that the Vinales family will tell you

22   about?  Does the Extreme weather prevent a landlord from making

23   diligent efforts to repair homes?  I would challenge that

24   Extreme weather is merely an excuse.

25   You'll hear the defendants, as you have already

 1    heard, try to get you to hold the Vinales family to a variety

 2    of obligations.  Those obligations are going to come from the

 3    lease, addendums to the lease, a resident guidelines.  They're

 4    going to come from the move-in, move-out form, which the

 5    Vinales family signed.  What the defendants will try to do is

 6    they will try to put the blame on the Vinales family in a

 7    variety of ways.  They'll claim that they didn't report the

 8    issues or they didn't timely report the issues.  They'll claim

 9    that the Vinales family agreed to accept the property in the

10    condition that it was in.

11            They'll cite the provision of their lease that we

12    looked at, and they'll tell you that the condition was not

13    brought to their attention by the Vinales family.  And they

14    didn't have an obligation to repair it.  You'll hear a variety

15    of other issues for why the Vinales family is the one at fault.

16    But when you see the exhibits, the lease, and the resident

17    guidelines, ask yourself this:  Why are there so few

18    obligations on the professional landlord and the professional

19    management company and so many obligations on Vinales family?

20    I challenge that you won't hear any testimony that puts any

21    real blame on the Vinales family.  The testimony, the evidence

22    will show that the Vinales family, when they encountered issues

23    in their house, they reported those issues to the landlord, and

24    they tried and tried and tried again until finally they were

25    forced to leave that house and move on to their next duty

1  station.

2         Mr. Michael Knight who is in the courtroom with us

3  today was a maintenance director, a regional maintenance

4  director and shares in environmental and maintenance

5  responsibilities with Hunt and with AETC II privatized Housing.

6  Listen to Mr. Knight's testimony about who he works for.

7  Listen to Mr. Knight's testimony about the mold policies and

8  procedures that they had in place and whether they complied

9  with those mold policies and procedures.  We'll all agree that

10  mold is everywhere.  But mold of the nature that you will see

11  in this case should not be inside a residence.  And in fact

12  that's what their policies and procedures say.  If there's

13  mold, it needs to be cleaned up.  Ask yourself why the

14  situation in the Vinales family got so bad.  How could it have

15  gotten so bad when that house was turned over from one family

16  to the next in October of 2017, and the Vinales family a mere

17  18 months later was leaving undergoing a mold remediation of

18  their entire household goods.

19         Mr. Chris Radliff, who is in the courtroom with us

20  today, is a senior vice president of operations.  Again, ask

21  yourself who does he work for?  Does he woke for Hunt military

22  communities?  Does he work for AETC II privatized Housing or

23  property managers?  And who does?  Where are those people who

24  worked for those companies and who are responsible for ensuring

25  that residents like the Vinales family had safe habitable

1  housing and that the landlord is making a diligent effort to

2  repair and actually and in fact repairing the issues that were

3  reported.

4           Mr. Robert Faircloth may appear to testify.  He was a

5  maintenance director at the time that the Vinales family lived

6  there.  The questions to him, the evidence will be, that

7  maintenance was not always timely done, that there were a

8  variety of methods of getting maintenance complaints in to the

9  system and that there were different prioritizations, that work

10  orders were not always completed, that maintenance technicians

11  were allowed to pick and choose which maintenance work orders

12  they wanted to work on leading to many conditions not being

13  timely and properly remediated.

14           Audra Froom, Danelle Megeath, Angela Unterbrink, each

15  of these witnesses has moved on from the position that they

16  formally had.  But you may hear from them.  And, again, same

17  types of questions.  If these were the people in charge, why

18  did they not ensure that the Vinales family had a healthy home,

19  had a safe home and that these issues were timely addressed.

20  Why did it take 18 months before the family was displaced from

21  their home and drastic measures were undertaken.  That is not

22  evidence of timely and diligently repairing problems in the

23  home.

24           Then we have a parade of experts.  Now, again, I

25  remind you, AETC II Privatized Housing in partnership with the

1    United States government as the private housing partner,

2    they're supposed to be the experts.  Why then are we now going

3    to hear from experts.  Why were the experts not on the staff of

4    AETC II privatized housing from the beginning?  You may hear

5    from a number of experts including Allison Stock, Joseph

6    Lstiburek,  Tom Sumner, and perhaps some others.  And listen to

7    their testimony.  After they look at the evidence, after they

8    look at the photographs of what occurred in the home, listen to

9    see if they truly believe that AETC II privatized Housing

10   timely and properly dealt with the issues in this home.  Timely

11   and properly repaired the issues in the home.  Why would

12   conditions get so bad in the house if the management company

13   was doing what they were supposed to be doing.

14        When you get done listening to each of the witnesses,

15   listen to hear if anybody takes responsibility for the

16   conditions in the home because the problems in that home are

17   what caused the harm to the Vinales family.  The problems in

18   the home, the structural issues, the gaps in the wall.  The

19   repeated water intrusion under the steps, the repeated

20   intrusion of insects and ants, ants that were biting their

21   children in their beds at night.

22        The mold growth.  The mold that was in the HVAC vent

23   registers.  The mold that grew on the family's household goods,

24   on their cherished belongings.  That's the harm that the family

25   suffered.  They paid good money for nearly 18 months to live in

1    a home that was managed by a professional management company.

2    Over that time issues manifested.  They were reported.  And

3    they were never properly repaired.  That led to a remediation

4    for a purported remediation on May and June of 2019.

5         As I've described, the evidence will show that the

6    remediation was fraught with errors, following containment that

7    resulted in the Vinales family having to discard many of their

8    cherished belonging when they arrived at their next duty

9    station.  The Vinales family was displaced for an extensive

10   period of time while their household goods were not fully

11   locked up, but they locked up away from the Vinales family.

12   They weren't able to live in their home.  They weren't able to

13   do the things they were normally able to do during that last

14   month that they were here in San Antonio.  That's the harm that

15   my clients suffered.

16        This case is about service.  The evidence is going to

17   show you that the defendants were poorly serving those who

18   proudly served our country.  We ask you, ladies and gentlemen

19   of the jury, to listen intently to the evidence.  Listen to the

20   testimony of the witnesses.  View the documents.  Read the

21   documents that come into evidence.  Look at the photographs and

22   make that determination as to whether the Vinales family

23   complied with the lease by timely reporting the issues and

24   whether the defendants made a diligent effort to repair the

25   house and whether they kept that house at 3 Southwest Road in a

1    good and safe working condition.

2         I appreciate your time and attention this afternoon.

3    Thank you, Your Honor.

4         THE COURT:  Thank you.

5              DEFENDANT'S OPENING STATEMENT

6         MR. BOONE:  Good afternoon.  I know it feels like a

7    long day.  Hopefully things will move quicker from now on.  I

8    introduced myself before.  I'm Walter Boone.  Again, good to

9    meet you again.  The military has an awesome phrase that I

10   love.  It's called BLUF.  Anybody ever heard of it?  Bottom

11   line up front.  And they put it on the top of all their memos

12   so you get right to it -- right to the quick of it.  And the

13   bottom line up front of this case is there is a tremendous,

14   huge divide, a great divide between what the claims are in the

15   case and what the proof is in the case, what the allegations

16   are, and what the reality is.  And to get from one to the other

17   there has to be a bridge, and there is no bridge here.

18        The bottom line up front is that the landlord

19   responded to each and every maintenance complaint the Vinales

20   had with diligent effort.  They paid for every out of pocket

21   cost that the Vinales had and offered to pay more.  And they

22   went above and beyond the mere contract obligations in the

23   lease.  That's the BLUF.  You have met our team already.  I

24   won't waste our time again with that.  You have met Chris

25   Radliff, Vice President of Operations of Hunt Military

1  Communities and one of the leadership elements that was --
2  oversaw things at Randolph Family Housing.  Mr. Reed was
3  correct.  Mike Knight was the residential maintenance director
4  at the time with responsibility over Randolph Family Housing
5  actually participated in the Vinales situation and resolution
6  of their issues.  They will be here the entire time because
7  this is important.  This is important.

8         Let me take a minute to address Lt. Col. Vinales and
9  his family and all the service members.  We all thank them for
10 their service to this country.  And if Lt. Col. Vinales and
11 other service members who are here, former service members, if
12 there's one thing I know about them, it's that they don't want
13 special distinction.  They don't want special attention.  They
14 don't want special treatment.  They want to do their duty.  And
15 I will tell you that Randolph Family Housing takes that duty
16 very seriously.  And all of Randolph Family Housing and all of
17 the people you will meet have chosen this line of work because
18 they enjoy serving those who serve.  That is why they do what
19 they do and that is why they work for who they work for.

20        This is the a cherished duty that they hold, and it
21 is something that is important to them.  And it's important to
22 us.  So why are we here?  It is about a contract.  And a
23 contract is a legally binding handshake.  And a handshake takes
24 two hands.  Two people.  Two entities.  Two parties with
25 rights.  Two parties with obligations.  This particular

1   contract is a lease.  And the question will be whether a

2   landlord did right by a tenant and whether a tenant did right

3   by a landlord.  The case is not about military housing in

4   general.  It's not even about military housing at Randolph

5   Family Housing.  It's not thankfully about personally injuries.

6   No one here has a claim that they were harmed and have

7   sustained personal injuries from these matters.  It is not

8   about mental or emotional stress.  Those will not be damages

9   that you will be asked to determine or award.  And it's not

10  about punitive damages or punishing anyone for anything.  It is

11  about a simple question:  Did the parties comply with the lease

12  or not?

13          Before we get too far into the detail, I do need to

14  give you a little bit of background.  And many of you know this

15  probably from being here and being around and knowing.  But

16  Randolph Air Force Base, Randolph Field is almost 100 years

17  old.  In 1930 it will be 100 years old.  And it has been known

18  historically as the west point of the air.  And by the way,

19  I'll tell you a trick about those screens.  You can actually

20  pull them out and adjust them however you like.  So get them

21  out if you like them.  But they're the west point of the air

22  because it's a training facility and lots of pilots and other

23  service people involved in with the Air Force have gone through

24  Randolph Field for almost a 100 years.

25          And in the 1930s, approximately 300, 317 exactly,

1    homes were built, and they were built consistent with the
2    Hispanic style at the time, age old style of the concrete
3    blocks, plaster on the outside, ceramic tile roofs.  Beautiful
4    homes and still here.  And they have amazing architectural
5    features that we'll talk about in a moment.
6          In 1996 Congress passed the military privatization
7    initiative.  And it basically said and was designed to attract
8    private sector financing expertise and innovation to provide
9    better, faster, and more efficient housing than the military
10   could do.  Also, in that year, is the year that Randolph Field
11   made the national register of historic places and later became
12   a national registered, national historic landmark, which I
13   think is the highest designation you can get in the historic
14   preservation area.
15         So the Air Force decided that pursuant to the
16   Military Housing Privatization Initiative that it would group a
17   number of bases together and make it a singular housing project
18   that would -- then send out a request for proposals for the
19   private sector to participate in that.  And the AETC, as Ryan
20   correctly said, is the Air, education, and Training Command.
21   The military also loves acronyms.  We didn't make that one up.
22   It is a military acronym just like BLUF.  But they are the ones
23   that decided to group these bases together.  Randolph is one.
24   Maximum well is another.  There are six or seven that are in
25   this group that comprise AETC.  And of course with the military

1    there's always not just one but two.  And it's AETC II because

2    that was the second grouping of these training centers that

3    they did.  That's the explanation behind the logo.

4             And then in 2007 that is the creation that is when

5    AETC II Privatized Housing LLC came into being.  And the

6    Vinales moved in some ten years later.  AETC II Privatized

7    housing is 51 percent privately owned and 49 percent owned by

8    the United States government acting through the Air Force.  So

9    every time you think about AETC II Housing, and that's

10   sometimes what we call it for short, you should think -- and

11   this is one of my clients.  51 percent of my client is

12   privately owned, and 49 of my client is government owned.

13   Together it's one thing.

14            The parties -- and you'll hear AETC II Privatized

15   Housing sometimes call the project owner because it does own

16   that entire project, the military housing projects for all of

17   those bases.  It's also called the landlord because it's the

18   one that actually entered into the lease with Shane Vinales.

19            Most project owners and landlords these days have

20   property managers and so too in this situation.  AETC II

21   Property Managers LLC is called the property manager.  And

22   there is a contract between them that you'll see that talks

23   about the rights and responsibilities between those two groups.

24   This is a normal everyday thing that happens all over.  Nothing

25   special here.  So now we have the landlord, the project owner,

1    AETC Housing, and the Vinales.  And there's a contract between

2    them.  The lease.

3         Now, Mr. Reed has already talked about some of the

4    other names that you are going to hear.  Randolph Family

5    Housing is one.  And it is nothing more than a brand name.  To

6    me when I thought about it I thought about Oxford Square.  That

7    means nothing to you, but that was the apartment complex I

8    lived in, in law school.  Now, there was -- the project owner

9    of Oxford Square was somebody else.  And the property manager

10   was someone else.  But when the sign -- when you walked through

11   the door said Oxford Square.  You got the same kind of

12   apartment complexes here in San Antonio.  There they are.  And

13   we can probably think of dozens of other examples where the

14   thing you go -- the neighborhood you go into is called one

15   thing but really owned and managed by somebody else.

16        You also heard the phrase Hunt Military Communities.

17   It too is a brand name.  There are not actually companies or

18   corporations or LLCs that make up these entities.  They are

19   just brand names.  An example here would be the Pearl.  You go

20   to the Pearl.  But we all know that there are different

21   buildings and different businesses within the Pearl that are

22   separately owned.  There are different property managers that

23   manage that property, but they all want to be together to  be

24   known as the Pearl.  Same thing happening here.  Randolph

25   Family Housing, one of many projects that is within the Hunt

1   Military Communities, brand name umbrella.

2          So let's look a little bit more closely at the lease

3   provisions because that's what the contract is that we'll be

4   dealing with.  The first thing you ought to know is that when

5   the resident moves in they're given what's called a memo form,

6   and this lease says move in report.  It's actually move in,

7   move out.  MIMO.  Another acronym.  There you go.  And what

8   they do, like you do all the time when you rent an apartment,

9   they want you to go through the apartment at your leisure, and

10  however long it takes you and note done all the things that

11  need to be repaired, all of the damages already currently in

12  existence.  And the primary purpose is so that you don't get

13  charged for it on the back end.

14         You are listing everything.  You get -- that is

15  damaged when you move in.  That way you don't get charged for

16  the same thing on the move out.  And what the lease says is:

17  Except for those things that are on the form that you filled

18  out after your inspection, you tell us that the place is in

19  good order and repair.  And that the premises were safe, clean,

20  and habitable conditions.  This is one of the obligations and

21  promises that the Vinales made to the landlord.

22         Paragraph 19 is the notice and repair obligation.

23  And one follows the other.  The residents shall immediately

24  notify the landlord of any damage to the premises and then the

25  landlord shall make a diligent effort to repair or remedy the

1    condition of the premises.  Notice repair.  Notice diligent

2    effort to repair.  That's how it works.  Of course repair can't

3    be done unless you let the landlord in.  And this section of

4    the lease says what I think we would all recognize:  That the

5    landlord may enter into the premises at reasonable times to

6    inspect it, make necessary or agreed repairs.  This is an

7    obligation that the tenant has to the landlord to allow access.

8           This lease, like many leases, also has what's called

9    a mold addendum because we all know that mold is something that

10   we don't want in our living spaces.  And there are simple and

11   effective ways of preventing it.  And that mold addendum lays

12   out some of those.  It says to keep the residence clean, which

13   is kind of self-explanatory.  It says to prevent and retard

14   mold growth from accumulating, it says to clean and dust again.

15   It says to remove visible moisture accumulation.  That's not

16   strange requests to make.  It's basically to do the things you

17   need to do to prevent mold from being a problem in the first

18   place.  It also has a notice obligation that says resident --

19   right there in the middle of the page.  Resident agrees to

20   immediately report to the landlord.  And the first one is:  Any

21   evidence of a water leak or excessive moisture.  And then the

22   next is evidence of mold or mildew-like growth that you can't

23   clean in a normal process.  Simple, straightforward run of the

24   mill.

25           This -- these homes are historic homes, and so there

1  are also contractual obligations that the landlord has with

2  respect to them and that -- actually, both parties have with

3  respect to them.  They are historic homes that fall under the

4  state historic preservation agency.  And that any changes in

5  the home or the neighborhood have to require approval,

6  sometimes repair a property requires approval, renovation.

7  That kind of thing.

8          So when you're thinking about this, there are certain

9  in this legal handshake, this contract, this agreement between

10  the parties, there are responsibilities on both sides.  For the

11  tenant, to fill out the memo form and report what you see.

12  Immediately notify -- we saw that in several different places

13  in the lease, of any issues, any water leaks, or moisture,

14  allow access for repairs, maintain the cleanliness.  And you

15  saw that said in different ways.  And then remove visible

16  moisture accumulation in the home.  These are not onerous

17  requirements.  They're pretty cut and dry.  Standard.  These

18  obligations.

19          Landlord responsibilities.  The primary one is make a

20  diligent effort to repair or remedy the issues notified of.

21  And you're going to do that by providing 24-hour emergency and

22  urgent maintenance service and timely routine, maintenance

23  service by providing a method that people can report

24  maintenance requests via the website, via phone, via in person.

25  You've got to arrange, the landlord has to arrange for regular,

1    preventative maintenance of the homes and undertake pest

2    control, if asked for, and regularly anyway.  And then also to

3    comply with the programmatic agreement, which is the historic

4    home regulations we talked about a minute ago.

5              So at the end of the case, you're going to be asked

6    to determine how the parties met with their responsibilities.

7    And that's what the evidence is going to show you.  It's going

8    to try to lay out how did we meet -- how did the respective

9    parties meet those responsibilities.  And there's some -- we've

10   talked about the lease language and kind of some of the general

11   responsibilities.  But there's some kind of common sense things

12   that go along with all of this.  And the first one is we can't

13   fix what the Vinales haven't told us about.  That should be

14   pretty easy.  But it's true.  If they don't report a condition,

15   we can't know about it to fix it.

16             We can't fix it if the Vinales don't let us or delay

17   us.  Pretty standard.  Common sense.  We can't always fix

18   everything perfectly or forever.  We heard a little bit of that

19   in voir dire this morning.  But we can and we should respond,

20   do our best, and do right.  Mr. Reed was talking about no

21   obligations.  Every single one of the defendant's witnesses

22   that we put on is going to be free to tell you about their

23   obligations, and they take them very seriously.

24             Here is how we're going to show you what the diligent

25   effort was.  We're going to show you first through our

1    processes, and then through our people, and then through our

2    policies, and then through our partner, and then through our

3    professional contractor.  And there's probably a joke relating

4    to those five Ps, but I'm not going to make it.

5            Processes:  Every home goes through a maintenance

6    life cycle, and that's -- you'll hear testimony about that,

7    primarily from Mike Knight.  You start at kind of high noon.

8    The old resident has moved out.  There's a change of occupancy

9    maintenance process, COM.  C-O-M.  Another acronym.  The COM

10   process, they go through a checklist, and they make sure of all

11   the things -- make sure it's ready for the next resident.  They

12   repair the items that were previously noted.  They do whatever

13   touch-up painting is necessary.  They get it ready for the next

14   resident.  Got a process for that.  Then the next resident has

15   the option to select, if they -- if that has worked out, a

16   unit.  Inspect it.  See if they look it.  Then they go through

17   the memo process where they come in and they write down on the

18   form everything that needs to be fixed or just damaged that's

19   already there.  And then through the normal life of the tenancy

20   there's a work order.  And these tenants at Randolph Family

21   Housing, as we mentioned, had all kinds of ways to enter work

22   orders.  They could do them themselves online.  They could make

23   a phone call to the office.  They could go to the office in

24   person.  They can pick up the phone.  They can email.  There's

25   a millions ways to make a work order.  And once you make the

1    work order, it goes into a system that's called YARDI.

2    Y-A-R-D-I.

3          Now, YARDI is the largest provider of these

4    maintenance requests data basis.  And they track all of this

5    stuff.  And that's the system that Randolph Family Housing

6    uses.  So when the maintenance complaint comes in, someone

7    types in what the person said about what's wrong.  And YARDI

8    tracks it.  When the maintenance tech goes to respond, it shows

9    the date of the response and it also shows what they did.  It

10   shows what comments they had about what they saw and what they

11   did.  And then once the repair has been done, the YARDI system

12   closes out the work out.

13         When the work order is complete, the next pie, that

14   automatically generates two different things.  One of them is

15   called warm calls.  And the other is called followups or

16   surveys.  The followups goes straight from the YARDI system to

17   the resident and says, hey, we finished that work order.  The

18   warm calls are either emails that go straight to the resident

19   upon the completion of every single work order or they're an

20   actual call from the leasing office saying, how did we do?

21   And in this case there were dozens of these warm calls to the

22   Vinales and only two responses.  They asked:  Did we exceed

23   your expectations, if not.  Were our people professional and

24   respectful?  What can we do better next time?  Except for two

25   times, crickets from the Vinales.

1            That's the processes.  The maintenance life cycle is

2    how we know on a day in day out basis there's a diligent effort

3    at repair.  And the warm calls and the followups of course are

4    designed to elicit the exact kind of things you want to know,

5    if you're the landlord.  No, they didn't come.  No, they didn't

6    finish it to my satisfaction.  The same thing happened again.

7    All of those things are asked for.  None of them were responded

8    to by the Vinales.  You're also going to hear from our people.

9    Now, Mr. Ryan, had a chart up here with a number of people.

10   And there were a lot of people that you're going to hear from,

11   from Randolph Family Housing.  And that's because we had a lot

12   of hands on deck that were dealing personally with the Vinales'

13   situation trying to go above and beyond what the lease

14   obligations were, certainly a diligent effort but beyond that.

15   And that's why there's so many people.

16           You heard about Audra Froom, Community Director,

17   works with the Vinales the whole way through their tenancy and

18   certainly after they raised serious issues at the town hall.

19           Nick Reed, the director of environmental and safety.

20   He actually came -- came and inspected the Vinales home.  Wrote

21   a report, took pictures, got a contractor there that afternoon.

22   And the contractor said they were ready to start the next day.

23   This is to repair the master bedroom.

24           Nick Miglieri, the director of environmental.  He's

25   going to talk to you about -- he gets a notice or alert anytime

1    there's a mold call or a mold complaint.  And he had personal

2    involvement with the restoration contractor and the clearance

3    that was a done to make sure that the Vinales goods were good

4    to go.

5            Angela Unterbrink, the director of operations.  She

6    was at the level between Audra and Chris, and she had direct

7    involvement in the Vinales situation.  This is just not a bunch

8    of people that are going to tell you something.  These are

9    people that were directly involved with trying to resolve the

10   Vinales situation, and you're going to hear from them.

11           Policies:  The policies are to make sure that we

12   address each complaint in a consistent, timely, and

13   professional manner.  The policies matter.  And you're going to

14   hear two people talk about them, and talk about not only how

15   they matter but also how our people are trained at them.

16           The partner, as I mentioned in the case of AETC

17   Housing is built in because it's shared ownership.  But the

18   partner, and you'll hear testimony from various witnesses, that

19   our government partner, the Air Force, was involved regularly

20   in the joint decision making regarding maintenance at Randolph

21   Family Housing.

22           Professional contractors:  When the need arises for

23   something that cannot be fixed within the normal maintenance

24   crew at Randolph Family Housing, we retain the professional

25   contractors.  You're going to hear from several of them.  I

1    listed them earlier this morning.  I won't do it.  And then

2    those five piece -- those five elements of proof of a diligent

3    effort, that's what happens day in day out at Randolph Family

4    Housing.  All of that stuff goes on all the time and ensures a

5    diligent effort.

6           But we did add something special.  And we think

7    necessary, and that is, we attempted to locate the best experts

8    that we could find to tell you whether what they were doing was

9    good enough because we think you're entitled to know that.

10   You're going to hear what they did.  But you're also going to

11   hear from these experts about whether what they did was enough.

12   And that's critical.  You're going to hear from Allison Stock

13   toxicologist and epidemiologist.  She's going to talk to us

14   about the mold.  EPA guidance on mold testing and mold, and

15   whatever responses to the Vinales complaints were timely and

16   reasonable.  And she says they were.

17          Tom Sumner, certified industrial hygienist, is going

18   to tell you but what some of the technical testing stuff meant

19   and said with respect to what was going on in the Vinales home.

20          Rachel Adams, restoration professional is going to

21   tell you that you contents inspection and assessment is

22   actually pretty complicated and that no one had done that in

23   this particular situation and that so no one can make a

24   decision or an opinion about the necessity of damage to any

25   contents.

1          But we went and located the finest experts we can

2     find because we think you deserve that, and we're going to

3     bring that testimony to you so you can make a judgment about

4     whether what Randolph Family Housing did was enough.

5          So let's talking about the Vinales and the timeline.

6     First, I think we're sharing some pictures.  You might see some

7     of these again.  But these are the homes that we're talking

8     about stucco on the outside, hollow core in the middle.  The

9     beautiful tile roofs.  Here are some of the design features we

10    were talking about.  There is one of the bathrooms.  You might

11    not like that color purple.  Some of us on our team like it.

12    But it's definitely cool.  And you definitely don't want to

13    mess with because it's something they chose back in the 30s.

14    All those features are architectural in those bathrooms.  Here

15    is another picture of the Vinales home.

16          So as a week before or so they signed the lease, the

17    Vinales came to Randolph and they got to inspect two different

18    homes.  They chose the one that they ultimately moved into.  At

19    the lease signing, which was October 16th, that's when they

20    signed the lease that said that the home was safe, clean, and

21    habitable except for the things they listed on the memo form.

22    They had nine days approximately to -- well, it took them nine

23    days to return the memo form.  That's fine.  They were in the

24    house nine days to figure out what exactly was wrong with it.

25    They did complain of a musty carpet on the memo form, and that

1    was later removed.  And at the same time they moved in they

2    filled out a new resident survey that rated Randolph Family

3    Housing four out of five.  And they said that we had the best

4    staff that they had seen in their military housing careers.

5         And then throughout the course of the first year of

6    their tenancy I won't say there were no maintenance work orders

7    because there were but nothing out of the ordinary.  Nothing

8    that got anybody hot under the collar, nothing that prompted a

9    response to those warm calls that you have seen about.  Nothing

10   unusual at all.  There were some complaints about it wasn't

11   quick enough and whatnot.  The normal run of the mill

12   complaints.  But nothing of the level that we're talking about

13   here today.  And the key about the lease ending on October 16th

14   is this:  It was a one-year lease.

15        Now, for military members, if they got transferred,

16   then they have an automatic right to go wherever they want to

17   go.  And we say as the landlord, that's what we want to

18   support.  We'll find another tenant.  Don't worry.  But on

19   their own without kind of being transferred they have an

20   obligation for a year.  And once the year is up it's over.  The

21   obligation is over.  They then have a month to month tenancy,

22   which means they can leave at any time that they want.  Now, we

23   know and recognize that military members move a lot and don't

24   want to the move more than they need to.  But at this one-year

25   mark they were free to go whenever they wished.

1          This next period is a series of complaints and

2    diligent effort to reach them and to meet them.  There was a

3    roof leak that was complained of in November 2018 above the

4    master bedroom.  There was duct cleaning requested in early

5    December.  But at that time Mrs. Vinales said, "I don't want to

6    leave the house for the two to three hours it takes to do that.

7    And so I don't want my ducts cleaned anymore."  And we said

8    fine.

9          The roof repair for the prior roof leak complaint

10   happened about a week later.  That was Martin Olivares.  You'll

11   hear about that.  There was another request for duct cleaning

12   in January of 2019.  And that was also met with the same

13   response from Mrs. Vinales, which is, "I don't want to leave my

14   house while this work is being done, and therefore I don't want

15   you to do it."

16         Now, you only saw three photographs in Mr. Ryan's

17   opening statement and one of them was of a vent.  Did you see

18   that?  The vent picture was taken way later after we'd already

19   tried to clean the ducts and clean the vents twice.  On

20   February 27th, 2019 there was a town hall at Randolph, and it

21   was organized by the Base Commander Gen. Laura Lenderman.  And

22   she brought together the housing community along with

23   representatives of Randolph Family Housing.  And the sole

24   purpose of that outing was to receive complaints and feedback

25   from the residents about what -- how we were doing.  And that's

1    what it was.

2          At that town hall, Mrs. Vinales stood up for the

3    first time and said she had mold in her house.  And we take the

4    complaint very seriously, and we entered work orders and you'll

5    see that.  But here is the trick, they have been living in this

6    house since October of 2017 and never mentioned the word mold.

7    Never made a work order for mold.  Never called in mold.  Never

8    stopped by the office and said mold.  The first time we hear

9    about mold in the Vinales house is in the town hall.  But that

10   doesn't matter.  Whenever we hear about it, we're going to

11   respond.  There were four attempts to contact Mrs. Vinales

12   after that to no avail.  There were work orders entered right

13   after the day after the town hall.  But there was no response

14   from Mrs. Vinales.

15         On March 8th, Nick Reed comes and inspects the master

16   bedroom in the Vinales house and other areas that Mrs. Vinales

17   points out.  But the primary problem is the roof leak in that

18   master bedroom.  That was the other picture that you saw.

19   Clearly, the roof -- roof leak had not been fixed, and it was

20   still leaking in some form or fashion because it showed that --

21   the kind of things you see when you have a roof leak in your

22   ceiling.  But no visible mold by a degree at all.

23         The Vinales then entered 20 different work orders

24   on -- on or about March 12th.  Ms. Audra Froom writes all of

25   them down and wants to make sure are these all of the things

1    that we need to fix so she can start the people getting about

2    fixing them.

3            Later in March we offered to do the master bedroom

4    repairs, and Mrs. Vinales said, "Well, can you wait until

5    mid-April?"  Well, this is someone who stood up in a town hall

6    and said mold, who has not been returning attempts for call.

7    And now the main problem that we're talking about in the master

8    bedroom wants to put off another three weeks and we say fine.

9    If that's what you want to do, that's what we'll do.

10           But we don't quit.  We keep working on the outside

11   and Martin Olivares is again back on the roof trying to find

12   the place where the water is coming from.  And during this time

13   as well, the Vinales had been complaining that their utility

14   bills had been too high.  And Randolph Family Housing went and

15   negotiated with the utility provider to clear their balance.

16   And the end result is that the Vinales over the whole period of

17   time that they lived there only paid $75 in utilities.

18           By April 10th, the work orders that had been allowed

19   had been completed and then Mike Knight is there for the

20   walk-through.  And at this point in time the focus has shifted

21   because the Vinales have received orders, and they're going to

22   be moving to Hawaii.  They say, "Would you please not do these

23   repairs to the master bedroom because we can't be out of the

24   house when we're short-timers and we're about to move."

25   Randolph Family Housing says fine.  But the subject also moved

1    to will you clean our contents.  And the answer was yes.

2           Mike Knight relayed all of that in May.  And the

3    contents cleaning begins in May 23rd for some portion, small

4    portion of the Vinales belongings, and it ultimately completes

5    and begins again on the 28th for the remainder.  And then

6    Randolph Family Housing hired an environmental firm to do

7    testing of the items that the Vinales wanted tested to make

8    sure that the goods were clear to travel to Hawaii.  And that

9    all happened.

10          At the end of the day, these are the things that were

11   paid to or for the Vinales family.  There was a $250 gift card

12   given -- provided to the Vinales right up front to avoid any

13   kind of unnecessary expenses they could have.  It's one of

14   those visa cards you can use it for anything you want.  As

15   Mr. Reed mentioned, the Vinales -- we were going to put them up

16   in a hotel but they said they wanted to stay in their travel

17   trailer.  And we said, we'll pay the camp ground fees.  And

18   they did that.  They also received $100 per day per diem for a

19   total of $2,000, which was to help with their expenses.  They

20   received a rent credit for the whole time that they were

21   inconvenienced.  They didn't pay rent.  That was credited back

22   to their account.  They received content's cleaning.  And

23   you're going to hear testimony that we didn't think that the

24   contents needed to be cleaned.  But they asked for that and we

25   did it.

1          And then you're going to hear about the clearance

2    testing to make sure that the cleaning had done what it was

3    supposed to do.  And we paid another sum for that.  Overall,

4    Randolph Family Housing paid in excess of $35,000 to address

5    the Vinales issues and to make them whole and make sure that

6    they didn't suffer any out of pocket costs.

7          But here is the great divide.  It's the divide

8    between what they claim and what they can prove.  It's the

9    divide between an allegation and reality.  It's the divide

10   between a complaint and a lawsuit and a verdict rendered by a

11   jury.  The plaintiffs have to build the bridge to get there.

12   But there is no bridge there.  And when you talk about

13   liability, the reason why they can't show the bridge is because

14   the facts don't bridge the gap.  Some complaints that you will

15   hear about, they never told us about at all.  Some complaints

16   they refused access for us to repair.  Some complaints -- other

17   complaints, they delayed access to repair.  Many complaints

18   were caused by housekeeping issues.  Some complaints do happen

19   again with the best maintenance.  Roof leaks is the classic

20   example.

21          There's also a great divide on damages between what

22   they say they were harmed and how they actually were harmed.

23   In this instance, we believe that the out of cost -- out of

24   pocket costs were paid, and actually more were offered when the

25   Vinales -- as they were about to leave, they itemized all the

1  elements that they thought had been damaged, and it came out to

2  about $9100.  And Randolph Family Housing offered to pay them

3  another 8,000 and the Vinales turned that down.

4         They're going to claim rent for the entire tenancy

5  but they don't have complaints for the entire tenancy or at

6  least so the warm calls we suggest.  There's no reliable

7  opinion that the contents were damaged in the first place.  And

8  no expert that's going to come in here and tell you about that

9  at all.  They don't even have anything in the way of receipts

10 or costs for the items that they do claim.  And some of the

11 things they claim were damaged and lost they actually took with

12 them.

13        So the end result is the same as the bottom line up

14 front.  It is that all complaints were addressed with diligent

15 effort and all damages had already been paid.  And there were

16 no other damages proven.  Thank you.

17        THE COURT:  Thank you, counsel.  Okay.  It looks like

18 we made it to 4:15, which is not too bad.  And so I think

19 that's enough for today.  So before I declare us on a break and

20 let y'all go for the day, let me just go over again the same

21 admonishment and caution that I have given to you on a couple

22 of times already.  We'll do this each time that we take a break

23 or that we depart for the evening.  Hopefully, it will serve as

24 a reminder just how important it is that you keep these

25 instructions in mind.  So you're not permitted to talk to

1    anyone about the case, you're not to talk to any witnesses,

2    you're not talk to the parties.  You're not to talk to any of

3    the lawyers in the case.  You're not permitted to talk with

4    each other, any of the fellow jurors until the close of trial

5    and you're in the jury room for deliberations and I've

6    instructed you.  Again, obviously, we all have cell phones or

7    most of us do with internet capability or we have the internet

8    at home, other tools of technology, obviously.  And you're not

9    to use those tools to communicate electronically with anybody

10   about the case or to provide yourself with any research or

11   investigations into the case.

12           You must not talk to anyone at any time about the

13   case.  This includes family or friends and includes any, you

14   know, any means by which you might communicate with those

15   friends.  Cell phone, email, text.  I don't know that I can

16   list all of the various different little apps and whatnot.

17   Snapchat, Twitter, on and on and on.  Just, you know, I think

18   we all know what it is that I'm referring to.  Please do

19   refrain from that, and including, if I haven't specifically

20   mentioned that particular platform or app.

21           I do expect you that -- I do expect that you'll

22   inform me as soon as you become aware of any of -- a violation

23   of any of these instructions including if another juror

24   violates these instructions.  A juror who violates these

25   instructions jeopardizes the fairness of these proceedings and

1  that could result in a mistrial which would require the process

2  to start all over again.  So please do take this seriously.

3          Also, again, thank you for your time and attention.

4  It was not lost on me how closely y'all were paying attention

5  today.  And it's very much appreciated.  And I know by everyone

6  who is participating in the case.  So with all of that, nothing

7  further from counsel; is that right?  For today.

8          MR. BOONE:  One small matter outside the presence of

9  the jury.

10          THE COURT:  All right.  Good.  I'm glad I checked

11  then.  Why don't I go ahead and excuse the jury.  Y'all are

12  excused.  Why don't you go with the bailiff, and he'll let you

13  all go out.

14          THE COURT SECURITY OFFICER:  All rise.

15          (Jury out.)

16          THE COURT:  Okay.  Counsel, and that can move or if

17  you don't want to move it, don't worry about it.

18          MR. BOONE:  It takes two.  We both decided that

19  before we started rearranging the furniture we'll do it

20  together, that way we can't get in trouble.

21          One -- well, it's -- Mr. Reed mentioned asbestos in

22  opening statement which was a subject of a motion in Limine

23  which the Court granted.  As I heard the Court's ruling, we

24  were to come back in front of the Court to talk about a basis

25  for whatever things that were within that subject matter.  I

1   did not object.  And I know what that means under the law.  But

2   I just wanted to raise it to the Court that that's a serious

3   infarction because we cannot have unsupported allegations about

4   serious things like asbestos floating into this trial with no

5   proof whatsoever.  And I just want the Court to be aware of

6   that.  I cannot roll back the time and make him undo what he

7   did.  But it did happen.

8          THE COURT:  Okay.  Dually noted.  Mr. Reed you want

9   to be heard?

10         MR. REED:  My recollection is that I referenced an

11  asbestos addendum to the lease that is undisputedly part of

12  lease that will come in.  I don't believe I made a reference

13  that there was asbestos on the wall.  I referenced an asbestos,

14  an addendum.  And so I do not believe that was a violation

15  because we're specifically talking about a piece of evidence

16  that's going to come in an addendum to the lease that will be

17  in the evidence.  So that's my perspective on it.  I did not I

18  think intend to or make a statement that there was in fact

19  asbestos in the house but rather a reference to an addendum to

20  the lease that the family signed so.

21         THE COURT:  Okay.  Would some further clarification

22  be helpful or an order with respect to asbestos and talking

23  about that subject.  Why don't we just say that before we say

24  the word asbestos, y'all come and approach, and we'll talk

25  about it up here.  That way there's no surprises if we're just

```
1   going to mention in some sort of innocuous way the asbestos

2   addendum, then it ought to be an easy thing for us to talk

3   about up here out of the presence of the jury.  And otherwise

4   we can just avoid controversy by just doing it that way.

5              MR. REED:  Fair enough, Your Honor.

6              THE COURT:  We're all on the same page?

7              MR. BOONE:  Thank you.

8              THE COURT:  Good for you, Mr. Boone?  Okay.

9              MR. BOONE:  Yes.

10             THE COURT:  Well, then that's it then.  We'll start

11  off tomorrow morning hopefully 9:30 sharp and start with the

12  first witness for plaintiffs.  Okay.  All right.  Thanks

13  everyone.  And court will be in recess.

14             (Adjournment.)

15

16

17

18

19

20

21

22

23

24

25
```

1    UNITED STATES DISTRICT COURT   )

2    WESTERN DISTRICT OF TEXAS      )

3              I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5              I further certify that the transcript fees and format

6    comply with those prescribed by the Court and the Judicial

7    Conference of the United States.

8              Date signed:   April 18, 2024.

9
                              /s/ Leticia Lucia Ornelas
10                            United States Court Reporter
                              262 West Nueva Street, Room 1-400
11                            San Antonio, Texas 78207
                              (210) 244-5039

12

13

14

15

16

17

18

19

20

21

22

23

24

25